### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **BANKRUPTCY NO. 16-10020-TMD** |
| **FPMC AUSTIN REALTY** | § | |
| **PARTNERS, LP,** | § | **CHAPTER 11 PROCEEDING** |
| | § | |
| **DEBTOR** | § | |

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE:

NOW COMES the debtor and debtor in possession in the above-captioned case (the "Debtor") and moves (the "Motion") for entry of interim and final orders, under Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code ("Code") and Bankruptcy Rules 4001 and 6003, authorizing the Debtor to: (a) enter into a Senior Secured Postpetition Financing Agreement on a Superpriority Basis (the "DIP Facility") in an aggregate principal amount of up to $1.7 million (the "DIP Commitment"), with $950,000 available on an interim basis, upon the terms and conditions described herein and the Senior Secured Superpriority Debtor-In-Possession Loan Agreement attached as **Exhibit A** (the "DIP Financing Agreement") and the proposed interim order attached as **Exhibit B** (as may be revised prior to the hearing with regard thereto, "Interim Order"); (b) authorizing the Debtor to execute and deliver the DIP Financing Agreement and all other loan documents contemplated therein, by and among the Debtor and the DIP Lender; (c)

**DIP FINANCING MOTION**

granting the DIP Facility and all obligations owing thereunder and under the DIP Documents to the DIP Lender (collectively, and including all obligations under or with respect to the DIP Financing Agreement, the "DIP Obligations") allowed superpriority administrative expense claim status in this chapter 11 case (the "Chapter 11 Case") and any successor case under chapter 7; (d) granting to the DIP Lender, automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "Cash Collateral" (as defined in section 363(a) of the Bankruptcy Code); and (e) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreement. The Debtor also request that the Court schedule a hearing to consider approval of the DIP Financing Agreement on a final basis (the "Final Order" and, together with the Interim Order, the "DIP Orders"). In support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Court's consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.       On January 4, 2016 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

3.       The Debtor continues to operate its business and manage its properties as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To date, no creditor's committee has been appointed in this Chapter 11 Case by the Office of the United

DIP FINANCING MOTION

2

States Trustee for the Western District of Texas (the "United States Trustee"). No trustee or examiner has been appointed in the Debtor's Chapter 11 Case.

4.      The Debtor's primary asset is a medical campus property commonly known as the Forrest Park Medical Center Hospital and Medical Office Building located 8.5 acres on the south side of SH 45 North between MoPac and I-35 in Round Rock, Texas (the "Property"). Forrest Park Medical Center consists of a short-term acute care hospital ("Hospital") and medical office building ("MOB") together with a 445 stall adjacent parking garage. The Hospital is a 4-story, 146,000 square foot facility containing 10 operating rooms, 6 ICU rooms, and 40 patient rooms, many including family suites.  The MOB contains 80,000 square feet of rentable area.  The Hospital is leased to a single tenant that does has yet to commence operations.  The Hospital and MOB share use of the parking garage.

5.      While one of the 3 buildings located on the Property was designed and built for the specific use as an acute care hospital, the Debtor does not operate the health care business conducted on site.  Construction of the Hospital, MOB and garage are complete with only minor additional completion and punch list items remaining.  Certificates of occupancy have issued for the Hospital and MOB.  However, as of the Petition Date, the Hospital is leased, but the MOB remains vacant.

## RELIEF REQUESTED

6.      The Debtor proposes to sell the Property through a court ordered sale pursuant to §363 of the Code.  The Debtor has received a pre-petition letter of intent to purchase the Property.  The Debtor is evaluating the terms of the offer and has not yet determined how it will proceed regarding the sale of the Property.  In order to secure and maintain the Property through the date

DIP FINANCING MOTION

3

a sale of the Property can be consummated, the Debtor requires access to adequate funds to pay

reasonable and necessary expenses to secure, preserve and maintain the Property.

7.     The Debtor business plan contemplated that it would derive its cash flow by leasing

the Property.  The lease of the hospital facility was intended to be the primary source of operating

cash flow.  The tenant under the lease of the hospital is in default and has not paid any rent.  The

Medical Office Building is in a pre-leasing status and is vacant at this time.  Accordingly, the

Debtor requires an external source of capital in order to pay its operating expenses.

*The Prepetition Financing Agreement*

8.     On or about December 20, 2013, Frost Bank, a Texas state bank ("Frost Bank" or

"DIP Lender") for itself and as Administrative Agent for Amarillo National Bank as a lender and

Whitney Bank as a Lender (collectively the "Prepetition Lenders") made a construction loan to

Debtor under various pre-Petition Date loan documents ("Construction Loan") in the original

principal amount of $63,742,287.

9.     The Debtor' obligations under the *Construction Loan* are secured pursuant to a

Deed of Trust dated December 23, 2013 between the Debtor and the Frost Bank as lender and

Administrative Agent for the Prepetition Lenders.  The Construction Loan encumbers Property,

including the land, improvements, fixtures, personal property and an assignment of rents, among

other collateral.  As of the Petition Date, approximately $ 57.577 million of indebtedness was

outstanding under the Construction Loan.

**DIP FINANCING MOTION**

*The Process Leading to the DIP Financing Agreement*

10.     The Debtor began to explore the need for additional debt financing in connection with pre-petition negotiations with the Prepetition Lenders in the context of forbearance negotiations in conjunction with the posting of the Property for non-judicial foreclosure in January 2016.  When those negotiations failed and the January foreclosure sale was imminent, the Debtor filed its voluntary petition and it became apparent that additional financing would likely be possible only through debtor-in-possession financing.

11.     The Debtor inquired with several lenders regarding their willingness to provide DIP financing and also sought additional capital from other sources.  After substantial negotiations with a third party lender regarding the terms of a potential priming DIP, the Debtor has determined in its business judgment that the DIP Facility proposed by the DIP Lender represents the best terms available under the circumstances, and will maximize the Debtor's ability to reorganize and preserve value for the benefit of its' stakeholders.

12.     The Debtor negotiated extensively with Frost Bank, including the proposed interim order and a draft DIP Financing Agreement.

13.     The proposed DIP Facility provides the Debtor and its' estate the most favorable financing under the circumstances confronting the Debtor, and the Debtor's decision to enter into the DIP Facility was the result of an intensive effort by the Debtor and its' professionals to obtain the best terms available. Indeed, in providing *committed*, new money in the aggregate amount of up to $1.7 million, the DIP Facility will provide the Debtor with the liquidity needed to secure, preserve, market and sell the Property.

DIP FINANCING MOTION

5

## RELIEF REQUESTED

14. The Debtor respectfully requests that the Court grant the relief provided in the DIP

Orders, summarized as follows.[1]

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Overview:** | Set forth below is a summary of the pertinent terms and conditions for the DIP Facility to be provided by the DIP Lender. The DIP Facility described herein would be provided on a pari passu basis with prepetition liens including replacement liens. |
| **Borrower:** | FPMC Austin Realty, LP, a Texas limited partnership, as a debtor and debtor in possession in a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed in the United States Bankruptcy Court for Western District of Texas (the "**Bankruptcy Court**"). |
| **DIP Lender:** | Frost Bank committed to provide 100% of the DIP Commitment. |
| **DIP Facility:** | A super-priority senior secured term loan credit facility in an aggregate principal amount of up to $1,700,000 (the "DIP Facility" or "DIP Commitment"), which shall be drawn in two tranches: (a) $910,000 upon entry of the Interim Order (the "Initial Amount"), and (b) $1,700,000 upon entry of the Final Order (the "Final Amount"). |
| **DIP Facility Termination Date:** | All DIP Obligations shall become due and payable on the DIP Facility Termination Date. The "**DIP Facility Termination Date**" shall be the earlier of (a) June 30, 2016, or such other date as may be subsequently agreed to in writing between the Lenders and Debtor; (b) the date of consummation of a sale transaction; and (c) an Event of Default. |

---

[1] The following summary comes from the DIP Financing Agreement. To the extent any of these terms are inconsistent with the DIP Financing Agreement, the DIP Financing Agreement governs.

**DIP FINANCING MOTION**

| | |
|---|---|
| **Purpose:** | In accordance with and subject to the Budget proceeds of the DIP Facility will be used for the following exclusive purposes: (i) to pay fees and expenses and interest in connection with the Loan to the Lender in accordance with the Loan Documents;(ii) to pay certain general operating expenses incurred by the Debtor-in-Possession after the Petition Date; and (iii) certain costs and expenses related to the administration of the Bankruptcy Case, including reasonable fees of the Case Professionals and certain other expenses as contemplated in the Budget, allowed by the Bankruptcy Court, and as set forth in the Orders, or as consented to by Lender in its sole and absolute discretion. |
| **Interest Rates:** | Fixed rate of ten percent (10%) per annum |
| **Amortization:** | None |
| **Optional Prepayments:** | The Borrower may prepay the DIP Facility in full or in part without premium or penalty |
| **DIP Documents:** | The DIP Facility will be documented by DIP Financing Agreement and other security and other relevant documentation (defined as the DIP Documents) reflecting the terms and provisions set forth herein and otherwise in form and substance reasonably satisfactory to the DIP Lender. |

DIP FINANCING MOTION

| | |
|---|---|
| **Security and Priority:** | All amounts owing by the Borrower under the DIP Facility will be secured, subject to a carve-out (the "**Carve-Out**") for (a) allowed administrative expenses pursuant to 28 U.S.C. §1930(a)(6), and (b) allowed reasonable fees and expenses of the Case Professionals as provided in the Budget approved by the Lender and incurred prior to the Termination Date, plus an amount up to $5,000 for such fees and expenses incurred after a Termination Date, by (i) a first priority perfected lien on all assets, property, and interests in assets or to property (whether tangible or intangible, real or personal) of Debtor, Debtor-in-Possession, and the Estate, whether now owned or hereafter acquired, whether acquired before or after the Petition Date, other than avoidance actions under §§547 and 548 of the Bankruptcy Code against entities other than Lender. Notwithstanding and without limiting the foregoing, the term "*Collateral*," as used herein, also includes (a) any other property or assets, real or personal, tangible or intangible, now existing or hereafter acquired, of Debtor, and (b) all **SUPPORTING OBLIGATIONS**, **PRODUCTS**, and **PROCEEDS** of all of the foregoing (including without limitation, insurance payable by reason of loss or damage to the foregoing property) and any property, assets securities, guaranties or monies of Debtor-in Possession that may at any time come into the possession of Debtor-in-Possession or Lender.  For the avoidance of doubt, causes of action under §549 of the Bankruptcy Code (and the proceeds thereof) are Collateral, and any lien or security interest avoided, recovered, or preserved pursuant to §§550, 551, and/or 552 of the Bankruptcy Code shall have the same priority as such avoided lien.<br><br>The liens granted under the DIP Facility will be *pari passu* with the liens and security interests in the Collateral securing the Borrower's pre-petition credit agreement with the Prepetition Lenders securing the Construction Loan and shall be junior only to the Carve Out and other liens and encumbrances permitted by the DIP Documents.   The DIP Lender will be granted in each of the Interim Order and the Final Order a superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the DIP Facility with priority above all other administrative claims, subject to the Carve-Out. |

| Interim Funding: | On the business day immediately following the date of entry of the Interim Order (the "Interim Funding Date"), the DIP Lender shall disburse up to and including the Initial Advance to an account designated by the Borrower and approved by the DIP Lender in accordance with the Interim Order and the DIP Facility. |
|---|---|
| Events of Default: | The DIP Documents will contain events of default customarily found in loan agreements for similar debtor in possession financings and other events of default deemed by the DIP Lenders to be reasonably appropriate to the specific transaction (which will be applicable to the Borrower), including, with, where appropriate, customary grace periods and exceptions to be determined. |

## SIGNIFICANT PROVISIONS

15.     As a condition to obtaining the proposed financing, the DIP Lender and the Debtor have agreed to certain provisions that may be considered significant provisions to be highlighted to the Court and parties in interest for purposes of the Court's complex procedures for chapter 11 cases.   These provisions include the following:

•     <u>Payment of Fees and Expenses</u>. In connection with the provision of adequate protection for the DIP Lender, the Debtor will pay (a) all costs and expenses incurred by Lender in connection with the preparation, negotiation, execution and administration of this DIP Financing Agreement and the other Loan Documents, including, without limitation, the fees and expenses of Lender's legal counsel and professionals; (b) all costs and expenses incurred by Lender in connection with the enforcement, workout or restructure of the DIP Financing Agreement or any other Loan Document, including, without limitation, the fees and expenses of Lender's legal counsel and professionals.

•     <u>Acknowledgment of Pre-Petition Debt and Liens.</u>  The DIP Facility proposes that the Debtor will represent, acknowledge and agree to the amount of the Pre-Petition Debt and the validity and priority of the liens securing that debt.

**BASIS FOR RELIEF**

16.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a

hearing, that debtors seeking postpetition financing on a secured basis cannot "obtain unsecured

credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense . . .

." 11 U.S.C. § 364(c).

17.     In evaluating proposed postpetition financing under section 364(c) of the

Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors,

including whether:

       a.     unencumbered credit or alternative financing without superpriority status is
available to the debtor;

       b.     the credit transactions are necessary to preserve assets of the estate;

       c.     the terms of the credit agreement are fair, reasonable, and adequate;

       d.     the proposed financing agreement was negotiated in good faith and at
arm's-length and entry thereto is an exercise of sound and reasonable business judgment
and in the best interest of the debtor's estate and its creditors; and

       e.     the proposed financing agreement adequately protects prepetition secured
creditors.

See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the

first three factors); In re Aqua Assoc., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the

first three factors in making a determination under section 364(c)); In re Crouse Group, Inc., 71

B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); Bland v. Farmworker Creditors, 308 B.R. 109, 113-

14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

17.     For the reasons discussed below, the Debtor satisfies the standards required to

obtain postpetition financing on a secured superpriority lien basis under section 364(c) of the

Bankruptcy Code.

DIP FINANCING MOTION

18.      Whether a debtor is unable to obtain unsecured credit is determined by application of a good faith effort standard, and the debtor must make a good faith effort to demonstrate that credit was not available without granting a security interest.  See In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); In re Gen. Growth Props., Inc., 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009). The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. See, e.g., Bray v. Shenandoah Fed. Say. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

19.      Here, the Debtor faces severe liquidity constraints due to the lack of rent payments from the hospital building tenant. The Debtor does not have sufficient funds on hand or generated from its business to fund operations. The Debtor was forced to file the Chapter 11 Case in order to stop an impending foreclosure on the Property.  The Debtor is unable, in the present circumstances, to meet its' liquidity needs by obtaining financing on an unsecured, administrative expense basis.  The Debtor pursued capital from its investors, lenders with an economic interest in maintaining operations on the Property and other sources of financing.  None were interested in extending financing to the Debtor.  Only the DIP Lender stepped forward to extend DIP financing to the Debtor.  Without the proposed DIP Facility, the Debtor's Property would be jeopardized and the Debtor and its creditors would be denied the opportunity to sell the Property in an orderly sale process.

20.      The Debtor respectfully submits that its' efforts to obtain postpetition financing satisfy the standards required under section 364(c) of the Bankruptcy Code. See, e.g., In re

DIP FINANCING MOTION

**11**

Simasko Production Co., 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); In re Ames Dept. Stores, 115 B.R.34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

***The Proposed Financing Is Necessary to Preserve the Assets of the Debtor's Estate.***

21.     The Debtor intends to pursue a sale of the Property through a Court sponsored sale process under section 363 of the Bankruptcy Code.  In order to maximize the value of the Property, the Debtor must maintain the Property and contents. The Debtor does not have sufficient sources of working capital, financing or cash collateral to pay the cost of securing and maintaining the Property together with the administrative costs which will be incurred in effectuating a section 363 sale strategy.  The proposed DIP Facility is essential to the Debtor's ability to consummate a sale of the Property.

***The Terms of the Proposed DIP Facilities Are Fair, Reasonable, and Appropriate.***

22.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender. In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp.  v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 n.7 (W.D.Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

DIP FINANCING MOTION

23.     The terms of the DIP Credit Agreements and the proposed DIP Orders were negotiated in good faith and at arm's-length between the Debtor and the DIP Lender, resulting in agreements designed to permit the Debtor to obtain the needed liquidity to maximize the value of the Property through a section 363 sale.

***Entry into the Proposed Financing Reflects the Debtor's Sound Business Judgment.***

24.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. See, e.g.,Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc., 115 B.R. at 38 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985).

25.     Here, the Debtor's sound business judgment clearly supports entry into the DIP Facility in order to gain access to needed funding and thereby maximize value for all constituents.

***The DIP lender is entitled to the protections under section 364(e) of the bankruptcy code***

26.     Bankruptcy Code section 364(e), which protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the

DIP FINANCING MOTION

**13**

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal, was designed to "encourage lenders to extend credit to debtors by eliminating the risk that any lien securing the loan will be modified on appeal." Keltic Fin. Partners, LP v. Foreside Mgmt. Co. (In re Foreside Mgmt. Co.), 402 B.R. 446, 451 (B.A.P. 1st Cir. 2009) (citing Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.), 963 F.2d 1490, 1493 (11th Cir. 1992)). See also White Rose Food v. General Trading (In re Clinton St. Food Corp., 170 B.R. 216, 220 (S.D.N.Y. 1994) (noting that section 364(e)'s purpose "is to overcome[s] parties' reluctance to lend to a bankrupt firm . . ."); Fleet Nat'l Bank v. Doorcrafters (In re N. Atl. Millwork Corp.), 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of Section 364(e) is to allow good- faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankruptcy entities.").The Debtor believes that the terms and conditions of the DIP Facility are fair and reasonable and are the best possible terms on which the Debtor could obtain postpetition financing. Further, the terms and conditions of the DIP Documents were negotiated in good faith and at arm's length with all parties represented by experienced counsel. Accordingly, the DIP Lender should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility is later modified, vacated, stayed, or terminated by subsequent order of this or any other Court, the DIP Lender will be fully protected with respect to any amounts previously disbursed.

***The Interests of the Prepetition Lenders Are Adequately Protected***

27.     The Debtor here is seeking authority to borrow additional funds on a post-petition basis from its Prepetition Lenders as set forth hereinabove. In addition to the above provisions regarding the DIP Facility, the Debtor has agreed to grant the Prepetition Lenders replacement liens to the same extent, validity and priority as the Prepetition Liens to the extent of any

DIP FINANCING MOTION

diminution in value of the Collateral as a result of the Debtor's use of cash collateral as adequate protection of the Prepetition Lenders' interests. ..

28.     What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  See, e.g., In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case . . . ."); In re Realty Sw. Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citations omitted)).

29.     Where a secured lender enjoys an adequate equity cushion in its collateral, courts have held that such facts support a finding of adequate protection. In re Las Torres  Development, L.L.C., 413 B.R. 687, 696 (Bankr. S.D. Tex. 2009) (applying the 20% equity cushion test to determine whether the secured lender was adequately protected); In re Knight Energy Corp., Nos. 09–32163, 09–32165, 2009 WL 1851739, at *3 (Bankr. N.D. Tex. June 26, 2009) (same); In re Matter of Mendoza, 111 F.3d 1264, 1272 (5th Cir. 1997); In re Snowshoe Co., 789 F.2d 1085 (4th Cir. 1986).

30.     In In re Las Torres Development LLC, this Court evaluated a creditor's objection to the debtor's use of cash collateral. After resolving that the Debtor had not met the thresholds to satisfy any of the criteria set forth in sections 361(1), (2) or (3), the court "conclude[d] that the Lender is nevertheless adequately protected because § 361 is not limiting." Specifically, the court noted that "case law is clear that an equity cushion of 20% or more constitutes adequate

DIP Financing Motion

15

protection." In a footnote, the court acknowledged that dicta in Fifth Circuit precedent also suggests taking into account other factors including the likelihood of depreciation or appreciation, insurance coverage, property tax payments, and the likelihood of a successful reorganization. In re Las Torres Development, L.L.C., 413 B.R. at 697, n.9.  The *Las Torres* court discounted the value of metrics used by the debtor due to the lack of relevant facts on the record, but did not generally dispute their value in assessing adequate protection. The court then applied the parties' conservative valuations to the collateral in question and determined that the property had an equity cushion well in excess of 20% and thus the lender was adequately protected for the use of its cash collateral. *Id.*

31.    Here, the liens and other security interests of the Prepetition Lenders encumber substantially all assets of the Debtor. The Prepetition Lenders claim that as of the Petition Date they are owed approximately $57.5 million. On an interim basis, the Debtor seek to borrow $950,000, of which sum, $875,000 will be used to pay 2015 ad valorem taxes. The Debtor will show, if necessary, that based on the market value of the Property that the Prepetition Lenders have a substantial equity cushion and that such equity cushion along with the granting of replacement liens constitutes adequate protection.

### The Scope of the Carve-Out is Appropriate

32.    As further provided in the proposed Interim Order, the DIP Facility would subject the security interests and administrative expense claims of the DIP Lenders to the Carve-Out in an aggregate amount up to $20,000 every other month, subject to the DIP Budget and allowance by the Bankruptcy Court. Such carve-outs for professional fees and other costs of administering chapter 11 cases have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can obtain appropriate assistance from counsel and other

DIP FINANCING MOTION

**16**

professionals.  See, e.g., Ames, 115 B.R. at 40; In re United Retail, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 1, 2012); In re Eastman Kodak Co., Case No. 12-10202 (Bankr. S.D.N.Y. Jan. 19, 2012); In re Gen. Maritime Corp., Case No. 11-15285 (Bankr. S.D.N.Y. Nov. 17, 2011).  The proposed Carve-Out was negotiated at arm's length. It is in a reasonable amount to protect against administrative insolvency during the Chapter 11 Cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtor' and the Statutory Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

***The DIP Lenders Should Be Deemed Good Faith Lenders***

33.  Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides as follows:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien  so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

34.  As explained herein, the DIP Facility is the result of the Debtor's reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between and among the Debtor, and the DIP Lender.  The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible

**DIP FINANCING MOTION**

under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Facility other than as described in this Motion and the proposed Interim Order. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of Section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

***Section 363 of the bankruptcy code authorizes the Debtor's use of cash collateral.***

35.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (i) each entity that has an interest in such cash collateral provides consent, or (ii) the court approves the use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c).

36.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

37.    Section 361 of the Bankruptcy Code provides that:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by:

(1)    requiring the [debtor in possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2)    providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3)    granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative

**DIP FINANCING MOTION**

expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.  11 U.S.C. § 361.

38.     "The determination of adequate protection is a fact-specific inquiry" to be decided on a case-by-case basis. In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." (internal quotation marks omitted) (citation omitted)).

39.     Here, the interests of the Prepetition Lender are adequately protected for purposes of section 363(e) of the Bankruptcy Code for the following reasons.

a.     First, the Prepetition Lenders consent to the Debtor's use of cash collateral on the terms of the DIP Facility and proposed DIP Orders, and

b.     Second, the Debtor intends to preserve value of the Property by using the cash collateral to preserve, secure and maintain the Property pending consummation of a section 363 sale.

40.     The Debtor believes that such protections are adequate under the circumstances. Further, given the significant value that the Debtor stands to lose in the event it is denied access to continued use of cash collateral, such protections are wholly appropriate and justified.

### INTERIM ORDER AND FINAL HEARING

41.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

42.     The urgent need to preserve the Debtor's assets, and avoid immediate and irreparable harm to the Debtor's estate, makes it imperative that the Debtor be authorized to obtain

DIP FINANCING MOTION

the liquidity provided by the DIP Facility and use Cash Collateral as of the Petition Date, pending the Final Hearing, in order to continue its' operations and administer the Case. Without the ability to obtain access to such funding, the Debtor would be unable to meet its' postpetition obligations, and otherwise would be unable to fund its working capital needs, thus causing irreparable harm to the value of the Debtor's assets for all stakeholders.

43.     Accordingly, the Debtor respectfully request that, pending the hearing on the Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Orders be approved in all respects and the terms and provisions of the Final Orders be implemented and be deemed binding.

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

44.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm). The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the court has instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh, 235 Fed. App'x 907, 910 (3d Cir. 2007) (citing Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977)). Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated. See, e.g., Acierno v. New Castle County, 40 F.3d 645, 653-55 (3d

DIP FINANCING MOTION

Cir. 1994). The Debtor submits that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor.

## REQUEST FOR FINAL HEARING

45.     Pursuant to Bankruptcy Rule 4001(c), the Debtor request that the Court set a date that is no longer than 15 days from the entry of the Interim Order as a final hearing for consideration of entry of the Final Order.

46.     The Debtor request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the parties listed below in the Notice section. The Debtor further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## REQUEST FOR WAIVER OF STAY

47.     The Debtor further seek a waiver of any stay of the effectiveness of the order approving this motion. Pursuant to Bankruptcy Rule 6004(h), "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the DIP Facility is essential to prevent irreparable damage to the Debtor' operations, value and ability to reorganize. Accordingly, the Debtor submit that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## NOTICE

48.     Notice of this Motion has been provided by email or overnight delivery to: (a) the Debtor and the Debtor' professionals; (b) the United States Trustee for the Western District of Texas; (c) any debtor-in-possession lender in these Chapter 11 Cases; (d) the 20 largest unsecured

**DIP FINANCING MOTION**

creditors of the Debtor on a consolidated basis; (e) the Internal Revenue Service; (f) all statutory committees appointed in this Chapter 11 Case; (g) all parties requesting notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (h) all parties on whom the Court orders notice. The Debtor believe that the notice provided for herein is fair and adequate and no other or further notice is necessary.

WHEREFORE, the Debtor respectfully request that the Court enter the DIP Orders, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Respectfully submitted January 31, 2016.

THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
66 Granburg Circle San
Antonio, Texas 78218
Telephone (210) 601-9405
Email: rbattaglialaw@outlook.com


By:*/s/Raymond W. Battaglia*
Raymond W. Battaglia
Texas Bar No. 01918055

ATTORNEYS FOR FPMC AUSTIN REALTY PARTNERS, LP

**CERTIFICATE OF SERVICE**

A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system, as set forth below. I further certify that it has been transmitted by first class mail to the parties on the attached service list

*/s/ Raymond W. Battaglia*
Raymond W. Battaglia

DIP FINANCING MOTION

22