

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: February 27, 2016.**

_____
**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | BANKRUPTCY NO. 16-10020-TMD |
| FPMC AUSTIN REALTY | § | |
| PARTNERS, LP, | § | CHAPTER 11 PROCEEDING |
| | § | |
| DEBTOR | § | |

**FINAL ORDER (i) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. §§105, 361, 362, 363, AND 364; (ii) SETTING A FINAL HEARING; AND (iii) GRANTING RELATED RELIEF**

Upon the motion (the "*Motion*") [1], dated January 29, 2016, of FPMC Austin Realty

Partners, LP, ( "*Debtor*" or "*Debtor-in-Possession*"), as debtor and debtor in possession, in the

---

[1] All capitalized terms and/or phrases set forth herein and not otherwise specifically described and defined herein shall bear the meanings and definitions ascribed thereto in the DIP Documents.

FINAL DIP FINANCING ORDER

1

above-captioned case (the "Chapter 11 Case") pursuant to §§105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of title 11 of the United States Code (the "*Bankruptcy Code*"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Western District of Texas (the "*Local Bankruptcy Rules*"), seeking, among other things, entry of an interim order (the "*Interim Order*") and a final order (the "*Final Order*"):

1)    Authorizing the Debtor to obtain post-petition financing (the "*Financing*") in the form of a multiple-advance term loan made available to the Debtor in a principal amount of up to $1,700,000.00 (the "*Facility*") with superpriority claims and first-priority liens *pari passu* with the liens of the Pre-Petition Lenders, pursuant to §§105, 361, 362, 363, and 364 of the Bankruptcy Code from Frost Bank or its designee (for itself or its designee and as Administrative Agent for the Pre-Petition Lenders) (the "*Lender*" or "*DIP Lender*");

2)    Authorizing the Debtor to (a) execute and deliver final documentation substantially in the form of the Senior Secured Superpriority Debtor-in-Possession Loan Agreement attached hereto as Exhibit A (the "*DIP Loan Agreement*") and any other document requested by the DIP Lender, in its sole and absolute discretion, in connection with the Financing including, without limitation, notes, security agreements, pledge agreements, mortgages, financing statements, deeds of trust, and other security documents (along with the DIP Loan Agreement and all of the foregoing whenever executed, collectively, the "*DIP Documents*") and (b) perform such other acts as may be requested by the DIP Lender as necessary or desirable, in the DIP Lender's sole and absolute discretion, in connection with the Financing and this Final Order;

3)    Granting the DIP Lender, for the purpose of securing the DIP Obligations, an automatically perfected first-priority lien, pursuant to §364(d)(1) of the Bankruptcy Code, subject only to Permitted Encumbrances and the Carve Out, on all property of the Debtor to secure all obligations owed to the DIP Lender under the Facility;

4)    Granting, with respect to the DIP Obligations of the Estate under this Final Order, an allowed administrative expense claim to the DIP Lender pursuant to §364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in or arising under the Bankruptcy Code (including, without limitation, §§105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), or 726 of the Bankruptcy Code), or other applicable law, but in all respects subject to the Carve Out;

FINAL DIP FINANCING ORDER

> 5) Authorizing and directing the Debtor to pay the principal, interest, fees, expenses, and other amounts payable under the Facility as such become due, including, without limitation, fees incurred and disbursements made by the DIP Lender for attorneys and other expenses incurred in connection with the negotiation, re-negotiation, documentation and enforcement of the DIP Documents, all to the extent provided in and in accordance with the terms of the DIP Documents, as amended, modified, and/or supplemented by this Final Order; and

> 6) Granting related relief.

The Court having considered the Motion, having examined the exhibits attached thereto, and having completed the Final Hearing (defined below) as provided for under §364 of the Bankruptcy Code, Bankruptcy Rule 4001(c), and applicable Local Bankruptcy Rules, and finding the Debtor provided notice as set forth below to all necessary parties and that no further notice is required:

## BASED ON THE RECORD ESTABLISHED AT THE FINAL HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A)   **Petition Date**. On January 5, 2016 (the "*Petition Date*"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "*Bankruptcy Court*" or this "*Court*").

B)   **Debtor-in-Possession.** The Debtor has continued in the management and operation of its business and property as debtor in possession pursuant to §§1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Case

C)   **Committee Formation.** As of the date hereof, the Office of the United States Trustee (the "*U.S. Trustee*") has not appointed an official committee of unsecured creditors in the Chapter 11 Case.

D)   **Jurisdiction**. This Court has core jurisdiction over the Chapter 11 Case, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§157(b) and 1334. The statutory predicates for the relief sought herein are §§105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014, and the Local Bankruptcy Rules. Venue for this Chapter 11 Case is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

E)   **Notice**. Due and appropriate notice of the Motion, the relief requested therein and the Final Hearing having been served by the Debtor on: (i) the Office of the United States Trustee for the Western District of Texas; (ii) the Debtor's twenty (20) largest unsecured creditors

on a consolidated basis; (iii) DIP Lender's counsel; (iv) any additional known Persons holding liens in the DIP Collateral in compliance with Bankruptcy Rules 4001(b) and 4001(c); and (v) any other parties-in-interest required to receive notice under the Local Bankruptcy Rules.

F)    **Opportunity to be Heard.** Pursuant to Bankruptcy Rule 4001, an interim hearing (the "*Interim Hearing*") on the Motion was held before this Court to consider entry of an interim order on February 9, 2016 the Interim Order was entered on February 9, 2016 [Doc. 35]. A final hearing on the Motion (the "*Final Hearing*") was held before this Court to consider entry of this Final Order on February 22, 2016.

G)    **Disposition**. The Motion is GRANTED on a final basis in accordance with the terms of this Final Order.  Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled for purposes of this Final Order.

H)    **Affirmation of Pre-Petition Indebtedness, Obligations Under and Related Thereto**. Debtor and Frost Bank, a Texas state bank ("*Frost Bank*" or "*DIP Lender*") for itself and as Administrative Agent for Amarillo National Bank as a lender and Whitney Bank as a Lender (collectively the "*Prepetition Lenders*") made a construction loan to Debtor under various pre-Petition Date loan documents ("*Construction Loan*") in the original principal amount of $63,742,287.  As part of this Final Order, the Debtor/Debtor-in-Possession on behalf of itself and the Estate stipulate, agree, and affirm:

   i)     The Debtor is in default of the Construction Loan and its obligations thereunder to the Prepetition Lenders. As of the Petition Date, the amount outstanding to the Prepetition Lenders is $57,577,110.52 in principal and pre-petition interest, fees, and expenses in the amount of $524,101.90;

   ii)    The debt owed under the Construction Loan is not subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever, and is not subject to avoidance, subordination, recharacterization, reduction, cap or limitation in amount under §502(b)(6) of the Bankruptcy Code, or any other challenge pursuant to applicable state or federal law, and nothing in this Final Order shall be construed to adversely affect or alter Debtor's obligations under the Prepetition Loan Documents.

   iii)   The Construction Loan and any other agreement ancillary thereto, arising under, connected with, or in any way related to the Construction Loan are unavoidable and valid, binding, and enforceable according to the terms, conditions, covenants, rights, duties, privileges, and responsibilities set forth in such documents, without defense, counterclaim or offset.

These stipulations shall be effective against creditors and other parties in interest that do not file an adversary proceeding objecting to the claims or liens of the Prepetition Lenders within sixty (60) days from the entry of the Final DIP Order (the "*Challenge Period*"). The rights of such parties to hereinafter file an adversary objecting to the claims or liens of the Prepetition Lenders shall be referred to as the "*Challenge Rights*").

FINAL DIP FINANCING ORDER

I) **Lender's Protections**. The DIP Lender is willing to lend money and provide other financial accommodations to the Debtor only on the terms and conditions and with the protections provided herein and in the DIP Documents and is relying on such terms, conditions, and protections in agreeing to lend money and provide financial accommodations to the Debtor hereunder.

J) **Immediate Entry of the Order.** The Debtor has requested that this Final Order become immediately effective and enforceable upon entry, notwithstanding any provisions that may apply in Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure.  The Debtor has demonstrated good cause for the entry of this Final Order and for this Final Order to become immediately effective and enforceable upon entry.  Among other things, entry of this Final Order and the immediate effectiveness and enforceability of this Final Order upon entry are (i) necessary to (xx) avoid immediate and irreparable harm to the Debtor's bankruptcy estate (the "*Estate*") pending a final hearing by permitting the Debtor to satisfy its critical operating expenses, (yy) increase the possibilities for a successful outcome in this case for the Debtor, and (ii) in the best interests of the Debtor, its creditors, and the Estate. The terms of the borrowings and other financial accommodations authorized hereby are fair and reasonable under the circumstances and reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties.

K) **Findings Regarding the Financing**.

    i)    Good cause has been shown for the entry of this Final Order;

    ii)    The Debtor has an immediate need to obtain the Financing on an final basis, to the extent set forth in the Budget attached hereto as Exhibit B, as the term "*Budget*" is defined in the DIP Loan Agreement, to (a) fund the post-petition operating expenses of the Debtor incurred in the ordinary course of business; and

    (b)    pay certain other costs and expenses of administration of the Chapter 11 Case. The Debtor's access to sufficient working capital and liquidity through the incurrence of new indebtedness is vital to the preservation and maintenance of the value of the Debtor's assets;

    iii)    The Debtor currently is unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Documents and is unable to obtain adequate unsecured credit allowable under §503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor is also unable to obtain secured credit allowable under §§364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the Debtor granting senior liens to the DIP Lender, subject to the priorities and under the terms and conditions set forth in this Final Order and in the DIP Documents;

    iv)    The terms of the Financing are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration;

v)      The Financing has been negotiated in good faith and at arm's length among the Debtor and the DIP Lender, and all of the Debtor's obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including, without limitation, all loans pursuant to the DIP Documents, and any other expenses or obligations under the DIP Documents, including professionals fees and expenses incurred by the DIP Lender (all of the foregoing collectively, the "*DIP Obligations*"), shall be deemed to have been extended by the DIP Lender and its designees in good faith, as that term is used in §364(e) of the Bankruptcy Code and in express reliance on the protections offered by §364(e) of the Bankruptcy Code, and the DIP Obligations, the DIP Liens (as defined below), and the Superpriority Claims (as defined below) shall be entitled to the full protection of §364(e) of the Bankruptcy Code if this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise;

vi)      The Financing constitutes new loans and financial accommodations from the DIP Lender to the Debtor, separate and distinct from any transaction entered into by the Debtor and the DIP Lender prior to the Petition Date.

vii)     Entering into the Financing and the DIP Documents reflects the Debtor's exercise of prudent business judgment consistent with its fiduciary duties; and

viii)     The Debtor has requested entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief sought by this Final Order, the Debtor's estate will be harmed immediately and irreparably. Consummation of the Financing in accordance with this Final Order and the DIP Documents is in the best interests of the Debtor's estate consistent with its fiduciary duties.

Based on the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion at the Final Hearing, and good and sufficient cause appearing therefore,

**ACCORDINGLY, IT IS HEREBY ORDERED THAT:**

The Motion is granted to the extent provided herein, the Financing is authorized and approved, on a final basis, subject to the terms and conditions set forth in this Final Order. All objections to the final relief sought in the Motion to the extent not withdrawn or resolved are hereby overruled.

FINAL DIP FINANCING ORDER

1.      **Authorization of the Financing and DIP Documents.**

(a)      The Debtor is hereby authorized and directed to (i) execute and enter into the DIP Documents on a final basis and (ii) perform any acts and take all actions requested by the DIP Lender, in its sole and absolute discretion, related to this Final Order and the DIP Documents, including, without limitation, the execution, delivery, and performance of the DIP Loan Agreement, any notes, security and pledge agreements, mortgages contemplated thereby and the other agreements referred to as and in the DIP Documents. All of the express and explicit terms, conditions, conditions precedent, negative covenants, affirmative covenants, promises, rights, duties, responsibilities, acknowledgements, agreements, representations and warranties set forth in the DIP Documents, which the same are expressly incorporated herein as if specifically set forth verbatim, are hereby approved in all aspects in form and in substance.

(b)      The Debtor is hereby authorized to borrow money pursuant to the DIP Documents on a final basis up to an aggregate principal amount not to exceed ONE MILLION SEVEN HUNDRED THOUSAND DOLLARS ($1,700,000), which shall be used only as permitted under the DIP Documents and in accordance with the Budget, and to enter into any and all other and further agreements and arrangements in connection therewith and to pay interest and expenses and incur DIP Obligations all in accordance with this Final Order and the DIP Documents, including, without limitation, reasonable costs and expenses as may be due from time-to-time, specifically including, without limitation, fees and expenses of the professionals retained by the DIP Lender provided for in the DIP Documents.

(c)      The Debtor shall furnish the Budget to the DIP Lender in accordance with the terms of the DIP Documents. Approval or disapproval by the DIP Lender of any Budget shall

be in the DIP Lender's sole and absolute discretion. In addition to and working in conjunction with the Budget, the amount of the Advances shall be limited to the lesser of (i) the Advance Amount; or (ii) an amount of funds approved and determined in Lender's sole and absolute discretion to be the minimum amount of funds required by Debtor-in- Possession to support Debtor-in-Possession's projected future expenditures to be incurred in Debtor-in-Possession's business operations during the Budget period.

(d)     The Debtor shall not make any disbursements other than those set forth in the Budget; provided, however, disbursements may exceed any line-item disbursement amount in the Budget by no more than 10% for any line item in the Budget, not to exceed 5% on a cumulative basis from the Petition Date through the end of the Budget Period.

(e)     In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized and directed to (i) perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and (ii) pay all fees required or necessary for the Debtor's performance of its obligations under the Financing and  under the  DIP Documents.

2.     **Valid, Binding, Non-Avoidable Obligations.**  Upon execution and delivery of the DIP Loan Agreement and the other DIP Documents, such DIP Documents shall constitute and represent valid, binding, and non-avoidable first-priority administrative-expense obligations of the Estate subject to the terms of this Final Order for all purposes and at all times, including during the Chapter 11 Case, any subsequently converted case of the Debtor under chapter 7 of  the Bankruptcy Code or after the dismissal of the Chapter 11 Case or any subsequently converted

chapter 7 case. No obligation, payment, right, transfer or grant of security or lien under the DIP Loan Agreement, the other DIP Documents or this Final Order shall be stayed, restrained, voided, avoided, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under §§502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

3.  **Superpriority Claims.**

(a)  Pursuant to §364(c)(1) of the Bankruptcy Code, all of the DIP Obligations approved under this Final Order shall constitute allowed senior administrative-expense claims against the Debtor/Estate (the "*Superpriority Claims*") with priority over any and all administrative expenses, adequate-protection claims, diminution-of-value claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in §§503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under §§105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of §1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under §503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof. The DIP Lender's Superpriority Claims granted under this Final Order are not subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or

nature whatsoever, and are not subject to avoidance, subordination, recharacterization, or any other challenge pursuant to applicable state or federal law.

(b)     At any sale of all or a portion of the Debtor's assets, including without limitation, sales pursuant to §363 of the Bankruptcy Code or sales included as part of any restructuring plan subject to confirmation pursuant to §1129(b)(2)(A)(iii) of the Bankruptcy Code, the DIP Lender shall have the indefeasible right to credit bid, pursuant to §363(k) of the Bankruptcy Code, an amount up to the DIP Obligations including pre-petition debt then-outstanding.

(c)     In addition to the fees, costs, charges, and expenses authorized under the DIP Facility, the Superpriority Claim shall expressly include all of the DIP Lender's reasonable and necessary attorneys' and other professionals' fees as provided for in the DIP Loan Agreement and approved by the Bankruptcy Court.

4.     **DIP Liens and DIP Collateral.**  As security for the DIP Obligations, effective and automatically perfected upon entry of this Final Order and without the necessity of the execution, delivery, recordation of filings by the Debtor or DIP Lender of any mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of, or over, any DIP Collateral, the DIP Lender shall have a DIP Lien on the DIP Collateral.  The DIP Lender shall have DIP Liens on all property and interests in property (whether tangible or intangible, real property or personal property), whether now owned or hereafter acquired by Debtor, whether acquired before or after the Petition Date. "*DIP Collateral*," as used herein, shall be all property, rights, title, and interests

FINAL DIP FINANCING ORDER

in all property of the Debtor or the Estate, whether tangible or intangible, real property or personal property, owned on the Petition Date or thereafter acquired as detailed in the DIP Agreement.

5. **Adequate Protection of Prepetition Lenders.** In accordance with section 363(e) of the Bankruptcy Code as adequate protection to the extent diminution of value of the Prepetition Lenders' interests in the Prepetition Collateral, the Prepetition Lenders are hereby granted replacement liens to the same extent, validity and priority as existed against the Prepetition Collateral.

6. **First-Priority Lien on DIP Collateral**. The liens and security interests granted to the DIP Lender pursuant to the terms of the DIP Documents or this Final Order ("*DIP Lien(s)*") shall constitute first-priority liens under §364(d)(1) on all assets of the Debtor, Debtor-in-Possession, or the Estate, owned now or acquired thereafter, *pari passu* with all other liens and security interests, including replacement liens of the Pre-Petition Lenders, but subject only to Permitted Encumbrances (as defined herein) and the Carve Out. No expense, cost, or charge in connection with the Case shall be charged against the DIP Collateral or DIP Lender under §§506(c) and 552(b) of the Bankruptcy Code, and the Debtor and the Estate hereby waive any rights each may have to seek such charges under §§506(c) and 552(b) of the Bankruptcy Code or other applicable law. DIP Lender shall be entitled to all of the rights and benefits of §552(b) of the Bankruptcy Code, and the "equities of the case" exception under §552(b) shall not apply to DIP Lender with respect to any proceeds, products, offspring, rents or profits of arising from the Lease or any of the DIP Collateral. "*Permitted Encumbrances*" is defined as (i) liens securing ad valorem taxes assessed against any piece of DIP Collateral and due and owing to the applicable state or local taxing authority who under Texas state law has a first-priority lien and (ii) any properly filed

mechanics and materialmen's liens which has first lien priority under Texas state law. The foregoing is without prejudice to the rights of the Debtor or any other party in interest, including the DIP Lender, to object to the validity, priority, or extent of such Permitted Encumbrances, or the allowance of such debts secured thereby, or to institute any actions or adversary proceedings with respect thereto. Notwithstanding anything in this Final Order to the contrary, for the avoidance of doubt, no property acquired by the Debtor on the Petition Date or any time thereafter shall be included in the definition of a Permitted Encumbrance. Instead, DIP Lender is granted a first- priority security interest and lien in all property acquired by the Debtor-in-Possession on the Petition Date and any time thereafter, except such first-priority lien shall not attach to proceeds of a Permitted Encumbrance.

7.      **Carve Out**. The carve out for certain expenses and professional fees incurred during the pendency of the Chapter 11 Case (the "*Carve Out*") means (a) allowed administrative expenses pursuant to 28 U.S.C. §1930(a)(6), and (b) allowed reasonable fees and expenses of the Case Professionals (as defined in the DIP Documents) as provided in the Budget approved by the Lender and incurred prior to a Termination Date (as defined in the DIP Documents), plus an amount up to $5,000 for such fees and expenses incurred after a Termination Date. Notwithstanding anything herein to the contrary, neither the Carve Out nor (i) any other DIP Collateral, (ii) dollar of funding provided by the Facility, and (iii) cash collateral of the Lender may be used to (xx) attempt to modify or otherwise alter any of the terms and conditions set forth in this Final Order, (yy) attempt to obtain, without Prepetition Lenders' written consent, this Court's use of the Prepetition Lenders' cash collateral, (zz) assert, allege, bring, including discovery, support any claim or cause of action, or the initiation or prosecution of any claim or

cause of action against DIP Lender, the Pre-Petition Lenders, their affiliates, or their agents, including any cause of action under chapter 5 of the Bankruptcy Code or state law of any type or nature whatsoever. No part of the Carve Out may be used to prepare, initiate, consult, and prosecute a lawsuit or other action against DIP Lender or the Prepetition Lenders.  For the avoidance of doubt, (iv) payment of the Carve Out shall not reduce the amounts payable to DIP Lender hereunder or under the DIP Documents or affect the rights of DIP Lender to receive such payment; and (v) under no circumstances shall DIP Lender be responsible or liable for, or itself obligated to pay, any of the fees or other items constituting the Carve Out.

8.     **Other Protection of DIP Lender's Rights.**

(a)     Except as explicitly set forth in this Final Order and the DIP Documents, none of the DIP Collateral shall be subject to any liens, claims, and encumbrances senior in priority to those of the DIP Lender under the DIP Documents and this Final Order;

(b)     Except as otherwise provided in this Final Order, so long as the DIP Obligations have not been indefeasibly paid, no party may take any action to exercise remedies against any DIP Collateral without further order of the Court;

(c)     The automatic-stay provisions of §362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit (i) the Debtor and the DIP Lender to commit all acts and take all actions necessary to implement the Facility and this Order, (ii) all acts, actions, and transfers contemplated herein, and (iii) consistent with the terms of this Order, to permit the DIP Lender, at its option, pursue its rights and remedies in accordance with the DIP Documents and this Agreement.

(d)     The Debtor waives and shall not be entitled to any right of setoff against the DIP Lender relating to the DIP Obligations.

(e)     The Debtor, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in this Chapter 11 Case or any successor case, shall obtain credit or incur debt pursuant to §364(b), (c), or (d) of the Bankruptcy Code in violation of the DIP Documents and/or this Final Order at any time prior to the indefeasible payment in full of all of the DIP Obligations, the satisfaction of the Superpriority Claims, or the termination of the DIP Lender's obligations to extend credit under the Facility and this Final Order, including subsequent to the confirmation of any plan with respect to the Estate, then all of the cash proceeds from such credit or debt shall immediately be turned over to DIP Lender to be applied to the DIP Obligations.

(f)     The Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral without the prior written consent of DIP Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender, except as otherwise provided for herein), which may be provided in the DIP Lender's sole and absolute discretion. Absent further order of this Court, the Debtor shall not create or permit to exist any postpetition liens or encumbrances on any of its assets or property except any postpetition liens agreed to by DIP Lender in writing.

(g)     Until the Financing is paid in full, the Debtor is not authorized to obtain credit secured by a lien or security interest in DIP Collateral without prior written consent of the DIP Lender.

FINAL DIP FINANCING ORDER

14

9.     **No Surcharge.**  No costs or expenses of administration or other costs or expenses of the Debtor or the Estate that have been or may be incurred in this Chapter 11 Case, or in any subsequent chapter 7 case of the Debtor or other proceedings or matters related thereto, shall be charged against the DIP Lender or any property that is collateral of the DIP Lender pursuant to §§506(c) or 552(b) or otherwise. No obligations incurred or payments or other transfers made by or behalf of the Debtor pursuant hereto or prior to the Petition Date shall be avoidable or recoverable from the Lender under any section of the Bankruptcy Code, or any federal, state, or other applicable law.

10.     **Monitoring of DIP Collateral.**  At all times, whether an Event of Default is in existence or not, Debtor will keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. Debtor will permit any representatives designated by DIP Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, to conduct examinations of and to monitor DIP Lender's DIP Collateral, and to discuss the Debtor's affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

11.     **Financial Reporting**. The Debtor shall provide the DIP Lender with financial and other reporting as described in the DIP Documents and the following (the "*Reporting Information*"):

(a)     The Reporting Information shall include: (i) weekly reports of receipts and budgeted cash usage; (ii) copies of all reports filed with the Office of the United States Trustee within two (2) days after such filing; and (iii) such additional financial or other information

FINAL DIP FINANCING ORDER

15

concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and transactions of the Debtor, or concerning any matter that may affect the administration of the estate, as the Lender may from time to time request within two (2) days of any such request. All Reporting Information shall be in accordance with generally acceptable accounting principles.

(b)     The Debtor shall immediately deliver to the Lender and the Agent for the Pre-Petition Lenders any and all documentation that in any way relates to a solicitation, offer, or proposed sale or disposition of any material amount of property of this estate, including, but not limited to, letters of inquiry, solicitations, letters of intent, or asset purchase agreements. The DIP Lender shall not disclose such information other than to its attorneys, agents and advisors without the prior consent of the Debtor or upon order of the Court.

(c)     DIP Lender, its representatives, agents, consultants, and other professionals shall be permitted, in coordination with the Debtor, to contact and communicate with the Debtor, creditors of the Debtor, and other third parties regarding potential transactions for the sale or other disposition of property of the Estate.

(d)     The DIP Lender and its respective agents and advisors shall have full access, upon notice during normal business hours, to the Debtor's business records, business premises, and to the DIP Collateral to enable the DIP Lender or its agents and advisors to (i) review, appraise, and evaluate the physical condition of the DIP Collateral, (ii) inspect and review the financial records and all other records of the Debtor concerning the operation of the Debtor's business, and (iii) evaluate the Debtor's overall financial condition and all other records relating to the operations of the Debtor.

FINAL DIP FINANCING ORDER

16

12.     **Perfection of DIP Liens**.  This Final Order and the DIP Loan Documents shall be sufficient and conclusive evidence of the priority, perfection, attachment, and validity of all of the DIP Lender's security interests in and liens on the DIP Collateral including replacement liens, and the liens and security interests granted and created by this Final Order, constitute valid, automatically perfected and unavoidable security interests, with the priorities granted hereunder and thereunder, without the necessity of creating, filing, recording, or serving any financing statements or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to the DIP Lenders by this Final Order and the DIP Loan Documents. To the extent that any applicable non- bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of the DIP Lender's liens and security interests authorized, ratified, or created by this Final Order or otherwise would impose filing or registration requirements with respect to such liens, such law is hereby preempted to the maximum extent permitted by the Bankruptcy Code, otherwise applicable federal law, and the judicial power of the United States Bankruptcy Court. If the DIP Lender shall, in its sole and absolute discretion, elect for any reason to file any Uniform Commercial Code financing statements or other recordable documents to evidence perfection of the Lender's interests in property of the Estate, the DIP Lender or upon the DIP Lender's request, the Debtor is authorized and directed to execute, or cause to be executed, all such financing statements or other documents, and the filing, recording, or service (as the case may be) of such financing statements or similar documents shall be deemed to have been made at the time of and on the Petition Date, and the signature(s) of any person(s) designated by the Debtor, whether by letter to the DIP Lender or by appearing on any one or more of the agreements or other

documents respecting the security interests and liens of the DIP Lender granted hereunder, shall bind the Debtor and the Estate. The DIP Lender may, in its sole and absolute discretion, execute such documents on the Debtor's behalf as the Debtor's attorney-in-fact, or file a certified copy of this Final Order in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property, and, in such event, the subject filing or recording officer is authorized and directed to file or record such documents or certified copy of this Financing Order. If directed by the DIP Lender, the Debtor shall file or record a copy of this Final Order in the recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such copy of this Final Order for filing and recording.

13. **Preservation of Rights Granted Under the Order.**

(a) No claim or lien having a priority superior to or *pari passu* with those granted by this Final Order to the DIP Lender shall be granted or allowed while any portion of the Financing or the commitments thereunder (including repayment of the Carve Out) or the DIP Obligations remain outstanding, and the DIP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under §551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under §364(d) of the Bankruptcy Code or otherwise;

(b) Unless all DIP Obligations shall have indefeasibly been paid in cash in full, the Debtor shall not seek, and it shall constitute an Event of Default, if there is, (i) any modification or extension of this Final Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction, or acquiescence; (ii) an order converting or

dismissing the Chapter 11 Case; or (iii) if Debtor seeks to obtain financing from any other source (such that any DIP Obligations would remain outstanding after any such funding) on either a *pari passu* or priority basis or if Debtor seeks to obtain financing junior to the DIP Lender without the DIP Lender's consent;

(c)     If an order dismissing the Chapter 11 Case under §1112 of the Bankruptcy Code, or otherwise, is at any time entered, such order shall provide (in accordance with §§105 and 349 of the Bankruptcy Code) that

(d)     The Superpriority Claims, first-priority liens, security interests and replacement security interests granted to the DIP Lender pursuant to this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations shall have been indefeasibly paid in cash in full and any claims for diminution have been satisfied (and that such Superpriority Claims, priority DIP Liens, replacement security interests, adequate protection superpriority claims and adequate protection liens shall, notwithstanding such dismissal, remain binding on all parties in interest); and this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to herein;

(e)     DIP Lender has acted in good faith in connection with the DIP Facility and with this Final Order, and its reliance on this Final Order is in good faith. Based on the findings set forth in this Final Order and the record made during the Final Hearing, and in accordance with §364(e) of the Bankruptcy Code and to the extent of applicable law, if any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority, or enforceability of any DIP

FINAL DIP FINANCING ORDER

Obligations, DIP Liens and adequate protection liens incurred prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation; or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Agreement with respect to any DIP Obligations. Notwithstanding any such reversal, stay, modification, or vacation, DIP Obligations incurred by the Debtor prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Final Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted in §364(e) of the Bankruptcy Code, this Final Order and pursuant to the DIP Documents with respect to all uses of DIP Obligations; and

(f)     Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens and the Superpriority Claims granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting the Chapter 11 Case to a case under chapter 7, dismissing the Chapter 11 Case, or by any other act or omission; or (ii) the entry of an order confirming a plan of reorganization (or a plan of liquidation) in the Chapter 11 Case and, pursuant to §1141(d)(4) of the Bankruptcy Code, the Debtor has waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Final Order and the DIP Documents shall continue in this Chapter 11 Case, in any successor case, or in any superseding chapter 7 case under the Bankruptcy Code. The DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Lender, and the adequate protection liens and the adequate protection superpriority claims granted by the provisions of this Final Order and the DIP Documents shall continue in full force and effect until

FINAL DIP FINANCING ORDER

20

the DIP Obligations are indefeasibly paid in cash in full and any claims for diminution have been satisfied.

14.     **Limitation on Use of Financing Proceeds and Collateral**. Notwithstanding anything herein or in any other order by this Court to the contrary, no DIP Collateral, portion of the proceeds of the Financing or part of the Carve Out may be used for any of the following (each, a "*DIP Lender Claim*") without the prior written consent of the DIP Lender: (a) to object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under any DIP Document, or the liens or claims granted under this Final Order or any DIP Document; (b) to assert any claim or cause of action against the DIP Lender or any of the Prepetition Lenders, their respective agents, affiliates, representatives, attorneys or advisors with respect to the DIP Documents, the Financing or the Construction Loan; (c) to prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Documents or this Final Order; (d) to assert or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses against the DIP Lender, the Prepetition Lenders or their respective affiliates, representatives, attorneys or advisors in connection with matters related to the Construction Loan, the Financing or the DIP Documents to the extent approved under this Final Order; or (e) to seek to modify any of the rights granted to the DIP Lender hereunder or under the DIP Documents. This provision shall be binding on any subsequently appointed or elected trustee or examiner, if any.

15.     **Events of Default**. The occurrence of any of the following shall constitute an Event of Default under this Final Order, whether with or without notice of any kind to the Debtor by the

Lender, and the Lender shall have no obligation to provide any notice of any such occurrence of any default, violation, or breach of any of the terms of this Final Order or the DIP Loan Agreement.

16.   **Remedies.**

(a)     Immediately upon the occurrence of any Event of Default, and at all times thereafter, and without further act or action by the Lender, or any further notice, hearing, or Order of this Court: (i) DIP Lender may, at its option, cease further Advances under the DIP Loan Agreement, and (ii) the DIP Lender shall be allowed to take any action authorized under the DIP Loan Agreement.

(b)     Furthermore, upon the occurrence of any Event of Default, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be modified and vacated to the extent necessary to enforce remedies against the Collateral securing this DIP Loan, without having to obtain any further order of the Bankruptcy Court. Borrower agrees to lift the automatic stay to permit the DIP Lender to exercise self-help without further order upon the earlier of (i) an Event of Default hereunder; (ii) June 30, 2016; or (iii) the date of Lender's receipt of a payoff of all outstanding indebtedness owed to it by Borrower (the "*Termination Date*"); and (e) exercise any and all rights and remedies afforded by any of the DIP Loan Documents, or by law or equity or otherwise, as Lender will deem appropriate, provided that the Lender shall not be obligated to take title to any of the DIP Collateral in the pursuit of the Lender's rights and remedies.

(c)     Also, upon or after the occurrence of any Event of Default, the DIP Lender shall not be obligated to, but may, in its sole and absolute discretion, advance funds to the Debtor, and all such advances (i) shall not constitute a waiver, limitation, or modification of the DIP

Lender's rights and remedies pursuant to the DIP Loan Documents, and applicable law and(ii) shall be and hereby are granted all of the protections granted to the DIP Lender under this Final Order in connection with the Facility. In addition to other remedies expressly set forth herein and those legal and equitable remedies available under applicable law, upon the occurrence of any Event of Default, DIP Lender shall have immediate relief from the automatic stay and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Indebtedness, and otherwise exercise remedies against the Collateral permitted by applicable law.

(d)     Before exercising any remedies against the Collateral, DIP Lender must give five (5) days' written notice to Debtor, the Case Professionals, and the United States Trustee. During such five (5)-day notice period, Debtor is entitled to an emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay of §362(a) of the Bankruptcy Code, as to Lender, shall be automatically terminated at the end of such notice period and without further notice or order.

17.    **Effect of Stipulations on Third Parties.**

(a)     Each stipulation, admission and agreement contained in this Final Order shall be binding on the Debtor and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for the Debtor) under all circumstances and for all purposes, and the Debtor is deemed to have irrevocably waived and relinquished all claims against the DIP Lender and the Prepetition Lenders as of the date of entry of this Final Order;

FINAL DIP FINANCING ORDER

23

(b)     Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtor or its estate; and

(c)     Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

(d)     Nothing in this Final Order shall be construed to adversely affect or alter or grant any lien or claim against certain equipment, as more specifically identified in the UCC Financing Statement filed with the Texas Secretary of State on October 31, 2014 in favor of STERIS Corporation for equipment purchased from STERIS Corporation by Debtor's tenant Forest Park Medical Center at Austin, LLC.

18.     **Order Governs.**  In the event of any inconsistency between the provisions of this Final Order and the DIP Documents, the provisions of this Final Order shall govern.

19.     **Binding Effect; Successors and Assigns.** The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding on all parties in interest in this Chapter 11 Case subject to the Challenge Rights during the Challenge Period, including, without limitation, the DIP Lender, the Prepetition Lenders, any committee appointed in this Chapter 11 Case, and the Debtor and of the respective successors and assigns of the foregoing (including, with respect to the Debtor, any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the Debtor's estate, an examiner appointed pursuant  to §1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the

Final DIP Financing Order

estate of the Debtor) and shall inure to the benefit of the DIP Lender and its respective successors and assigns, provided, however, that the DIP Lender shall have no obligation to permit the use of DIP Collateral or to extend any financing or permit the use of cash collateral to any chapter 11 or 7 trustee or similar responsible person appointed for the estate of the Debtor. In determining to make any loan (whether under  the DIP Loan Agreement, a promissory note or otherwise), or in exercising any rights or remedies as  and when  permitted pursuant to this Final Order or the DIP Documents, the DIP Lender shall not (a) be deemed to be in control of the operations of the Debtor; (b) owe any fiduciary duty to the Debtor, its creditors, shareholders or estate; or (c) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of  the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§9601, et seq., as amended, or any similar federal or state statute).

20.    **Effective Dates**. This Order shall constitute findings of fact and conclusions of law, shall take effect upon its entry, shall not be subject to stay, and shall be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.  The Clerk of the Court is hereby directed to forthwith enter this Order on the docket of the Court maintained in regard to the Chapter 11 Case.

21.    **Headings**. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

22.     **Notice Of Entry Of Final Order**. The Debtor's counsel shall serve a  copy of this Final Order or a suitable notice respecting same on all of the following parties: (a) the U.S. Trustee; (b) the Internal Revenue Service; (c) the parties included on the Debtor's list of its twenty (20) largest unsecured creditors; (d) counsel to the DIP Lender for the Prepetition Lenders; (e) all other known parties with liens of record on the Debtor's assets as of the Petition Date; and (f) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001, or 9014, the Local Bankruptcy Rules, or requesting to receive notice prior to the date hereof.

23.     **Retention of Jurisdiction**. The Court shall retain jurisdiction to hear, determine, and, if applicable, to enforce the terms of any and all matters arising in, arising under, or related to the Facility or this Final Order.

### 

AGREED AS TO FORM AND SUBSTANCE:


By: */s/ Linda LaRue*
Michael J. Quilling
State Bar No 16432300
Linda S. LaRue
State Bar No. 24046269
Timothy A. York
State Bar No. 24035719
Quilling Selander Lownds, Winslett & Moser, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas  75201
(214) 871-2100 – Telephone
 214) 871-2111 – Facsimile
mquilling@qslwm.com
llarue@qslwm.com
tyork@qslwm.com

ATTORNEYS FOR FROST BANK, N.A., AS DIP LENDER AND AGENT FOR THE PREPETITION LENDERS

FINAL DIP FINANCING ORDER

By: */s/ Ray Battaglia*_____

RAYMOND W. BATTAGLIA
Texas State Bar 01918055
THE LAW OFFICES OF RAY BATTAGLIA, PLLC
66 Granburg Circle
San Antonio, Texas 78218
T: (210) 601-9405
RBattaglialaw@outlook.com


ATTORNEYS FOR FPMC SAN ANTONIO REALTY PARTNERS, LP

FINAL DIP FINANCING ORDER



# SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT

Borrower:   FPMC Austin Realty Partners, LP   Lender:   Frost Bank
Address:   3030 Olive St., Suite 220   Address:  P.O. Box 1600
   Dallas, Texas 75219   San Antonio, Texas  78296

**THIS SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT** (this "Loan Agreement") is dated January ___, 2016 by and between Borrower and Lender. Lender is the Administrative Agent to the Pre-Petition Lenders and is hereinafter "Lender."

## ARTICLE I

### Definitions and Use of Terms

Section 1.01.  Certain Definitions.  As used herein, the following terms have the meanings indicated, unless the context otherwise requires:

"Advance" means a disbursement by Lender of any of the proceeds of a Loan.

"Affiliate" means any individual or entity directly or indirectly controlling, controlled by, or under common control with, another individual or entity.

"Applicable Bankruptcy Law" means the United States Bankruptcy Code or any other present or future insolvency, bankruptcy, liquidation, conservatorship, reorganization or moratorium Governmental Requirement or other similar Governmental Requirements.

"Bankruptcy Code" means the United States Bankruptcy Code, as in effect from time to time.

"Budget" means the cash flow budget on a receipts and disbursements basis satisfactory in form and substance to Lender prepared from time to time by the Borrower and approved by the Lender in its sole and absolute discretion. The initial Budget is attached hereto as Exhibit "A". Any requests by Borrower for funding beyond the initial Budget must be made in writing to the Lender with a new Budget. Lender has sole and absolute discretion to approve or reject any such request. Borrower is authorized to pay any approved line item in the Budget so long as the actual amount paid is no more than ten percent (10%) above the amount budgeted. The Budget shall include line item disbursements for the Case Professionals, with such limited amounts being subject to the approval of the Lender, in its sole and absolute discretion. So long as there are no Events of Default under this Agreement, budgeted amounts may be paid to Case Professionals, which amounts shall be held in trust until such time as fees and expenses are authorized and approved by the Bankruptcy Court.

"Business Day" means a day other than a Saturday, Sunday or a day on which commercial banks in the State of Texas are authorized to be closed, or are in fact closed.



FPMC Exhibit

A

"Case Professionals" means any and all of the professionals formally retained by the Debtor, as such professionals' employment is formally approved under a final order by the Bankruptcy Court pursuant to Sections 327 and 1103, as applicable, of the Bankruptcy Code.

"Carveout" means (a) allowed administrative expenses pursuant to 28 U.S.C. 1930(a)(6); and (b) allowed reasonable fees and expenses of the Case Professionals as provided in the Budget approved by Lender and incurred prior to the Termination Date, plus an amount up to $5,000 for such fees and expenses incurred after the Termination Date.

"Closing Date" means the later of the date of this Loan Agreement or the date of entry of the Interim Order.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated and rulings issued thereunder.

"Collateral" means any and all assets, Property and rights and interests in or to Property of Borrower, whether tangible or intangible, in which a Lien is granted or purported to be granted pursuant to the Loan Documents, including, without limitation, all of the following property and interests in property of Borrower, wherever located and whether now or hereafter existing or now owned or hereafter acquired or arising, and whether constituting pre-petition property or post-petition property: (i) all Receivables; (ii) all Inventory; (iii) all Equipment; (iv) all Contract Rights; (v) all General Intangibles; (vi) all Investment Property; (vii) each Deposit Account and all certificates of deposit maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit that is an instrument under the UCC; (viii) all goods and other property, whether or not delivered; (ix) all mortgages, deeds to secure debt and deeds of trust on real or personal property, guaranties, leases, security agreements, and other agreements and property which secure or relate to any Receivable or other Collateral, or are acquired for the purpose of securing and enforcing any item thereof; (x) all documents of title, policies and certificates of insurance, securities, chattel paper (including electronic chattel paper and tangible chattel paper) and other documents and instruments; (xi) all other goods and personal property, whether tangible or intangible, wherever located, including money, supporting obligations, letters of credit, and each letter-of-credit right; (xii) all files, correspondence, computer programs, tapes, discs and related data processing software which contain information identifying or pertaining to any of the Debtor's property; (xiii) any "commercial tort claims" as that term is defined in the UCC, as set forth in the Security Agreement executed by Borrower in favor of Lender; and (xiv) any and all products and proceeds of the foregoing (including, but not limited to, any claim to any item referred to in this definition, and any claim against any third party for loss of, damage to or destruction of any or all of, the Collateral or for proceeds payable under, or unearned premiums with respect to, policies of insurance) in whatever form, including, but not limited to, cash, negotiable instruments and other instruments for the payment of money, chattel paper, security agreements and other documents.

"Credit Commitment" is defined in Section 2.01(a).

"Credit Loans" is defined in Section 2.01(a).

"Credit Note" means a promissory note executed by Borrower and payable to the order of Lender, evidencing the Credit Loans made by Lender, as the same may be amended, restated, supplemented, modified, extended or increased from time to time.

2

"Deeds of Trust" means, collectively, mortgages, deeds to secure, deeds of trust, leasehold mortgages, leasehold deeds to secure, leasehold deeds of trust or other security documents or instruments of a similar nature which create a Lien or security interest from time to time in, to or covering the Property or any other property of Borrower to secure the Obligations, including any modifications, amendments, supplements, ratifications, and restatements thereto.

"Default" means any event or circumstance that constitutes an Event of Default or, that with, the lapse of time, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"DIP Orders" shall mean the Interim Order and the Final Order entered by the Bankruptcy Court or any other court of competent jurisdiction.

"Distributions" means all dividends and other distributions made by a Person to its equity holders.

"Environmental Laws" means any and all Federal, state, local, and foreign Governmental Requirements, judgments, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of health and the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Estate" means the bankruptcy estate of Borrower created pursuant to 11 U.S.C. § 541(a).

"Event of Default" has the meaning set forth in Article XIII.

"Final Order" shall mean the order entered after a final hearing under Bankruptcy Rule 4001(c)(2), pursuant to Section 364(c) and (d) of the Bankruptcy Code, as to which no stay pending appeal has been entered, and no motion to reconsider filed, and which has not been vacated, modified or reversed, (i) authorizing the Borrower to incur post-petition secured indebtedness and to grant Liens in accordance with this Loan Agreement and the other Loan Documents, (ii) providing for the super-priority of the Obligations, including without limitation, a specific grant of a security interest to Lender in all Collateral, as well as the right to the proceeds from all Collateral in accordance with this Loan Agreement and the other Loan Documents, (iii) providing "adequate protection" pursuant to Section 364(d) of the Bankruptcy Code to such creditors whose liens have been primed, and (iv) authorizing the payment by the Borrower of all fees and expenses contemplated by this Loan Agreement and the other Loan Documents, and in all respects to be satisfactory to Lender.

"Financial Statements" means financial information of Borrower, as required herein and as, at the time in question, have been most recently furnished to Lender.

"GAAP" means generally accepted accounting principles in the United States set forth in the statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"<u>Governmental Authority</u>" means the United States, the state, the county, the city or any other political subdivision in which the Property is located, and any court or political subdivision, agency, or instrumentality having jurisdiction over Borrower or the Property, domestic or foreign.

"<u>Governmental Requirements</u>" means all constitutions, statutes, laws, ordinances, rules, regulations, orders, writs, injunctions or decrees of any Governmental Authority applicable to Borrower or the Property.

"<u>Hazardous Materials</u>" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"<u>Improvements</u>" means any and all buildings, covered garages, air conditioning towers, open parking areas, structures and other improvements of any kind or nature, and any and all additions, alterations, betterments or appurtenances thereto, now or at any time hereafter situated, placed or constructed upon the Land or any part thereof.

"<u>Indebtedness</u>" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:  (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; and (b) indebtedness (excluding prepaid interest thereon) secured by a Lien on Property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness will have been assumed by such Person or is limited in recourse.  For all purposes hereof, the Indebtedness of any Person will include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"<u>Information</u>" means all information received from Borrower, other than any such information that is available to Lender on a nonconfidential basis prior to disclosure by Borrower, provided that, in the case of information received from Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential.

"<u>IRS</u>" means the United States Internal Revenue Service.

"<u>Interim Order</u>" shall mean the order entered pursuant to Section 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), as to which no stay pending appeal, has been entered, and which Interim Order has not been vacated, modified or reversed, (i) authorizing the Borrower to incur post-petition secured indebtedness and to grant Liens in accordance with this Loan Agreement and the other Loan Documents, (ii) providing for the super-priority of the Obligations, including without limitation, a specific grant of a security interest to Lender in all Collateral, as well as the right to the proceeds from all Collateral in accordance with this Loan Agreement and the other Loan Documents, and (iii) authorizing the payment by the Borrower of all fees and expenses contemplated by this Loan Agreement and the other Loan Documents, each on an interim basis and as set forth in such order, and in all respects to be satisfactory to Lender.

"Land" means the real estate described in Schedule 1.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loans" are defined in Section 2.01, each individually a "Loan."

"Loan Documents" means this Loan Agreement, the Notes, the court orders approving the Debtor-in-Possession financing, and such other documents, instruments and agreements, evidencing, securing or pertaining to the Obligations as will from time to time be executed and delivered to Lender by Borrower or any other party pursuant to this Loan Agreement, and any future amendments, restatements, modifications, ratifications, confirmations, extensions or supplements hereto or thereto including those documents ratified herein.

"Managerial Official" means, with respect to any Person, an officer or a governing Person of such Person.

"Material Adverse Change" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, prospects, properties, assets, liabilities (actual or contingent), condition (financial or otherwise) of Borrower; (b) a material impairment of the ability of the Borrower to perform its obligations under any Loan Document to which it is a party; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against Borrower of any Loan Document to which it is a party or the rights of Lender under any Loan Document; or (d) a material restatement or revision of a previously submitted financial statement pursuant to an audit.

"Notes" means, collectively, the Credit Note and any renewals, extensions, modifications, refinancings, consolidations and substitutions thereof.

"Obligated Party" means any party other than Borrower who secures, guarantees and/or is otherwise obligated to pay all or any portion of the Obligations.

"Obligations" mean all present and future Indebtedness, obligations and liabilities of Borrower to Lender arising pursuant to the Loans, this Loan Agreement or any of the other Loan Documents or otherwise, and any renewals, extensions, increases, or amendments thereof, or any part thereof, regardless of whether such Indebtedness, obligations and liabilities are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several or joint and several and including interest and fees that accrue after the commencement by or against Borrower of any proceeding under any Applicable Bankruptcy Law naming Borrower as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"Patriot Act" is defined in Section 5.05.

"Person" means any individual, firm, corporation, association, partnership, joint venture, trust, entity, unincorporated organization or Governmental Authority.

"Petition Date" means the date that Borrower commences a case under the Bankruptcy Code.

"Post-Petition" means any event, matter or item that arose on or after the Petition Date.

"Pre-Petition" means any event, matter or item that arose prior to the Petition Date.

"Pre-Petition Debt" shall mean all indebtedness, liabilities, and obligations in connection with the Pre-Petition Loan Agreement and the Pre-Petition Loan Documents owed by the Borrower to Lender as of the Petition Date, whether direct or indirect, absolute or contingent, primary or secondary, due or to be come due, including all interest thereon accruing after the Petition Date and all reasonable legal fees and collection expenses heretofore incurred by Lender in collecting any of such indebtedness, liabilities or obligations, as reduced by payments applied thereto after the Petition Date.

"Pre-Petition Lenders" means Frost Bank, Amarillo National Bank and Whitney Bank.

"Pre-Petition Liens" means the Liens against the property of Borrower described in the Pre-Petition Loan Agreement and the Pre-Petition Loan Documents granted to Lender by Borrower in each case as security for the payment and performance of the Borrower's obligations under or in connection with the Pre-Petition Loan Agreement and the Pre-Petition Loan Documents, and Pre-Petition Debt.

"Pre-Petition Loan Agreement" means that certain Construction Loan Agreement executed by and between Borrower and Lender, dated December 20, 2013, as amended.

"Pre-Petition Loan Documents" shall mean the Pre-Petition Loan Agreement and all other "Loan Documents" as such term is defined and used in the Pre-Petition Loan Agreement, but which term shall not include those documents included in the term "Loan Documents" as defined herein.

"Property" means the Land, the Improvements and all other property, whether real or personal, tangible or intangible, including the Collateral.

"Reorganization Plan" shall mean a plan of reorganization proposed by Borrower or any other Person in the Bankruptcy Case.

"Security Agreements" means, collectively, (a) those Security Agreements executed by the Borrower in connection with the Pre-Petition Loan Documents, as ratified herein; and (b) any security agreement executed by any Person in connection with this Loan Agreement, as each may be amended, modified, ratified, supplemented, restated or replaced from time to time.

"Subordinated Debt" means any Indebtedness owing by Borrower which has been subordinated by written agreement to all Indebtedness now or hereafter owing by Borrower to Lender, such agreement to be in form and substance satisfactory to Lender.

"Termination Date" means the earlier of (i) an Event of Default hereunder; (ii) June 30, 2016; or (iii) the date of Lender's receipt of a payoff of all outstanding indebtedness owed to it by Borrower.

"UCC" means the Uniform Commercial Code of the State of Texas or of any other state having jurisdiction with respect to any of the rights and remedies of Lender under the Loan Documents, as amended.

Headings.  The headings, captions, and arrangements used in any of the Loan Documents are, unless specified otherwise, for convenience only and will not be deemed to limit, amplify, or modify the terms of the Loan Documents nor to affect the meaning thereof.

Section 1.02.  Number and Gender of Words.  Whenever herein the singular number is used, the same will include the plural where appropriate, and words of any gender will include each other gender where appropriate.

Section 1.03.  Money.  Unless stipulated otherwise, all references herein or in any of the Loan Documents to "Dollars," "money," "payments," or other similar financial or monetary terms are references to currency of the United States of America.

Section 1.04.  Articles, Sections and Exhibits.  All references herein to Articles and Sections are, unless specified otherwise, references to articles and sections of this Loan Agreement.  All references herein to an "Exhibit," "Annex" or "Schedule" are references to exhibits, annexes or schedules attached hereto, all of which are made a part hereof for all purposes, the same as if set forth herein verbatim, it being understood that if any exhibit, annex or schedule attached hereto, which is to be executed and delivered, contains blanks, the same will be completed correctly and in accordance with the terms and provisions contained and as contemplated herein prior to or at the time of the execution and delivery thereof.  The words "herein," "hereof," "hereunder" and other similar compounds of the word "here" when used in this Loan Agreement will refer to the entire Loan Agreement and not to any particular provision or section.

Section 1.05.  Accounting Terms.  Unless otherwise specified, all accounting and financial terms and covenants set forth above and in Article VIII are to be determined according to GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either Borrower or Lender will so request, Lender and Borrower will negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Lender), provided that, until so amended, (a) such ratio or requirement will continue to be computed in accordance with GAAP prior to such change therein and (b) Borrower will provide to Lender financial statements and other documents required under this Loan Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

## ARTICLE II

## Loans

Section 2.01.   Loans.  Subject to the terms and conditions set forth in this Loan Agreement and the other Loan Documents, Lender hereby agrees to provide to Borrower the following credit facilities:

(a)     Credit Loans.  Lender agrees to lend to Borrower, on an advancing basis from time to time during the period commencing on the Closing Date and continuing through the Termination Date, such amounts as Borrower may request hereunder (the "Credit Loans"); provided, however, the total principal amount outstanding at any time will not exceed $1,700,000.00 (the "Credit Commitment"); and provided, further, that the initial advance shall not exceed $950,000.00 (the "Initial Advance").  Funds from the Initial Advance shall be used to pay (i) on or before January 31, 2016, the 2015 ad valorem taxes in full due on the real estate and provide Lender proof of payment within five (5) business days; and (ii) the outstanding post-petition utility bills, utility deposits and reasonable and necessary expenses to secure and maintain the Property which are required during the period provided for in the Interim Order and approved in writing by the Lender.

All Credit Loans will be collectively called the "Loans."   Lender reserves the right to require Borrower to give Lender not less than one Business Day prior notice of each requested Advance specifying (1) the aggregate amount of such requested Advance along with specific line item detail, (2) the requested date of such Advance, and (3) the purpose for such Advance, with such Advances to be requested in a form satisfactory to Lender.

Section 2.02.   Promissory Notes.  The Loans will be evidenced by one or more Notes. Interest on the Notes will accrue at the rate set forth therein.  The principal of and interest on the Notes will be due and payable in accordance with the terms and conditions set forth in the Notes and in this Loan Agreement.

Section 2.03.   Priority of All Advances and Loans.   All advances and loans made hereunder by Lender to Borrower shall constitute and be deemed a cost and expense of administration in the Bankruptcy Case and shall be entitled to priority under Section 364(c)(1), Section 364(c)(2), Section 364(c)(3),  and Section 364(d) of the Bankruptcy Code ahead of all other costs and expenses of administration of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code, except as may be otherwise provided in the DIP Orders.

Section 2.04.   Prohibition Against Surcharge.  Except as expressly provided in the DIP Orders, no expenses, costs or charges shall be charged against the Collateral or Lender under Section 506(c) of the Bankruptcy Code and Borrower hereby waives any rights it has to seek such charges under Section 506(c) of the Bankruptcy Code.

Section 2.05.   Credit Bid.  Borrower hereby acknowledges and agrees that Lender has the absolute right to credit bid any and/or all the Obligations at any sale of all or any portion of the Collateral and/or any other asset of the Borrower.  Borrower agrees not to object or otherwise dispute any credit bid of Lender and further agrees to support and assert Lender's right to credit bid.

8

ARTICLE III

Pre-Petition Debt and Liens.

Section 3.01.  Pre-Petition Debt.  Borrower hereby represents, acknowledges and agrees that as of the Petition Date, the total principal owed to Lender is: (i) $57,577,110.52 in addition to (ii) Pre-Petition Interest and fees and expenses in the amount of $524,101.90.  Borrower further represents, acknowledges, and agrees that it owes to Lender additional outstanding interest as it continues to accrue at the default interest rate and all fees and costs incurred by Lender including any out-of-pocket fees and expenses of counsel or other professionals retained by or on behalf of Lender in connection with its efforts to collect the amounts owed by Borrower.

Section 3.02.  Pre-Petition Liens.  Borrower represents, acknowledges and agrees that the Lender's Pre-Petition Liens represent valid and perfected first priority liens upon and security interests in all of the Borrower's property to the extent and amount of the indebtedness (as such continues to accrue).

ARTICLE IV

Conditions Precedent

Section 4.01.  Initial Extension of Credit.  The obligation of Lender to make the initial Advance is subject to the condition precedent that Lender will have received on or before the day of such Advance, each dated (unless otherwise indicated) the Closing Date, in form and substance satisfactory to Lender and the following conditions shall have occurred:

(a)     the Interim Order, in form and substance satisfactory to Lender, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, appealed stayed or subject to any motion to reconsider in any respect;

(b)     the representations and warranties contained in this Agreement and in each of the other Loan Documents shall be true on and as of the date of the signing of this Agreement and on the date of each extension of credit or the making of any Loans pursuant to this Agreement, with the same effect as though such representations and warranties had been made on and as of each such date, and on each such date, no Event of Default, and no condition, event or act which with the giving of notice or the passage of time or both would constitute an Event of Default, shall have occurred and be continuing or shall exist;

(c)     there shall be no Material Adverse Change, as determined by Lender in its discretion, in the financial condition or business of Borrower nor any material decline, as determined by Lender in its discretion, in the market value of any Collateral or a substantial or material portion of the assets of Borrower, and no change or event shall have occurred which would impair the ability of the Borrower to perform its obligations hereunder or under any of the other Loan Documents to which it is a party or of Lender to enforce the Obligations or realize upon the Collateral, other than the filing of the Bankruptcy Case and the financial history described in the motion to approve the DIP orders;

(d)     Lender shall have received the Budget;

(e)     Lender shall have received this Loan Agreement and all other Loan Documents and all instruments and documents to be delivered hereunder and thereunder by the date hereof, each of which shall have been duly executed by all respective parties thereto and each of which shall be in full force and effect and in form and substance satisfactory to Lender;

(f)     Lender shall have received copies of the insurance policies on the Property naming Lender as an additional insured and a loss payee;

(g)     Lender shall have received copies of the amended partnership agreements; and,

(h)     Lender will have received such additional approvals, opinions, instruments or documents as Lender or its legal counsel may request.

Section 4.02.  <u>Conditions to Extension of Credit</u>.  Notwithstanding any other provision of this Agreement or any of the other Loan Documents and without affecting in any manner the rights of Lender under other Sections of this Agreement, it is understood and agreed that any obligation of Lender making the Loans is subject to the satisfaction of all of the following conditions:

(a)     The Final Order, in form and substance satisfactory to Lender, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, appealed stayed or subject to any motion to reconsider in any respect;

(b)     The representations and warranties contained in this Loan Agreement and in each of the other Loan Documents shall be true on and as of the date of the signing of this Loan Agreement and on the date of each extension of credit or the making of any Advances pursuant to this Loan Agreement, with the same effect as though such representations and warranties had been made on and as of each such date, and on each such date, no Event of Default, and no condition, event or act which with the giving of notice or the passage of time or both would constitute an Event of Default, shall have occurred and be continuing or shall exist;

(c)     There shall be no material adverse change, as determined by Lender in its discretion, in the financial condition or business of Borrower, nor any material decline, as determined by Lender in its discretion, in the market value of any Collateral or a substantial or material portion of the assets of Borrower, and no change or event shall have occurred which would impair the ability of the Borrower to perform its obligations hereunder or under any of the other Loan Documents to which it is a party or of Lender to enforce the Obligations or realize upon the Collateral, other than the occurrence of the Petition Date and the financial history described in the motion to approve the DIP Orders;

(d)     Lender shall have received a request for an advance pursuant to Section 2.01 hereof;

(e)     Each advance shall be for the purpose of funding the items set forth on the Budget to the extent authorized by the DIP Orders; and/or

(f)     the amount of the Obligations after giving effect to the requested Loan shall not exceed the Credit Commitment.

Each request for Advance hereunder submitted by Borrower will be deemed to be a representation and warranty that the conditions specified in Sections 4.02(b) and (c) have been satisfied on and as of the date of the applicable Advance.

ARTICLE V

Representations and Warranties

Borrower hereby represents and warrants, and upon each request for an Advance or the issuance of a Letter of Credit further represents and warrants, to Lender as follows:

Section 5.01.  Binding Obligations.  The execution, delivery, and performance of this Loan Agreement and all of the other Loan Documents by Borrower have been duly authorized by all necessary action by Borrower and constitute legal, valid and binding obligations of Borrower enforceable in accordance with their respective terms, except as enforcement of remedies may be limited by Applicable Bankruptcy Law.

Section 5.02.  Insurance.  Borrower and the Properties of Borrower are insured with financially sound and reputable insurance companies not Affiliates of Borrower in such amounts, with such deductibles and covering such risks required by Lender and in the absence of such requirements, as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where Borrower operates.

Section 5.03.  Disclosure.  Borrower has disclosed to Lender all agreements, documents, instruments and organizational documents or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of Borrower to Lender in connection with the transactions contemplated hereby and the negotiation of this Loan Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 5.04.  Intellectual Property.  Borrower owns, or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses, slogans, other advertising products and processes, and other intellectual property rights that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person.  To the best knowledge of Borrower, no slogan or other advertising product, process or other material now used by Borrower infringes upon any rights held by any other Person.

Section 5.05.  Patriot Act.  All capitalized words and phrases and all defined terms used in the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) (the "Patriot Act") and in other statutes and all orders, rules and regulations of the United States government and its various executive department, agencies and offices related to the subject matter of the Patriot Act, including, but not limited to, Executive Order 13224 effective September 24, 2001, are hereinafter collectively referred to as the "Patriot Rules" and are incorporated into this section of the Loan

11

Agreement.  Borrower represents and warrants to Lender that neither it nor any of its principals, shareholders, members, partners, or Affiliates, as applicable, is a Person named as a Specially Designated National and Blocked Person (as defined in Presidential Executive Order 13224) and that it is not acting, directly or indirectly, for or on behalf of any such Person.  Borrower further represents and warrants to Lender that Borrower and its principals, shareholders, members, partners, or Affiliates, as applicable, are not, directly or indirectly, engaged in, nor facilitating, the transactions contemplated by this Loan Agreement on behalf of any Person named as a Specially Designated National and Blocked Person.  Borrower hereby agrees to defend, indemnify and hold harmless Lender from and against any and all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing representations and warranties.

ARTICLE VI

Affirmative Covenants

Until (i) all Obligations are fully paid and satisfied, and (ii) the Credit Commitment has been terminated, Borrower agrees and covenants that it will:

Section 6.01.  Furnish to Lender:

(a)    Payables Aging.  An accounts payable aging report signed by a Managerial Official of Borrower within ten (10) days after the end of each calendar month, in form and detail satisfactory to Lender.

(b)    Tax Returns.  Copies of Borrower's income tax returns (federal and state, if any) within 30 days after the applicable filing date for the tax reporting period thereof, prepared by a tax professional satisfactory to Lender.

Section 6.02.  Notices.  Promptly notify Lender:

(a)    of the occurrence of any Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Change, including (i) breach or non-performance of, or any default under, a contractual obligation of Borrower; (ii) any dispute, litigation, investigation, proceeding or suspension between Borrower and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting Borrower;

(c)    of a change in name of Borrower or a change in the location of Borrower, or any Collateral, in each case, within 30 days prior to such change; and

(d)    of any material change in accounting policies or financial reporting practices by Borrower.

Each notice pursuant to this Section will be accompanied by a statement of a Managerial Official of Borrower setting forth details of the occurrence referred to therein and stating what action Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to this

Section will describe with particularity any and all provisions of this Loan Agreement and any other Loan Document that have been breached or affected thereby.

Section 6.03.  <u>Accounts and Records</u>.  Maintain its books and records in accordance with GAAP.

Section 6.04.  <u>Preservation of Existence, Etc.</u>  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Governmental Requirements of the jurisdiction of its organization and each state in which it is qualified to do business; and (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Change.

Section 6.05.  <u>Maintenance of Properties</u>.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Change; (c) use the standard of care typical in the industry in the operation and maintenance of its facilities; and (d) preserve or renew all of its registered patents, trademarks, trade names and service marks (including licenses thereof), except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Change.

Section 6.06.  <u>Maintenance of Insurance</u>.  Maintain with financially sound and reputable insurance companies not Affiliates of Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, including but not limited to, commercial property insurance, all risks property damage, commercial general liability, worker's compensation, business interruption and other insurance, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and providing for not less than 30 days' prior notice to Lender of termination, lapse or cancellation of such insurance.  Each insurance policy will name Lender as "additional insured" and "mortgagee," as applicable.

Section 6.07.  <u>Right of Inspection</u>.   Permit Lender to (a) visit its properties and installations, (b) examine, audit and make and take away copies or reproductions of its books and records, and (c) discuss with its respective directors, partners, principal officers, consultants, and independent auditors its respective businesses, assets, liabilities, financial positions, results of operations, and business prospects, at all reasonable times.  Borrower shall be responsible for the reasonable costs and expenses associated with such inspection.  To the extent Borrower maintains any records, including computer generated records and software programs for the generation of such records in the possession of a third party, Borrower will, to the extent such records constitute Collateral, (i) notify such third party of Lender's Lien in such records, (ii) cause such party to grant access to Lender to such records and (iii) provide Lender with copies of any records Lender may request, all at Borrower's sole cost and expense.

Section 6.08.  <u>Right to Additional Information</u>.  Furnish Lender with such additional information and statements, lists of assets and liabilities, statements of contingent liabilities, tax returns, and other reports and certificates with respect to Borrower's financial condition, business operations and compliance with the terms of the Loan Documents as Lender may request from time to time.

Section 6.09.   Compliance with Governmental Requirements.   Conduct its business in an orderly and efficient manner consistent with good business practices, and perform and comply with all Governmental Requirements applicable to Borrower and its business, operations and Property (including without limitation, all applicable Environmental Laws).

Section 6.10.   Use of Proceeds.   Borrower shall use the proceeds of all Credit Loans, and all other loans or accommodations made by Lender for Borrower for only those purposes described on the Budget without permitted variance, and not for any purpose prohibited by law or by the terms and conditions of this Loan Agreement or any of the Loan Documents or of the DIP Orders; and expressly excluding the investigation or prosecution of any claim and/or cause of action against Lender, including but not limited to any and/or all claims and causes of action arising under Sections 542, 544, 547, 548, 549 and/or 550 of the Bankruptcy Code; under a theory of equitable subordination or recharacterization; or that challenges Lender's Pre-Petition Liens, the Security Interest, the Pre-Petition Debt or the Obligations.   Borrower shall use the proceeds of the subsequent advance after entry of the Final Order to satisfy the Pre-Petition Debt.

Section 6.11.   Compliance with the DIP Orders.   Borrower shall, at all times, comply with all terms, conditions and provisions of the DIP Orders.

Section 6.12.   Notice of Indebtedness.   Promptly inform Lender of the creation, incurrence or assumption by Borrower of any actual or contingent liabilities not permitted under this Loan Agreement or any other Loan Document.

Section 6.13.   Additional Documents.   Execute and deliver, or cause to be executed and delivered, to Lender, from time to time as required by Lender, any and all other agreements, instruments and documents which Lender may reasonably request in order to provide the rights and remedies to Lender granted or provided for by the Loan Documents or give effect to the transactions contemplated under this Loan Agreement and the other Loan Documents.

Section 6.14.   Lender as Principal Depository.   Maintain with Lender primary deposit accounts, including business, cash management, operations and administrative deposit accounts.

ARTICLE VII

Negative Covenants

Until (i) all Obligations are fully paid and satisfied, and (ii) the Credit Commitment has been terminated in full, Borrower will not directly or indirectly:

Section 7.01.   Consent to Amendment of DIP Orders.   Borrower shall not seek to amend, supplement or modify any of the terms of the Interim Order or the Final Order.

Section 7.02.   Other Court Filings and Applications.   Borrower shall not apply to the Bankruptcy Court for authority to use "cash collateral" or to take any action that is prohibited by the terms of any of the Loan Documents or otherwise refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or permit any debt or claim to be pari passu with or senior to any of the Obligations, except as provided by this Agreement or the DIP Orders or as otherwise consented to by Lender.

ARTICLE VIII

Events of Default

Section 8.01.  Events of Default.  Each of the following will constitute an "Event of Default" under this Loan Agreement:

(a)     the bringing of a motion by Borrower to obtain additional financing from a party other than Lender under Section 364 of the Bankruptcy Code unless the proceeds from such financing are used to immediately repay in cash all Obligations under this Loan Agreement or to use "cash collateral" of Lender under Section 363(c) of the Bankruptcy Code in a manner and to the extent not otherwise consented to by Lender;

(b)     a trustee appointed or a responsible officer or an examiner with expanded powers appointed (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code and the order appointing such trustee, responsible officer, or examiner shall not have been stayed, reversed or vacated within thirty (30) days after the entry thereof; Borrower shall seek confirmation by the Bankruptcy Court of or the Bankruptcy Court shall confirm any Reorganization Plan that proposes to treat the Obligations in any manner other than payment-in-full on the date of confirmation, other than a Reorganization Plan proposed or accepted in writing by Lender, Borrower shall file any motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, any DIP Order or, without Lender's prior written consent; the Bankruptcy Court shall grant super-priority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code to any Person other than to Lender; or Borrower shall challenge the validity, extent, priority or enforceability of any of the Pre-Petition Loan Documents or Pre-Petition Debt;

(c)     the dismissal of the Borrower's bankruptcy case, or the conversion of the Borrower's bankruptcy case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(d)     the entry of an Order by the Bankruptcy Court granting relief from or modifying the Automatic Stay (i) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (ii) with respect to any Lien of or to permit the granting of any Lien on any Collateral to any State or local environmental or regulatory agency or authority;

(e)     the commencement of a suit or action against Lender that asserts, by or on behalf of Borrower, the Environmental Protection Agency, any state environmental protection or health and safety agency or any official committee, any creditor, or any other party-in-interest in the Borrower's bankruptcy case, any claim or legal or equitable remedy which seeks the avoidance or subordination of the Obligations, the Security Interest, the Pre-Petition Debt and/or the Lender's Pre-Petition Lien;

(f)     the material and adverse modification of any DIP Order authorizing Borrower to execute this Loan Agreement and the other Loan Documents;

15

(g)     if Borrower makes any payment on account of debt or claim, or on account of any interest, principal, premium or otherwise, except (i) as expressly permitted by this Loan Agreement or by the DIP Orders, or (ii) as set forth in the Budget;

(h)     any covenant, agreement or obligation of Borrower contained in or evidenced by any of the Loan Documents shall cease to be enforceable or shall be determined by a court of competent jurisdiction to be unenforceable in accordance with its terms or the Borrower shall file a pleading with the Bankruptcy Court asserting the same; the Borrower shall deny or disaffirm their obligations under any of the Loan Documents or Security Interest granted in connection therewith or ratified or reaffirmed thereby; or any Security Interest in any of the Collateral granted under the Loan Documents shall be determined by a court of competent jurisdiction to be voidable, invalid or unperfected, or subordinated or not given the priority contemplated by this Loan Agreement;

(i)     Borrower fails to file, by April 30, 2016 (unless Lender provides prior written consent otherwise), a motion, in form and substance acceptable to Lender, for authority to sell all or substantially all of its assets to the highest bidder (or to a stalking horse bidder subject to higher and better offers), which motion shall acknowledge Lender's right to credit bid;

(j)     Borrower fails to consummate a sale of all or substantially all of its assets to the highest bidder after auction, with the Security Interest attaching to the proceeds thereof, by June 30, 2016 unless Lender provides prior written consent otherwise;

(k)     Borrower exceeds, for any given period, the disbursements set forth in the Budget by more than ten percent (10%), whether collectively or for any given line item without the prior written consent of Lender;

(l)     the failure of Borrower, to timely and properly observe, keep or perform any covenant, agreement or condition required in Sections 6.01 and 6.02 and Article VII;

(m)     the failure of Borrower to timely and properly observe, keep or perform any covenant, agreement or condition required herein or in any of the other Loan Documents;

(n)     any representation or warranty contained herein, in any of the other Loan Documents or in any other document ever delivered or furnished by Borrower to Lender in connection with the Obligations is or proves to have been false, misleading, erroneous or breached in any material respect; or

(o)     the occurrence of a Material Adverse Change.

Nothing contained in this Loan Agreement will be construed to limit the events of default enumerated in any of the other Loan Documents and all such events of default will be cumulative.

Section 8.02.  Remedies.  Upon the occurrence of any Event of Default, (a) the entire unpaid balance of principal of the Notes, together with all accrued but unpaid interest thereon, and all other Indebtedness owing to Lender by Borrower at such time will, at the option of Lender, become immediately due and payable without further notice, demand, presentation, notice of dishonor, notice of intent to accelerate, notice of acceleration, protest or notice of protest of any

kind, all of which are expressly waived by Borrower; (b) Lender may, at its option, cease further Advances under any of the Notes; (c) Lender may, at its option, reduce any claim to judgment; (d) the automatic stay provisions of Section 362 of the Bankruptcy Code shall be modified and vacated to the extent necessary to enforce remedies against the Collateral securing this Loan, without having to obtain any further order of the Bankruptcy Court. Borrower agrees to lift the automatic stay to permit Lender to exercise self-help without further order upon the earlier of (i) an Event of Default hereunder; (ii) June 30, 2016; or (iii) the date of Lender's receipt of a payoff of all outstanding indebtedness owed to it by Borrower; and (e) exercise any and all rights and remedies afforded by any of the Loan Documents, or by law or equity or otherwise, as Lender will deem appropriate. All rights and remedies of Lender set forth in this Loan Agreement and in any of the other Loan Documents may be exercised by Lender at its option and in its sole discretion, upon the occurrence of an Event of Default. Borrower may not seek to enjoin Lender in pursuit of its rights or remedies.

Section 8.03. <u>Right of Setoff</u>. If an Event of Default shall have occurred and be continuing, Lender or its Affiliates is hereby authorized at any time and from time to time, to the fullest extent not prohibited by applicable Governmental Requirements, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Lender or any such Affiliate to or for the credit or the account of Borrower against any and all of the Obligations now or hereafter existing under this Loan Agreement or any other Loan Document, irrespective of whether or not Lender shall have made any demand under this Loan Agreement or any other Loan Document and although the Obligations may be contingent or unmatured or are owed to a branch or office of Lender different from the branch or office holding such deposit or obligated on such Indebtedness. The rights of Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that Lender or its Affiliates may have.

Section 8.04. <u>Rights Cumulative; Election of Remedies</u>. All rights and remedies of Lender under the terms of this Loan Agreement will be cumulative of, and in addition to, the rights and remedies of Lender under any and all other agreements between Borrower and Lender (including, but not limited to, the other Loan Documents), and not in substitution or diminution of any rights and remedies now or hereafter held by Lender under the terms of any other agreement. Such rights and remedies may be pursued separately, successively or concurrently against Borrower or any Property covered under the Loan Documents at the sole discretion of Lender. The exercise or failure to exercise any of the same will not constitute a waiver or release thereof or of any other Right, and the same will be nonexclusive.

Section 8.05. <u>Waiver of Deficiency Statute</u>. In the event an interest in any of the Collateral is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, Borrower agrees, notwithstanding the provisions of Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent not prohibited by Governmental Requirements, that Lender shall be entitled to seek a deficiency judgment from Borrower equal to the difference between the Obligations and the amount for which the Collateral was sold pursuant to judicial or nonjudicial foreclosure sale. Borrower acknowledges and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Collateral for purposes of calculating deficiencies owed by Borrower and others against whom recovery of a deficiency is sought.

## ARTICLE IX

## Miscellaneous

Section 9.01.  Waiver and Agreement.  Neither the failure nor any delay on the part of Lender to exercise any right, remedy, power or privilege herein or under any of the other Loan Documents will operate as a waiver thereof, nor will any single or partial exercise of such right, remedy, power or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  No waiver of any provision in this Loan Agreement or in any of the other Loan Documents will be effective unless the same will be in writing and signed by Lender, and then will be effective only in the specific instance and for the purpose for which given and to the extent specified in such writing.  No modification or amendment to this Loan Agreement or to any of the other Loan Documents will be valid or effective unless the same is signed by the party against whom it is sought to be enforced.

Section 9.02.  Benefits.  This Loan Agreement will be binding upon and inure to the benefit of Lender and Borrower, and their respective successors and assigns, provided, however, that Borrower may not, without the prior written consent of Lender, assign or encumber any interests, rights, remedies, powers, duties or obligations under this Loan Agreement or any of the other Loan Documents.

Section 9.03.  Notices.

(a)  All notices, requests, demands or other communications required or permitted to be given pursuant to this Loan Agreement shall be in writing and given by (i) personal delivery, (ii) expedited delivery service with proof of delivery, or (iii) United States mail, postage prepaid, registered or certified mail, return receipt requested, sent to the intended addressee at the address set forth on the first page hereof and will be deemed to have been received either, in the case of personal delivery, as of the time of personal delivery, in the case of expedited delivery service, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of mail, upon deposit in a depository receptacle under the care and custody of the United States Postal Service.  Either party will have the right to change its address for notice hereunder to any other location within the continental United States by notice to the other party of such new address at least 30 days prior to the effective date of such new address.

(b)  Borrower and Lender agree that no notices or other communications by electronic means between such parties or their representatives in connection with this Loan Agreement or any instrument executed in connection herewith shall constitute a transaction, agreement, contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions, unless otherwise specifically agreed to in writing.

Section 9.04.  Continuation and Survival.  All covenants, agreements, representations and warranties made in or pursuant to this Loan Agreement and the other Loan Documents will be deemed continuing and made at and as of the date of this Loan Agreement and at and as of all times thereafter.  All statements contained in any certificate, financial statement, legal opinion or other instrument delivered by or on behalf of Borrower pursuant to or in connection with any of

18

the Loan Documents will constitute additional representations and warranties made under this Loan Agreement.  All covenants, agreements, representations and warranties made in or pursuant to this Loan Agreement and the other Loan Documents will survive until payment in full of all sums owing and performance of all other obligations hereunder by Borrower to Lender and will not be waived by the execution and delivery of this Loan Agreement or any Advance, any investigation by Lender or any other event except a specific written waiver by Lender.

Section 9.05.  Controlling Agreement.  The parties hereto intend to conform strictly to the applicable usury Governmental Requirements.  In no event, whether by reason of demand for payment or acceleration of the maturity of the Obligations or otherwise, will the interest contracted for, charged or received by Lender hereunder or otherwise exceed the maximum amount permissible under applicable Governmental Requirements.  If, from any circumstance whatsoever, interest would otherwise be payable to Lender in excess of the maximum lawful amount, the interest payable to Lender will be reduced automatically to the maximum amount permitted under applicable Governmental Requirements.  If Lender will ever receive anything of value deemed interest under applicable Governmental Requirements which would apart from this provision be in excess of the maximum lawful amount, an amount equal to any amount which would have been excessive interest will be applied to the reduction of the principal amount owing on the Obligations in the inverse order of its maturity and not to the payment of interest, or if such amount which would have been excessive interest exceeds the unpaid principal balance of the Obligations, such excess will be refunded to Borrower.  The interest and any other amounts that would have been payable in respect of any portion of the Obligations or during any period but were not payable as a result of the operation of this Section shall be cumulated and the interest and other amounts on any other portion of the Obligations or periods shall be increased (but not above the maximum amount permitted under applicable Governmental Requirement) until such cumulated amount shall have been received by Lender.  All interest paid or agreed to be paid to Lender will, to the extent permitted by applicable Governmental Requirements, be amortized, prorated, allocated and spread throughout the full stated term (including  any renewal or extension) of such Indebtedness so that the amount of interest on account of such Indebtedness does not exceed the maximum permitted by applicable Governmental Requirements.  The provisions of this Section will control all existing and future agreements between Borrower and Lender.

Section 9.06.  No Third Party Beneficiary.  This Loan Agreement is for the sole benefit of Lender and Borrower and is not for the benefit of any third party.

Section 9.07.  Lender's Consent or Approval.  Except where otherwise expressly provided in the Loan Documents, in any instance where the approval, consent or the exercise of judgment of Lender is required, the granting or denial of such approval or consent and the exercise of such judgment will be (a) within the sole discretion of Lender; and (b) deemed to have been given only by a specific writing intended for the purpose and executed by Lender.  Each provision for consent, approval, inspection, review, or verification by Lender is for Lender's own purposes and benefit only.

Section 9.08.  Applicable Governmental Requirements.  This Loan Agreement and the other Loan Documents have been executed and delivered in the State of Texas, are performable in Bexar County, Texas, and will be governed by and construed in accordance with the Governmental Requirements of the State of Texas and the Governmental Requirements of the United States applicable to transactions within the State of Texas.  Except to the extent that the Governmental Requirements of the United States may apply to the terms hereof, the substantive Governmental

19

Requirements of the State of Texas shall govern the validity, construction, enforcement and interpretation of this Loan Agreement and the other Loan Documents. In the event of a dispute involving this Loan Agreement, any other Loan Document or any other instrument executed in connection herewith, Borrower irrevocably agrees that venue for such dispute shall lie in any court of competent jurisdiction in Bexar County, Texas. To the extent that Chapter 303 of the Texas Finance Code is applicable to any Loan, any Advance or any Loan Document, the "WEEKLY CEILING" specified in such article is the applicable ceiling; provided that, if any applicable Governmental Requirement permits greater interest, the Governmental Requirement permitting the greatest interest will apply.

Section 9.09. <u>DIP Orders Control</u>. This Agreement and the other Loan Documents are each subject to the terms and provisions contained in the DIP Orders to the same extent and effect as if the DIP Orders were fully set forth herein and therein; and in the event that any term or provision of this Agreement or any other Loan Document conflicts or is inconsistent with any term or provision of any DIP Order, the term and provision of the applicable DIP Order shall control and be given effect.

Section 9.10. <u>Time of Essence</u>. Time will be of the essence in this Loan Agreement.

Section 9.11. <u>Patriot Act Notice</u>. Lender hereby notifies Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Act.

Section 9.12. <u>Invalid Provisions</u>. If any provision of this Loan Agreement or any of the other Loan Documents is held to be illegal, invalid or unenforceable under present or future Governmental Requirements, such provision will be fully severable and the remaining provisions of this Loan Agreement or any of the other Loan Documents will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance.

Section 9.13. <u>Expenses of Lender</u>. Borrower shall be obligated to pay Lender: (a) all costs and expenses incurred by Lender in connection with the preparation, negotiation, execution and administration of this Loan Agreement and the other Loan Documents and any and all amendments, modifications, renewals, extensions, increases, and supplements thereof and thereto, including, without limitation, the fees and expenses of Lender's legal counsel and professionals; (b) all costs and expenses incurred by Lender in connection with the enforcement, workout or restructure of this Loan Agreement or any other Loan Document, including, without limitation, the fees and expenses of Lender's legal counsel and professionals; and (c) all other costs and expenses incurred by Lender in connection with this Loan Agreement or any other Loan Document, including, without limitation, all costs, expenses, taxes, assessments, filing fees, and other charges levied by a Governmental Authority or otherwise payable in respect of this Loan Agreement or any other Loan Document.

Section 9.14. <u>Participation of the Loans</u>. Borrower agrees that Lender may, at its option, sell interests in the Loans and its rights and remedies under this Loan Agreement to one or more financial institutions or other Person acceptable to Lender and, in connection with each such sale, Lender may disclose any financial and other information available to Lender concerning Borrower to each prospective purchaser.

Section 9.15.   Counterparts; Facsimile Documents and Signatures.  This Loan Agreement may be separately executed in any number of counterparts, each of which will be an original, but all of which, taken together, will be deemed to constitute one and the same instrument.  For purposes of negotiating and finalizing this Loan Agreement, if this document or any document executed in connection with it is transmitted by facsimile machine, electronic mail or other electronic transmission, it will be treated for all purposes as an original document.  Additionally, the signature of any party on this document transmitted by way of a facsimile machine or electronic mail will be considered for all purposes as an original signature.  Any such transmitted document will be considered to have the same binding legal effect as an original document.  At the request of any party, any faxed or electronically transmitted document will be re-executed by each signatory party in an original form.

Section 9.16.   Imaging of Documents.  Borrower understands and agrees that (a) Lender's document retention policy may involve the electronic imaging of executed Loan Documents and the destruction of the paper originals; and (b) Borrower waives any right that it may have to claim that the imaged copies of the Loan Documents are not originals.

Section 9.17.   No Oral Agreements.  The term "WRITTEN AGREEMENT" will include this Loan Agreement, together with each and every other document relating to and/or securing the Obligations, regardless of the date of execution.  **THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Section 9.18.   **WAIVER OF RIGHT TO TRIAL BY JURY.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE GOVERNMENTAL REQUIREMENT, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

Section 9.19.   Extension, Renewal and Additional Funds.  This Loan Agreement is given in extension and renewal of and to provide additional funds to Borrower and not in extinguishment or novation of the obligations of Borrower under the Pre-Petition Loan Agreement and the Pre-Petition Loan Documents, and any other loan documents by and between Borrower and Lender, as the same has been amended, restated or modified from time to time.  Each of the foregoing security instruments is hereby ratified and adopted as security instruments securing the Collateral for this Loan Agreement.

[Remainder of Page Intentionally Left Blank]

Executed as of the date first written above.

**<u>BORROWER</u>**:

FPMC Austin Realty Partners, L.P.

By: _____
Name: _____
Title: _____

**<u>LENDER</u>**:

FROST BANK,
a Texas state bank


By: _____
Name: _____
Title: _____

**Schedule 1**

**<u>Real Estate</u>**

The real property described as: Lot 1, Block "A", FOREST PARK MEDICAL CENTER, a subdivision in Williamson County, Texas, according to the map or plat thereof recorded in Document No. 2013109810, Official Public Records of Williamson County, Texas, improvements, and personal property described in and mortgaged in the Deed of Trust, including all rights and appurtenances thereto.



# EXHIBIT A

# BUDGET

4837-1855-8253, v. 1

# FPMC Austin Realty Partner, LP - Budget (Executed)

2/17/2016

neal richards group

| Expense Items | Dep./Pre-Pet. | Interim Funding Request for February | February | March | April | May | June | July |
|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 10,626 | (82,066) | (161,139) | (1,193,697) | (1,314,056) | (1,451,215) | (1,567,074) | (1,711,763) |
| **Operating Expense (Hospital & Garage)** | | | | | | | | |
| Meter - Electricity * | 34,500 | | 25,000 | 25,000 | 25,000 | 26,000 | 27,000 | 27,000 |
| Elec - Hospital | 700 | | 700 | 700 | 700 | 700 | 700 | 700 |
| Gas - Hospital | 15,315 | | 15,315 | 15,315 | 15,315 | 15,315 | 15,315 | 15,315 |
| AT&T - Data & Phone Lines | 1,526 | | 1,170 | 1,170 | 1,170 | 1,170 | 1,170 | 1,170 |
| COA Utilities - Water * | 5,930 | | 3,000 | 2,500 | 2,500 | 2,500 | 5,930 | 3,000 |
| **Operating Expense (MOB)** | | | | | | | | |
| Elec - MOB | 5,967 | | 6,000 | 6,000 | 5,800 | 5,500 | 5,400 | 5,300 |
| Gas - MOB * | 5,105 | | 5,105 | 5,105 | 5,105 | 5,105 | 5,105 | 5,105 |
| COA Utilities - Water * | 17,790 | | 9,000 | 7,500 | 7,500 | 7,500 | 12,000 | 9,000 |
| AT&T - Data & Phone Lines | 821 | | 630 | 630 | 630 | 630 | 630 | 630 |
| Club - Liability & MOB Prop. Insurance | 5,038 | | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 |
| **Operating Expense (Both Hospital & MOB)** | | | | | | | | |
| Misc Repair and Maintenance* | | | 4,000 | 3,000 | 3,000 | 2,000 | 1,000 | 1,000 |
| Commercial Protection Systems | | 4,911 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Fire Protection (Fire Alarm Monitoring) | | 150 | 150 | 150 | 150 | 150 | 150 | 150 |
| Clean Scapes - Landscaping* | | | 14,183 | 4,053 | 4,053 | 4,053 | 4,053 | 4,053 |
| GN Eco. Solutions* | | | 272 | 136 | 136 | 136 | 136 | 136 |
| Cont - Prop. Insurance | | 61,012 | | | | | | |
| Cleaning & Janitorial* | | 13,000 | 15,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 |
| Environmental Punch List* | | | 1,000 | 4,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Service - Frost | | | 867,083 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Asset Management* | | | 12,000 | | | | | |
| Ad Valorem Taxes * | | | | | 6,500 | | 4,875 | |
| UST Trustee | | | 20,000 | 13,500 | | | 15,125 | |
| Legal Expenses* | | | | | | | | |
| **Total Operating (Weekly)** | 92,692 | | | | | | | |
| **Weekly Cash Balance** | 92,692 | 79,073 | 1,032,558 | 120,359 | 137,159 | 115,859 | 144,689 | 118,659 |
| Monthly Comp. (Budget vs Actual) | | 79,073 | 1,032,287 | 120,359 | 137,159 | 115,859 | 144,689 | 118,659 |
| | | (161,138) | (1,193,697) | (1,314,056) | (1,451,215) | (1,567,074) | (1,711,763) | (1,830,422) |

## Receipts

| Date | Notes | Amount |
|---|---|---|
| 1/6/2016 | Beginning Cash - 1/16 | 10,625.52 |
| **Total Receipts** | | 10,625.52 |

### Budget vs Actual - Total

| Budgeted | Actual | Delta |
|---|---|---|
| 1,748,356.00 | 261.22 | 1,748,094.78 |

### Receipts vs Distributions

| Receipts | Receipts | Delta |
|---|---|---|
| 10,625.52 | 261.22 | 10,364.30 |

This line will reflect cash activity from month to month and can be removed upon Bank's req...

Interim Funding Request is: 110,000

Highlighted amounts to be paid immediately upon receipt of interim 93,125

Subject to final order approving DIP Financing

FPMC Exhibit B
exhibitsticker.com