*CONFIDENTIAL*
*FOR DISCUSSION PURPOSES ONLY*
*NOT AN OFFER (ANY AGREEMENT SUBJECT TO DEFINITIVE*
*WRITTEN DOCUMENTATION SIGNED BY THE PARTIES*
*KREAGER MITCHELL DRAFT 4/25/16*

**PURCHASE AND SALE AGREEMENT**

between

**FPMC AUSTIN REALTY PARTNERS, LP**

and

[_____]

dated as of

May __, 2016



FPMC Exhibit

A

*CONFIDENTIAL*
*FOR DISCUSSION PURPOSES ONLY*
*NOT AN OFFER (ANY AGREEMENT SUBJECT TO DEFINITIVE*
*WRITTEN DOCUMENTATION SIGNED BY THE PARTIES*
*KREAGER MITCHELL DRAFT 4/25/16*

# CONTENTS

ARTICLE I. Conveyance of the Property.........................................................................................1

ARTICLE II. Purchase Price ........................................................................................................4

ARTICLE III. Closing ...................................................................................................................5

ARTICLE IV. Title Matters.........................................................................................................14

ARTICLE V. Representations and Warranties ............................................................................17

ARTICLE VI. Risk of Loss ..........................................................................................................21

ARTICLE VII. Remedies .............................................................................................................21

ARTICLE VIII. Escrow................................................................................................................22

ARTICLE IX. Bankruptcy Matters..............................................................................................23

ARTICLE X. Miscellaneous........................................................................................................25

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "**Agreement**"), dated as the Effective Date (as defined in <u>Section 10.18</u>) is entered into between FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership ("**Seller**"), having an address at 2101 Cedar Springs Road, Suite 1540, Dallas, TX 75219 and [_____], a [_____] ("**Purchaser**") having an address at [_____].

## RECITALS

WHEREAS, Seller is a debtor and debtor-in-possession in a chapter 11 case pending in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "**Bankruptcy Court**"), Case No. 16-10020-TMD (the "**Bankruptcy Case**"). As such, the Property is being sold pursuant to this Agreement, and the sale of the Property is subject to the Bankruptcy Court's approval. As a result of arm's length negotiations between Seller and Purchaser culminating in this Agreement, Seller is selling the Property to Purchaser free and clear of (i) all liens, interests, claims, or encumbrances in the Property and (ii) successor liability of Seller, pursuant to 11 U.S.C. § 363(f) of the United States Bankruptcy Code (the "**Bankruptcy Code**"), and this provision controls over any conflicting language contained in this Agreement. In addition, if there is any conflict between terms of this Agreement and any order issued by the Bankruptcy Court, the Bankruptcy Court's order shall supersede terms in this Agreement.

WHEREAS, Seller is the owner of the Property (as hereinafter defined); and

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Purchaser the Property and Purchaser desires to purchase the Property from Seller.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.
## CONVEYANCE OF THE PROPERTY

**Section 1.01.** <u>**Property**</u>. Seller agrees to sell and convey to Purchaser and Purchaser agrees to purchase from Seller, upon the terms and conditions hereinafter set forth, all right, title and interest of Seller in and to the following, including all rights, title, and interests and appurtenances described below (collectively referred to herein as the "**Property**"):

(a) that certain tract of real property located in Williamson County, Texas, more particularly described in **<u>Exhibit A</u>** attached hereto and made a part hereof for all purposes, together with all of Seller's right, title and interest in and to all and singular the rights and appurtenances pertaining to such real property (all of the foregoing being hereinafter collectively referred to as the "**Land**");

(b) all improvements, structures, buildings and fixtures now constructed and completed with respect to and situated on the Land, including without limitation that certain hospital building totaling approximately 146,997 rentable square feet (the "**Hospital**"), that certain

4-story medical office building consisting of approximately 84,176 gross building area square feet (79,708 rentable square feet) (the "**MOB**"), together with all of Seller's right, title and interest in all surface parking areas, parking structures, loading dock facilities, landscaping and other improvements, structures and fixtures (all of the foregoing being hereinafter collectively referred to as the "**Improvements**");

(c)       all of Seller's right, title and interest in all fixtures, systems, equipment, machinery, apparatus, appliances, and other articles of personal property located on and used in connection with the ownership, use, maintenance, and operation of the MOB and the Hospital, except for the Excluded Personal Property, as such term is defined herein (collectively, the "**Personal Property**");

(d)       all of Seller's right, title and interest in all construction warranties issued and construction guaranties with respect to the Property that are capable of being assigned to Purchaser at Closing ("**Construction Warranties**");

(e)       all of Seller's right, title and interest in the contracts listed in **Exhibit B** attached hereto (the "**Assigned Contracts**") and assumed pursuant to applicable provisions under chapter 11 of title 11 of the Bankruptcy Code.

(f)       all Seller's rights, title and interests in minerals and mineral interests, royalty interests, working interests, leasehold interests, production payments and any other economic interests and executive rights related thereto, that are owned by Seller in, on, under, across and/or relating to the Land (collectively, "**Mineral Interests**");

(g)       all of Seller's rights, title and interests in all utilities and utility commitments, lines, easements, rights, or recovery charges and other rights and equipment pertaining to any utilities or utility service for the Property; and

(h)       all of Seller's rights, title and interests in its other permits, licenses, and other similar documents, whether governmental, regulatory or otherwise, relating to the use, operation or maintenance of the Improvements that are capable of being assigned to Purchaser at Closing and approved by Purchaser (the "**Licenses and Permits**").

**Section 1.02.  Excluded Property**. Notwithstanding the foregoing, the sale of the Property contemplated by this Agreement shall not include (a) any leases affecting the Property prior to the Closing Date, including any rights, claims, and remedies of Seller thereunder (for unpaid rents or otherwise), and any associated liens, guarantees, security deposits, and prepaid rentals, (b) all cash, cash equivalents, marketable securities, and investments and all bank accounts and lockboxes, and (c) any tenant fixtures or other property belonging to the tenants at the Property, any items leased from third-parties, all tax, insurance and other deposits of the Seller held by the third party (unless otherwise specifically provided in this Agreement) and all the property described on **Exhibit C** (collectively, the "**Excluded Personal Property**"), which Excluded Personal Property is expressly excluded from such conveyance.

**Section 1.03.  AS-IS, WHERE-IS.**

2

(a)     Purchaser expressly acknowledges that the Property is being sold and accepted AS IS, WHERE-IS AND WITH ALL FAULTS, and, except for Seller's representations and warranties set forth in this Agreement, which survive Closing (defined hereafter) to the extent provided in <u>Section 10.03</u>, and the warranties of title contained in the deed (collectively, "**Seller's Warranties**"), Seller makes no representations or warranties with respect to the physical condition or any other aspect of the Property, including, without limitation, (i) the structural integrity of any Improvements on the Property, (ii) the manner, construction, condition, and state of repair or lack of repair of any of such Improvements, (iii) the conformity of the Improvements to any plans or specifications for the Property, including but not limited to any plans and specifications that may have been or which may be provided to Purchaser, (iv) the conformity of the Property to past, current or future applicable zoning or building code requirements or the compliance with any other laws, rules, ordinances, or regulations of any government or other body, (v) the financial earning capacity or history or expense history of the operation of the Property, (vi) the nature and extent of any right of way, lease, possession, lien, encumbrance, license, reservation, condition, or otherwise, (vii) the existence of soil instability, past soil repairs, soil additions or conditions of soil fill, susceptibility to landslides, sufficiency of undershoring, sufficiency of drainage, (viii) whether the Property is located wholly or partially in a flood plain or a flood hazard boundary or similar area, (ix) the existence or non-existence of asbestos, underground or above ground storage tanks, hazardous waste or other toxic or hazardous materials of any kind or any other environmental condition or whether the Property is in compliance with applicable laws, rules and regulations, (x) the Property's investment potential or resale at any future date, at a profit or otherwise, (xi) any tax consequences of ownership of the Property, or (xii) any other matter whatsoever affecting the stability, integrity, other condition or status of the Land or any Improvements on the Land (collectively, the "**Property Conditions**"), and, except for Seller's Warranties, PURCHASER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS PURCHASER MIGHT HAVE REGARDING ANY FORM OF WARRANTY, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE RELATING TO THE PROPERTY, ITS IMPROVEMENTS OR THE PROPERTY CONDITIONS, SUCH WAIVER BEING ABSOLUTE, COMPLETE, TOTAL AND UNLIMITED IN ANY WAY.  IN DECIDING TO PURCHASE THE PROPERTY, PURCHASER IS RELYING UPON ITS OWN INVESTIGATION OF THE PROPERTY, AND, EXCEPT FOR SELLER'S WARRANTIES, NOT UPON ANY REPRESENTATIONS OR WARRANTIES FROM SELLER OR ITS AGENTS.  PURCHASER ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS THE "AS IS, WHERE IS" NATURE OF THIS SALE AND ANY FAULTS, LIABILITIES, DEFECTS OR OTHER ADVERSE MATTERS THAT MAY BE ASSOCIATED WITH THE PROPERTY.

(b)     Neither party to this Agreement is relying on any statement or representation not expressly stated in this Agreement. Purchaser specifically confirms and acknowledges that in entering into this Agreement, Purchaser has not been induced by, and has not relied upon, whether express or implied, warranties, guaranties, promises, statements, inducements, representations or information pertaining to the Property or its uses, the physical condition, environmental condition, state of title, income, expenses or operation of the Property, or any other matter or thing with respect thereto, written or unwritten, whether made by Seller or any agent, employee or other representative of Seller, or any broker or any other person

representing (or purporting to represent) Seller, which are not expressly set forth in this Agreement.  Seller shall not be liable for or bound by any written or unwritten statements, representations, warranties, brokers' statements or other information pertaining to the Property furnished by Seller, any broker, any agent, employee or other actual (or purported) representative of Seller, or any person, unless and only to the extent the same are expressly set forth in this Agreement.

(c)     Except for any Claims (as defined below) arising out of a breach or default by Seller under this Agreement (including a breach of any of Seller's representations and warranties in Article V) or Seller's Closing Documents (as defined in Section 3.02 herein) executed by Seller ("**Excepted Claims**"), THE CLOSING (DEFINED BELOW) HEREUNDER SHALL BE DEEMED TO CONSTITUTE AN EXPRESS WAIVER OF PURCHASER'S RIGHT TO RECOVER FROM SELLER, AND FOREVER RELEASES, COVENANTS NOT TO SUE AND DISCHARGES SELLER FROM, ANY AND ALL DAMAGES, DEMANDS, CLAIMS, LOSSES, LIABILITIES, PENALTIES, FINES, LIENS, JUDGMENTS, COSTS OR EXPENSES WHATSOEVER, INCLUDING ATTORNEYS' FEES AND COSTS, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THAT MAY ARISE ON ACCOUNT OF OR IN ANY WAY BE CONNECTED WITH THE PROPERTY (collectively, "**Claims**").

(d)     The provisions of this Section 1.03 shall survive the Closing and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

## ARTICLE II.
## PURCHASE PRICE

**Section 2.01.  Purchase Price and Escrow Deposit**. The purchase price to be paid by Purchaser to Seller for the Property is [_____] Dollars ($[_____]) (the "**Purchase Price**").  The Purchase Price shall be payable as follows:

(b)     Purchaser has delivered the sum of Ten Million Dollars ($10,000,000.00) (the "**Escrow Deposit**") by cash or by delivery of an irrevocable letter of credit, in a form approved by the Seller, to Allegiance Title Company, 109 N. Post Oak Lane, Suite 150, Houston, Texas 77024, Attention: William V. Condrey, Phone: 713 993-9355, Email: vcondrey@allegiancetitle.com ("**Title Company**"), as escrow agent, which Escrow Deposit is refundable only as specifically set forth herein.

(c)     The Escrow Deposit shall be held in an interest-bearing escrow account by Title Company in an institution as directed by Seller and reasonably acceptable to Purchaser.  All interest and income on the Escrow Deposit will be remitted to the party entitled to the Escrow Deposit pursuant to this Agreement.  Any interest earned on the principal portion of the Escrow Deposit shall be deemed to be part of the Escrow Deposit and shall be paid together with the principal portion of the Escrow Deposit, it being understood and agreed that if the transaction contemplated under this Agreement closes, any interest earned on the Escrow Deposit shall be credited to the Purchase Price upon the Closing or, if the transaction contemplated by this Agreement does not close, the Escrow Deposit will be paid as provided in this Agreement.  Title

4

Company is authorized and directed to pay the Escrow Deposit to the party entitled to receive the Escrow Deposit under the terms of this Agreement.  Seller or Purchaser, as appropriate, shall deliver a letter of instruction to Title Company directing the disbursement of the Escrow Deposit to the party entitled to receive the Escrow Deposit promptly upon receipt of a demand from that party.

(d)    The balance of the Purchase Price shall be paid to the Title Company for the benefit of Seller on the Closing Date, subject to any credits or apportionments as provided for under this Agreement, by transfers of immediately available federal funds to an account, or accounts, designated in writing by Seller no later than three (3) days prior to the Closing Date.

## ARTICLE III.
## CLOSING

**Section 3.01.  Closing Date**.  The closing of the transaction contemplated by this Agreement (the "**Closing**") will be held through escrow at the offices of the Title Company and shall occur on the later of (a) the date that is seven (7)  days after the date on which Purchaser and Seller have satisfied or waived in writing each of the Closing Conditions (as defined in Section 3.07 herein) and (b) the date that is seven (7) days after the expiration of the Inspection Period (such date, the "**Scheduled Closing Date**"); the actual date of Closing being referred to hereinafter as the "**Closing Date**"), subject to the terms of this Agreement.   Purchaser and Seller shall, no later than 1:00 p.m. (CT) on the Business Day immediately preceding the Scheduled Closing Date, deposit the respective Closing deliveries described in Sections 3.02 and 3.03 with the Title Company with appropriate instructions for recording and disbursement consistent with this Agreement.

**Section 3.02.  Seller's Closing Deliverables**.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser, the following executed, certified and acknowledged by Seller, as appropriate (collectively, "**Seller's Closing Documents**"):

(a)    A special warranty deed conveying the Land, the Improvements and the Mineral Interests, duly executed and acknowledged by Seller, substantially in the form attached as **Exhibit D**, containing no exceptions or conditions except the Permitted Exceptions (defined below).

(b)    A bill of sale whereby Seller conveys to Purchaser all of Seller's right, title and interest in and to the Personal Property (the "**Bill of Sale**").  The Bill of Sale will be delivered without any Seller representations or warranties, substantially in the form attached to this Agreement as **Exhibit E**.

(c)    Two (2) counterparts of an Assignment of Contracts (the "**Assignment of Contracts**") duly executed by Seller, substantially in the form attached to this Agreement as **Exhibit F**.

(d)    Consent of the governing authority of Seller authorizing the transaction contemplated hereby and the execution and delivery of the documents required to be executed and delivered hereunder.

5

(e)     A certification that Seller is not a "foreign person" as such term is defined in Section 1445 of the Internal Revenue Code of 1984, as amended and the regulations thereunder, which certification shall be signed under penalty of perjury in substantially the form attached to this Agreement as **Exhibit G**.

(f)     Originals, or copies certified by Seller as being complete, of all applicable bills, invoices, fuel readings and other items that shall be apportioned as of the Closing Date.

(g)     All original Construction Warranties, Licenses and Permits, certificates of occupancy, and Assigned Contracts, to the extent in Seller's possession, otherwise copies of such documents (provided that the parties agree to cooperate to deliver such items outside of escrow).

(h)     A counterpart of a closing statement jointly prepared by Seller and Purchaser reflecting the prorations and adjustments required under Section 3.05 of this Agreement and the balance of the Purchase Price due Seller.

(i)     All keys and access codes to any portion of the Property, to the extent in Seller's possession or control (provided that the parties agree to cooperate to deliver such items outside of escrow).

(j)     An assignment and assumption of the Construction Warranties, Licenses and Permits in substantially the form of **Exhibit H** attached hereto and incorporated herein by this reference executed by Seller (the "**Construction Warranties, Licenses and Permits Assignment**").

(k)     Such evidence as may be reasonably required by the Title Company demonstrating that Seller has the legal power, right and authority to consummate the sale of the Property.

(l)     All other documents reasonably necessary or otherwise required by the Title Company to consummate the transaction contemplated by this Agreement, including such affidavits concerning parties in possession and claims for mechanics' liens as may be reasonably required by Title Company in order to issue the Title Policy (as defined in Section 4.03(g) (the "**Title Affidavits**") including but not limited to the owner's affidavit (the "**Owner's Affidavit**") in substantially the form attached to this Agreement as **Exhibit I**.

(m)     Possession of the Property, subject to the Permitted Exceptions and any other matters authorized herein.

**Section 3.03.  Purchaser's Closing Deliverables**. At the Closing, Purchaser shall deliver or cause to be delivered to Seller, the following, executed, certified and acknowledged by Purchaser, as appropriate:

(a)     The balance of the Purchase Price as set forth in Section 2.01.

(b)     Purchaser shall, where applicable, join with Seller in the execution and delivery of the Seller's Closing Documents and instruments required under Section 3.02 of this Agreement.

(c)     Consent of the governing authority of Purchaser authorizing the transaction contemplated hereby and the execution and delivery of the documents required to be executed and delivered hereunder.

(d)     Two (2) counterparts of the Assignment of Contracts, duly executed by Purchaser.

(e)     All other documents reasonably necessary or otherwise required by the Title Company to consummate the transaction contemplated by this Agreement (the documents to be delivered at Closing by Purchaser under this <u>Section 3.03</u> are referred to herein collectively as the "**Purchaser's Closing Documents**"; together with the Seller's Closing Documents being referred to herein collectively as the "**Closing Documents**").

## Section 3.04.  <u>Closing Costs.</u>

(a)     Seller and Purchaser shall each pay the fees and expenses of its own counsel in connection with the preparation and negotiation of this Agreement.

(b)     Seller shall pay:

(i)     the costs charged by Title Company, including, without limitation, costs related to the Title Commitment (defined below), one-half of the escrow fees and the cost of the premium for the Title Policy to be issued to Purchaser in the amount of the Purchase Price; *provided, however*, the costs of any endorsement or modification to the Title Policy shall be paid by Purchaser;

(ii)     all transfer taxes payable in connection with the transaction contemplated by this Agreement;

(iii)     all recording fees for the release of any liens on the Property, as required pursuant to the terms of this Agreement; and

(iv)     all brokerage commissions and fees payable to Seller's brokers, CBRE, Inc., and KOA Partners, LLC, ("**Seller's Brokers**"), which shall be paid pursuant to a separate written contract with Seller's Brokers.

(c)     Purchaser shall pay:

(i)     one-half of escrow fees charged by the Title Company and the costs of any endorsement or modification to the Title Policy;

(ii)     the commissions owed to Purchaser's real estate brokers and consultants;

(iii)     any other fees or costs related to Purchaser's due diligence reviews; and

(iv)    all costs related to the recording fees payable in connection with the recording of the deed and any other documents that the Purchaser may require to be recorded at Closing, if any.

**Section 3.05.  Apportionments**. Except as otherwise specifically provided below, all expenses, charges and other obligations relating to the operation of the Property (including, without limitation, real estate taxes and expenses, charges and other obligations under the Assigned Contracts) shall be prorated between Purchaser and the Seller on a per diem basis as of 11:59 P.M. on the date immediately preceding the Closing Date.  For purposes of the prorations contained in this Section 3.05, Purchaser shall be deemed to be the owner of the Property for the entire Closing Date.  Whether amounts are allocable for the above purposes for the period before or after Closing shall be determined in accordance with generally accepted accounting principles using the accrual method.  In furtherance of the foregoing: (i) any bills, invoices or other payments that are apportionable hereunder and that are received by Seller or Purchaser following Closing or otherwise become due following Closing, shall in the first instance be paid by Purchaser, and upon evidence of the payment thereof, Seller shall reimburse Purchaser its apportioned share thereof in accordance with the provisions of this Section 3.05, and (ii) any bills, invoices or other payments that relate exclusively to periods prior to Closing and are received by Seller or Purchaser following Closing or otherwise become due following Closing, shall be sent to Seller and shall be paid for by Seller when due.  To the extent possible, the parties shall undertake to have services or contracts effectively terminated on the Closing Date in order to avoid (to the extent practicable) prorations of such items.  In light of the above, the following shall be apportioned as of 11:59 p.m. on the date immediately preceding the Closing Date, unless expressly provided for otherwise:

(b)    All real estate and personal property taxes based on the fiscal year for which they are assessed and any assessments applicable to the Property shall be apportioned as of 11:59 p.m. on the date immediately preceding the Closing Date. If the Closing shall occur before a new tax rate or valuation is fixed, the apportionment of real estate taxes at Closing shall be estimated upon the basis of the tax rate for the preceding fiscal period applied to the latest assessed valuation. If the Property shall be, or has been, affected by any assessments or special assessments payable in a lump sum or which are, or may become, payable in installments, of which the first installment is then a charge or lien, or has already been paid, then at the Closing such amounts will be paid or apportioned, as the case may be in the following manner:

(i)    any such assessments or installments, or portion thereof, payable on or after the Closing Date shall be the responsibility of Purchaser; *provided, however*, if the assessment or installment covers any period prior to the Closing Date, Purchaser shall be entitled a credit from Seller for the proportionate amount of such assessment or installment that is applicable to the period of time prior to the Closing Date; and

(ii)    any such assessments or installments, or portion thereof, payable prior to the Closing Date shall be the responsibility of Seller; *provided, however,* if the assessment or installment covers any period on or after the Closing Date, Seller shall be entitled a credit from Purchaser for the proportionate amount of such assessment or installment that is applicable to the period of time on or after to the Closing Date.

(iii)     To the extent there are any interest or penalties associated with the payment of any taxes, such interest and penalties shall be allocated to the party who is responsible for the payment of such tax to the taxing authority.

(c)     Any and all unpaid property association fees, including without limitation any such existing delinquent fees due and payable (which such delinquent sums shall be charged in full to Seller) shall be apportioned as of 11:59 p.m. on the date immediately preceding the Closing Date.

(d)     Purchaser and Seller shall cooperatively take all steps necessary to effectuate the transfer of all utilities for the Property from Seller to Purchaser as of the Closing Date, and where necessary, Purchaser will post deposits with the utility companies. Seller and Purchaser shall cooperate and use commercially reasonable efforts to further ensure that all utility meters, if any, for the Property are read as of the day prior to the Closing Date. Charges for utilities, if any, serving the Property shall be determined as of the Closing Date, and Purchaser shall be responsible for all utility charges for the period after the Closing Date and Seller shall be responsible for all utility charges for the period prior to and on the Closing Date. To the extent any such expenses and charges are not determinable as of the Closing Date, such expenses and charges shall be paid promptly upon receipt of an invoice therefor by the party obligated for payment thereof. Seller shall be entitled to recover any and all deposits held by any utility company for the Property as of the date of Closing. If the Purchaser does not cause the utilities to be switched over to the Purchaser as of the Closing Date and as a result of such failure Seller is unable to cause the utility company(s) to release to Seller its utility deposit(s) within sixty (60) days after the Closing Date, then Purchaser shall reimburse the Seller the amount of such deposit(s) no later than sixty-five (65) days after the Closing Date. In such event, the deposit(s) will be assigned to Purchaser who shall have rights to have the deposit(s) released to it upon satisfaction of the conditions imposed by the utility company.

(e)     Seller shall deliver to Purchaser and the Title Company proration information sufficient for preparation of the Closing Statement not less than three (3) Business Days prior to Closing Date and Purchaser and Seller shall work in good faith to mutually approve and provide to Title Company a schedule of prorations in as complete and accurate a form as possible. All demands for reimbursement proration amounts (other than those relating to ad valorem taxes and assessments) must be made within sixty (60) days after the Closing Date and thereafter the prorations made at Closing (adjusted in accordance with timely made demands for reimbursement) will be considered final for all purposes.

(f)     All other items customarily apportioned in connection with sales of buildings substantially similar to the Property in the State of Texas shall be apportioned as of 11:59 p.m. on the date immediately preceding the Closing Date.

**Section 3.06. Purchaser's Conditions to Closing**. The Purchaser is not obligated to perform under this Agreement unless all of the following conditions precedent ("**Purchaser's Closing Conditions**") are satisfied (or waived in writing by Purchaser) an as of the Closing Date:

(a)     The Sale Order (as defined in <u>Section 9.03(a)</u> herein), in the form required by this Agreement, shall have been entered by the Bankruptcy Court approving this Agreement

and shall have become a Final Order (for the purposes hereof, an order is a "**Final Order**" if such order has not been vacated and is not then subject to a stay of proceedings, and either (i) the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari with respect to such order has expired and no such appeal, motion or petition is pending, or (ii) a petition for writ of certiorari has been finally decided and no further appeal, motion for rehearing or reconsideration, or a petition for writ of certiorari can be taken or granted as to such order).

(b)  The Assignment Order (as defined in Section 9.04 herein), in the form required by this Agreement, shall have been entered by the Bankruptcy Court approving the assignment of any Assigned Contracts to Purchaser, and shall have become a Final Order, and Seller shall have paid any cure costs associated with such Assigned Contracts as contemplated by Section 9.04.

(c)  An order (the "**Rejection Order**") of the Bankruptcy Court, in the form required by this Agreement, shall have been entered rejecting all leases affecting the Property and shall have become a Final Order, unless Seller, in its sole discretion, has terminated such leases in writing and Title Company has agreed to issue the Title Policy free and clear of such leases.

(d)  All representations and warranties of the Seller contained in the Agreement shall be true and correct in all material respects as of the date of Closing, after giving effect to any updates provided by Seller pursuant to Section 5.01(n).

(e)  As of the Closing, Seller shall have in all material respects performed all of the obligations required to be performed by Seller under this Agreement.

(f)  The Title Company shall be unconditionally and irrevocably obligated to issue the Title Policy in the form required by this Agreement upon payment of the title premium.

(g)  All necessary consents and/or regulatory approvals (including clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "**HSR Act**")) with respect to this Agreement and the transaction contemplated herein shall have been obtained, or any applicable waiting period shall have expired.

If Purchaser determines that any of the Purchaser's Closing Conditions cannot be or have not been satisfied prior to June 30, 2016 (the "**Outside Closing Date**"), Purchaser may, as its sole and exclusive remedy, terminate this Agreement, in which event the Escrow Deposit shall be refunded to Purchaser and Seller shall retain the Independent Consideration (as defined in Section 10.17), and neither party shall have any further rights and obligations hereunder, except those obligations and rights which expressly survive termination of this Agreement.

**Section 3.07.  Seller's Conditions to Closing**. The Seller is not obligated to perform under this Agreement unless all of the following conditions precedent ("**Seller's Closing Conditions**", and together with Purchaser's Closing conditions, the "**Closing Conditions**") are satisfied (or waived in writing by Seller) as of the Closing Date:

(a)  The Sale Order (as defined in Section 9.03(a) herein), in the form required by this Agreement, shall have been entered by the Bankruptcy Court approving this Agreement and shall have become a Final Order.

(b)     The Assignment Order (as defined in <u>Section 9.04</u> herein), in the form required by this Agreement, shall have been entered by the Bankruptcy Court approving the assignment of any Assigned Contracts to Purchaser and shall have become a Final Order.

(c)     The Rejection Order, in the form required by this Agreement, shall have been entered by the Bankruptcy Court rejecting all leases affecting the Property and shall have become a Final Order, unless Seller, in its sole discretion, has terminated such leases in writing and Title Company has agreed to issue the Title Policy free and clear of such leases.

(d)     All representations and warranties of the Purchaser contained in the Agreement shall be true and correct in all material respects as of the date of Closing.

(e)     As of the Closing, Purchaser shall have in all material respects performed all of the obligations required to be performed by Purchaser under this Agreement.

(f)     All necessary consents and/or regulatory approvals (including clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976) with respect to this Agreement and the transaction contemplated herein shall have been obtained, or any applicable waiting period shall have expired.

If Seller determines that any of the Seller's Closing Conditions cannot be or have not been satisfied prior to the Outside Closing Date, and such failure constitutes a default under this Agreement, then Seller shall have the rights and remedies provided in <u>Section 7.01(a)</u> hereof. If any of the Seller's Closing Conditions have not been satisfied prior to the Outside Closing Date and such failure does not constitute a default under this Agreement, then Seller may, as its sole and exclusive remedy, terminate this Agreement, in which event the Escrow Deposit shall be refunded to Purchaser and Seller shall retain the Independent Consideration (as defined in <u>Section 10.17</u>), and neither party shall have any further rights and obligations hereunder, except those obligations and rights which expressly survive termination of this Agreement.

**Section 3.08.  Inspection Period**.

(a)     Purchaser has from the Effective Date until 5:00 p.m. (CT) on the seventh (7th) day following the Effective Date (the "**Inspection Period**") to conduct such inspections as Purchaser deems necessary and at its sole cost and expense.  Seller will permit Purchaser and Purchaser's agents and representatives to have reasonable access to enter upon the Property for the purpose of making such tests and inspections; provided Purchaser shall not unreasonably interfere with Seller's use of the Property.  PURCHASER SHALL, AT ITS EXPENSE, REPAIR ANY DAMAGE TO THE PROPERTY CAUSED BY PURCHASER'S INSPECTION OF THE PROPERTY.  PURCHASER HEREBY AGREES TO AND SHALL INDEMNIFY, DEFEND, PROTECT AND HOLD SELLER HARMLESS OF, FROM AND AGAINST ANY AND ALL LIABILITIES, SUITS, CLAIMS, LOSSES, CAUSES OF ACTION, LIENS, FINES, PENALTIES, COSTS AND EXPENSES, INCLUDING, WITHOUT LIMITATION, COURT COSTS, REASONABLE ATTORNEYS' FEES AND COSTS, AND DAMAGES SUSTAINED BY SELLER OR THE PROPERTY (COLLECTIVELY "**CLAIMS**"), INCLUDING, BUT NOT LIMITED TO, INJURY TO OR DEATH OF ANY PERSON OR DAMAGE TO OR THEFT OF ANY PROPERTY, OR MECHANICS' AND MATERIALMEN'S LIENS, CAUSED AS A

RESULT OF OR ARISING OUT OF OR IN CONNECTION WITH ANY INSPECTIONS OR EXAMINATIONS CONDUCTED BY PURCHASER OR ITS CONTRACTORS OR AGENTS, **EVEN IF SUCH CLAIMS ARISE FROM THE NEGLIGENCE OF SELLER**; PROVIDED, HOWEVER, THAT THE FOREGOING INDEMNITY SHALL NOT APPLY IN CONNECTION WITH ANY MATTERS CONCERNING THE CONDITION OF THE PROPERTY OR THE PROPERTY'S COMPLIANCE WITH APPLICABLE LAWS THAT ARE UNCOVERED OR DISCOVERED BY PURCHASER OR ITS CONTRACTORS OR AGENTS IN CONDUCTING THEIR INSPECTIONS AND EXAMINATIONS HEREUNDER.  ADDITIONALLY, PURCHASER'S INDEMNIFICATION OBLIGATIONS HEREUNDER DO NOT APPLY TO ANY CLAIMS ARISING SOLELY FROM SELLER'S NEGLIGENT ACT OR WILLFUL MISCONDUCT.  THIS INDEMNIFICATION OBLIGATION SHALL SURVIVE THE CLOSING AND ANY TERMINATION OF THIS AGREEMENT.

(i)     Purchaser may engage an independent environmental consultant, at its cost, to conduct an environmental assessment of the Property to determine the current environmental status of the Property so that any such environmental assessment is completed before the end of the Inspection Period.  Seller shall remain responsible for and shall indemnify Purchaser from all liability arising directly from the release or contamination from the Property relating to hazardous materials existing thereon prior to the date of closing, *provided further*, that Seller shall not be responsible for and Purchaser shall be responsible for any liability caused as a result of or arising out of or in connection with any inspections or examinations conducted by Purchaser or its contractors or agents, **EVEN IF SUCH LIABILITY ARISES FROM THE NEGLIGENCE OF SELLER**.

(ii)    Purchaser must not, under any circumstances, compromise or affect the structural integrity of the Improvements or violate any applicable law, rule or regulation. Neither Purchaser nor any of its agents, representatives or independent contractors may contact any tenant at the Property or Seller's employees, management company, service providers and vendors, or any governmental or municipal authorities unless Seller has given its prior written consent (which consent will not be unreasonably withheld, conditioned or delayed) and, (i) a representative for Seller is present during any such contact or communication, or (ii) Seller has waived, in writing (which writing may be by email), its right to be present during such meeting. Purchaser must obtain Seller's prior written approval, which Seller may withhold in its sole and absolute discretion, of the scope and method of any physically intrusive inspection, testing or investigation of the Property, including, but without limitation, any inspection which would involve taking subsurface borings or related investigations, and any inspection that would alter the physical condition of the Property.  The right of entry granted in this Agreement is subject to the rights of any grantees under any existing easements (recorded and unrecorded) and to any leases that are in place, and the rights of tenants of the Property, and Purchaser shall not interfere with the rights of such grantees and tenants.

(iii)   Purchaser for itself and for its employees, and any of Purchaser's agents, representatives or independent contractors who enter the Property, shall maintain a policy of commercial general liability insurance, with a single combined limit of not less than Two Million Dollars ($2,000,000), insuring all activity and conduct of Purchaser's employees, agents, representatives and independent contractors during any such entry, including contractual liability coverage.  Seller shall be named as additional insured on such commercial general liability policy,

and Purchaser shall provide proof of such insurance to Seller, in a form reasonably acceptable to Seller, prior to any such entry.

(iv)     If the Closing does not occur, Purchaser shall deliver to Seller, free of charge, copies of any final reports Purchaser obtains in connection with its inspection of the Property including, without limitation, any Phase I environmental site assessment performed by or on behalf of Purchaser.  Any such delivery shall be made without recourse to Purchaser nor any representation or warranty from Purchaser.  Purchaser's obligations under this Section 3.08(a)(iv) shall survive termination of this Agreement.

(v)     Purchaser shall cause its agents, representatives, employees and independent contractors to comply with the terms of this Section 3.08(a).

(b)     Seller has provided Purchaser access to Seller's virtual data room as of the Effective Date.  The Seller's virtual data room contains certain documents that may include the following: "as built" plans, other plans specifications and drawings, surveys, permits, engineering reports, tax bills, building permits, occupancy permits, maintenance and service records, leases, contracts, environmental reports and other documents and information pertaining to the ownership, use, operation, maintenance and condition of the Property.  Seller shall use its best efforts to obtain copies of any other documents as may be reasonably requested by the Purchaser during the Inspection Period related to the transactions under this Agreement (all such documents provided to Purchaser pursuant to this Section 3.08(b), the "**Property Documents**").     Purchaser acknowledges that the Property Documents are provided or made available for inspection with no representations or warranties as to the truth, accuracy, completeness, methodology of preparation of the Property Documents, or otherwise, of any kind, including without limitation any reports or audits or any other materials, data or other information supplied to Purchaser in connection with Purchaser's inspection of the Property.  Seller expressly disclaims any such representation or warranty with respect to the Property Documents.  Purchaser acknowledges that the Property Documents are provided only for Purchaser's convenience as a starting point for commencing Purchaser's own examination of the Property.  Purchaser agrees that it will rely exclusively on its own independent investigation and evaluation of every aspect of the Property and not on the Property Documents supplied by Seller.  Purchaser expressly disclaims any intent and waives any right to rely on any of the Property Documents provided to it by Seller, agrees that it shall not rely on any of the Property Documents provided to it by Seller, and agrees that it shall rely solely on its own independently developed or verified information.  Seller shall not be liable for any claims by Purchaser as to the adequacy or completeness of any Property Document(s) or the failure of Seller to furnish any of the same.

(c)     Purchaser shall have the right in its sole discretion and for any reason or no reason whatsoever to terminate this Agreement at any time prior to expiration of the Inspection Period by timely providing written notice to Seller of its termination of this Agreement.  Upon termination of this Agreement by Purchaser pursuant to this Section 3.08(c): (x) if Purchaser's termination of this Agreement is specified by Purchaser as being for "Good Cause" (as defined below) in a written notice to Seller specifying with particularity the reason for such termination, the Escrow Deposit shall be delivered to Purchaser, and (y)  if  Purchaser's termination of this Agreement is not specified by Purchaser as being for  "Good Cause" as provided above, Nine Million Dollars ($9,000,000) of the Escrow Deposit shall be delivered to Purchaser and the

remaining One Million Dollars ($1,000,000) shall be delivered to Seller; and in each case neither party hereto will have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement. For the purposes hereof, "**Good Cause**" means that termination is due to (a) a physical defect in the Improvements (other than a defect arising from a Material Casualty or Condemnation Event) which, in the Purchaser's reasonable discretion, would cost in excess of $1,000,000 to repair so as to cause (x) the roof of the Hospital and the MOB to be watertight and structurally sound, (y) the structural elements of the Improvements to be structurally sound, or (z) the plumbing, electrical and HVAC systems of the Improvements to be in working condition; or (b) any contamination at, under, in, or above the Property by hazardous substances which, in the Purchaser's reasonable discretion, would cost in excess of $1,000,000 to remediate.

(d)     If on or before the last day of the Inspection Period the Title Company and the Seller do not receive written notice from Purchaser terminating this Agreement during the Inspection Period, Purchaser shall be deemed to have elected not to terminate this Agreement and the full Escrow Deposit and the accrued interest thereon shall be non-refundable, except under the following conditions: (i) in the event this Agreement is terminated based upon a Seller Default (as defined in Section 7.01(b) herein), (ii) the failure of any of the Purchaser's Closing Conditions to be satisfied or waived in writing by Purchaser on or before the Outside Closing Date, (iii) in the event this Agreement is terminated pursuant to Section 4.03(c) or (d), and (iv) the occurrence of Material Casualty or Condemnation Event (defined below), and in each such event the Title Company shall refund the Escrow Deposit to Purchaser.

(e)     If this Agreement has been terminated in accordance with, and subject to the terms of this Section, the parties hereto shall thereupon be relieved of all liabilities and obligations hereunder, excluding indemnification obligations and any other provisions that specifically survive termination under the terms of this Agreement.

## ARTICLE IV.
## TITLE MATTERS

**Section 4.01.  Conveyance**. At the Closing, Seller will convey to Purchaser (a) fee simple indefeasible title to the Land, the Improvements and the Mineral Interests by a special warranty deed free and clear of any and all liens, charges, security interests, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(f), except only Permitted Exceptions (defined below), (b) Seller's right, title and interest in the Personal Property by the Bill of Sale free and clear of any and all liens, charges, security interests, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(f), except only Permitted Exceptions, (c) Seller's right, title and interest in the Assigned Contracts by the Assignment of Contracts free and clear of any and all liens, charges, security interests, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(f), except only Permitted Exceptions, and (d)  Seller's right, title and interest in the Construction Warranties, Licenses and Permits by the Construction Warranties, Licenses and Permits Assignment free and clear of any and all liens, charges, security interests, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(f), except only Permitted Exceptions.

**Section 4.02.  Permitted Exceptions**. The Property shall be sold, assigned and conveyed by Seller to Purchaser, and Purchaser shall accept and assume same, subject to all matters shown

on the Title Commitment (other than <u>Schedule C</u> matters), title exception documents, or the Seller's Survey or Purchaser's Survey: (i) which are approved or deemed approved by Purchaser pursuant to Section 4.03, (ii) constituting the lien of all ad valorem real estate taxes, lienable utility services and assessments not yet delinquent as of the Closing Date, or (iii) constituting leases of the Property that Purchaser elects to assume (collectively, the "**Permitted Exceptions**").

**Section 4.03. <u>Title.</u>**

(a) Purchaser acknowledges receipt of a current TLTA form commitment for title insurance (the "**Title Commitment**") issued by the Title Company, setting forth the state of title to the Land and the Improvements.

(b) Purchaser acknowledges receipt of a copy of Seller's existing survey ("**Seller's Survey**"). On or before the Title Objection Date (as defined below), Purchaser, at Purchaser's sole cost and expense, shall have the right to obtain a new or recertified survey of the Land and Improvements (the "**Purchaser's Survey**") prepared by a surveyor licensed in the state of Texas and approved by Seller.

(c) Purchaser shall deliver to Seller and Seller's attorney, in writing, any objections to the exceptions to title set forth in the Title Commitment, Seller's Survey and Purchaser's Survey, other than the Permitted Exceptions and Immaterial Exceptions (as defined below), as to which Purchaser may not object (collectively, "**Title Objection Notice**"), by no later than 5:00 P.M. (CT) on the expiration date of the Inspection Period ("**Title Objection Date**"). The failure by Purchaser to deliver the Title Objection Notice on or before the Title Objection Date shall constitute Purchaser's irrevocable acceptance of the Title Commitment, Seller's Survey, and Purchaser's Survey, and Purchaser shall be deemed to have unconditionally waived any right to object to (and shall be deemed to have approved) any matters set forth therein. For the purposes hereof, "**Immaterial Exception**" means any (a) lien for taxes, assessments and water and sewer charges not yet delinquent, or being contested in good faith by appropriate proceedings (including any interest, penalties or additions to any such taxes, assessments and charges) and the amount of which is fully bonded by a reputable surety company; (b) utility easements for electricity, gas, water, sanitary sewer, surface water drainage or other general easements that would not reasonably be expected to impair the Purchaser's use, possession or quiet enjoyment of the Property in the ordinary course of business, consistent with Seller's current use thereof; (c) encumbrances consisting of zoning restrictions, easements and other restrictions on the use of the Property that would not reasonably be expected to impair the Purchaser's use, possession or quiet enjoyment of the Property in the ordinary course of business, consistent with Seller's current use thereof; (d) any laws, regulations or ordinances affecting the Property that would not reasonably be expected to impair the Purchaser's use, possession or quiet enjoyment of the Property in the ordinary course of business, consistent with Seller's current use thereof; (e) any utility company rights, easements or franchises for electricity, water, steam, gas, telephone or other service or the right to use and maintain poles, lines, wires, cables, pipes, boxes and other fixtures and facilities in, over, under and upon the Property, which rights would not reasonably be expected to impair the Purchaser's use, possession or quiet enjoyment of any of the Property in the ordinary course of business, consistent with Seller's current use thereof; (f) any non-material encroachments of improvements upon any street or highway; (g) all mechanics', carriers' workers', repairers' and similar liens (provided Seller agrees to cause the Title Company to delete such items from the Title Policy); (h)

liens, title defects or irregularities that would not reasonably be expected to impair the Purchaser's use, possession or quiet enjoyment of the Property in the ordinary course of business, consistent with Seller's current use thereof; (i) any non-material encroachments of improvements over any easements, rights of way, set-back lines, or boundaries; or (j) any lien or other matter that would be discharged by the Sale Order.

(i)     Seller is under no obligation to cure any objections in the Title Objection Notice, save and except any items listed, including without limitation those certain current mechanic's liens against the Property, in <u>Schedule C</u> of the Title Commitment.  If Seller does not notify Purchaser that Seller will cause any objections in the Title Objection Notice to be removed from title, insured over or cured (either by endorsement or by "**writing over**" in a manner reasonably satisfactory to Buyer) to Purchaser's satisfaction within five (5) days after the date on which Seller receives Purchaser's Title Objection Notice (the "**Cure Period**"), then Purchaser shall have the right to choose one of the following, as its sole and exclusive remedy: (i) close escrow subject to any such objections, without any change in Purchaser's obligations under this Agreement and with no reduction in the Purchase Price, or (ii) terminate this Agreement, in each case by providing written notice thereof to Seller on or before the date that is five (5) days after the expiration of the Cure Period; *provided, however*, if any such objection consists of one or more monetary liens or items listed on <u>Schedule C</u> of the Title Commitment, then Seller will have an obligation to either (i) pay (at or prior to Closing) any amount due in satisfaction or release of such monetary lien(s) or (ii) cause the Property to be sold free and clear of such liens or items in <u>Schedule C</u> under Section 363(f) of the Bankruptcy Code and have such liens or items attach to the sale proceeds by operation of the Sale Order.  Purchaser's failure to give Seller such notice shall be deemed to be an election by Purchaser to lose escrow subject to any such objections under clause (i) above.

(d)     If, after giving the Title Objection Notice to Seller and Seller's attorney (or, if no Title Objection Notice has been given, after the Title Objection Date), Purchaser receives any amendment or update to the Title Commitment showing any title defects which Purchaser claims are not Permitted Exceptions or Immaterial Exceptions, Purchaser shall give written notice (a "**Supplemental Notice**") of any objections to Seller within two (2) Business Days of the receipt of such amendment or update and the Purchaser and Seller shall have the same rights and obligations with respect to such notice as apply to the Title Objection Notice in this Section; *provided, however*, that in the event that Seller receives a Supplemental Notice within five (5) days of the Scheduled Closing Date, the Scheduled Closing Date shall be extended on a day to day basis at Seller's option in order to provide Seller with five (5) days to respond to the Supplemental Notice.

(e)     Purchaser acknowledges and agrees that **TIME IS OF THE ESSENCE** with respect to all time periods relating to Purchaser's obligations as set forth in this <u>Section 4.03</u>.

(f)     From and after the date hereof, Seller shall not execute any deed, easement, restriction, covenant or other matter affecting title to the Property that will survive Closing unless Purchaser has received a copy thereof and has approved the same in writing.  If Purchaser fails to approve in writing to any such proposed instrument within five (5) Business Days after receipt of the aforementioned notice, Purchaser shall be deemed to have disapproved the proposed instrument.  Purchaser's consent shall not be unreasonably withheld, conditioned or delayed with respect to any such instrument that is proposed prior to the expiration of the Inspection Period.

Purchaser, in its sole and absolute discretion, shall be entitled to grant or withhold its consent with respect to any such instrument that is proposed between the expiration of the Inspection Period and the Closing.

(g)     Upon Closing, the Title Company shall issue an owner's Title Policy (the "**Title Policy**") to Purchaser, insuring that fee simple title to the Property is vested in Purchaser subject only to the Permitted Exceptions and the standard printed exceptions in the form of owner's policy of title insurance promulgated by the Texas Department of Insurance and issued by title insurance companies in the State of Texas which the Title Company is not permitted to remove or will not agree to remove.  Purchaser shall be entitled to request that the Title Company provide such endorsements (or amendments) to the Title Policy as Purchaser may reasonably require, provided that such endorsements (or amendments) shall be at no cost to, and shall impose no additional liability on, Seller except if such endorsements are issued for purposes of removing an exception.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

**Section 5.01.  Seller's Representations and Warranties**. Seller represents and warrants to Purchaser on and as of the date of this Agreement and on and as of the Closing Date as follows:

(a)     Seller is a duly organized, validly existing limited partnership in good standing under the laws of the State of Texas and is authorized to conduct business in the State of Texas.

(b)     Subject to Bankruptcy Court approval, this Agreement has been duly authorized, executed and delivered by Seller, and is and at the time of the Closing will be a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(c)     Subject to Bankruptcy Court approval, the execution and delivery of this Agreement, the consummation of the transactions provided for herein and the fulfillment of the terms hereof will not result in a breach of any of the terms or provisions of, or constitute a default under, any agreement of Seller or any instrument to which Seller is a party or by which Seller or the Property are bound, or any judgment, decree or order of any court or governmental authority or any applicable laws.

(d)     Except for the contracts identified on **Exhibit B** (each of which shall continue to be in full force and effect as of the Closing), the Permitted Exceptions and other agreements contemplated by this Agreement, there are no contracts of any kind or description in existence that will survive Closing which shall be binding on Purchaser.

(e)     Except for Seller's Brokers, no agent, broker, finder, or investment or commercial banker, or other person or firm engaged by, or acting on behalf of, Seller in connection with the negotiation, execution, or performance of this Agreement or the transactions contemplated by this Agreement, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions.

(f)    Seller is not a "foreign person" as such term is defined in Section 1445 of the Internal Revenue Code or any regulations promulgated thereunder, as amended.

(g)    Other than the Bankruptcy Case, there is no pending or, to Seller's actual knowledge, threatened litigation or condemnation action against the Property or against Seller with respect to the Property as of the date of this Agreement.

(h)    To Seller's actual knowledge, except as set forth on **Exhibit K,** Seller has not received written notice from any Governmental Authority that it is not now in compliance with all applicable laws, ordinances, regulations, statutes, codes, rules, orders, decrees, determinations, covenants and restrictions relating to the Property and every part thereof (hereinafter collectively referred to as the "**Applicable Laws**" or individually, "**Applicable Law**") including those promulgated or imposed by any agency, department, commission, board, bureau or instrumentality of any governmental authority of the United States, the State of Texas, the County of Williamson, the City of Austin or any other local authority (hereinafter collectively referred to as the "**Governmental Authorities**", or individually, a "**Governmental Authority**").

(i)    There are no adverse or other parties in possession of the Land, Improvements or of any part thereof, as lessees, tenants at sufferance or trespassers, except that certain tenants under leases affecting the Property as of the Effective Date have personal property located on the Property.

(j)    To Seller's actual knowledge, there are no liens encumbering the Personal Property, save and except liens to be released by Seller or otherwise discharged at the Closing.

(k)    Seller has granted no outstanding options to purchase or rights of first refusal with respect to all or any part of the Property and has entered into no outstanding contracts with others for the sale of all or any part of the Property that remain in effect.

(l)    No labor has been performed or material furnished for the Property contracted for by Seller that will not be fully paid by Seller prior to or at the Closing, or the lien securing which will not otherwise be discharged at the Closing.

(m)    The phrase "**Seller's actual knowledge**" means the actual (and not constructive) knowledge of Todd Furniss.

(n)    Prior to the Closing Date, Seller may notify Purchaser in writing of any facts, conditions or circumstances which come to Seller's actual knowledge that render any of the representations and warranties set forth in this Section 5.01 in any way inaccurate, incomplete, incorrect or misleading.  In the event of any update to Seller's warranties and representations, Seller shall not be in default hereunder and shall have no liability as a result thereof except as provided herein.  If an updated representation or warranty has a material adverse effect on the current use of the Property or Seller's ability to consummate the transaction contemplated by this Agreement, as reasonably determined by Purchaser, Purchaser's sole right and remedy as a result thereof shall be the right to terminate this Agreement by giving written notice thereof to Seller, and thereupon the Escrow Deposit shall be refunded to Purchaser.

**Section 5.02.  Purchaser's Representations and Warranties**. Purchaser represents and warrants to Seller on and as of the date of this Agreement and on and as of the Closing Date as follows:

(a)  Purchaser is a [_____] [_____] duly organized, validly existing and in good standing under the laws of the State of Texas.

(b)  This Agreement has been duly authorized, executed and delivered by Purchaser, and, subject to Bankruptcy Court approval, is and at the time of the Closing will be a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

(c)  No agent, broker, finder, or investment or commercial banker, or other person or firm engaged by, or acting on behalf of, Purchaser in connection with the negotiation, execution, or performance of this Agreement or the transactions contemplated by this Agreement, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions.

(d)  Purchaser has not violated any contract, agreement or other instrument to which Purchaser is a party nor any judicial order, judgment or decree to which Purchaser is bound by: (i) entering into this Agreement; (ii) executing any of the documents Purchaser is obligated to execute and deliver on the Closing Date or (iii) performing any of its duties or obligations under this Agreement or otherwise necessary to consummate the transactions contemplated by this Agreement.

(e)  There are no actions, lawsuits, litigation or proceedings pending or threatened in any court or before any governmental or regulatory agency that affect Purchaser's power or authority to enter into or perform this Agreement.  There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, or, to the best of Purchaser's knowledge, threatened against Purchaser, which would have any material adverse effect on the business or assets or the financial condition of Purchaser or the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(f)  Purchaser has not (i) commenced a voluntary case, or had entered against it a petition, for relief under any federal bankruptcy act or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors, (ii) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator or similar official in any federal, state or foreign judicial or non-judicial proceeding, to hold, administer and/or liquidate all or substantially all of its property, or (iii) made an assignment for the benefit of creditors.

(g)  Purchaser is not (i) a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the OFAC of the Department of the Treasury (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), regulation or other governmental action (ii) a "specially designated global terrorist" or other person listed in Appendix A to Chapter V of 31 C.F.R., as the same has been from time to time updated and

19

amended, or (iii) a person either (A) included within the term "designated national" as defined in the Cuban Assets Control Regulations, 31 C.F.R., Part 515 or (B) designated under Sections 1(a), 1(b), 1(c), or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or a person similarly designated under any related enabling legislation or any other similar executive orders.

(h)     Purchaser has taken measures as required by law to assure that (i) funds to be used to pay the Purchase Price and (ii) with respect to each holder of a direct interest in Purchaser, funds invested by such holders in Purchaser, are derived from legal sources and such measures have been undertaken in accordance with the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and all applicable laws, regulations and government guidance on compliance therewith and on the prevention and detection of money laundering violations under 18 U.S.C. §§ 1956 and 1957.

**Section 5.03.  Operating Covenants**. Seller shall cause the Property to be maintained in substantially the same manner as prior to the Effective Date pursuant to Seller's normal course of business, consistent with prior practices, making all reasonable and ordinary maintenance repairs resulting from the breakdown or improper functioning of a particular item or system which is required to keep the Property in substantially the same condition as on the date hereof, subject to reasonable wear and tear and Article VI of this Agreement; provided that Seller shall not be obligated to perform any capital improvements or capital repairs to any part of the Property.  Seller shall not enter into any new contracts, leases (or renewals, modifications or amendments of existing contracts or leases; *provided, however,* that Seller may terminate any existing leases), easements or encumbrances without the prior written consent of Purchaser, such consent not to be unreasonably withheld, conditioned or delayed, *provided however*, Seller shall have the right to enter into contracts which may be terminated on or before the Closing Date without payment of any termination fee.  Seller shall maintain property and liability insurance on the Property until the Closing Date with substantially the same coverage as in effect on the date of this Agreement.

**Section 5.04.  Governmental Approvals.**  Subject to the terms and conditions of this Agreement, each of the Purchaser and the Seller shall use their commercially reasonable efforts, without the obligation to sell any assets, pursue any litigation or pay, incur, convey, endure or deliver any material monetary payments or other form of consideration ("**Reasonable Efforts**") (provided however that Purchaser shall pay all filing and other fees required under the HSR Act) to (i) take all action (or refrain from taking any detrimental action within its control) and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement including the satisfaction of the conditions precedent set forth in Section 3.06 and Section 3.07; provided, however, that the foregoing shall not require or cause Purchaser or Seller to waive any right it may have under other provisions of this Agreement, (ii) make, or cause to be made, the filings required of it or any of their affiliates under the HSR Act in connection with this Agreement and the transactions contemplated hereby no later than the fifth (5th) day following the Effective Date or such later date as the Purchaser and Seller may otherwise agree in writing, (iii) comply at the earliest practicable date and after consultation with the other party with any request for additional information or documentary material received by them or any of their affiliates from any Governmental Authority having jurisdiction with respect to the HSR Act and any other applicable antitrust or competition laws and use their Reasonable Efforts to take, or cause to be taken, all other actions consistent with this Section 5.04 necessary to cause the expiration or termination of the applicable waiting periods under the HSR Act (including any

extensions thereof) as soon as practicable; and (iv) obtain all other actions or non-actions, approvals, consents, waivers, registrations, permits, authorizations and other confirmations from any Governmental Authority or third party necessary, proper or advisable to consummate the transactions contemplated by this Agreement as soon as practicable.

## ARTICLE VI.
## RISK OF LOSS

**Section 6.01.  Risk of Loss**. If after the Effective Date and prior to the Closing Date all or any portion of the Property shall be taken by condemnation or eminent domain or damaged or destroyed by fire or other casualty, which (in the case of casualty) is estimated by the insurance carrier currently providing coverage for the Property to cost more than One Million Dollars ($1,000,000) to repair (or in the case of condemnation) is valued at greater than One Million Dollars ($1,000,000), (a "**Material Casualty or Condemnation Event**") Purchaser shall have the option to terminate this Agreement and receive the Escrow Deposit or proceed to closing with a deduction from the Purchase Price for the full estimated costs to Purchaser of repairing and/or restoring the Property in an amount to be agreed by Purchaser and Seller; *provided, however*, in the event Purchaser elects to proceed to closing, Purchaser may elect to pay the full Purchase Price without deduction and require Seller to pay the applicable deductible under Seller's applicable insurance policies and to assign to Purchaser any and all insurance proceeds received or to be received by Seller, less Seller's attorneys' fees and third party costs and other expenses incurred by Seller to collect or adjust such insurance or to secure the Improvements or initiate repairs of restoration of the Property and any portion of such proceeds paid or to be paid on account of the loss of rents or other income from the Property for the period prior to the Closing Date. If after the Effective Date and prior to the Closing Date all or any portion of the Property shall be taken by condemnation or eminent domain or damaged or destroyed by fire or other casualty and same does not constitute a Material Casualty and Condemnation Event, this Agreement shall remain in full force and effect and Purchaser shall pay the full Purchase Price without deduction and Seller shall pay the applicable deductible under Seller's applicable insurance policies and assign to Purchaser any and all insurance proceeds received or to be received by Seller, less Seller's attorneys' fees and third party costs and other expenses incurred by Seller to collect or adjust such insurance or to secure the Improvements or initiate repairs of restoration of the Property and any portion of such proceeds paid or to be paid on account of the loss of rents or other income from the Property for the period prior to the Closing Date.

## ARTICLE VII.
## REMEDIES

**Section 7.01.  Remedies**

(a)  If Purchaser shall default in the observance or performance of Purchaser's obligations under this Agreement and the Closing does not occur as a result thereof (a "**Purchaser Default**"), Seller's sole and exclusive remedy shall be to retain the Escrow Deposit plus any accrued interest thereon, if any, as and for full and complete liquidated and agreed damages for Purchaser's Default, and the parties shall be released from further liability to each other hereunder,

except for those obligations and liabilities that are expressly stated to survive termination of this Agreement.  Seller waives any right it may have to seek specific performance of Purchaser's obligation under this Agreement or to sue for damages for the Purchaser's Default.  SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE ESCROW DEPOSIT AND ANY INTEREST EARNED THEREON, AS THE CASE MAY BE, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT. SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW.  THIS SECTION DOES NOT LIMIT THE SELLER'S RIGHTS TO INDEMNIFICATIONS IN THIS AGREEMENT.

(b)     If Seller shall default in the observance or performance of any of the terms of this Agreement, and Purchaser is ready, willing, and able to close in accordance with the terms, provisions and conditions of this Agreement and the Closing does not occur as a result thereof (a "**Seller Default**"), Purchaser shall elect as its exclusive remedy either (i) terminate this Agreement and obtain the return of the Escrow Deposit plus any accrued interest thereon, or (ii) specific performance.  The remedy of specific performance is only available to Purchaser if (i) any suit for specific performance is filed within thirty (30) days after Purchaser first becomes aware of the breach or default by Seller, and (ii) Purchaser is not then in breach or default in the performance of any of its obligations under this Agreement.  Notwithstanding anything to the contrary contained in this Agreement, except for claims brought by Purchaser under Section 10.03 of this Agreement after the Closing Date, in no event shall Seller be liable to Purchaser for any damages.

(c)     Upon the termination of this Agreement and release of the Escrow Deposit, and any interest accrued thereon, to either Purchaser or Seller, as the case may be, in accordance with this Section, this Agreement shall be deemed null and void and no party hereto shall have any obligations to, or rights against, the other hereunder, except as to any terms herein that expressly survive termination of this Agreement.

(d)     The provisions of this Article shall survive the Closing or termination of this Agreement.

## ARTICLE VIII.
## ESCROW

**Section 8.01.    Escrow Terms**. Title Company shall hold and disburse the Escrow Deposit in accordance with the following provisions:

(a)     Title Company shall hold the Escrow Deposit in a federally insured interest-bearing account, and shall not be liable for any losses suffered in connection with any such investment.

(b)     If the Closing occurs, then the Title Company shall deliver the Escrow Deposit to Seller.

(c)     If for any reason the Closing does not occur and either party makes a written demand upon Title Company for payment of the Escrow Deposit, the Title Company shall give written notice to the other party of such demand.  If the Title Company does not receive a written objection from the other party to the proposed payment within five (5) days after the giving of such notice, the Title Company is hereby authorized to make such payment.  If the Title Company does receive such written objection within such five (5) day period or if for any other reason the Title Company in good faith shall elect not to make such payment, the Title Company shall continue to hold such amount until otherwise directed by written instructions from the parties to this Agreement or a final judgment in the Bankruptcy Court.  However, the Title Company shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Bankruptcy Court.  The Title Company shall give written notice of such deposit to Seller and Purchaser.  Upon such deposit, the Title Company shall be relieved and discharged of all further obligations and responsibilities as an escrow agent hereunder.

## ARTICLE IX.
## BANKRUPTCY MATTERS

**Section 9.01.  Bankruptcy Court Approval**.  Seller's and Purchaser's obligations under this Agreement are subject to the Bankruptcy Court having entered the Sale Order (defined below) and the Sale Order not being subject of a stay (pursuant to Bankruptcy Rule 6004 or otherwise) or appeal as of the Closing Date, or in the event a stay is in effect the Sale Order shall have become final.

**Section 9.02.  Sale Motion**.  Within five (5) Business Days of the Effective Date, the Seller shall file a motion with the Bankruptcy Court seeking authority to sell the Property under the terms of this Agreement (the "**Sale Motion**"), which Sale Motion shall be subject to the prior approval of Purchaser, which approval shall not be unreasonably withheld, conditioned or delayed. The Sale Motion will also seek approval to assign the Assigned Contracts, the Construction Warranties, the Licenses and Permits and other contract rights contemplated by this Agreement to Purchaser at Closing.

**Section 9.03.  Sale Order**

(a)     Seller shall use Reasonable Efforts to promptly obtain the entry of an order (the "**Sale Order**") of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby (which Sale Order must be in form and substance acceptable to Purchaser, approval of which shall not be unreasonably withheld, conditioned or delayed provided that the Sale Order otherwise satisfies the requirements set forth in subsection (b) below).

(b)     The Sale Order contemplated hereby shall contain the following provisions (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Sale Order):

(i)     the sale of the Property by Seller to Purchaser: (A) are or will be legal, valid and effective transfers of the Property; and (B) vests or will vest Purchaser with all right, title and interest of Seller to the Property free and clear of all liens, encumbrances, interests

and claims pursuant to Section 363(f) of the Bankruptcy Code except as to the Permitted Exceptions and those matters which may be expressly approved by Purchaser;

(ii)  Purchaser has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, the transactions contemplated by this Agreement are undertaken by Purchaser and Seller at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of Section 363(m) of the Bankruptcy Code;

(iii)  all persons and entities, including lien holders and interest holders, are enjoined from taking any actions against Purchaser or any affiliate or assignee of Purchaser or the Property to recover any claim that such person has solely against Seller unless such claim or interest is specifically assumed under this Agreement by the Purchaser;

(iv)  the Bankruptcy Court retains exclusive jurisdiction to interpret and enforce the provisions of this Agreement and the Sale Order in all respects; *provided, however*, that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other federal court in the Western District of Texas or Texas state court in Williamson County, Texas, having competent jurisdiction with respect to any such matter.

**Section 9.04.  Assumption Contracts**.  Seller shall use Reasonable Efforts to obtain entry of an order by the Bankruptcy Court authorizing the Seller to assign the Assigned Contracts to the Purchaser as of the Closing Date (collectively, the "**Assignment Order**"). To the extent any of the Assigned Contracts are assigned to and assumed by Purchaser, Seller shall be responsible for paying any cure costs associated with such contracts or agreements.

**Section 9.05.  Cooperation in Bankruptcy Matters**

(a)  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, such as furnishing affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement or other documents or information for filing with the Bankruptcy Court and making its representatives available to be interviewed by Seller's attorneys and to testify before the Bankruptcy Court and at depositions.

(b)  If a written objection is filed to the motion seeking approval of this Agreement, which is an objection that would prohibit or otherwise prevent the Closing from occurring pursuant to the terms of this Agreement, Seller and Purchaser shall use reasonable efforts to have such objection overruled.

(c)  In the event the Sale Order is appealed, Seller and Purchaser shall each use their respective reasonable efforts to defend such appeal or, by mutual written agreement, close the transactions contemplated hereby unless such closing is stayed by the Bankruptcy Court.

## ARTICLE X.
## MISCELLANEOUS

**Section 10.01. <u>Governing Law</u>**. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Texas in accordance with the laws applicable to contracts executed in such state (without giving effect to the principles of conflicts of laws thereof), provided that the validity and enforceability of all conveyance documents or instruments executed and delivered pursuant to this Agreement insofar as they affect title to real property shall be governed by and construed in accordance with the laws of the jurisdiction in which such property is located. Without limiting any party's right to appeal any order of the Bankruptcy Court, the parties agree that the Bankruptcy Court shall retain sole jurisdiction over any legal action or proceeding with respect to this Agreement and Seller. Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby; *provided, however*, that if the Bankruptcy Case has been fully and finally dismissed and/or the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Western District of Texas. If that court declines jurisdiction, the parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the Texas courts located in Williamson County, Texas. In addition, the parties irrevocably consent to service of process by delivering a copy of the process to such person to the address provided pursuant to <u>Section 10.05</u> of this Agreement by federal express or other overnight courier for overnight delivery or by certified mail, postage prepaid.

**Section 10.02. <u>Merger; No Representations; Entire Agreement</u>**. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersedes any other prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. This Agreement is entered into after full investigation, no party relying upon any statement or representation, not set forth in this Agreement, made by any other party.

**Section 10.03. <u>Limited Survival</u>**. All representations warranties , covenants or other obligations of the parties contained in, or arising out of, this Agreement shall survive the Closing hereunder for a period of six (6) months after the Closing Date (the "**Survival Period**") as provided in this Section. If any claim for a breach of a representation, warranty, covenant, or other obligation is not made prior to the expiration of the Survival Period, then such claim shall be forever waived and barred, regardless of whether either the Seller or the Purchaser had knowledge of such claim or the facts giving rise to such claim before the expiration of the applicable survival period. If the party asserting a claim under, or arising out of, this Agreement (the "**Claiming Party**") provides notice to the other party of a claim prior to the end of the Survival Period, then the Claiming Party shall be required to file suit on such claim within ninety (90) days after such notice of claim is delivered to the other party (unless such claim has been mutually resolved in writing prior to the expiration of such ninety (90) day period), otherwise such claim shall be forever waived and barred. If the Claiming Party provides notice of a claim prior to the end of the Survival Period and files suit on such claim in accordance with the immediately preceding sentence, then the liability for such claim will continue until the claim is fully resolved. Notwithstanding anything to the

contrary contained in this Agreement or in any exhibits attached hereto or in any documents executed or to be executed in connection herewith (collectively, the "Purchase Documents"), it is expressly agreed that: (1) after Closing, the remedies of Purchaser or its successors or assigns against Seller with respect to the alleged breach by Seller of any representation, warranty, covenant, undertaking, indemnity or obligation contained in any of the Purchase Documents shall be limited to an amount not to exceed $500,000.00 in the aggregate; (2) no personal liability or personal responsibility of any sort with respect to any representation, warranty, covenant, undertaking, indemnity or obligation contained in any of the Purchase Documents or any alleged breach thereof is assumed by, or shall at any time be asserted or enforceable against Seller's shareholders, directors, officers, employees, agents, constituent partners, members, beneficiaries, trustees or representatives.  Notwithstanding anything to the contrary contained in the Purchase Documents, Purchaser and Seller shall be liable only for any direct or actual damages, but not any consequential or punitive damages.

**Section 10.04.** Time: Business Days.  **TIME IS OF THE ESSENCE IN THIS AGREEMENT**; however,  whenever any action must be taken (including the giving of notices) under this Agreement during a certain time period (or by a particular date) that ends or occurs on a non-Business Day, then such period (or date) shall be extended until the next succeeding Business Day.  As used herein, the term "**Business Day**" shall be deemed to mean any day, other than a Saturday or Sunday, on which commercial banks in Austin, Texas are not required or authorized to be closed for business.

**Section 10.05.** Notices.  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given:  (a) on the day of service if served personally on the party to whom notice is to be given; (b) on the day of transmission if sent via facsimile transmission to the facsimile number given below, and confirmation of receipt is obtained; (c) on the day of transmission if sent via e-mail transmission to the e-mail address given below; (d) on the Business Day of delivery to Federal Express or similar overnight courier for overnight delivery; or (e) on the date of postmark, if mailed to the party to whom notice is to be given by first class, registered, or certified mail, with postage prepaid, to the party as follows, so long as a copy is also sent the same day under subsection (a), (b), (c) or (d):

|  |  |
|---|---|
| If to Seller: | FPMC Austin Realty Partners, LP |
|  | c/o Mary Hatcher |
|  | 2101 Cedar Springs Road, Suite 1540 |
|  | Dallas, TX 75219 |
|  | Email: MHatcher@glendonTodd.com |
|  |  |
| With a copy to: | Law Offices of Ray Battaglia, PLLC |
|  | 66 Granburg Circle |
|  | San Antonio, TX 78218 |
|  | Attn:  Ray Battaglia |
|  | Email:  rbattaglialaw@outlook.com |

If to Purchaser:


with copies to:

with copies to:

If to Title Company:

Any Party may change its address for the purpose of this <u>Section 10.05</u> by giving the other parties written notice of its new address in the manner set forth above.

**Section 10.06. <u>Modifications and Amendments</u>**. This Agreement cannot under any circumstance be modified or amended orally and no agreement shall be effective to waive, change, modify, terminate or discharge this Agreement, in whole or in part, unless such agreement is in writing and is signed by both Seller and Purchaser.

**Section 10.07. <u>No Recording</u>**. Neither this Agreement, nor any memorandum of this Agreement, shall be recorded. The recording of this Agreement, or any memorandum of this Agreement, by Purchaser shall constitute a material default and shall entitle Seller to retain the Escrow Deposit and any interest earned thereon.

**Section 10.08. <u>Successors and Assigns; Assignment</u>**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.  Purchaser may assign its rights and obligations under this Agreement  to an entity under common control with Purchaser without Seller's prior written consent, provided such assignee accepts and assumes Purchaser's obligations under this Agreement, Purchaser provides written notice to Seller at least five (5) Business Days before the Closing and such assignment is consummated on the Closing Date.   No assignment of this Agreement or Purchaser's rights hereunder shall relieve Purchaser of its liabilities under this Agreement.

**Section 10.09. <u>Severability</u>**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect, invalidate or render unenforceable any other term or provision of this Agreement. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

**Section 10.10. <u>Further Assurances</u>**.  Each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby, provided such documents are customarily delivered in real estate transactions in Texas and do not impose any material obligations upon any party hereunder except as set forth in this Agreement.

**Section 10.11. Counterparts**.  This Agreement may be executed by the parties in separate counterparts, each of which when so executed and delivered shall be an original for all purposes, but all such counterparts shall together constitute but one and the same instrument.

**Section 10.12. Headings**. The captions or paragraph titles contained in this Agreement are for convenience and reference only and shall not be deemed a part of the text of this Agreement.

**Section 10.13. No Waivers**. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party providing the waiver. No waiver by either party of any failure or refusal to comply with any obligations under this Agreement shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

**Section 10.14. Waiver of Jury Trial**.  SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY SUCH PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

**Section 10.15. Confidentiality**.  Seller agrees to maintain in confidence the dealings, negotiations and agreements of the parties with respect to the Property and this Agreement, and will not make any public release of information regarding those matters, unless (a) both parties otherwise agree in writing, (b) as either party may deem necessary or in order to comply with the federal securities law, after consultation with its legal counsel or (c) as required under applicable bankruptcy law; *provided, however*, that the Seller shall include a copy of this Agreement and disclose details regarding the Seller's dealings, negotiations and agreements with the Purchaser as it deems appropriate in connection with the Sale Motion.  All non-public information provided by Seller to Purchaser or obtained by Purchaser relating to the Property in the course of Purchaser's inspection, including, without limitation, (a) the Property Documents, (b) any environmental assessment or audit, (c) the identities of Seller and Purchaser, and the fact that they have entered into this Agreement, and (d) the terms of this Agreement (collectively, the "**Information**") shall be treated as confidential by Purchaser, and Purchaser agrees to transmit the Information only to such of its attorneys, accountants, consultants, equity investors and lenders ("**Representatives**") who need to know the Information for the sole purpose of Purchaser's review and who agree to maintain the confidentiality of such Information, unless (i) both parties otherwise agree in writing, (ii) as either party may deem necessary or in order to comply with the federal securities law, after consultation with its legal counsel or (iii) as required under applicable bankruptcy law.  In the event that this transaction is not closed for any reason, then Purchaser shall destroy or return to Seller all copies of all Information (including electronic copies) in its possession or in the possession of any of its Representatives, shall maintain the confidentiality of the Information, and shall require all Representatives not to disclose any Information to any other party.  In the event either party desires to issue a press release concerning the execution of this Agreement or the closing of the transaction contemplated by this Agreement, the party desiring to make such press release shall submit a draft of such press release to the other party for review and approval.  Neither party shall issue such a press release unless and until both parties have mutually agreed upon the form and substance of such press release.

**Section 10.16. Exclusivity; Irrevocable Offer**.  Upon and after the Effective Date, Seller will not enter into any agreement pertaining to (a) the sale, exchange, or transfer or all or any party of the Property to any person or entity other than Purchaser or its assigns, unless the Bankruptcy Court orders the Seller to conduct an auction of the Property, or (b) the lease of all or any party of the Property without the prior written consent of Purchaser, such consent not to be unreasonably withheld.   In consideration for the Seller and the Bankruptcy Court allowing Purchaser to participate in the Auction (as defined in the Bid Procedures Order (the "**Bid Procedures**") entered by the Bankruptcy Court on April [26], 2016) in accordance with and to the extent provided by the Bid Procedures, Purchaser agrees that upon submission of an executed counterpart of this Agreement to Seller, such submission shall be irrevocable.

**Section 10.17. Independent Consideration**.   Purchaser tenders to Seller and Seller acknowledges receipt of the sum of $100 as independent and non-refundable Agreement consideration ("**Independent Consideration**") for any options granted in this Agreement, provided that the option is subject to Bankruptcy Court approval.  This Independent Consideration is in addition to any other deposits made under this Agreement, is earned by Seller upon its execution of this Agreement, and will not be credited against the Purchase Price.

**Section 10.18. Effective Date**.  As used herein, the "**Effective Date**" of this Agreement or "date" of this Agreement shall in each case mean and be deemed to be the date the Bankruptcy Court enters the Sale Order on its docket.

**Section 10.19. Authorship**.  Each of the parties has actively participated in the negotiation and drafting of this Agreement and the Closing Documents and each has received independent legal advice from attorneys of its choice with respect to the advisability of making and executing this Agreement and the Closing Documents.  In the event of any dispute or controversy regarding this Agreement or any of the Closing Documents, the parties will be conclusively deemed to be the joint authors of this Agreement and the Closing Documents and no provision of this Agreement or the Closing Documents will be interpreted against a party be reason of authorship.

**Section 10.20. Dispute**.  In the event of any dispute between the parties hereto regarding any of the transactions contemplated by this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all reasonable out-of-pocket costs and expenses, including reasonable attorneys' fees on an hourly basis and not as a percentage of the debt, actually incurred by the prevailing party in connection with such dispute, with any right to have the amount of "reasonable" attorneys' fees determined by the Bankruptcy Court in accordance with any applicable laws of the State of Texas.

**Section 10.21. Reporting Person**.  Seller and Purchaser hereby designate Title Company to act as and perform the duties and obligations of the "reporting person" with respect to the transaction contemplated by this Agreement for purposes of 26 C.F.R. Section 1.6045 4(e)(5) relating to the requirements for information reporting on real estate transactions closed on or after January 1, 1991.  In this regard, Seller and Purchaser each agree to execute at Closing, and to cause Escrow Agent to execute at Closing, a designation agreement designating Title Company as the reporting person with respect to the transaction contemplated by this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

PURCHASER

[_____]

By: _____

Name: _____

Title: _____

SELLER

**FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership**

By: NEAL RICHARDS GROUP AUSTIN
   DEVELOPMENT LLC,
  Its:  General Partner

  By: _____
    Todd Furniss
    Manager

ACKNOWLEDGED:

**ALLEGIANCE TITLE COMPANY**

By: _____

31

LIST OF EXHIBITS

| | |
|---|---|
| EXHIBIT A | LAND |
| EXHIBIT B | LIST OF ASSIGNED CONTRACTS |
| EXHIBIT C | DESCRIPTION OF EXCLUDED PERSONAL PROPERTY |
| EXHIBIT D | FORM OF SPECIAL WARRANTY DEED |
| EXHIBIT E | FORM OF BILL OF SALE |
| EXHIBIT F | FORM OF ASSIGNMENT OF CONTRACTS |
| EXHIBIT G | FORM OF FIRPTA AFFIDAVIT |
| EXHIBIT H | FORM OF ASSIGNMENT OF CONSTRUCTION WARRANTIES, CONSTRUCTION GUARANTIES, LICENSES AND PERMITS |
| EXHIBIT I | FORM OF OWNER'S AFFIDAVIT |
| EXHIBIT J | [RESERVED] |
| EXHIBIT K | VIOLATIONS |

**EXHIBIT A**

**LEGAL DESCRIPTION**[1]

---

[1] NTD: Property description to be added prior to distributing final PSA Template to bidders.

**EXHIBIT B**

**ASSIGNED CONTRACTS**

1.  Landscape Maintenance Agreement with Clean Scapes, LP; and

2.  Commercial Contract for Supply of Electricity with U.S. Retailers, LLC, d/b/a  Cirro Energy.

# EXHIBIT C

## DESCRIPTION OF EXCLUDED PERSONAL PROPERTY

| **Vendor** | **Description** |
|---|---|
| Balfour Beatty Construction Group | Proj 12627000 (Equipment Planning contract)- Not Signed, Warehouse Agrmt CO #002 |
| Park Place International | Meditech Servers |
| FormFast | Digital custom form image for checks |
| Meditech | Meditech Software |
| ACCESS | Access Eforms & Signatures |
| COREPOINT HEALTH | Corepoint Engine - 20 connections |
| INTERCLOUD | Technology Package CAD Drawings |
| VDI | VMWare expansion & storage upgrade |
| Dell | Laptops for C-levels |
| Healthline Systems | Echo credentialing |
| STRYKER | Inpatient beds |
| STRYKER | OR Lights & Booms |
| VDI | VM ware hosts for the SIS project - VDI |
| CDW-G | Terminal Server Hardware for the SIS project - CDW |
| SIS | Surgical Information System |
| Carefusion | Carefusion Carousel |
| Siemens Healthcare Diagnostics | Siemens Luminos Agile R & F |
| Siemens Healthcare Diagnostics | Siemens CT |

| | |
|---|---|
| Siemens Healthcare Diagnostics | Siemens portable x-ray machine |
| Siemens Healthcare Diagnostics | Siemens Espree MRI 1.5T/Magnet/Chiller |
| Selart | 175 pieces of Hospital Artwork |
| Steris | Double Sink Chair Carriers |
| AP Gulf States | Kitchen Equipment |
| AP Gulf States | Pneumatic Tube |
| Siemens Healthcare Diagnostics | Crane for chiller |
| Innovative Consulting, LLC | Onsite PM |
| Forward Advantage | Fax Server Application for Radiology and Lab |
| Steris | Start Up Facility Purchases |
| MoreDirect | 3 Laptops |
| Baker | Hoods |
| DMI | Structured Cabling |
| Convergint Technologies | Access Control System |
| Critical Alert Systems | Nurse Call & RTLS systems |
| Fisher Healthcare | Gross Lab Station |
| VDI | DAS Solution |
| VDI | LAN Equipment |
| VDI | Virtual Servers Network Configuration |
| VDI | WAP Proposal |
| EPS Texas | Ice Machines |
| EPS Texas | Dishwasher |
| Ultrapure | Water purification system |
| Medivators | Scope Buddy, Medivator DSD Edge, 2 each |

| | |
|---|---|
| EPS Texas | Viewbox 2 panel recessed |
| More Direct | 10 Laptops |
| More Direct | SmartDraw Acrobat |
| VDI | Telephone system |
| Page | MOB TI Arch design |
| Siemens Healthcare Diagnostics | Bypass Panel |
| More Direct | Blue Beam software |
| DMI | UPS & PDU's for IT rooms |
| DMI | Nurse Call & RTLS systems - Installation |
| Solta Medical | Vaser Lipo system |
| Mindray | Gateway Installation |
| Mindray | Mindray Infrastructure |
| Universal Medical | Wall Mounted lead apron rack - 15 |
| Beckman Coulter | DxH 600 Hematology Analyzer |
| Orthoscan | HD Flat Detector Mini C-Arm |
| Stryker Corporation | Cast cutter |
| Stryker Corporation | Tourniquets |
| Stryker Instruments | System 7 Drills and Saw |
| Stryker Corporation | Core console |
| Stryker Corporation | Flyte Helmets |
| Stryker Corporation | Neptunes - 2 |
| Stryker Corporation | Camera Head & Light Cord - No Charge |
| Stryker Corporation | Camera Heads, Laparoscopes, Arthroscopes, Instruments |
| Stryker Corporation | CCU-10, L9000 light source-10, Insufflators - 8 |

| | |
|---|---|
| Stryker Corporation | Flexible Control Unit - 2 - No Charge |
| Stryker Corporation | Digital Ureteroscopes - 4 |
| DMI | Overhead paging System |
| Databank | Onbase - Phase I(AP and MM) |
| Medical Information tech | Interface for billing vendors |
| COREPOINT HEALTH | 10 connection licenses |
| AEC | Shower Curtains/Privacy Curtains |
| MIndray | Central monitoring station |
| MoreDirect | 10 laptops and accessories |
| Beckman Coulter | DxC and Access 2 Analyzer |
| Carefusion | Alaris pumps |
| VDI | Non-MediTech SAN expansion |
| Stryker | camera heads, light source, camera box (for 4 future OR) |
| Mindray | GCX brackets |
| Mindray | Ultrasound units |
| Mindray | Patient Monitoring |
| Stryker | Camera Heads, Laparoscopes, Arthroscopes, Instruments |
| Southwest Solutions | High Density Shelving |
| McKesson | System Sofware, Implementation, Equipment |
| Baker Co | interface cable for hood to connect to BAS |
| Stryker Endoscopy | HD 3 chip CCU, L9000 light source, Pneumo Sure,Standard video cart, 26"display |

## EXHIBIT D

## FORM OF SPECIAL WARRANTY DEED

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## SPECIAL WARRANTY DEED

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | Known all men by these presents: |
| COUNTY OF WILLIAMSON | § | |

FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership ("**Grantor**") and a debtor in the bankruptcy case styled In re FPMC Austin Realty Partners LP in the United States Bankruptcy Court for the Western District of Texas, Case No. 16-10020-TMD (the "**Bankruptcy Case**"), as of [_____], 2016, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other valuable consideration to the undersigned in hand paid by [**Purchaser**] ("**Grantee**"), the receipt and sufficiency of which are hereby acknowledged, has GRANTED, SOLD AND CONVEYED, and by these presents does GRANT, SELL AND CONVEY unto Grantee, the land in Williamson County, Texas fully described on **Exhibit A** attached hereto (the "**Land**"), together with (a) all buildings, structures, parking areas, sidewalks, landscaping and other improvements and fixtures located on the Land (collectively, the "**Improvements**") and (b) all of Grantor's right, title, and interest in and to all related rights and appurtenances, including, without limitation, any and all right, title and interest of Grantor in and to (i) easements, adjacent streets, waterways, air rights, strips and gores, roads, alleys or rights of way open or proposed, and rights, titles and interests of Grantor in and to any reversionary rights, if any, attributable or appurtenant to the Land, (ii) any land lying in the bed of any street, alley, road or avenue, opened or proposed, public or private, in front of or adjoining the Land, (iii) any award made or to be made with respect to a condemnation, eminent domain or other governmental acquisition proceedings applicable to the Land, (iv) any unpaid award for damage to the Land by reason of change of grade of any street, and (v) minerals and mineral interests, royalty interests, working interests, leasehold interests, production payments and any other economic interests and executive rights that are owned by Grantor in, on, under, across and/or relating to the Land or the Improvements (collectively, the "**Appurtenant Rights**"; together with the Land and the Improvements being referred to hereinafter as the "**Property**"), pursuant to that certain Order Confirming Sale of Property [Docket No. _____] as attached hereto as **Exhibit B** (the "**Bankruptcy Order**");

39

This conveyance, however, is made and accepted subject to the matters described on **Exhibit C** attached hereto and made a part hereof (hereinafter referred to as the "**Permitted Encumbrances**").

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee and Grantee's successors and assigns forever, subject to the Permitted Encumbrances. Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND all and singular the Property unto Grantee, Grantee's successors and assigns against every person whomsoever claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise.

THE CONVEYANCE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" BASIS, AND GRANTEE ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF GRANTOR HEREIN, EXCEPT AS OTHERWISE SPECIFIED HEREIN, GRANTOR MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY.

EXECUTED on the date set forth in the acknowledgement certificate below, to be effective as of the date first written above.

GRANTOR:

**FPMC AUSTIN REALTY PARTNERS, LP,**
**a Texas limited partnership**

By:    Neal Richards Group Austin Development LLC,
its General Partner

By: _____
Todd Furniss
Manager

THE STATE OF _____    §

§

COUNTY OF _____    §

Before me, the undersigned Notary Public of the State of Texas, on this day personally appeared _____, _____ of Neal Richards Group Austin Development, LLC, a Texas limited liability company and the general partner of FPMC Austin Realty Parnters, LP, a Texas limited partnership, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he or she executed the same in such capacity for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, A.D., _____.

_____
Notary Public in and for the State of _____

GRANTEE'S ADDRESS FOR TAX NOTICES &

WHEN RECORDED RETURN TO:

_____

_____

41

_____

**EXHIBIT A**

**LAND**

**EXHIBIT B**

**BANKRUPTCY ORDER**

## EXHIBIT C

## PERMITTED ENCUMBRANCES

## EXHIBIT E

## FORM OF BILL OF SALE

This Bill of Sale (this "**Bill of Sale**") is made as of _____, 2016, by FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership ("**Grantor**") and a debtor in the bankruptcy case styled In re FPMC Austin Realty Partners LP in the United States Bankruptcy Court for the Western District of Texas, Case No. 16-10020-TMD (the "**Bankruptcy Case**") to [**Purchaser**] ("**Grantee**"). Unless otherwise defined in this Bill of Sale, all capitalized terms used herein shall have the meaning given to them in that certain Purchase and Sale Agreement by and between Grantor and Grantee (the "**Contract**").

For and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other valuable consideration to Grantor paid by the Grantee, the receipt and sufficiency of which are acknowledged, Grantor GRANTS, SELLS, and CONVEYS to Grantee, all equipment, furniture, fittings, fixtures, and articles of personal property owned by Grantor and either located on or used exclusively in connection with the real property described on **Exhibit A** attached to this Bill of Sale (such equipment, furniture, fittings, fixtures, and articles of personal property are referred to collectively as the "**Personal Property**") more particularly described on **Exhibit B** attached hereto and made a part hereof pursuant to that certain Order Confirming Sale of Property [Docket No. _____] as attached hereto as **Exhibit C** (the "**Bankruptcy Order**").  It is expressly agreed, however, that the Personal Property shall not include the Excluded Personal Property as defined in the Contract.

Except as expressly set forth in the Contract to which this Bill of Sale relates, THE CONVEYANCE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" BASIS, AND GRANTEE ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF GRANTOR HEREIN, EXCEPT AS OTHERWISE SPECIFIED HEREIN, GRANTOR MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY. The conveyance is made without recourse against Grantor.

**[Signature page follows]**

EXECUTED to be effective as of the date first written above.

**FPMC AUSTIN REALTY PARTNERS, LP**,
a Texas limited partnership


By:     NEAL RICHARDS GROUP FOREST PARK
        DEVELOPMENT LLC,
        its General Partner


        By: _____
             Todd Furniss
             Manager

**Exhibit A**

**Real Property Description**

**Exhibit B**

**Personal Property Description**

**Exhibit C**

**Bankruptcy Order**

# EXHIBIT F

## FORM OF ASSIGNMENT OF CONTRACTS

This ASSIGNMENT OF CONTRACTS (this "**Assignment**") is made as of _____, 2016 (the "**Effective Date**"), by FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership ("**Assignor**") and a debtor in the bankruptcy case styled In re FPMC Austin Realty Partners LP in the United States Bankruptcy Court for the Western District of Texas, Case No. 16-10020-TMD (the "**Bankruptcy Case**"), and [**Purchaser**] ("**Assignee**").

Recitals:

A.     Pursuant to the Purchase and Sale Agreement dated as of _____, 2016 by and between Assignor and Assignee (the "**Purchase Agreement**"), Assignor is conveying to Assignee certain real property, together with all structures and other improvements located thereon and thereunder, located in Williamson County, Texas as described on **Exhibit A** of the Purchase Agreement and by this reference incorporated herein (the "**Property**").  Capitalized terms used but not defined in this Assignment shall have the meanings ascribed to them in the Purchase Agreement.

B.     This Assignment is being entered into pursuant to the Purchase Agreement, upon the closing thereunder, in order to effect the assignment and assumption of Assignor's interest under the contracts for service, repair, supply, utility, equipment and maintenance of the Property set forth on Schedule A attached to this Assignment (the "**Service Contracts**"), pursuant to that certain Order Confirming Sale of Property [Docket No. _____] as attached hereto as **Exhibit 1** (the "**Bankruptcy Order**") entered in the Bankruptcy Case.

NOW, THEREFORE, FOR VALUE RECEIVED, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     Assignment.  Assignor hereby ASSIGNS, GRANTS, DELIVERS and CONVEYS to Assignee all of Assignor's rights, interests and obligations in the Service Contracts.

2.     Assumption.  Assignee hereby (i) accepts the assignment of the Service Contracts, and (ii) assumes those obligations of the Assignor under the Service Contracts that first arise or accrue from and after the date hereof.

3.     Indemnification. Assignor hereby agrees to indemnify Assignee from and against any and all actual losses incurred by Assignee arising from claims brought against Assignee, as successor to the interest of Assignor under the Service Contracts, relating to the breach by Assignor of any of the obligations under the Service Contracts which accrued prior to the date hereof.

4.     Binding Effect.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.     <u>Counterparts</u>. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

**[SIGNATURE PAGES FOLLOW]**

DATED EFFECTIVE as of the first date above written.

**GRANTOR**:

**FPMC AUSTIN REALTY PARTNERS, LP,**
a Texas limited partnership

By:    NEAL RICHARDS GROUP FOREST PARK
        DEVELOPMENT LLC,
        its General Partner


By: _____
     Todd Furniss, Manager

DATED EFFECTIVE as of the first date above written.

**[PURCHASER]**

By: _____

Name: _____

Title: _____

**SCHEDULE A**

**SERVICE CONTRACTS**

**[INSERT]**

**EXHIBIT 1**

**BANKRUPTCY ORDER**

**[INSERT]**

## EXHIBIT G

## FORM OF NON-FOREIGN CERTIFICATE

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by **FPMC Austin Realty Partners, LP**, a Texas limited partnership ("**Transferor**"), the undersigned hereby certifies the following on behalf of Transferor.

1.      Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Transferor is not a disregarded entity as defined in Section 1.1445-2(b)(2)(iii);

3.      Transferor's U.S. employer identification number is                ; and

4.      Transferor's office address is:        2101 Cedar Springs Road, Suite 1540 Dallas, Texas 75219

Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

**FPMC AUSTIN REALTY PARTNERS**, **LP**,
a Texas limited partnership


By:     NEAL RICHARDS GROUP FOREST PARK DEVELOPMENT LLC,
its General Partner


By:     _____
        Todd Furniss
        Manager

STATE OF _____          §

§

COUNTY OF _____          §

      This instrument was acknowledged before me on _____, 20__, by _____, _____ of _____, a _____, on behalf of said _____.

_____

Notary Public, State of _____

      SWORN TO AND SUBSCRIBED BEFORE ME by _____ on _____, 20____.

Notary Public, State of _____

**EXHIBIT H**

**ASSIGNMENT OF CONSTRUCTION WARRANTIES, CONSTRUCTION GUARANTIES, LICENSES AND PERMITS**

This ASSIGNMENT OF CONSTRUCTION WARRANTIES, CONSTRUCTION GUARANTIES, LICENSES AND PERMITS (this "**Assignment**") is dated as of _____, 2016 (the "**Effective Date**"), by and between FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership ("**Assignor**"), and [**Purchaser**] ("**Assignee**").

Recitals:

A.	Pursuant to the Purchase and Sale Agreement dated as of _____, 2016 by and between Assignor and Assignee (the "**Purchase Agreement**"), Assignor is conveying to Assignee certain real property, together with all structures and other improvements located thereon and thereunder, located in Williamson County, Texas as described on **Exhibit A** of the Purchase Agreement and by this reference incorporated herein (the "**Property**"). Capitalized terms used but not defined in this Assignment shall have the meanings ascribed to them in the Purchase Agreement.

B.	In connection with the above conveyance, Assignor is to assign, transfer and convey to Assignee to the extent assignable or transferable, all of Assignor's right, title and interest in and to all (i) construction warranties and construction guaranties issued with respect to the improvements on the Property that are capable of being assigned to Assignee (collectively, the "**Construction Warranties**"), and (ii) licenses, permits or similar documents to the improvements on the Property that are capable of being assigned to Assignee (collectively, the "**Licenses and Permits**" and together with the Construction Warranties, the "**Intangible Property**").

NOW, THEREFORE, FOR VALUE RECEIVED, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.	Assignment.  Assignor hereby grants, transfers, assigns, delivers and conveys to Assignee, without any representation or warranty (whether express or implied), as of the Effective Date, all of Assignor's right, title and interest in and to the Intangible Property.  Except as expressly set forth in the Purchase Agreement, the Intangible Property is sold and conveyed, AS IS, WHERE IS, AND WITH ALL FAULTS, and without recourse against Assignor.  Assignor remains responsible for all liabilities and obligations of Assignor relating to the Intangible Property which accrue prior to the Effective Date.

2.	Assumption.  Assignee hereby assumes, and agrees to be bound by, all obligations and liabilities of Assignor under or relating to the Intangible Property which shall arise or be incurred, or which are required to be performed, on and after the Effective Date.

3.	Binding Effect.  This Assignment shall inure to the benefit of, and be binding upon, each of the parties hereto and their respective successors and assigns.

4.	Applicable Law.  This Assignment shall be governed by, and construed in accordance with, the laws of the State of Texas.

5.      Recitals.  The recitals are herein incorporated into this Assignment.

6.      Counterparts.  This Assignment may be executed in multiple counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument.

**[Signatures appear on the following page]**

IN WITNESS WHEREOF, the undersigned have executed this Assignment as of the Effective Date.

ASSIGNOR:

**FPMC AUSTIN REALTY PARTNERS, LP**, a Texas limited partnership

By:    Neal Richards Group Austin Development LLC, its General Partner

By: _____
     Todd Furniss, Manager

ASSIGNEE:

**[PURCHASER]**

By: _____
Name: _____
Title: _____

# EXHIBIT I

# FORM OF OWNER'S AFFIDAVIT

TITLE ORDER:

ESCROW ORDER:

PROPERTY:

COUNTY:

STATE:

FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership (collectively, "**Seller**"), as seller, and [**Purchaser**] ("**Buyer**"), as buyer, are parties to that certain Purchase and Sale Agreement (the "**Purchase Agreement**") dated _____, 2016, as the same has been amended and modified, relating to the improved real property (the "**Real Property**") referred to in **Exhibit A** attached hereto and made a part hereof.

In connection with the consummation of the transactions contemplated by the Purchase Agreement, Seller hereby represents and warrants to [**Title Company**] the following:

Each party comprising Seller has consented to the sale of the Real Property as provided in the Purchase Agreement and has authorized Todd Furniss as Manager of the Neal Richards Group Austin Development LLC, the Seller's General Partner, as its agent and attorney in fact, to execute any and all closing documents on its behalf.

1.      To Seller's actual knowledge, except as disclosed in **Exhibit B** attached hereto and made a part hereof,there is no capital improvement work currently being constructed (or that was constructed during the last 3 months) on the Real Property that is the subject of a written contract with Seller which could give rise to a mechanic's or materialman's lien on the Real Property.

2.      To Seller's actual knowledge, there are no leases or occupancy agreement affecting the Real Property that give any entity or person occupancy rights in and to the Real Property.

3.      Seller shall not hereafter cause any encumbrances or other instruments to be recorded against the Real Property (other than the recording of a special warranty deed (the "**Deed**") transferring fee title to the Real Property to Buyer) through the date the Deed is recorded in Williamson County, Texas.

For purposes hereof, the "actual knowledge" of Seller shall be limited to the actual knowledge (and not implied, imputed, or constructive) of Todd Furniss (whom the Seller represents is the representative of the general partner of the Seller), with no duty of inquiry.

Notwithstanding anything contained herein to the contrary, the representations and warranties set forth in this Owner's Affidavit shall only survive the closing of the transactions as provided in the

Purchase Agreement, after which date this Owner's Affidavit shall be of no further force or effect. This Owner's Affidavit is being executed for the sole and exclusive benefit of the Title Company and no other party or person shall have any rights hereunder.

[SIGNATURES ON NEXT PAGE]

Executed as of _____, 2016

**FPMC AUSTIN REALTY PARTNERS, LP**,
a Texas limited partnership

By:   NEAL RICHARDS GROUP FOREST PARK
         DEVELOPMENT LLC,
         its General Partner

By: _____
      Todd Furniss
      Manager

<u>Exhibit A</u>

REAL PROPERTY

<u>Exhibit B</u>

**EXHIBIT J**

[RESERVED]

**EXHIBIT K**

**VIOLATIONS**

Certificate of Blocking Code Violation dated January 27, 2016