**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **BANKRUPTCY NO. 16-10020-TMD** |
| FPMC AUSTIN REALTY | § | |
| PARTNERS, LP, | § | **CHAPTER 11 PROCEEDING** |
| | § | |
| DEBTOR | § | |

**MOTION FOR AN ORDER (I) APPROVING PURCHASE AND SALE AGREEMENT FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS TO ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP, (II) AUTHORIZING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING <u>RELATED RELIEF</u>**

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE:

NOW COMES the debtor and debtor in possession in the above-captioned case (the "Debtor") by and through its undersigned counsel, submits this motion (the "Motion") for an Order (I) approving the Purchase and Sale Agreement (the "PSA") for the sale (the "Asset Sale") of substantially all of Debtor's assets (the "Property") to ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP ("Purchaser" or "St. David's") (II) authorizing the sale of the Property free and clear of all liens, claims, encumbrances, and interests, (III) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (IV) granting related relief.  In support of the Motion, Debtor respectfully represents as follows:

## V.     JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 6004 and 9014 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Western District of Texas (the "**Local Rules**").

## VI.    BACKGROUND

3.    On January 5, 2016 (the "**Petition Date**"), the Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**").

4.    The Debtor continues to operate its business and manage its properties as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To date, no creditor's committee has been appointed in this Chapter 11 Case by the Office of the United States Trustee for the Western District of Texas (the "**United States Trustee**").  No trustee or examiner has been appointed in the Debtor's Chapter 11 Case.

5.    The Debtor's primary asset is a medical campus property commonly known as the Forest Park Medical Center Hospital and Medical Office Building located on 8.5 acres on the south side of SH 45 North between MoPac and I-35 in Round Rock, Texas.  Forest Park Medical Center consists of a short-term acute care hospital ("**Hospital**") and medical office building ("**MOB**") together with a 445 stall adjacent parking garage ("**Garage**" together with the Hospital and the MOB are collectively referred to herein as the "**Property**"[1]). The Hospital is a 4-story, 146,000

---

[1] Also included within the definition of "Property" are (i) all furniture, fixtures, equipment, appliances, supplies and other articles of personal property located on and used in connection with the operation or maintenance of the Property

2

square foot facility containing 10 operating rooms, 6 ICU rooms, and 40 patient rooms, many including family suites.  The MOB contains 80,000 square feet of rentable area.  The Hospital and MOB share use of the Garage.

6.      While one of the 3 buildings located on the Property was designed and built for the specific use as an acute care hospital, the Debtor does not operate the health care business conducted on site.  Construction of the Hospital, MOB and Garage are complete with only minor additional completion and punch list items remaining.  Certificates of occupancy have issued for the Hospital and MOB.  However, as of the Petition Date, the Hospital is leased to a single tenant that has yet to commence operations.  Two tenants have executed leases for space in the MOB, although neither tenant has taken possession of the leased space.

7.      The Debtor filed the Chapter 11 Case to prevent foreclosure upon the Property and to conduct an orderly sale of the Property.  Since the Petition Date, and prior to engaging a real estate broker or actively marketing the Property, the Debtor received numerous expressions of interest to acquire the Property.  Those early expressions of interest progressed quickly to negotiations of a Purchase and Sale Agreement with one particular prospective buyer.  As those negotiations concluded, the Debtor received letters of intent from several other prospective purchasers.

8.      Considering the number of prospective purchasers, the identity of those potential purchasers and the terms contained in their offers[2], the Debtor determined to forgo a market clearing process and a formal sale procedure.  Instead, the Debtor engaged CBRE, Inc. and KOA

---

provided they are owned by the Debtor; (ii) all warranties and guaranties issued with respect to the Improvements that are capable of being assigned at Closing; and (iii) those contract rights that the Debtor and the purchaser mutually agree to sell and purchase, respectively.

[2] All of the offers provided for a purchase price significantly exceeding the total of all claims against the Debtor.

Partners, LLC ("**Brokers**") to assist in managing an informal sale process.  The Brokers notified the prospective purchasers of a call for "Best and Final Offers".  Shortly after the expiration of the self-imposed offer deadline, the Debtor received an offer to purchase the Property from St. David's which was clearly superior to the next best offer which would have netted the estate less than $90 million and contained conditions to closing materially inferior to the St. David's offer.  The Debtor advised that prospective purchaser of the Debtor's intent to proceed with a motion to sell the Property to the St. David's as a designated buyer.  Within 24 hours, the Debtor received a revised offer from the lower bidder of $105 million on conditions similar to the St. David's offer.

9.     Presented with a superior offer to the St. David's offer, the Debtor could no longer proceed with the informal process previously outlined.  While a sale to either purchaser would have fulfilled the Debtor's obligations under the Bankruptcy Code to pay its creditors in full, the Debtor no longer believed that a sale to St. David's at that price would fulfill its fiduciary obligations to its limited partners.  In order to restore credibility, predictability and transparency to the sale process, the Debtor decided to request approval from this Court an abbreviated sale process.

10.    On April 28, 2016 the Court entered its Order (A) Approving Sale Procedures Relating to Sale of the Debtor's Property and Other Assets; (B) Scheduling a Hearing to Consider the Sale; and (C) Granting Related Relief (the "**Sale Procedures Order**").  Subsequent to entry of the Sale Procedures Order, St. David's approached the Debtor and increased its offer to purchase the Property from $100 million to $115 million ("**St. David's Offer**").  St. David's Offer includes a deposit equal to 2% of the purchase price which is immediately non-refundable and includes no meaningful conditions to closing.

11.    On numerous occasions, the Debtor has advised the Court and the prospective

bidders that above a certain price point, "certainly of closing" is of paramount importance to the Debtor and its limited partners.  The St. David's Offer presents superior price, terms and closing conditions.  The Debtor presented the terms of the St. David's Offer to its limited partners as required under the terms of its partnership agreement.  The partnership requires approval of the sale of the Property by a two thirds super majority.  After the partner meeting and before limited partners registered their position on the St. David's sale, a competing bidder in possession of confidential information regarding the deliberations of the partners advised the Debtor of its intention to offer more than $115 million to purchase the Property.  The Debtor apprised the limited partners of this development.  Notwithstanding the potential receipt of a higher offer, the limited partners approved the St. David's Offer by more than the required super-majority.

12.     The limited partners consented to the acceptance of the St. David's Offer on an exclusive basis and instructed the Debtor not to solicit or accept competing offers.  The Debtor and the holders of a super majority of its limited partner interests have determined in their best business judgment to accept the St. David's Offer and terminate the auction process set forth in the Sale Procedures Order.  The Debtor requests that this Court enter orders terminating the auction, accept the business judgment of the Debtor's management and partners and approve the sale of the Property to St. David's on the terms and conditions of the Purchase and Sale Agreement between the Debtor and St. David's attached as Exhibit "A" (the "**St. David's PSA**").

A.     **Liens Encumbering the Property**

13.     On or about December 20, 2013, Frost Bank, a Texas state bank ("Frost Bank" or "DIP Lender") for itself and as Administrative Agent for Amarillo National Bank as a lender and Whitney Bank as a Lender (collectively the "**Prepetition Lenders**") made a construction loan to Debtor under various pre-Petition Date loan documents ("**Construction Loan**") in the original

principal amount of $63,742,287.

14.     The Debtor's obligations under the Construction Loan are secured pursuant to a Deed of Trust dated December 23, 2013 between the Debtor and the Frost Bank as lender and Administrative Agent for the Prepetition Lenders. The Construction Loan encumbers Property, including the land, improvements, fixtures, personal property and an assignment of rents, among other collateral. As of the Petition Date, approximately $ 57.577 million of indebtedness was outstanding under the Construction Loan

15.     An interim hearing was held on the Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (a) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And (b) Use Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) And (c)  ("*DIP Motion*") was held before this Court to consider entry of an interim order on February 9, 2016 the Interim Order was entered on February 9, 2016 [Doc. 35].  A final hearing on the Motion was held before this Court to consider entry of this Final Order on February 22, 2016 (the "**Final Order**").

16.     Under the terms of the financing approved by the Final Order, the Debtor was authorized to borrow up to $1.7 million post-petition secured by the Property.  A portion of the DIP loan proceeds were used to pay accrued and unpaid ad valorem taxes due for 2015 on the Property.  Ad Valorem taxes for 2016 continue to accrue on the Property.

17.     The only additional liens on the Property may consist of lienable mechanics and materialmen's claims. According to a current title search, no mechanic's or materialmen's liens have been recorded.  The Debtor believes that the time has expired for any possible lien claims to

be filed.

B.      **Marketing the Property**

18.      Prior to filing its voluntary petition, the Debtor marketed the Property for sale and received several offers to purchase the Property. Ultimately the Debtor negotiated a letter of intent to purchase the Property for $94 million dollars.  The purchaser's financing fell through and that sale did not close.  The Debtor received a letter of intent from St. David's to purchase the Property immediately prior to the Petition Date

19.      Since the Petition Date, the Debtor and its professionals have marketed the sale of the Property in the manner described in paragraphs 7 through 11 *infra*.

## II.      RELIEF REQUESTED

20.      By this Motion, Debtor requests that the court enter an Order, substantially in the form of Exhibit "B" attached hereto, authorizing Debtor to (i) sell substantially all of the Property, free and clear of all liens, claims, and interests (other than certain specified assumed liabilities), on substantially the terms set forth in the St. David's PSA; (ii) assume certain of the executory contracts and unexpired leases associated with Debtor's business (the "**Assigned Contracts**"); (iii) assign the Assigned Contracts to St. David's; and (iv) allow the Debtor to pay the amounts, if any, necessary to cure existing defaults or arrearages under the Assigned Contracts. (the "**Sale Order**").

21.      The St. David's PSA contemplates a sale of the Property to St. David's as a designated purchaser, not subject to overbid by auction as provided for in the Sale Procedures Order.  The Debtor believes the sale of the Property is in the best interest of Debtor's estate, its creditors and partners.  Accordingly, Debtor seeks approval of the St. David's PSA and the Sale Order.

MOTION TO SELL – ST. DAVID'S

A.     **The St. David's PSA**

22.     Pursuant to the St. David's PSA, Debtor will (i) sell the Property free and clear of all liens, claims, interests, and encumbrances and (ii) assume and assign to St. David's the Assigned Contracts, if any.

23.     The PSA was negotiated at arm's length and in good faith by the Debtor and St. David's.  The Debtor and its partners, exercising their business judgment believe the consideration being paid under the St. David's PSA and the certainty of closing represents the best value proposition for the estate.  The purchase price of $115 million to be paid by St. David's will pay all creditors of the estate in full and will provide for a positive return on the limited partners original investment.

24.     The executed PSA generally provides the following:

a)     Purchase Price. On the Closing Date, Purchaser will (i) pay to Debtor One Hundred Ffiteen Million Dollars ($115,000,000.00) in cash, and (ii) assume certain liabilities of Debtor.

b)     Property. The proposed sale will include the Property (as more specifically defined in the PSA), which comprise substantially all of the property of the Debtor's estate.

c)     Sale Free and Clear. The Property is to be transferred free and clear of all all liens, interests, claims, or encumbrances in the Property other than the Assumed Liabilities pursuant to section 363(f) of the Bankruptcy Code.

d)     Assumption of Executory Contracts and Leases. Seller shall assume and assign to the Buyer all of Debtor's rights under, title to, and interest in those Assigned Contracts identified in the St. David's PSA. Seller shall cure any past defaults under the Assigned Contracts to facilitate Debtor's assumption and assignment of same to Purchaser.

e)     Conditions to Closing. The St. David's PSA does not contain any financing or due diligence conditions.  The closing conditions in the St. David's PSA are limited and include, among other things: (i) entry of the Sale Order which shall become a final order; and (ii) if necessary, clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 with respect to the St. David's PSA or expiration of any applicable waiting period pertaining thereto,

This summary of the St. David's PSA is intended to be for convenience only. To the extent the summary differs from the actual terms of the St. David's PSA, the terms of the PSA shall be controlling.

B.     **Notice of Sale Hearing**

22.     Contemporaneously with filing this Motion, the Debtor has filed a motion seeking an expedited hearing on May 13, 2016, the date previously set by this Court for the Sale Hearing in the Sale Procedures Order.   The Debtor previously served notice of the Sale Hearing contemplated in the Sale Procedures Order upon (i) the Office of the United States Trustee; (ii) counsel for the Prepetition Lender; (iii) counsel for St. David's; (iv)  all federal, state, and local regulatory or taxing authorities or recording offices that have a known interest in the Property; (v) the creditors identified on the Debtor's List of Creditors; and (vi) all other entities that have filed

requests for notices pursuant to Bankruptcy Rule 2002 (the "**Notice Parties**").

### C.    Assumption and Assignment of Contracts

23.    As part of the Motion, Debtor also seeks authority to assume and assign the Assigned Contracts to Purchaser. The St. David's PSA does not currently identify any executory contracts to be assumed by the Debtor and assigned to St. David's.

24.    To the extent applicable, with respect to Assigned Contracts, the Debtor will file with the Court and serve on each party to an Assigned Contract notice of Debtor's intention to assume and assign that party's contract to Purchaser (the "**Assignment Notice**"). Debtor will mail the Assignment Notice and within ten days after the date upon which the Court enters the Sale Order. The Assignment Notice will set forth the monetary amount Debtor believes to be necessary to cure any and all monetary defaults with respect to the Assigned Contract pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**") and provide the contracting parties with an opportunity to object to (i) the assumption and assignment, (ii) the Cure Amount, or (iii) both. If no objection is timely received, the Cure Amount set forth in the Assignment Notice will be controlling notwithstanding anything to the contrary in any Assigned Contract or other document, and the non debtor party to the Assigned Contract will be forever barred from asserting any other claim arising prior to the assignment against Debtor or Purchaser as to such Assigned Contract. If an objection to the assumption and assignment is made, the Debtor will file pleadings requesting a hearing on such objection prior to the Closing Date. If an objection by the non-debtor contracting party is made *only* with respect to the Cure Amount, a hearing to fix the Cure Amount will be set for the first hearing date available from the Court after the Closing Date; provided, however, that Debtor reserves its right to reject any executory contract until such time as the Cure Amount is fixed and accepted.

25.     The effective date of any assumption and assignment of any Assumed Contract shall be the Closing Date.  Accordingly, any Cure Amounts to be paid under any Assumed Contract will also be paid upon the closing of the Asset Sale or as soon thereafter as the Cure Amount is fixed.

## III.    APPLICABLE AUTHORITY

### A.    The Asset Sale Is Within Debtor's Sound Business Judgment.

26.     Bankruptcy Code section 363(b)(1) provides, in relevant part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate … ." Bankruptcy Code section 105(a) provides in relevant part: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

27.     The Fifth Circuit has set forth the standard for the authorization of sales pursuant to section 363 in *International Creditors of Continental Air Lines, Inc. v. Continental Airlines Inc. (In re Continental Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986).  The assets to be sold must be property of the debtor's estate.  Continental Air Lines, Inc., 780 F.2d at 1226.  Additionally, there must exist a valid "business justification" for the sale.  Id.  In determining whether there is sufficient business justification for the sale, the court

> should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.  He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.  This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*Id.* (quoting *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d. Cir. 1983).; *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 145–47 (3d Cir. 1986) (adding "good faith" requirement to *Lionel's* test).

28.     Debtor believes the Sale is the best way to preserve the value of the Property and maximize the value of Debtor's estate for the benefit of Debtor's creditors and other parties in interest.

B.      **The Sale of the Property Satisfies the Sound Business Purpose Test.**

29.     There is more than adequate business justification to sell the Property to St. David's.  As set forth above, Debtor believes the proposed St. David's PSA maximizes recovery to the estate. *See In re Tempo Technology Corp.*, 202 B.R. 363 (D. Del. 1996), *aff'd*, 141 F.3d 1155 (3d Cir. 1998) (sale of substantially all of a chapter 11 debtor's assets pursuant to a section 363(b) motion where the debtor "faced a severe cash shortfall and had no readily available source of investment capital or loans," and would shortly have run out of cash absent the debtor-in-possession financing provided by the prospective Purchaser); *see also, In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 177 (D. Del. 1991) (affirming bankruptcy court's approval of sale of substantially all assets where debtor would have been "in liquidation mode if required to delay a sale until after filing a disclosure statement and obtaining approval for a reorganization plan"); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396 (Bankr. W.D. Pa. 1991) (bankruptcy court granted expedited hearing on 363(b) motion based on "deterioration" of debtor's assets); *Coastal Indus., Inc. v. IRS (In re Coastal Indus., Inc.)*, 63 B.R. 361, 366–69 (Bankr. N.D. Ohio 1986) (approving expedited 363(b) sale five weeks postpetition to buyer with "the name recognition required by [the debtor's] customers" where debtor was suffering operating losses and lacked financing to continue its operations).

30.     Based upon an analysis of Debtor's ongoing and future business prospects, Debtor's general partner and its limited partners have concluded that, given the Debtor's continuing cash losses and its inability to obtain additional financing, the best way to maximize the value of Debtor's estate is to sell its assets immediately to the purchaser of their selection at the price that they have determined to be adequate on terms that afford them confidence of closing quickly.

31.     St. David's has offered substantial value for the Property and is willing to close quickly, thereby enabling the Debtor to reduce the risk that the value of the Property will deteriorate. Moreover, by selling the Property now, Debtor will relieve itself of certain ongoing costs and expenses, thereby minimizing administrative expenses and maximizing creditor recoveries. Accordingly, well-articulated business reasons exist for approving the St. David's PSA, such that the "business purpose" test under Bankruptcy Code section 363 is met. *See Lionel*, 722 F.2d at 1071 ("[M]ost important [] perhaps, [is] whether the asset is increasing or decreasing in value.").

## C.     **The Consideration Offered by Purchaser is Fair and Reasonable.**

32.     Debtor submits that a sale of the Property pursuant to the St. David's PSA will provide fair and reasonable consideration to Debtor's estate. The St. David's PSA requires Purchaser to pay $115,000,000 for the Property and to assume certain liabilities. Debtor respectfully submits that such consideration in exchange for the Property is both fair and reasonable.

33.     Moreover, the proposed purchase price exceeds the total debt owed to creditors by a substantial margin.   Accordingly, the consideration to be paid for the Property is both fair and reasonable and should be deemed to have satisfied the requirements of Bankruptcy Code section

363(n).

**D.     The PSA Was Negotiated in Good Faith.**

34.     The PSA is the product of extensive arm's length negotiations between St. David's and Debtor. These negotiations have involved substantial time and energy by the parties and their professionals, and the St. David's PSA reflects give-and-take and compromises by both sides.

**E.     Adequate Notice of the Asset Sale is Being Provided.**

35.     The final element for the approval of a sale under Bankruptcy Code section 363 is the requirement that interested parties receive adequate notice.  The Debtor has previously notified the Notice Parties of its intent to sell the Property and the date of the Sale Hearing.  The Debtor shall serve a copy of this Motion and the St. David's PSA upon the Notice Parties.

36.     Debtor submits that such notice is reasonable and appropriate pursuant to Bankruptcy Rule 2002(a).

**F.     The Proposed Sale was Negotiated in Good Faith**

34.     The proposed sale and the PSA were negotiated in good faith.  St David's is not an insider or affiliate of the Debtor, and the proposed sale and St. David's PSA have been negotiated at arms length and in good faith.  The proposed sale to St. David's represents the highest and best offer received considering the purchase price, the terms of the sale and the certainty of closing. The purchase price significantly exceeds the total claims of creditors and is acceptable to the debtor's interest owners.  Accordingly, the Debtor requests that the Court make a finding that St. David's is entitled to the protections of Section 363(m) of the Bankruptcy Code.

35.     As a matter of full disclosure, Hospital Corporation of America ("**HCA**") owns an interest in St. David's.  HCA North Texas, an affiliate of HCA, acquired hospital operations owned by Forest Park Medical Center at Frisco, an affiliate of Neal Richards Group, Inc, ("**NRG**") which

is the managing member of the Debtor's general partner. An affiliate of HCA has also expressed an interest in acquiring a hospital building and adjacent real property owned by another affiliate of NRG. The proposed sale to St. David's is unrelated to the other transactions identified above.

36.     Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith. . . ." 11 U.S.C. § 363(m) (emphasis added).

37.     To demonstrate a lack of good faith there must be a showing of fraud or collusion between the purchaser and the debtor or trustee. *Bleaufontaine, Inc. v. Roland Int'l (In re Bleaufontaine, Inc.)*, 634 F.2d 1383, 1388 n. 7 (5th Cir. 1981) ("[t]ypically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."). No such facts exist here.

### G.     The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Liens, Encumbrances, and Interests.

38.     Under Bankruptcy Code section 363(f), a debtor in possession may sell property of the estate free and clear of any lien or interest of an entity in such property if, among other things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

39.     Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice as justification to approve the sale of the Property free and clear of liens and other interests (collectively, the "**Interests**"). *See* 11 U.S.C. § 363(f); *Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the subsections is met); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343 (E.D. Pa. 1988) (same).

40.     Debtor believes that the only lienholders on the Property are the Prepetition Lenders and the DIP Lender. The Prepetition and DIP Lenders are aware of the proposed sale, and thus, Debtor is confident it will obtain any necessary consent on or before the Sale Hearing, thereby satisfying Bankruptcy Code section 363(f)(2). Moreover, the purchase price proposed in the St. David's PSA are sufficient to pay all known claims against the Debtor.  Accordingly, the Debtor submits that one or more of the subsections of Bankruptcy Code section 363(f) applies, and that any such Interest will be adequately protected by having it attach to the net proceeds of the sale, subject to any claims and defenses Debtor may possess with respect thereto.

41.     Accordingly, the sale should be approved under Bankruptcy Code section 363(f).

H.      **The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.**

42.     Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if:

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

43.     Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor. This subsection provides:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

44.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, and should be given practical, pragmatic construction. *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g. Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992); *see In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

45.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

46.     As set forth in the St. David's PSA, to the extent any defaults exist under any executory contract or unexpired lease that is assumed and assigned, Debtor will cure any such default in connection with the assumption and assignment.

47.     Moreover, Debtor will adduce facts at the Sale Hearing to show the financial wherewithal of St. David's, experience in the industry, and willingness and ability to perform under the contracts to be assumed and assigned to it.

48.     The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of St. David's to provide adequate assurance of future performance under the contracts to be assumed, as required under Bankruptcy Code section 365(b)(1)(C). The Court should therefore authorize Debtor to assume and assign contracts as set forth herein.

## IV.    WAIVER OR REDUCTION OF THE FOURTEEN DAY STAY PERIOD REQUIRED BY RULES 6004(h) AND 6006(d) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

49.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after the entry of the order.  The purposed of Bankruptcy Rule 6004(h) is to

MOTION TO SELL – ST. DAVID'S

provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. See Advisory Committee Notes to the Bankruptcy Rule 6004(h).

50.     Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes do not address when a court should eliminate or reduce the 14 day stay period, Collier on Bankruptcy suggests that the 14 day (formerly 10 day) stay period should be eliminated to allow a sale to close immediately "where there has been no objection to the procedure" 10 COLLIER ON BANKRUPTCY ¶¶ 6004.09, 6006.05 (Resnick & Sommer, 16th rev. ed. 2013).  If an objection has been filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such an appeal. See *Id.*

51.     To preserve the value of the Property and to limit the costs of preserving such Property, it is critical that the Debtor close the sale to St. David's as soon as possible after all closing conditions have been met or waived.  Inasmuch as the purchase price set forth in the PSA will pay all creditors in full and make significant distributions to interest holders as well, no party will be harmed by waiver of the appeal period.  Accordingly, the Debtor requests that the Court waive the 14 day stay period under Bankruptcy Rule 6004(h) or in the alternative, if an objection to the proposed sale is filed, reduce the stay periods to the minimum time needed by the objecting party to file its appeal to allow the proposed sale to close as provided for under the PSA.

52.     Based on the forgoing, the Debtor submits that the relief requested herein is necessary and appropriate, is in the best interest of the Debtor and its estate, and should be granted in all respects.

## V.     CONCLUSION

WHEREFORE, Debtor respectfully requests that this Court enter an order substantially in the form attached hereto as Exhibit"B" (a) approving the St. David's PSA; (b) authorizing Debtor to (i) sell the Property free and clear of all Interests; (ii) assume and assign the Assigned Contracts; and (c)  finding that the Purchaser is a good faith purchaser under Section 363(m); (d) **waiving the 14 day stay period under Bankruptcy Rule 6004(g)**; and (e).granting such other and further relief as is just and proper;

Respectfully submitted May 10, 2016.

THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
66 Granburg Circle
San Antonio, Texas 78218
Telephone (210) 601-9405
Email: rbattaglialaw@outlook.com


By:   */s/ Raymond W. Battaglia*
Raymond W. Battaglia
Texas Bar No. 01918055

ATTORNEYS FOR FPMC AUSTIN REALTY PARTNERS, LP


## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system, as set forth below. I further certify that it has been transmitted by first class mail to the parties on the attached service list


*/s/ Raymond W. Battaglia*

MOTION TO SELL – ST. DAVID'S