IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.

Dated: May 16, 2016.

_____

TONY M. DAVIS
UNITED STATES BANKRUPTCY JUDGE

_____

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **Chapter 11** |
| **FPMC AUSTIN REALTY** | § | |
| **PARTNERS, LP,** | § | **Case No. 16-10020-TMD** |
| | § | |
| Debtor. | § | |

**ORDER (I) APPROVING THE PURCHASE AND SALE AGREEMENT
BETWEEN THE DEBTOR AND ST. DAVID'S HEALTHCARE
PARTNERSHIP, L.P., (II) AUTHORIZING THE SALE OF THE DEBTOR'S
ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS AND ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF**

Upon the motion, dated May 10, 2016 (Docket No. 97, the "Motion")[1] of FPMC Austin

Realty Partners, LP, as debtor and debtor in possession in the above-captioned chapter 11 case (the

---

[1]      Terms used in this Order but not defined herein shall have the meanings ascribed to them in the Motion or the Purchase and Sale Agreement (as defined herein), as applicable.  For the avoidance of doubt, the term "Property" has the meaning ascribed to it in the Purchase and Sale Agreement.

4842-1807-2113.6

1

"Debtor" or "Seller"), for orders (1) approving the purchase and sale agreement attached hereto as Exhibit A (the "Purchase and Sale Agreement") between the Debtor and St. David's Healthcare Partnership, L.P. (the "Buyer"), (2) approving the sale of assets free and clear of all liens, claims, encumbrances and other interests, and (3) granting related relief; and the Debtor having determined in its business judgment that it is in the best interests of the Debtor, its estate, and its creditors to withdraw the Sale Procedures (as defined in the Order (A) Approving Sale Procedures Relating to Sale of the Debtor's Property and Other Assets; (B) Scheduling a Hearing to Consider the Sale; and (C) Granting Related Relief (the "Sale Procedures Order", Docket No. 84)); and Buyer's offer being the highest and best offer for the Property; and upon each of the objections and other pleadings filed in response to the Motion and the Debtor's reply thereto; and the Court having conducted a hearing on May 13, 2016 to approve the sale of the Property to Buyer (the "Sale Hearing"); and all parties in interest having been heard, or having had the opportunity to be heard, regarding the Purchase and Sale Agreement and the transaction contemplated thereby (the "Sale Transaction"); and the Court having reviewed and considered the Motion, and the arguments of counsel made, and the evidence adduced, at the Sale Hearing; and it appearing that due notice of the Purchase and Sale Agreement and the form of this order (the "Proposed Sale Order") having been provided; and any objections to the relief requested or the Sale Transaction having been withdrawn, resolved or overruled; and it appearing that the relief granted herein is in the best interests of the Debtor, its estate, and creditors and all parties in interest in this chapter 11 case; and upon the record of the Sale Hearing and this chapter 11 case; and after due deliberation thereon; and good cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

4842-1807-2113.6

A.  **Findings of Fact and Conclusions of Law**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. The Court's finding shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing. The factual determinations set forth below are based on the Court's taking judicial notice of the docket in the case, the testimony of C. David Huffstutler, Todd Furniss and Scott Herbold, and the absence of testimony or evidence to the contrary.

B.  **Jurisdiction and Venue**.  This Court has jurisdiction to decide the relief requested in the Motion over the Sale Transaction and the property of the Debtor's estate (as defined in 11 U.S.C. §§ 541 and 1115), pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this chapter 11 case and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.

C.  **Statutory and Rule Predicates**.  The statutory and other legal predicates for the relief sought in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, rules 2002, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002 and 6004 of the Local Bankruptcy Rules (the "Local Rules").

D.  **Notice and Opportunity to Object**.  Actual written notice of, and a fair and reasonable opportunity to object to and to be heard with respect to the Motion, the Sale Transaction, and the sale of the Property free and clear of any Claims (as defined herein) has been given, as required by the Bankruptcy Code and the Bankruptcy Rules, to all persons entitled to

notice, including, without limitation: (i) all known creditors of the Debtor, including all persons asserting Claims against the Property or any portion thereof, (ii) all parties who have requested notice in this chapter 11 case pursuant to Bankruptcy Rule 2002, and (iii) all applicable federal, state and local taxing and regulatory authorities.

E.      **Final Order**.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

F.      **Sound Business Purpose**.   The Debtor has demonstrated good, sufficient, and sound business purposes and justifications for (i) termination of the auction provided for in the Sale Procedures Order and (ii) approval of the Purchase and Sale Agreement and the Sale Transaction and in entering into the Purchase and Sale Agreement. The Debtor's entry into and performance under the Purchase and Sale Agreement (i) are a result of due deliberation by the Debtor and constitute a sound and reasonable exercise of the Debtor's business judgment consistent with its fiduciary duties, (ii) provide value to and are beneficial to the Debtor's estate, and are in the best interests of the Debtor and its stakeholders, and (iii) are reasonable and appropriate under the circumstances. Business justifications for the Sale Transaction include, but are not limited to, the following: (i) the Purchase and Sale Agreement constitutes the highest and best offer received for the Property, taking all of the terms and conditions of that Agreement into consideration and represents the fair market value of the assets being sold, (ii) the Purchase and Sale Agreement presents the best opportunity to maximize the value of the Property and to avoid decline and devaluation of the Property, (iii) unless the Sale Transaction and all of the other transactions contemplated by the Purchase and Sale Agreement are concluded expeditiously, as provided for pursuant to the Purchase and Sale Agreement, recoveries to creditors may be materially diminished, and (iv) the value of the Debtor's estate will be maximized through the sale

of the Property pursuant to the Purchase and Sale Agreement.

G.    **Highest and Best Value**.  The Debtor and its advisors engaged in a robust and extensive marketing process, which was designed to obtain the highest value for the Property.  The Debtor conducted a fair and open sale process. The sale process was non-collusive, duly noticed and provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Property.  The process conducted by the Debtor obtained the highest and best value for the Property for the Debtor and its estate.

H.    **Fair Consideration**.  The Property was extensively marketed and the Court is satisfied that most, if not all, potential buyers for the Property were given full and fair opportunity to bid on the Property. As a result of this process, a valid market was created such that the Buyer is paying fair market value for the Property. Further, the consideration to be paid by the Buyer pursuant to the Purchase and Sale Agreement (i) constitutes fair and reasonable consideration for the Property, (ii) is the highest and best offer for the Property, (iii) will provide a greater recovery for the Debtor's estate and creditors than would be provided by any other practically available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and fair market value for the Property under applicable laws of the United States, any state, territory, possession or District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

I.    **No Successor or Other Derivative Liability**.  The sale and transfer of the Property to the Buyer, including the transfer of title to any portion of the Property subject to any lien, will not make the Buyer a successor of the Debtor nor subject the Buyer to any liability (including any successor liability) with respect to the operation of the Debtor's business prior to the Closing or by reason of such transfer. The Buyer (i) is not, and shall not be considered a successor to the

Debtor or any officer, director, agent, employee or anyone under the direction of any of the foregoing, (ii) has not, *de facto* or otherwise, merged with or into the Debtor, (iii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of the Debtor, the Debtor's estate, or their respective, businesses or operations, or any enterprise of the Debtor, and (iv) does not have a common identity of incorporators, directors or equity holders with the Debtor.

J.      **Good Faith; No Collusion**.  The Debtor and the Buyer, and their respective counsel and advisors, have negotiated, proposed and entered into the Purchase and Sale Agreement and each of the transactions contemplated therein in good faith, without collusion and from arm's-length bargaining positions. The Buyer is a "good faith purchaser" and is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby.  The Buyer has proceeded in good faith in all respects in that, among other things, (i) the Buyer recognized that the Debtor was free to deal with any other party interested in acquiring the Property and (ii) all payments to be made by the Buyer and all other material agreements or arrangements entered into by the Buyer and the Debtor in connection with the Sale Transaction have been disclosed and are appropriate. The sale price in respect of the Property was not controlled by any agreement among potential purchasers and neither the Debtor nor the Buyer has engaged in collusion or any conduct that would cause or permit the Purchase and Sale Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. The Buyer has paid the fair market value for the Property, in an arm's length transaction, and the Court has not been presented with any evidence of collusion or fraud between the Buyer and any other party, including the Seller. Accordingly, neither the Purchase and Sale Agreement nor the Sale Transaction may be avoided and no party shall be entitled to damages or

other recovery pursuant to section 363(n) of the Bankruptcy Code.  The Buyer is not an "insider" or "affiliate" of any of the Debtor, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Buyer and the Debtor. The Buyer is entitled to the full protections of 11 U.S.C. section 363(m) as a good faith purchaser.

K.      **Notice**.  As evidenced by the certificates of service filed with the Court: (i) due, proper, timely, adequate and sufficient notice of the Sale Hearing, the Sale Transaction, the Proposed Sale Order and the other relief requested in the Motion was provided by the Debtor, (ii) such notice was good, sufficient and appropriate under the particular circumstances, and (iii) no other or further notice of the Sale Transaction, the Sale Hearing, the Proposed Sale Order or any of the relief requested in the Motion is required.

L.      **Satisfaction of 363(f) Standards**. The Debtor may sell the Property free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances and other interests of any kind or nature whatsoever against the Debtor or the Property, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, or claims for taxes of or against the Debtor and any derivative, vicarious, transferee or successor liability claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of this chapter 11 case, whether known or unknown, accrued or contingent, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to the Debtor, the Debtor's

interests in the Property, the operation of the Debtor's business before the effective time of the Closing pursuant to the Purchase and Sale Agreement, or the transfer of the Debtor's interests in the Property to the Buyer (collectively, the "Claims"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of Claims who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the Property could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims that constitute interests in the Property, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtor.

M.     **Claims by Frost Bank Against Property**. The Purchase Price being paid by Buyer is intended to pay in full all holders of secured claims against the Property or any portion thereof, other than Excluded Personal Property, whether such Property is subject to a true lease or a financing arrangement.  Frost Bank ("Frost"), as a secured creditor under a deed of trust recorded on or about December 20, 2013 and as debtor in possession lender under that certain Senior Secured Superpriority Debtor-In-Possession Loan Agreement, has consented to having its collateral sold, and such sale of the Property to the Buyer pursuant to the Purchase and Sale Agreement is free and clear of any Claims of Frost against the Property, with any claim, lien or right Frost may have against the Property attaching to the proceeds of the Sale Transaction.

N.     **Claims by Lessees of Property Being Sold**.  The Debtor is party to three alleged leases: that certain Lease Agreement by and between the Debtor and Forest Park Medical Center at Austin, LLC ("OpCo"), dated as of July 26, 2013, that certain Medical Office Lease Agreement between the Debtor and OpCo and that certain Medical Office Lease Agreement between the Debtor (collectively, the "OpCo Leases") and Clinic 21 of Collin County, PLLC (the "Clinic 21 Lease" and collectively, with the OpCo Leases, the "Leases").  By prior order, the Court has terminated the Clinic 21 Lease. With respect to the OpCo Leases, the Debtor is pursuing the remedies provided under the OpCo Leases to terminate them by sending demand and cure notices. Upon the passage of time, with no cure, the Debtor intends to send a letter to OpCo notifying it that the OpCo Leases have been terminated. The Court finds, that upon transmission of letters purporting to terminate the OpCo Lease, the OpCo Leases shall be terminated for purposes of the sale of the Property, and OpCo shall have no further rights to possess or make claim against the Property, with any claim for damages (to the extent any such clams exist) attaching to the proceeds of this sale.

O.     **Free and Clear Sale Required**. The Buyer would not have entered into the Purchase and Sale Agreement and would not consummate the transactions contemplated thereby if the sale of the Property was not free and clear of all Claims, or if the Buyer would, or in the future could, be liable for any such Claims.  A sale of the Property other than one free and clear of all Claims would adversely impact the Debtor, its estate and their creditors, and would yield substantially less value for the Debtor's estates, with less certainty than the Sale Transaction. The total consideration to be provided under the Purchase and Sale Agreement reflects the Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Property free and clear of all Claims.

P.     **Payments to Third Parties**.    Except in compliance with applicable legal requirements, or except as may form the basis for any fraudulent conveyance claim or other avoidance action by the estate, neither the Debtor nor any director, officer or employee of any of the foregoing or any agent acting on behalf of or for the benefit of any of the foregoing, has directly or indirectly engaged in any of the following conduct such that such conduct would violate any state or federal law or regulation regarding the operation of the Property (a) offered, paid or received any remuneration, in cash or in kind, to or from, or made any financial arrangements with, any past, present or potential customers, suppliers, patients, physicians, contractors, third-party payors or any other person in exchange for business or payments from such person; (b) given or agreed to give, received or agreed to receive, or is aware that there has been made or that there is any agreement to make, any gift or gratuitous payment of any kind, nature or description (whether in money, property or services) to any past, present or potential customers, suppliers, physicians, contractors, third-party payors or any other person in exchange for business or payments from such person; (c) made or agreed to make, or is aware that there has been made or that there is any agreement to make, any contribution, payment or gift of funds or property to, or for the private use of, any governmental official, employee or agent; (d) established or maintained any unrecorded fund or asset for any improper purpose or made any misleading, false, or artificial entries on any of its books or records for any reason; (e) made, or agreed to make, or is aware that there has been made or that there is any agreement to make, any improper payment to any person; (f) made or caused to be made a false statement or representation of a material fact in any application for any benefit or payment; (g) made or caused to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment; (h) presented or caused to be presented a claim for reimbursement for services under any healthcare program that is for an item

4842-1807-2113.6

or service that is known or should be known to be not provided as claimed, not provided in accordance with applicable law, or false or fraudulent; (i) failed to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment; (j) offered, paid, solicited, or received any remuneration (including any kickback, bribe or rebate), overtly or covertly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any healthcare program or in return for purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part by any healthcare program; (k) made or caused to be made or induced or sought to induce the making of any false statement or representation (or omitted to state a material fact required to be stated therein) in order that the hospital may qualify for any healthcare program certification; or (l) charged for any healthcare program service, money or other consideration in excess of the rates established by law. No finding contained in this paragraph shall impair any claim of the Debtor (or its designee) or serve as a claim or defense to any party the Debtor (or its designee) may pursue for a fraudulent conveyance or avoidance action.

Q.     **<u>Validity of the Transfer</u>**.  As of the Closing, the transfer of the Property to the Buyer will be a legal, valid and effective transfer of the Property, and will vest the Buyer with all right, title and interest of the Debtor in and to the Property, free and clear of all Claims. The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction. Further, the condition in the Purchase and Sale Agreement that the Purchase Price being paid is fair market value has also been

satisfied.

R. **Corporate Authority**. The Debtor

(i) is a duly organized, validly existing limited partnership in good standing under the laws of the State of Texas and is authorized to conduct business in the State of Texas;

(ii) is not a "foreign person" as such term is defined in Section 1445 of the Internal Revenue Code or any regulations promulgated thereunder, as amended;

(iii) has full power and authority to execute the Purchase and Sale Agreement and all other documents contemplated thereby, and the sale of the Property by Debtor has been duly and validly authorized by all necessary partnership agreements of the Debtor and company agreements of its general partner and applicable state law;

(iv) has all of the limited liability company power and authority necessary to consummate the transactions contemplated by the Purchase and Sale Agreement;

(v) has not received written notice from any agency, department, commission, board, bureau or instrumentality of any governmental authority of the United States, the State of Texas, the County of Williamson, the City of Austin or any other local authority (collectively "Governmental Authority") that it is not now in compliance with all applicable laws, ordinances, regulations, statutes, codes, rules, orders, decrees, determinations, covenants and restrictions relating to the Property and every part thereof including those promulgated or imposed by any agency, department, commission, board, bureau or instrumentality of any Governmental Authority; and

(vi) upon entry of this Sale Order, other than any consents identified in the Purchase and Sale Agreement, need no consent or approval from any other person to consummate the Sale Transaction.

S. **Property is Property of the Estate**. The Property constitutes property of the

Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code. The Debtor is the

sole and rightful owner of the Property with all right, title and interest to transfer and convey the

Property to the Buyer, and no other person has any ownership right, title, or interests therein except

as referenced in Schedule J of the Purchase and Sale Agreement.

T.      **Purchase and Sale Agreement is Valid and Binding**.  The Purchase and Sale Agreement is a valid and binding contract between the Debtor and the Buyer and shall be enforceable pursuant to its terms. The Purchase and Sale Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia.  The Purchase and Sale Agreement and the Sale Transaction itself, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtor, any chapter 7 or chapter 11 trustee appointed in this chapter 11 case, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

U.      **No Claims against Buyer**.  Other than the claims arising under the Purchase and Sale Agreement, the Debtor and its estates agree and acknowledge that they have no claims against the Buyer.

V.      **Statements of Debtor True and Correct**.  The Purchase and Sale Agreement and all other documents and information furnished to the Buyer and the Buyer's representatives by the Debtor pursuant hereto do not and will not include any untrue statement of a material fact or omit to state any material fact necessary to make the statements made and to be made not misleading.

W.      **No Sub Rosa Plan**.  The Sale Transaction does not constitute a de facto plan of reorganization or liquidation as it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtor, (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtor, (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests or extend debt maturities.

X. **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**. The sale of the Property must be approved and consummated promptly in order to preserve the value of the Property. Indeed, one of the reasons the Buyer was chosen is because of its ability to close quickly. Therefore, time is of the essence in consummating the Sale Transaction, and the Debtor and the Buyer intend to close the Sale Transaction on or about May 31, 2016. The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Purchase and Sale Agreement. Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regards to the transactions contemplated by this Sale Order.

Y. **Legal and Factual Bases**. The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS ORDERED THAT:**

1. **Relief Requested is Granted**. The relief requested is granted and approved  as set forth herein and the auction sale provided for in the Sale Procedures Order is hereby terminated.

2. **Objections Overruled**. All objections, if any, to the relief requested that have not been withdrawn with prejudice, waived or settled as announced to the Court at the Sale Hearing or as otherwise addressed in this Sale Order are hereby overruled on the merits and with prejudice.

3. **Notice**. Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002 and 6004.

4. **Fair Purchase Price**. The consideration provided by the Buyer pursuant to the Purchase and Sale Agreement is fair and reasonable and constitutes (i) reasonably equivalent value

under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, (iii) fair market value, and (iv) reasonably equivalent value, fair consideration, fair value, and fair market value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

5. **Approval of the Purchase and Sale Agreement**. The Purchase and Sale Agreement, all related agreements, all transactions contemplated therein (including, but not limited to, all ancillary agreements contemplated thereby) and all of the terms and conditions thereof are hereby approved. The failure specifically to include any particular provision of the Purchase and Sale Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase and Sale Agreement (including, but not limited to, all ancillary agreements contemplated thereby) be authorized and approved in its entirety.

6. **Consummation of Sale Transaction**. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtor, as well as its officers, employees and agents, are authorized to execute, deliver and perform their obligations under and comply with the terms of the Purchase and Sale Agreement and all related agreements and to close and consummate the Sale Transaction, pursuant to and in accordance with the terms and conditions of the Purchase and Sale Agreement, all related agreements and this Sale Order. Payment of all amounts owed by Buyer under this Sale Order and all payments to be made by the Debtor to Frost as authorized in this Sale Order or subsequent orders of this Court shall be handled through First American Title Insurance Company, National Commercial Services Office, 6363 Poplar Avenue, Suite 434, Memphis, 38119 (the "Escrow Agent"). Upon consummation of the Sale Transaction, the Escrow Agent is authorized to pay all customary, reasonable and necessary costs provided for in the Purchase and Sale

4842-1807-2113.6

Agreement, including, but not limited to brokers' commissions in accordance with the terms of their employment approved by prior orders of the Court.

7.      **Authorization**.  The Debtor and its respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase and Sale Agreement and to take all further actions as may be (a) reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to the Buyer's possession, the Property, or (b) necessary or appropriate to the performance of the obligations contemplated by the Purchase and Sale Agreement or to implement the Sale Transaction, all without further order of the Court.

8.      **Transfer of Property**.  All persons that are currently in possession of some or all of the Property or hold liens or Claims against the Property or any portion thereof are hereby directed to surrender possession of such Property or deliver title to the Buyer as of the Closing. To the extent required by the Purchase and Sale Agreement, the Debtor shall exercise commercially reasonable efforts to assist the Buyer in assuring that all persons that are presently, or on the applicable Closing Date may be, in possession of some or all of the Property will surrender possession of the Property to either (i) the Debtor before the Closing, or (ii) the Buyer on or after the Closing, or to the extent an entity holds a lien or Claim against the Property or any portion thereof, such entity shall deliver title or execute such other documents that may be necessary to deliver clean title to such Property to the Buyer. In the event any entity holding a lien or Claim against the Property or any portion thereof fails or refuses to deliver title to such Property at or after Closing, then this Order shall serve to effectuate the transfer of any such Property to

Buyer free and clear of any lien, claim or encumbrance against such Property and vest title in the Buyer.

9.  **Prohibition against Interference**.  All persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtor to transfer the Property to the Buyer in accordance with the Purchase and Sale Agreement and this Sale Order.  Debtor or Buyer may seek relief from this Court to enforce this or any other provisions of this Order.

10.  **Transfer of Property Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtor is authorized to transfer the Property in accordance with the terms of the Purchase and Sale Agreement.  The Property shall be transferred to the Buyer, and, upon the Closing, such transfer shall: (a) be valid, legal, binding and effective, (b) vest the Buyer with all right, title and interest of the Debtor in the Property, and (c) be free and clear of all Claims (specifically including Claims of any Governmental Authority) in accordance with section 363(f) of the Bankruptcy Code, with all Claims that represent interests in property to attach to the net proceeds of the Sale Transaction, in the same amount and order of their priority, with the same validity, force and effect which they have against the Property, and subject to any claims and defenses the Debtor may possess with respect thereto in each case immediately before such Closing.

11.  **Ad Valorem Taxes**.  The tax liens of Williamson County for the 2016 tax year shall be expressly retained until the payment of the 2016 taxes, plus any penalties and interest that may accrue thereon, in the ordinary course of business. If not so paid, Williamson County shall be at liberty to exercise all state law collection activities, for all amounts due by this debtor, without further recourse to the Bankruptcy Court.

4842-1807-2113.6

12.     **Claim Preclusion**.  Except as otherwise expressly provided in the Purchase and Sale Agreement or in this Sale Order, all persons (and their respective successors and assigns) including, without limitation, the Debtor, the Debtor's estate, Frost or any of their respective officers, directors, employees, agents or anyone else acting at their direction, all debt security holders, equity security holders, governmental, tax and regulatory authorities, governmental units, lenders, employees, former employees, trade creditors and any other creditors holding Claims against the Debtor, the Property or any portion thereof (except as set forth on Schedule J) or the Debtor's business (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtor, the Property or the Debtor's business prior to the Closing Date or the transfer of the Property to the Buyer, are hereby forever barred and estopped from asserting or pursuing such Claims against the Buyer, its affiliates, successors or assigns, its property or the Property or any portion thereof. Following the Closing, no holder of any such Claim shall interfere with the Buyer's title to or use and enjoyment of the Property based on or related to any such Claim or based on any actions the Debtor may take in this chapter 11 case.

13.     **Recordation.**  A certified copy of this Sale Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded encumbrances, claims, liens and other interests against the Property (other than those listed on Schedule J) recorded prior to the date of this Sale Order. All Recording Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase and Sale Agreement.

4842-1807-2113.6

14.     **Termination Statements**.  If any person that has filed financing statements mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtor or the Property or any portion thereof, including Frost, shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests  which such person has with respect to the Debtor or the Property or otherwise, then with regard to  the Property that are purchased by the Buyer pursuant to the Purchase and Sale Agreement and

this Sale Order (a) the Debtor is hereby authorized and directed to execute and file such statements,  instruments, releases and other documents on behalf of the person with respect to the Property and (b) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of  the release of all Claims against the Property. This Sale Order is deemed to be in recordable form  sufficient to be placed in the filing or recording system of each and every federal, state, county or  local government agency, department or office.

15.     **No Liability**.  Except as expressly set forth in the Purchase and Sale Agreement the Buyer and its successors and assigns shall have no liability for any Claim, whether known or  unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent,  whether derivatively, vicariously, as a transferee or successor or otherwise, of any kind, nature or  character whatsoever, by reason of any theory of law or equity.

16.     **Assignment of Property**. On the Closing Date, this Sale Order shall be

considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Property acquired under the Purchase and Sale Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in all of the Property to the Buyer effective as of Closing. The Buyer may transfer its right to purchase the Property to an affiliate or subsidiary prior to Closing.

17. **Licenses and Approvals**. To the maximum extent available under applicable law and to the extent provided for under the Purchase and Sale Agreement, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtor with respect to the Property and, to the maximum extent available under applicable law and to the extent provided for under the Purchaseand Sale Agreement, all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been transferred to the Buyer as of the Closing Date. All existing licenses or permits applicable to the business shall remain in place for the Buyer's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures. Buyer is not obtaining under this Sale Order or the Purchase and Sale Agreement any license or other agreement issued in connection with billing or obtaining payment in connection with the Medicare or Medicaid programs. Notwithstanding the foregoing or anything contained in this Sale Order or the Purchase and Sale Agreement to the contrary, nothing in this Sale Order or the Purchase and Sale Agreement releases Buyer from compliance with any applicable government-issued license, permit, registration, authorization or approval acquired by Buyer under this Sale Order related to government-sponsored or government-supervised healthcare billing or payment programs as though such sale took place outside of bankruptcy. Further, notwithstanding anything contained in this

4842-1807-2113.6

Sale Order  or the Purchase and Sale Agreement to the contrary, nothing in this Sale Order or the Purchase and Sale Agreement shall authorize the transfer or assignment of any government-issued license, certificate or registration related to government-sponsored or government-supervised healthcare billing or payment programs if such transfer or assignment is prohibited by applicable non- bankruptcy law. Finally, notwithstanding anything contained in this Sale Order or the Purchase  and Sale Agreement to the contrary, nothing in this Sale Order or the Purchase and Sale Agreement  releases, nullifies or enjoins the enforcement of any liability to a governmental unit under police  and regulatory statutes or regulations that any entity would be subject to as the owner or operator  of property after the date of entry of this Sale Order.

18.     **<u>No Successor or Other Derivative Liability</u>**.  By virtue of the Sale Transaction the Buyer and its affiliates, successors and assigns shall not be deemed or considered to, (a) be a  legal successor, or otherwise be deemed a successor to the Debtor, (b) have, *de facto* or otherwise,  merged with or into the Debtor, or (c) be a continuation or substantial continuation, or be holding  itself out as a mere continuation, of the Debtor, the Debtor's estate, or the Debtor's business or  operations, or any enterprise of the Debtor in each case by any law or equity, and the Buyer has  not assumed nor is it in any way responsible for any liability or obligation of the Debtor or the Debtor's estate. Except as expressly set forth in the Purchase and Sale Agreement, the Buyer and  its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any  kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, assignee or transferee liability, labor, employment, de  facto merger, substantial continuity, or other law, rule, regulation or doctrine, whether

known or unknown as of the Closing, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, without limitation, liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of the Property prior to the Closing Date or arising based on actions of the Debtor taken after the Closing Date.

19.     **Rejection of Executory Contracts, Licenses and Leases**. The Purchase and Sale Agreement provides that the Buyer may add additional executory contracts, licenses and leases to be assumed before or after Closing. In the event the cure cost of an executory contract, license or lease added after the Closing exceeds $5,000, Buyer agrees to pay any such cure cost in excess of

$5,000. Debtor is authorized to bring to the Court following notice a hearing to have cure and assumption and assignment determined by the Court.

20.     **Taxing Authorities**. Pursuant to 11 U.S.C. Sections 105(a) and 363(f) of the Bankruptcy Code, the Property shall be transferred to the Buyer, and upon closing shall be free and clear of all liens, claims, encumbrances and interests of any kind or nature as may be asserted by any taxing authority, except as may be provided in this Sale Order.

21.     **Statutory Mootness**.   The transactions contemplated by the Purchase and Sale Agreement are undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the Property to the Buyer,

free and clear of Claims, unless such authorization is duly stayed before the Closing pending appeal. The Buyer is a good faith purchaser of the Property and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code. The Debtor and the Buyer will be acting in good faith if they proceed to consummate the Sale Transaction at any time after entry of this Sale Order.

22. **No Avoidance of Purchase and Sale Agreement**. Neither the Debtor nor the Buyer has engaged in any conduct that would cause or permit the Purchase and Sale Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Purchase and Sale Agreement and the Sale Transaction shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Purchase and Sale Agreement or the Sale Transaction.

23. **Payoff and Release Letter**. Five (5) Business Days prior to Closing, Frost shall provide the Debtor with a payoff and release letter, which sets forth the following, each as of the date of such payoff and the release letter:

a. The unpaid principal balance of the Debtor's obligations to Frost (inclusive of (b), (c), (d), and (e) below, the "<u>Frost Debt</u>");

b. The aggregate amount of accrued and unpaid interest owed to the Frost by the Debtor;

c. The aggregate amount of accrued and unpaid reasonable attorneys' fees, costs, and expenses owed to Frost for which the Debtor is responsible; and

d. A per diem interest amount with respect to the Frost Debt.

The Escrow Agent shall pay the Frost Debt on the later to occur of the (i) Closing, or (ii) entry of an order of this Court authorizing payment of the Frost Debt.

24. **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**. Notwithstanding

4842-1807-2113.6

the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in consummating the Sale Transaction, and the Debtor and the Buyer intend to close the Sale Transaction on or before May18, 2016, which given the nature of the business of a hospital, is as soon as practicable to facilitate a seamless transition of the business and minimize potential harm to patients. Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, or risk its appeal will be foreclosed as moot.

25. **<u>Binding Effect of Sale Order</u>**. The terms and provisions of the Purchase and Sale Agreement and this Sale Order shall be binding in all respects upon the Debtor and its estate and its creditors, any affected third parties, all holders of equity interests in the Debtor, all holders of any claims, whether known or unknown, against the Debtor, any holders of Claims against or on all or any portion of the Property, including, but not limited to, all contract counterparties, leaseholders, governmental units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar entities for the Debtor, if any, subsequently appointed in the Debtor's chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtor's chapter 11 case, and their affiliates, successors and assigns. The Purchase and Sale Agreement and the Sale Order shall inure to the benefit of the Debtor, its estate and creditors, the Buyer and their respective successors and assigns. The Purchase and Sale Agreement, the Sale Transaction

4842-1807-2113.6

and this Sale Order shall not be subject to rejection or avoidance by the Debtor, its estate, its creditors or any trustee, examiner or receiver.

26.     **Conflicts; Precedence**. In the event that there is a direct conflict between the terms of this Sale Order, the Purchase and Sale Agreement, and any documents executed in connection therewith, the provisions contained in this Sale Order, the Purchase and Sale Agreement and any documents executed in connection therewith shall govern, in that order. Nothing contained in any chapter 11 plan hereinafter confirmed in this chapter 11 case, any order confirming such plan, or in any other order of any type or kind entered in this chapter 11 case (including, without limitation, any order entered after any conversion of this chapter 11 case to a case under chapter 7 of the Bankruptcy Code) or in any related proceeding shall alter, conflict with or derogate from the provisions of the Purchase and Sale Agreement or the terms of this Sale Order.

27.     **Modification of Purchase and Sale Agreement**.   The Purchase and Sale Agreement, and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed each party, or otherwise in accordance with the terms thereof, without further order of the Court; *provided* that any such modification, amendment or supplement does not materially change the terms of the Purchase and Sale Agreement or any related agreements, documents or other instruments.

28.     **Bulk Sales; Taxes**. No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction (including those relating to taxes) shall apply in any way to the transactions contemplated by the Purchase and Sale Agreement or this Sale Order. Except as otherwise expressly provided in the Purchase and Sale Agreement, all obligations of the Debtor relating to taxes, whether arising under any law, by the Purchase

4842-1807-2113.6

and Sale Agreement, or otherwise shall be the obligation of and fulfilled and paid by the Debtor.

29.     **Retention of Jurisdiction/Interpretation**.   This  Court  shall  retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of  this  Sale  Order  and  the  Purchase  and  Sale  Agreement,  all  amendments thereto, any waivers and  consents thereunder (and of each of the agreements executed in connection therewith), to  adjudicate disputes related to this Sale Order or the Purchase and Sale Agreement (and such other  related agreements, documents or other instruments) and to enforce the injunctions set forth herein.

###

## Exhibit A

**Purchase and Sale Agreement**

**PURCHASE AND SALE AGREEMENT**

between

**FPMC AUSTIN REALTY PARTNERS, LP**

and

**ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP**

dated as of

May    , 2016

[FINAL EXECUTION VERSION]

## CONTENTS

ARTICLE I. Conveyance of the Property ..................................................................................

ARTICLE II. Purchase Price ........................................................................................... 4

ARTICLE III. Closing ................................................................................................... 5

ARTICLE IV. Title Matters ........................................................................................... 14

ARTICLE V. Representations and Warranties .......................................................... 17

ARTICLE VI. Risk of Loss ........................................................................................... 21

ARTICLE VII. Remedies ............................................................................................... 22

ARTICLE VIII. Escrow ................................................................................................. 23

ARTICLE IX. Bankruptcy Matters ............................................................................ 23

ARTICLE X. Miscellaneous ........................................................................................ 25

[FINAL EXECUTION VERSION]

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "**Agreement**"), dated as the Effective Date (as defined in <u>Section 10.18</u>) is entered into between FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership ("**Seller**"), having an address at 2101 Cedar Springs Road, Suite 1540, Dallas, TX 75219 and ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP, a Texas limited liability partnership ("**Purchaser**") having an address at One Park Plaza, Nashville, Tennessee 37203.

## RECITALS

WHEREAS, Seller is a debtor and debtor-in-possession in a chapter 11 case pending in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "**Bankruptcy Court**"), Case No. 16-10020-TMD (the "**Bankruptcy Case**"). As such, the Property is being sold pursuant to this Agreement, and the sale of the Property is subject to the Bankruptcy Court's approval. As a result of arm's length negotiations between Seller and Purchaser culminating in this Agreement, Seller is selling the Property to Purchaser free and clear of (i) all liens, interests, claims, or encumbrances in the Property and (ii) successor liability of Seller, pursuant to 11 U.S.C. § 363(f) of the United States Bankruptcy Code (the "**Bankruptcy Code**"), and this provision controls over any conflicting language contained in this Agreement. In addition, if there is any conflict between terms of this Agreement and any order issued by the Bankruptcy Court, the Bankruptcy Court's order shall supersede the terms in this Agreement.

WHEREAS, Seller is the owner of the Property (as hereinafter defined); and

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Purchaser the Property and Purchaser desires to purchase the Property from Seller.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.
## CONVEYANCE OF THE PROPERTY

**Section 1.01. <u>Property</u>**. Seller agrees to sell and convey to Purchaser and Purchaser agrees to purchase from Seller, upon the terms and conditions hereinafter set forth, all right, title and interest of Seller in and to the following, including all rights, title, and interests and appurtenances described below (collectively referred to herein as the "**Property**"):

(a) that certain tract of real property located in Williamson County, Texas, more particularly described in **<u>Exhibit A</u>** attached hereto and made a part hereof for all purposes, together with all of Seller's right, title and interest in and to all and singular the rights and appurtenances pertaining to such real property (all of the foregoing being hereinafter collectively referred to as the "**Land**");

(b) all improvements, structures, buildings and fixtures now constructed and completed with respect to and situated on the Land, including without limitation that certain hospital building totaling approximately 146,997 rentable square feet (the "**Hospital**"), that

[FINAL EXECUTION VERSION]

certain 4-story medical office building consisting of approximately 84,176 gross building area square feet (79,708 rentable square feet) (the "**MOB**"), together with all of Seller's right, title and interest in all surface parking areas, parking structures, loading dock facilities, landscaping and other improvements, structures and fixtures (all of the foregoing being hereinafter collectively referred to as the "**Improvements**");

(c)      all of Seller's right, title and interest in all fixtures, systems, equipment, machinery, apparatus, appliances, and other articles of personal property located on and used in connection with the ownership, use, maintenance, and operation of the MOB and the Hospital, except for the Excluded Personal Property, as such term is defined herein (collectively, the "**Personal Property**");

(d)      all of Seller's right, title and interest in all construction warranties issued and construction guaranties with respect to the Property that are capable of being assigned to Purchaser at Closing ("**Construction Warranties**");

(e)      all of Seller's right, title and interest in the contracts listed in **Exhibit B** attached hereto (the "**Assigned Contracts**") and assumed pursuant to applicable provisions under chapter 11 of title 11 of the Bankruptcy Code.

(f)      all Seller's rights, title and interests in minerals and mineral interests, royalty interests, working interests, leasehold interests, production payments and any other economic interests and executive rights related thereto, that are owned by Seller in, on, under, across and/or relating to the Land (collectively, "**Mineral Interests**");

(g)      all of Seller's rights, title and interests in all utilities and utility commitments, lines, easements, rights, or recovery charges and other rights and equipment pertaining to any utilities or utility service for the Property; and

(h)      all of Seller's rights, title and interests in its other permits, licenses, and other similar documents, whether governmental, regulatory or otherwise, relating to the use, operation or maintenance of the Improvements that are capable of being assigned to Purchaser at Closing and approved by Purchaser (the "**Licenses and Permits**").

**Section 1.02.  Excluded Property**. Notwithstanding the foregoing, the sale of the Property contemplated by this Agreement shall not include (a) any leases affecting the Property prior to the Closing Date, including any rights, claims, and remedies of Seller thereunder (for unpaid rents or otherwise), and any associated liens, guarantees, security deposits, and prepaid rentals, (b) all cash, cash equivalents, marketable securities, and investments and all bank accounts and lockboxes, and (c) any tenant fixtures or other property belonging to the tenants at the Property, any items leased from third-parties, all tax, insurance and other deposits of the Seller held by the third party (unless otherwise specifically provided in this Agreement) and all the property described on **Exhibit C** (collectively, the "**Excluded Personal Property**"), which Excluded Personal Property is expressly excluded from such conveyance.

**Section 1.03.  AS-IS, WHERE-IS.**

(a)    Purchaser expressly acknowledges that the Property is being sold and accepted AS IS, WHERE-IS AND WITH ALL FAULTS, and, except for Seller's representations and warranties set forth in this Agreement, which survive Closing (defined hereafter) to the extent provided in Section 10.03, and the warranties of title contained in the deed (collectively, "**Seller's Warranties**"), Seller makes no representations or warranties with respect to the physical condition or any other aspect of the Property, including, without limitation, (i) the structural integrity of any Improvements on the Property, (ii) the manner, construction, condition, and state of repair or lack of repair of any of such Improvements, (iii) the conformity of the Improvements to any plans or specifications for the Property, including but not limited to any plans and specifications that may have been or which may be provided to Purchaser, (iv) the conformity of the Property to past, current or future applicable zoning or building code requirements or the compliance with any other laws, rules, ordinances, or regulations of any government or other body, (v) the financial earning capacity or history or expense history of the operation of the Property, (vi) the nature and extent of any right of way, lease, possession, lien, encumbrance, license, reservation, condition, or otherwise, (vii) the existence of soil instability, past soil repairs, soil additions or conditions of soil fill, susceptibility to landslides, sufficiency of undershoring, sufficiency of drainage, (viii) whether the Property is located wholly or partially in a flood plain or a flood hazard boundary or similar area, (ix) the existence or non-existence of asbestos, underground or above ground storage tanks, hazardous waste or other toxic or hazardous materials of any kind or any other environmental condition or whether the Property is in compliance with applicable laws, rules and regulations, (x) the Property's investment potential or resale at any future date, at a profit or otherwise, (xi) any tax consequences of ownership of the Property, or (xii) any other matter whatsoever affecting the stability, integrity, other condition or status of the Land or any Improvements on the Land (collectively, the "**Property Conditions**"), and, except for Seller's Warranties, PURCHASER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS PURCHASER MIGHT HAVE REGARDING ANY FORM OF WARRANTY, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE RELATING TO THE PROPERTY, ITS IMPROVEMENTS OR THE PROPERTY CONDITIONS, SUCH WAIVER BEING ABSOLUTE, COMPLETE, TOTAL AND UNLIMITED IN ANY WAY. IN DECIDING TO PURCHASE THE PROPERTY, PURCHASER IS RELYING UPON ITS OWN INVESTIGATION OF THE PROPERTY, AND, EXCEPT FOR SELLER'S WARRANTIES, NOT UPON ANY REPRESENTATIONS OR WARRANTIES FROM SELLER OR ITS AGENTS. PURCHASER ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS THE "AS IS, WHERE IS" NATURE OF THIS SALE AND ANY FAULTS, LIABILITIES, DEFECTS OR OTHER ADVERSE MATTERS THAT MAY BE ASSOCIATED WITH THE PROPERTY.

(b)    Neither party to this Agreement is relying on any statement or representation not expressly stated in this Agreement. Purchaser specifically confirms and acknowledges that in entering into this Agreement, Purchaser has not been induced by, and has not relied upon, whether express or implied, warranties, guaranties, promises, statements, inducements, representations or information pertaining to the Property or its uses, the physical condition, environmental condition, state of title, income, expenses or operation of the Property, or any other matter or thing with respect thereto, written or unwritten, whether made by Seller or

any agent, employee or other representative of Seller, or any broker or any other person representing (or purporting to represent) Seller, which are not expressly set forth in this Agreement. Seller shall not be liable for or bound by any written or unwritten statements, representations, warranties, brokers' statements or other information pertaining to the Property furnished by Seller, any broker, any agent, employee or other actual (or purported) representative of Seller, or any person, unless and only to the extent the same are expressly set forth in this Agreement.

(c)     Except for any Claims (as defined below) arising out of a breach or default by Seller under this Agreement  (including a breach of any of Seller's representations and warranties in Article V) or Seller's Closing Documents (as defined in Section 3.02 herein) executed by Seller ("**Excepted Claims**"), THE CLOSING (DEFINED BELOW) HEREUNDER SHALL BE DEEMED TO CONSTITUTE AN EXPRESS WAIVER OF PURCHASER'S RIGHT TO RECOVER FROM SELLER, AND FOREVER RELEASES, COVENANTS NOT TO SUE AND DISCHARGES SELLER FROM, ANY AND ALL DAMAGES, DEMANDS, CLAIMS, LOSSES, LIABILITIES, PENALTIES, FINES, LIENS, JUDGMENTS, COSTS OR EXPENSES WHATSOEVER, INCLUDING ATTORNEYS' FEES AND COSTS, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THAT MAY ARISE ON ACCOUNT OF OR IN ANY WAY BE CONNECTED WITH THE PROPERTY (collectively, "**Claims**").

(d)     The provisions of this Section 1.03 shall survive the Closing and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

<h2 style="text-align:center">ARTICLE II.<br>PURCHASE PRICE</h2>

**Section 2.01. Purchase Price and Escrow Deposit**. The purchase price to be paid by Purchaser to Seller for the Property is One Hundred Fifteen Million Dollars ($115,000,000) (the "**Purchase Price**").  The Purchase Price shall be payable as follows:

(a)     Purchaser has delivered, or shall deliver within two (2) Business Days after the Effective Date, the sum of Ten Million Dollars ($10,000,000.00) (the "**Escrow Deposit**") by cash to Allegiance Title Company, 109 N. Post Oak Lane, Suite 150, Houston, Texas 77024, Attention: William V. Condrey, Phone: 713 993-9355, Email: vcondrey@allegiancetitle.com ("**Escrow Agent**"), as escrow agent, which Escrow Deposit is refundable only as specifically set forth herein. If Purchaser fails to timely deliver the Escrow Deposit to the Escrow Agent, Seller may terminate this Agreement upon written notice to Purchaser at any time before Purchaser delivers the Escrow Deposit to the Escrow Agent.

(b)     The Escrow Deposit shall be held in an interest-bearing escrow account by Escrow Agent in an institution as directed by Seller and reasonably acceptable to Purchaser. All interest and income on the Escrow Deposit will be remitted to the party entitled to the Escrow Deposit pursuant to this Agreement. Any interest earned on the principal portion of the Escrow Deposit shall be deemed to be part of the Escrow Deposit and shall be paid together with the principal portion of the Escrow Deposit, it being understood and agreed that if the transaction contemplated under this Agreement closes, any interest earned on the Escrow Deposit shall be

credited to the Purchase Price upon the Closing or, if the transaction contemplated by this Agreement does not close, the Escrow Deposit will be paid as provided in this Agreement. Escrow Agent is authorized and directed to pay the Escrow Deposit to the party entitled to receive the Escrow Deposit under the terms of this Agreement. Seller or Purchaser, as appropriate, shall deliver a letter of instruction to Escrow Agent directing the disbursement of the Escrow Deposit to the party entitled to receive the Escrow Deposit promptly upon receipt of a demand from that party. The Escrow Deposit shall be non-refundable to Purchaser except as expressly provided in <u>Section 3.06</u>, <u>Section 3.07</u>, <u>Section 4.03(a)</u>, <u>Section 4.03(b)</u>, <u>Section 5.01(o)</u>, <u>Section 6.07</u>, and <u>Section 7.07(b)</u>.

(c)     No later than 1:00 p.m. (CT) on the Business Day immediately preceding the Scheduled Closing Date, Escrow Agent shall deliver the Escrow Deposit together with any interest earned thereon to First American Title Insurance Company, National Commercial Services Office, 6363 Poplar Avenue, Suite 434, Memphis, Tennessee 38119, Rita Bost-Senior Commercial Escrow (the "**Title Company**") and Purchaser shall pay the balance of the Purchase Price to Title Company for the benefit of Seller, subject to any credits or apportionments as provided for under this Agreement, by transfer of immediately available federal funds to an account, or accounts, designated in writing by Seller no later than three (3) days prior to the Closing Date.

## ARTICLE III.
## CLOSING

**Section 3.01.** <u>**Closing Date**</u>. The closing of the transaction contemplated by this Agreement (the "**Closing**") will be held through escrow at the offices of the Title Company and shall occur on the later of (a) the date that is seven (7) days after the date on which Purchaser and Seller have satisfied or waived in writing each of the Closing Conditions (as defined in <u>Section 3.07 </u>herein) and (b) the date that is seven (7) days after the expiration of the Inspection Period (such date, the "**Scheduled Closing Date**"); the actual date of Closing being referred to hereinafter as the "**Closing Date**"), subject to the terms of this Agreement. Purchaser and Seller shall, no later than 1:00 p.m. (CT) on the Business Day immediately preceding the Scheduled Closing Date, deposit the respective Closing deliveries described in <u>Sections 3.02 </u>and <u>3.03 </u>with the Title Company with appropriate instructions for recording and disbursement consistent with this Agreement.

**Section 3.02.** <u>**Seller's Closing Deliverables**</u>. At the Closing, Seller shall deliver or cause to be delivered to the Title Company for the benefit of Purchaser, the following executed, certified and acknowledged by Seller, as appropriate (collectively, "**Seller's Closing Documents**"):

(a)     A special warranty deed conveying the Land, the Improvements and the Mineral Interests, duly executed and acknowledged by Seller, substantially in the form attached as <u>**Exhibit D**</u>, containing no exceptions or conditions except the Permitted Exceptions (defined below).

(b)     A bill of sale whereby Seller conveys to Purchaser all of Seller's right, title and interest in and to the Personal Property (the "**Bill of Sale**").  The Bill of Sale will be

[FINAL EXECUTION VERSION]

delivered without any Seller representations or warranties, substantially in the form attached to this Agreement as **Exhibit E**.

(c)     If applicable, two (2) counterparts of an Assignment of Contracts (the "**Assignment of Contracts**") duly executed by Seller, substantially in the form attached to this Agreement as **Exhibit F**.

(d)     Consent of the governing authority of Seller authorizing the transaction contemplated hereby and the execution and delivery of the documents required to be executed and delivered hereunder.

(e)     A certification that Seller is not a "foreign person" as such term is defined in Section 1445 of the Internal Revenue Code of 1984, as amended and the regulations thereunder, which certification shall be signed under penalty of perjury in substantially the form attached to this Agreement as **Exhibit G**.

(f)     Originals, or copies certified by Seller as being complete, of all applicable bills, invoices, fuel readings and other items that shall be apportioned as of the Closing Date.

(g)     All original Construction Warranties, Licenses and Permits, certificates of occupancy, and Assigned Contracts, to the extent in Seller's possession, otherwise copies of such documents (provided that the parties agree to cooperate to deliver such items outside of escrow).

(h)     A counterpart of a closing statement jointly prepared by Seller and Purchaser reflecting the prorations and adjustments required under Section 3.05 of this Agreement and the balance of the Purchase Price due Seller.

(i)     All keys and access codes to any portion of the Property, to the extent in Seller's possession or control (provided that the parties agree to cooperate to deliver such items outside of escrow).

(j)     An assignment and assumption of the Construction Warranties, Licenses and Permits in substantially the form of **Exhibit H** attached hereto and incorporated herein by this reference executed by Seller (the "**Construction Warranties**, **Licenses and Permits Assignment**").

(k)     Such evidence as may be reasonably required by the Title Company demonstrating that Seller has the legal power, right and authority to consummate the sale of the Property.

(l)     All other documents reasonably necessary or otherwise required by the Title Company to consummate the transaction contemplated by this Agreement, including such affidavits concerning parties in possession and claims for mechanics' liens as may be reasonably required by Title Company in order to issue the Title Policy (as defined in Section 4.03(a) (the "**Title Affidavits**") including but not limited to the owner's affidavit (the "**Owner's Affidavit**") in a customary form mutually acceptable to the Title Company, Seller and Purchaser.

[FINAL EXECUTION VERSION]

(m)     Possession of the Property, subject to the Permitted Exceptions and any other matters authorized herein (including, without limitation, the personal property referenced in <u>Section 5.01(i)</u>).

(n)     Two (2) counterparts of the form of notice (the "**Water District Notice**) to the Upper Brushy Creek Water Control and Improvement District No. 1a (the "**Water Control District**") required by the Water Control District to which the Property is subject.

(o)     Two (2) counterparts of a partial assignment and assumption of agreement (the "**Assignment of Enforcement Rights**") whereby Seller shall assign to Purchaser its rights of enforcement under the Agreement Regarding Declaration dated October 26, 2005, by and among Cousins La Frontera, LP, 35/45 Investors, L.P., William S. Smalling, Donald G. Martin and Derlis Salinas, III, as affected by that certain Partial Assignment and Assumption of Agreement Regarding Declaration dated July 12, 2013 by and between Cousins La Frontera, LLC and Seller, and as further affected by that certain Partial Assignment and Assumption of Agreement Regarding Declaration dated November 14, 2013 by and between Cousins La Frontera, LLC and Seller (the "**Cousins/Seller Agreement**").

**Section 3.03.  <u>Purchaser's Closing Deliverables</u>**.  At the Closing, Purchaser shall deliver or cause to be delivered to the Title Company for the benefit of Seller, the following, executed, certified and acknowledged by Purchaser, as appropriate:

(a)     The balance of the Purchase Price as set forth in <u>Section  2.01</u>.

(b)     Purchaser shall, where applicable, join with Seller in the execution and delivery of the Seller's Closing Documents and instruments required under <u>Section 3.02 </u>of this Agreement.

(c)     Consent of the governing authority of Purchaser authorizing the transaction contemplated hereby and the execution and delivery of the documents required to be executed and delivered hereunder.

(d)     If applicable, two (2) counterparts of the Assignment of Contracts, duly executed by Purchaser.

(e)     Two (2) counterparts of the Water District Notice and the Assignment of Enforcement Rights.

(f)     Two (2) counterparts of the form of acknowledgement of transfer of responsibility (the "**EARZ Transfer Notice**") required under the Deed Recordation Affidavit concerning Edwards Aquifer Protection Plan as set forth in instrument recorded as County Clerk's File No. 2014032889, Official Public Records of Williamson County, Texas.

(g)     All other documents reasonably necessary or otherwise required by the Title Company to consummate the transaction contemplated by this Agreement (the documents to be delivered at Closing by Purchaser under this <u>Section 3.03 </u>are referred to herein collectively as the "**Purchaser's Closing Documents**"; together with the Seller's Closing Documents being referred to herein collectively as the "**Closing Documents**").

**Section 3.04.  Closing Costs.**

(a)      Seller and Purchaser shall each pay the fees and expenses of its own counsel in connection with the preparation and negotiation of this Agreement.

(b)      Seller shall pay:

(i)      the costs charged by Title Company, including, without limitation, costs related to the Title Commitment (defined below), one-half of the escrow fees charged by Escrow Agent, one-half of the closing escrow fees charged by Title Company and the entire cost of the premium for the Title Policy to be issued to Purchaser in the amount of the Purchase Price; *provided, however*, the costs of any endorsement or modification to the Title Policy shall be paid by Purchaser;

(ii)      all transfer taxes payable in connection with the transaction contemplated by this Agreement;

(iii)      all recording fees for the release of any liens on the Property, as required pursuant to the terms of this Agreement; and

(iv)      all brokerage commissions and fees payable to Seller's brokers, CBRE, Inc., and KOA Partners, LLC, ("**Seller's Brokers**"), which shall be paid pursuant to a separate written contract between Seller and Seller's Brokers.

(c)      Purchaser shall pay:

(i)      one-half of closing escrow fees charged by the Title Company, one one-half of the escrow fees charged by Escrow Agent and the entire cost of any endorsement or modification to the Title Policy;

(ii)      the commissions owed to Purchaser's real estate brokers and consultants;

(iii)      any other fees or costs related to Purchaser's due diligence reviews; and

(iv)      all costs related to the recording fees payable in connection with the recording of the deed and any other documents that the Purchaser may require to be recorded at Closing, if any.

**Section 3.05.  Apportionments**.  Except as otherwise specifically provided below, all expenses, charges and other obligations relating to the operation of the Property (including, without limitation, real estate taxes and expenses, charges and other obligations under the Assigned Contracts) shall be prorated between Purchaser and the Seller on a per diem basis as of 11:59 P.M. on the date immediately preceding the Closing Date. For purposes of the prorations contained in this Section 3.05, Purchaser shall be deemed to be the owner of the Property for the entire Closing Date. Whether amounts are allocable for the above purposes for the period before or after Closing shall be determined in accordance with generally accepted accounting principles

using the accrual method. In furtherance of the foregoing: (i) any bills, invoices or other payments that are apportionable hereunder and that are received by Seller or Purchaser following Closing or otherwise become due following Closing, shall in the first instance be paid by Purchaser, and upon evidence of the payment thereof, Seller shall reimburse Purchaser its apportioned share thereof in accordance with the provisions of this Section 3.05, and (ii) any bills, invoices or other payments that relate exclusively to periods prior to Closing and are received by Seller or Purchaser following Closing or otherwise become due following Closing, shall be sent to Seller and shall be paid for by Seller when due. To the extent possible, the parties shall undertake to have services or contracts effectively terminated on the Closing Date in order to avoid (to the extent practicable) prorations of such items. In light of the above, the following shall be apportioned as of 11:59 p.m. on the date immediately preceding the Closing Date, unless expressly provided for otherwise:

(a)     All real estate and personal property taxes based on the fiscal year for which they are assessed and any assessments applicable to the Property shall be apportioned as of 11:59 p.m. on the date immediately preceding the Closing Date. If the Closing shall occur before a new tax rate or valuation is fixed, the apportionment of real estate taxes at Closing shall be estimated upon the basis of the tax rate for the preceding fiscal period applied to the latest assessed valuation. If the Property shall be, or has been, affected by any assessments or special assessments payable in a lump sum or which are, or may become, payable in installments, of which the first installment is then a charge or lien, or has already been paid, then at the Closing such amounts will be paid or apportioned, as the case may be in the following manner:

(i)     any such assessments or installments, or portion thereof, payable on or after the Closing Date shall be the responsibility of Purchaser; *provided, however*, if the assessment or installment covers any period prior to the Closing Date, Purchaser shall be entitled a credit from Seller for the proportionate amount of such assessment or installment that is applicable to the period of time prior to the Closing Date; and

(ii)     any such assessments or installments, or portion thereof, payable prior to the Closing Date shall be the responsibility of Seller; *provided, however,* if the assessment or installment covers any period on or after the Closing Date, Seller shall be entitled a credit from Purchaser for the proportionate amount of such assessment or installment that is applicable to the period of time on or after to the Closing Date.

(iii)     To the extent there are any interest or penalties associated with the payment of any taxes, such interest and penalties shall be allocated to the party who is responsible for the payment of such tax to the taxing authority.

(b)     Any and all unpaid property association fees, including without limitation any such existing delinquent fees due and payable (which such delinquent sums shall be charged in full to Seller) shall be apportioned as of 11:59 p.m. on the date immediately preceding the Closing Date.

(c)     Purchaser and Seller shall cooperatively take all steps necessary to effectuate the transfer of all utilities for the Property from Seller to Purchaser as of the Closing Date, and where necessary, Purchaser will post deposits with the utility companies.  Seller and

Purchaser shall cooperate and use commercially reasonable efforts to further ensure that all utility meters, if any, for the Property are read as of the day prior to the Closing Date. Charges for utilities, if any, serving the Property shall be determined as of the Closing Date, and Purchaser shall be responsible for all utility charges for the period after the Closing Date and Seller shall be responsible for all utility charges for the period prior to and on the Closing Date. To the extent any such expenses and charges are not determinable as of the Closing Date, such expenses and charges shall be paid promptly upon receipt of an invoice therefor by the party obligated for payment thereof. Seller shall be entitled to recover any and all deposits held by any utility company for the Property as of the date of Closing. If the Purchaser does not cause the utilities to be switched over to the Purchaser as of the Closing Date and as a result of such failure Seller is unable to cause the utility company(s) to release to Seller its utility deposit(s) within sixty (60) days after the Closing Date, then Purchaser shall reimburse the Seller the amount of such deposit(s) no later than sixty-five (65) days after the Closing Date. In such event, the deposit(s) will be assigned to Purchaser who shall have rights to have the deposit(s) released to it upon satisfaction of the conditions imposed by the utility company.

(d)     Seller shall deliver to Purchaser and the Title Company proration information sufficient for preparation of the Closing Statement not less than three (3) Business Days prior to Closing Date and Purchaser and Seller shall work in good faith to mutually approve and provide to Title Company a schedule of prorations in as complete and accurate a form as possible. All demands for reimbursement proration amounts (other than those relating to ad valorem taxes and assessments) must be made within sixty (60) days after the Closing Date and thereafter the prorations made at Closing (adjusted in accordance with timely made demands for reimbursement) will be considered final for all purposes.

(e)     All other items customarily apportioned in connection with sales of buildings substantially similar to the Property in the State of Texas shall be apportioned as of 11:59 p.m. on the date immediately preceding the Closing Date.

**Section 3.06. <u>Purchaser's Conditions to Closing</u>**. The Purchaser is not obligated to perform under this Agreement unless all of the following conditions precedent ("**Purchaser's Closing Conditions**") are satisfied (or waived in writing by Purchaser) as of the Closing Date:

(a)     The Sale Order (as defined in <u>Section 9.03(a)</u> herein), in substantively the form required by this Agreement, shall have been entered by the Bankruptcy Court approving this Agreement and shall have become a Final Order (for the purposes hereof, an order is a "**Final Order**" if such order has not been vacated and is not then subject to a stay of proceedings, and either (i) the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari with respect to such order has expired and no such appeal, motion or petition is pending, or (ii) a petition for writ of certiorari has been finally decided and no further appeal, motion for rehearing or reconsideration, or a petition for writ of certiorari can be taken or granted as to such order).

(b)     If applicable, the Assignment Order (as defined in <u>Section 9.04</u> herein), in in form and substance acceptable to Purchaser, the approval of which shall not be unreasonably withheld, conditioned or delayed, shall have been entered by the Bankruptcy Court approving the assignment of any Assigned Contracts to Purchaser, and shall have become a Final Order, and

**[FINAL EXECUTION VERSION]**

Seller shall have paid any cure costs associated with such Assigned Contracts as contemplated by Section 9.04.

        (c)     An order (the "**Rejection Order**") of the Bankruptcy Court, in form and substance acceptable to Purchaser, approval of which shall not be unreasonably withheld, conditioned or delayed, shall have been entered rejecting all leases affecting the Property and shall have become a Final Order, unless Seller, in its sole discretion, has terminated such leases in writing and Title Company has agreed to issue the Title Policy free and clear of such leases.

        (d)     All representations and warranties of the Seller contained in the Agreement shall be true and correct in all material respects as of the date of Closing, after giving effect to any updates provided by Seller pursuant to Section 5.01(o), except for any of the same that specifically refers to an earlier date, which shall be true and correct in all material respects as of such earlier date, and except for any failure of the same to be true and correct that would not reasonably be expected to have a material adverse effect on the current or prior use of the Property or Seller's ability to consummate the transaction contemplated by this Agreement.

        (e)     As of the Closing, Seller shall have in all material respects performed all of the obligations required to be performed by Seller under this Agreement through Closing.

        (f)     The Title Company shall be unconditionally and irrevocably obligated to issue the Title Policy in the form required by this Agreement upon payment of the title premium.

        (g)     Seller shall have satisfied or Purchaser shall have waived in writing the conditions precedent set forth in Section 4.03(a) herein.

If Purchaser determines that any of the Purchaser's Closing Conditions cannot be or have not been satisfied prior to June 30, 2016 (the "**Outside Closing Date**"), Purchaser may, as its sole and exclusive remedy, terminate this Agreement, in which event the Escrow Deposit shall be refunded to Purchaser and Seller shall retain the Independent Consideration (as defined in Section 10.17), and neither party shall have any further rights and obligations hereunder, except those obligations and rights which expressly survive termination of this Agreement.

    **Section 3.07. <u>Seller's Conditions to Closing</u>**. The Seller is not obligated to perform under this Agreement unless all of the following conditions precedent ("**Seller's Closing Conditions**", and together with Purchaser's Closing conditions, the "**Closing Conditions**") are satisfied (or waived in writing by Seller) as of the Closing Date:

        (a)     The Sale Order (as defined in Section 9.03(a) herein), in substantively the form required by this Agreement, shall have been entered by the Bankruptcy Court approving this Agreement and shall have become a Final Order.

        (b)     If applicable, the Assignment Order (as defined in Section 9.04 herein), in in form and substance acceptable to Purchaser, the approval of which shall not be unreasonably withheld, conditioned or delayed, shall have been entered by the Bankruptcy Court approving the assignment of any Assigned Contracts to Purchaser, and shall have become a Final Order, and Seller shall have paid any cure costs associated with such Assigned Contracts as contemplated by Section 9.04.

(c)     The Rejection Order, in form and substance acceptable to Purchaser, approval of which shall not be unreasonably withheld, conditioned or delayed, shall have been entered by the Bankruptcy Court rejecting all leases affecting the Property and shall have become a Final Order, unless Seller, in its sole discretion, has terminated such leases in writing and Title Company has agreed to issue the Title Policy free and clear of such leases.

(d)     All representations and warranties of the Purchaser contained in the Agreement shall be true and correct in all material respects as of the date of Closing, except for any failure of the same to be true and correct that would not reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transaction contemplated by this Agreement.

(e)     As of the Closing, Purchaser shall have in all material respects performed all of the obligations required to be performed by Purchaser under this Agreement through Closing.

If Seller determines that any of the Seller's Closing Conditions cannot be or have not been satisfied prior to the Outside Closing Date as the sole result of a Purchaser Default (as defined in Section 7.01(a) hereof) of its obligations under this Agreement, then Seller shall have the rights and remedies provided in Section 7.01(a) hereof. If any of the Seller's Closing Conditions have not been satisfied prior to the Outside Closing Date for any reason other than the sole result of a Purchaser Default of its obligations under this Agreement, then Seller may, as its sole and exclusive remedy, terminate this Agreement, in which event the Escrow Deposit shall be refunded to Purchaser and Seller shall retain the Independent Consideration (as defined in Section 10.17), and neither party shall have any further rights and obligations hereunder, except those obligations and rights which expressly survive termination of this Agreement.

**Section 3.08.   Inspection Period**.

(a)     Purchaser has from the Effective Date until 5:00 p.m. (CT) on the seventh (7th) day following the Effective Date (the "**Inspection Period**") to conduct such inspections as Purchaser deems necessary and at its sole cost and expense. Seller will permit Purchaser and Purchaser's agents and representatives to have reasonable access to enter upon the Property for the purpose of making such tests and inspections; provided Purchaser shall not unreasonably interfere with Seller's use of the Property. PURCHASER SHALL, AT ITS EXPENSE, REPAIR ANY DAMAGE TO THE PROPERTY CAUSED BY PURCHASER'S INSPECTION OF THE PROPERTY. PURCHASER HEREBY AGREES TO AND SHALL INDEMNIFY, DEFEND, PROTECT AND HOLD SELLER HARMLESS OF, FROM AND AGAINST ANY AND ALL LIABILITIES, SUITS, CLAIMS, LOSSES, CAUSES OF ACTION, LIENS, FINES, PENALTIES, COSTS AND EXPENSES, INCLUDING, WITHOUT LIMITATION, COURT COSTS, REASONABLE ATTORNEYS' FEES AND COSTS, AND DAMAGES SUSTAINED BY SELLER OR THE PROPERTY (COLLECTIVELY "**CLAIMS**"), INCLUDING, BUT NOT LIMITED TO, INJURY TO OR DEATH OF ANY PERSON OR DAMAGE TO OR THEFT OF ANY PROPERTY, OR MECHANICS' AND MATERIALMEN'S LIENS, CAUSED AS A RESULT OF OR ARISING OUT OF OR IN CONNECTION WITH ANY INSPECTIONS OR EXAMINATIONS CONDUCTED BY PURCHASER OR ITS CONTRACTORS OR AGENTS, **EVEN IF SUCH CLAIMS ARISE FROM THE NEGLIGENCE OF SELLER**; PROVIDED,

HOWEVER, THAT THE FOREGOING INDEMNITY SHALL NOT APPLY IN CONNECTION WITH ANY MATTERS CONCERNING THE CONDITION OF THE PROPERTY OR THE PROPERTY'S COMPLIANCE WITH APPLICABLE LAWS THAT ARE UNCOVERED OR DISCOVERED BY PURCHASER OR ITS CONTRACTORS OR AGENTS IN CONDUCTING THEIR INSPECTIONS AND EXAMINATIONS HEREUNDER. ADDITIONALLY, PURCHASER'S INDEMNIFICATION OBLIGATIONS HEREUNDER DO NOT APPLY TO ANY CLAIMS TO THE EXTENT ARISING SOLELY FROM SELLER'S NEGLIGENT ACT OR WILLFUL MISCONDUCT. THIS INDEMNIFICATION OBLIGATION SHALL SURVIVE THE CLOSING AND ANY TERMINATION OF THIS AGREEMENT.

(i)     Purchaser may engage an independent environmental consultant, at its cost, to conduct an environmental assessment of the Property to determine the current environmental status of the Property so that any such environmental assessment is completed before the end of the Inspection Period. If Purchaser's environmental assessment discovers that hazardous materials exist on the Property prior to the Closing Date, such discovery by Purchaser shall not relieve Seller of any liability to which Seller would otherwise have been subject pursuant to this Agreement or applicable law arising directly from the release or contamination from the Property relating to such hazardous materials.

(ii)     Purchaser must not, under any circumstances, compromise or affect the structural integrity of the Improvements or violate any applicable law, rule or regulation. Neither Purchaser nor any of its agents, representatives or independent contractors may contact any tenant at the Property or Seller's employees, management company, service providers and vendors, or any governmental or municipal authorities unless Seller has given its prior written consent (which consent will not be unreasonably withheld, conditioned or delayed) and, (i) a representative for Seller is present during any such contact or communication, or (ii) Seller has waived, in writing (which writing may be by email), its right to be present during such meeting. Purchaser must obtain Seller's prior written approval, which Seller may withhold in its sole and absolute discretion, of the scope and method of any physically intrusive inspection, testing or investigation of the Property, including, but without limitation, any inspection which would involve taking subsurface borings or related investigations, and any inspection that would alter the physical condition of the Property. The right of entry granted in this Agreement is subject to the rights of any grantees under any existing easements (recorded and unrecorded) and to any leases that are in place, and the rights of tenants of the Property, and Purchaser shall not interfere with the rights of such grantees and tenants.

(iii)     Purchaser for itself and for its employees, and any of Purchaser's agents, representatives or independent contractors who enter the Property, shall maintain a policy of commercial general liability insurance, with a single combined limit of not less than Two Million Dollars ($2,000,000), insuring all activity and conduct of Purchaser's employees, agents, representatives and independent contractors during any such entry, including incidental contractual liability coverage. Seller shall be named as additional insured on such commercial general liability policy, and Purchaser shall provide proof of such insurance to Seller, in a form reasonably acceptable to Seller, prior to any such entry.

4830-4018-7953.13

13

(iv)     If the Closing does not occur, Purchaser shall deliver to Seller, free of charge, copies of any final reports Purchaser obtains in connection with its inspection of the Property including, without limitation, any Phase I environmental site assessment performed by or on behalf of Purchaser. Any such delivery shall be made without recourse to Purchaser and without any representation or warranty from Purchaser. Purchaser's obligations under this Section 3.08(a)(iv) shall survive termination of this Agreement.

(v)     Purchaser shall cause its agents, representatives, employees and independent contractors to comply with the terms of this Section 3.08(a).

(b)     Seller has provided Purchaser access to Seller's virtual data room as of the Effective Date. The Seller's virtual data room contains certain documents that may include the following: "as built" plans, other plans specifications and drawings, surveys, permits, engineering reports, tax bills, building permits, occupancy permits, maintenance and service records, leases, contracts, environmental reports and other documents and information pertaining to the ownership, use, operation, maintenance and condition of the Property. Seller shall use its best efforts to obtain copies of any other documents as may be reasonably requested by the Purchaser during the Inspection Period related to the transactions under this Agreement (all such documents provided to Purchaser pursuant to this Section 3.08(b) are hereinafter referred to as the "**Property Documents**"). Purchaser acknowledges that the Property Documents are provided or made available for inspection with no representations or warranties as to the truth, accuracy, completeness, methodology of preparation of the Property Documents, or otherwise, of any kind, including without limitation any reports or audits or any other materials, data or other information supplied to Purchaser in connection with Purchaser's inspection of the Property. Seller expressly disclaims any such representation or warranty with respect to the Property Documents. Purchaser acknowledges that the Property Documents are provided only for Purchaser's convenience as a starting point for commencing Purchaser's own examination of the Property. Purchaser agrees that it will rely exclusively on its own independent investigation and evaluation of every aspect of the Property and not on the Property Documents supplied by Seller. Purchaser expressly disclaims any intent and waives any right to rely on any of the Property Documents provided to it by Seller, agrees that it shall not rely on any of the Property Documents provided to it by Seller, and agrees that it shall rely solely on its own independently developed or verified information. Seller shall not be liable for any claims by Purchaser as to the adequacy or completeness of any Property Document(s) or the failure of Seller to furnish any of the same.

**ARTICLE IV.**
**TITLE MATTERS**

**Section 4.01.  Conveyance**. At the Closing, Seller will convey to Purchaser (a)  fee simple indefeasible title to the Land, the Improvements and the Mineral Interests by a special warranty deed free and clear of any and all liens, charges, security interests, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(f), except only Permitted Exceptions (as defined in Section 4.02 hereof), (b) Seller's right, title and interest in the Personal Property by the Bill of Sale free and clear of any and all liens, charges, security interests, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(f), except only Permitted Exceptions, (c) if applicable, Seller's right, title and interest in the Assigned Contracts by the Assignment of

Contracts free and clear of any and all liens, charges, security interests, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(f), except only Permitted Exceptions,] and (d) Seller's right, title and interest in the Construction Warranties, Licenses and Permits by the Construction Warranties, Licenses and Permits Assignment free and clear of any and all liens, charges, security interests, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(f), except only Permitted Exceptions.

**Section 4.02.  Permitted Exceptions**. The Property shall be sold, assigned and conveyed by Seller to Purchaser, and Purchaser shall accept and assume same, free and clear of any and all liens, charges, security interests, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(f), except for those matters described in **Exhibit J** attached hereto and incorporated herein, and except for those matters approved or deemed approved by Purchaser pursuant to Section 4.03(a)(y) or Section 4.03(b) (collectively, the "**Permitted Exceptions**").

**Section 4.03.  Title and Survey.**

(a)  Purchaser has received and reviewed (a) that certain Title Insurance Commitment (Commitment No. NCS-785642-NAS), dated effective March 24, 2016 and issued April 7, 2016 (the "**Title Commitment**") by Title Company (together with accompanying exception documents) whereby Title Company proposes to issue, as of the Closing Date, a Texas T-1 Owner's Policy of Title Insurance (Revised February 1, 2010) (the "**Title Policy**") for the Property in an amount equal to the Purchase Price, and (b) that certain ALTA/ACSM Land Title Survey of the Property dated April 11, 2016 (as revised on April 14, 2016 and April 20, 2016) by Pixis, LLC, Job Number 16-03-019 (the "**Survey**"). The Title Commitment provides for the issuance of the Title Policy to Purchaser as of the Closing and shall insure fee simple title to the Property subject only to the Permitted Exceptions. Seller agrees to deliver any information as may be reasonably required by the Title Company under Schedule C (requirements) of the Title Commitment or otherwise in connection with the issuance of the Title Policy. Purchaser accepts the condition of title to the Property as set forth in the Title Commitment subject to the Permitted Exceptions and subject to the following conditions precedent being satisfied by Seller or waived in writing by Purchaser: (i) Seller shall have satisfied the requirements under Schedule C of the Title Commitment through the Sale Order, which will provide that the sale is free and clear of liens and therefore, no lien releases will be required, but may be provided, and (ii) Seller shall have performed and completed in all material respects the curative title actions described in **Exhibit L** attached hereto and incorporated herein (the "**Title Curative Actions**"). If each of the foregoing conditions precedent is not satisfied by Seller or waived in writing by Purchaser by the Outside Closing Date, then Purchaser shall have the right to choose one of the following, as its sole and exclusive remedy: (y) close escrow subject to any such objections, without any change in Purchaser's obligations under this Agreement and with no reduction in the Purchase Price (in which case the matters objected to shall be deemed to be Permitted Exceptions), or (z) terminate this Agreement by providing written notice thereof to Seller whereupon Escrow Agent shall refund the Escrow Deposit to Purchaser (less and except the Independent Consideration which shall be paid by Escrow Agent to Seller).

(b)  If at any time after March 24, 2016 (the effective date of the Title Commitment), Purchaser receives any amendment or update to the Title Commitment showing any title defects which Purchaser claims are not Permitted Exceptions or an Immaterial

Exception (as defined in <u>Section 4.03(c)</u> herein) Purchaser shall give written notice (a "**Title Notice**) of any objections to such defects to Seller within two (2) Business Days of the receipt of such amendment or update (the "**Title Notice Date**"). The failure by Purchaser to deliver the Title Notice on or before the Title Notice Date shall constitute Purchaser's irrevocable acceptance of the new items or matters shown in the amendment or update to the Title Commitment, and Purchaser shall be deemed to have unconditionally waived any right to object to (and shall be deemed to have approved) any such new items or matters shown in the amendment or update to the Title Commitment. In the event that Seller receives a Title Notice within five (5) days of the Scheduled Closing Date, the Scheduled Closing Date shall be extended on a day to day basis at Seller's option in order to provide Seller with five (5) days to respond to the Title Notice. In the event Seller receives a Title Notice and fails to insure over or cure the objection set forth in such Title Notice to Purchaser's reasonable satisfaction (it being understood that Seller shall have no obligation to cure any such objection), then Purchaser shall have the right to choose one of the following, as its sole and exclusive remedy: (i) close escrow subject to any such objections, without any change in Purchaser's obligations under this Agreement and with no reduction in the Purchase Price (in which case the matters objected to shall be deemed to be Permitted Exceptions), or (ii) terminate this Agreement by providing written notice thereof to Seller whereupon Escrow Agent shall refund the Escrow Deposit to Purchaser (less and except the Independent Consideration which shall be paid by Escrow Agent to Seller).

(c)     For the purposes of this Agreement, "**Immaterial Exception**" means any (i) lien for taxes, assessments and water and sewer charges not yet delinquent, or being contested in good faith by appropriate proceedings (including any interest, penalties or additions to any such taxes, assessments and charges) and the amount of which is fully bonded by a reputable surety company; (ii) utility easements for electricity, gas, water, sanitary sewer, surface water drainage or other general easements that would not reasonably be expected to materially impair the Purchaser's use, possession or quiet enjoyment of the Property in the ordinary course of business, consistent with Seller's current or prior use thereof; (iii) encumbrances consisting of zoning restrictions, easements and other restrictions on the use of the Property that would not reasonably be expected to materially impair the Purchaser's use, possession or quiet enjoyment of the Property in the ordinary course of business, consistent with Seller's current or prior use thereof; (iv) any laws, regulations or ordinances affecting the Property that would not reasonably be expected to materially impair the Purchaser's use, possession or quiet enjoyment of the Property in the ordinary course of business, consistent with Seller's current or prior use thereof; (v) any utility company rights, easements or franchises for electricity, water, steam, gas, telephone or other service or the right to use and maintain poles, lines, wires, cables, pipes, boxes and other fixtures and facilities in, over, under and upon the Property, which rights would not reasonably be expected to materially impair the Purchaser's use, possession or quiet enjoyment of any of the Property in the ordinary course of business, consistent with Seller's current or prior use thereof; (vi) any non-material encroachments of improvements upon any street or highway; (vii) all mechanics', carriers' workers', repairers' and similar liens (provided Seller agrees to cause the Title Company to delete such items from the Title Policy); (viii) liens, title defects or irregularities that would not reasonably be expected to materially impair the Purchaser's use, possession or quiet enjoyment of the Property in the ordinary course of business, consistent with Seller's current or prior use thereof; (ix) any non-material encroachments of improvements over

any easements, rights of way, set-back lines, or boundaries; or (x) any lien or other matter that would be discharged by the Sale Order.

(d) Purchaser acknowledges and agrees that **TIME IS OF THE ESSENCE** with respect to all time periods relating to Purchaser's obligations as set forth in this Section 4.03.

(e) From and after the date hereof, Seller shall not execute any deed, easement, restriction, covenant or other matter affecting title to the Property that will survive Closing unless Purchaser has received a copy thereof and has approved the same in writing. If Purchaser fails to approve in writing to any such proposed instrument within five (5) Business Days after receipt of the aforementioned notice, Purchaser shall be deemed to have disapproved the proposed instrument. Purchaser's consent shall not be unreasonably withheld, conditioned or delayed with respect to any such instrument that is proposed prior to the expiration of the Inspection Period. Purchaser, in its sole and absolute discretion, shall be entitled to grant or withhold its consent with respect to any such instrument that is proposed between the expiration of the Inspection Period and the Closing.

(f) Upon Closing, the Title Company shall issue the Title Policy to Purchaser, insuring that fee simple title to the Property is vested in Purchaser subject only to the Permitted Exceptions and the standard printed exceptions in the form of owner's policy of title insurance promulgated by the Texas Department of Insurance and issued by title insurance companies in the State of Texas which the Title Company is not permitted to remove or will not agree to remove. Purchaser shall be entitled to request that the Title Company provide such endorsements (or amendments) to the Title Policy as Purchaser may reasonably require, provided that such endorsements (or amendments) shall be at no cost to, and shall impose no additional liability on, Seller, and provided further that the inability of Purchaser to obtain any such endorsement or amendment shall not be deemed a failure to satisfy the condition set forth in Section 3.06(f), in each case except if such endorsements are issued for purposes of removing an exception that is not a Permitted Exception.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

**Section 5.01. Seller's Representations and Warranties**. Seller represents and warrants to Purchaser on and as of the date of this Agreement and on and as of the Closing Date as follows:

(a) Seller is a duly organized, validly existing limited partnership in good standing under the laws of the State of Texas and is authorized to conduct business in the State of Texas.

(b) Subject to Bankruptcy Court approval, this Agreement has been duly authorized, executed and delivered by Seller, and is and at the time of the Closing will be a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(c) Subject to Bankruptcy Court approval, the execution and delivery of this Agreement, the consummation of the transactions provided for herein and the fulfillment of the

4830-4018-7953.13

terms hereof will not result in a breach of any of the terms or provisions of, or constitute a default under, any agreement of Seller or any instrument to which Seller is a party or by which Seller or the Property are bound, or any judgment, decree or order of any court or governmental authority or any applicable laws.

(d)     Except for the contracts identified on **Exhibit B** (each of which shall continue to be in full force and effect as of the Closing), the Permitted Exceptions and other agreements contemplated by this Agreement, there are no contracts of any kind or description in existence that will survive Closing which shall be binding on Purchaser.

(e)     Except for Seller's Brokers, no agent, broker, finder, or investment or commercial banker, or other person or firm engaged by, or acting on behalf of, Seller in connection with the negotiation, execution, or performance of this Agreement or the transactions contemplated by this Agreement, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions.

(f)     Seller is not a "foreign person" as such term is defined in Section 1445 of the Internal Revenue Code or any regulations promulgated thereunder, as amended.

(g)     Other than the Bankruptcy Case, there is no pending or, to Seller's actual knowledge, threatened litigation or condemnation action against the Property or against Seller with respect to the Property as of the date of this Agreement.

(h)     To Seller's actual knowledge, except as set forth on **Exhibit K,** Seller has not received written notice from any Governmental Authority (as defined below) that it is not now in compliance with all applicable laws, ordinances, regulations, statutes, codes, rules, orders, decrees, determinations, covenants and restrictions relating to the Property and every part thereof (hereinafter collectively referred to as the "**Applicable Laws**" or individually, "**Applicable Law**") including those promulgated or imposed by any agency, department, commission, board, bureau or instrumentality of any governmental authority of the United States, the State of Texas, the County of Williamson, the City of Austin or any other local authority (hereinafter collectively referred to as the "**Governmental Authorities**", or individually, a "**Governmental Authority**").

(i)     There are no adverse or other parties in possession of the Land, Improvements or of any part thereof, as lessees, tenants at sufferance or trespassers, except that personal property owned by, or formerly owned by, certain tenants under leases affecting the Property as of the Effective Date is located on the Property.

(j)     To Seller's actual knowledge, there are no liens encumbering the Personal Property, save and except liens to be released by Seller or otherwise discharged at the Closing.

(k)     Seller has granted no outstanding options to purchase or rights of first refusal with respect to all or any part of the Property and has entered into no outstanding contracts with others for the sale of all or any part of the Property that remain in effect.

4830-4018-7953.13

(l)     No labor has been performed or material furnished for the Property contracted for by Seller that will not be fully paid by Seller prior to or at the Closing, or the lien securing which will not otherwise be discharged at the Closing.

(m)     As of the Effective Date, Seller does not own any of the excluded personal property listed on **Exhibit C** attached hereto.

(n)     The phrase "**Seller's actual knowledge**" means the actual (and not constructive) knowledge of Todd Furniss.

(o)     Prior to the Closing Date, Seller may notify Purchaser in writing of any facts, conditions or circumstances which come to Seller's actual knowledge that render any of the representations and warranties set forth in this Section 5.01 in any way inaccurate, incomplete, incorrect or misleading. In the event of any update to Seller's warranties and representations, Seller shall not be in default hereunder and shall have no liability as a result thereof except as provided herein. If an updated representation or warranty has a material adverse effect on the current or prior use of the Property or Seller's ability to consummate the transaction contemplated by this Agreement, as reasonably determined by Purchaser, Purchaser's sole right and remedy as a result thereof shall be the right to terminate this Agreement by giving written notice thereof to Seller, and thereupon the Escrow Deposit (Ten Million Dollars) shall be refunded to Purchaser.

**Section 5.02. Purchaser's Representations and Warranties**. Purchaser represents and warrants to Seller on and as of the date of this Agreement and on and as of the Closing Date as follows:

(a)     Purchaser is a Texas limited liability partnership duly organized, validly existing and in good standing under the laws of the State of Texas.

(b)     This Agreement has been duly authorized, executed and delivered by Purchaser, and, subject to Bankruptcy Court approval, is and at the time of the Closing will be a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

(c)     No agent, broker, finder, or investment or commercial banker, or other person or firm engaged by, or acting on behalf of, Purchaser in connection with the negotiation, execution, or performance of this Agreement or the transactions contemplated by this Agreement, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions.

(d)     Purchaser has not violated any contract, agreement or other instrument to which Purchaser is a party nor any judicial order, judgment or decree to which Purchaser is bound by: (i) entering into this Agreement; (ii) executing any of the documents Purchaser is obligated to execute and deliver on the Closing Date or (iii) performing any of its duties or obligations under this Agreement or otherwise necessary to consummate the transactions contemplated by this Agreement.

[FINAL EXECUTION VERSION]

(e)      There are no actions, lawsuits, litigation or proceedings pending or threatened in any court or before any governmental or regulatory agency that affect Purchaser's power or authority to enter into or perform this Agreement. There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, or, to the best of Purchaser's knowledge, threatened against Purchaser, which would have any material adverse effect on the business or assets or the financial condition of Purchaser or the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(f)      Purchaser has not (i) commenced a voluntary case, or had entered against it a petition, for relief under any federal bankruptcy act or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors, (ii) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator or similar official in any federal, state or foreign judicial or non-judicial proceeding, to hold, administer and/or liquidate all or substantially all of its property, or (iii) made an assignment for the benefit of creditors.

(g)      Purchaser is not (i) a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the OFAC of the Department of the Treasury (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), regulation or other governmental action (ii) a "specially designated global terrorist" or other person listed in Appendix A to Chapter V of 31 C.F.R., as the same has been from time to time updated and amended, or (iii) a person either (A) included within the term "designated national" as defined in the Cuban Assets Control Regulations, 31 C.F.R., Part 515 or (B) designated under Sections 1(a), 1(b), 1(c), or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or a person similarly designated under any related enabling legislation or any other similar executive orders.

(h)      Purchaser has taken measures as required by law to assure that (i) funds to be used to pay the Purchase Price and (ii) with respect to each holder of a direct interest in Purchaser, funds invested by such holders in Purchaser, are derived from legal sources and such measures have been undertaken in accordance with the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and all applicable laws, regulations and government guidance on compliance therewith and on the prevention and detection of money laundering violations under 18 U.S.C. §§ 1956 and 1957.

**Section 5.03.  <u>Operating Covenants</u>**. Seller shall cause the Property to be maintained in substantially the same manner as prior to the Effective Date pursuant to Seller's normal course of business, consistent with prior practices, making all reasonable and ordinary maintenance repairs resulting from the breakdown or improper functioning of a particular item or system which is required to keep the Property in substantially the same condition as on the date hereof, subject to reasonable wear and tear and <u>Article VI</u> of this Agreement; provided that Seller shall not be obligated to perform any capital improvements or capital repairs to any part of the Property. Seller shall not enter into any new contracts, leases (or renewals, modifications or amendments of existing contracts or leases; *provided, however,* that Seller may terminate any existing leases), easements or encumbrances without the prior written consent of Purchaser, such consent not to be unreasonably withheld, conditioned or delayed, *provided however*, Seller shall have the right

to enter into contracts which may be terminated on or before the Closing Date without payment of any termination fee. Seller shall maintain property and liability insurance on the Property until the Closing Date with substantially the same coverage as in effect on the date of this Agreement.

**Section 5.04. <u>Governmental Approvals.</u>** Subject to the terms and conditions of this Agreement, each of the Purchaser and the Seller shall use their commercially reasonable efforts, without the obligation to sell any assets, pursue any litigation or pay, incur, convey, endure or deliver any material monetary payments or other form of consideration ("**Reasonable Efforts**") to (i) take all action (or refrain from taking any detrimental action within its control) and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement including the satisfaction of the conditions precedent set forth in <u>Section 3.06</u> and <u>Section 3.07</u>; provided, however, that the foregoing shall not require or cause Purchaser or Seller to waive any right it may have under other provisions of this Agreement, and (ii) obtain all other actions or non-actions, approvals, consents, waivers, registrations, permits, authorizations and other confirmations from any Governmental Authority or third party necessary, proper or advisable to consummate the transactions contemplated by this Agreement as soon as practicable.

# ARTICLE VI.
# RISK OF LOSS

**Section 6.01. <u>Risk of Loss</u>**. If after the Effective Date and prior to the Closing Date all or any portion of the Property shall be taken by condemnation or eminent domain or damaged or destroyed by fire or other casualty, which (in the case of casualty) is estimated by the insurance carrier currently providing coverage for the Property to cost more than One Million Dollars ($1,000,000) to repair (or in the case of condemnation) is valued at greater than One Million Dollars ($1,000,000) (a "**Material Casualty or Condemnation Event**") Purchaser shall have the option to terminate this Agreement and receive the Escrow Deposit or proceed to closing with a deduction from the Purchase Price for the full estimated costs to Purchaser of repairing and/or restoring the Property in an amount to be agreed by Purchaser and Seller; *provided, however*, in the event Purchaser elects to proceed to closing, Purchaser may elect to pay the full Purchase Price without deduction and require Seller to pay the applicable deductible under Seller's applicable insurance policies and to assign to Purchaser any and all insurance proceeds received or to be received by Seller, less Seller's attorneys' fees and third party costs and other expenses incurred by Seller to collect or adjust such insurance or to secure the Improvements or initiate repairs of restoration of the Property and any portion of such proceeds paid or to be paid on account of the loss of rents or other income from the Property for the period prior to the Closing Date. If after the Effective Date and prior to the Closing Date all or any portion of the Property shall be taken by condemnation or eminent domain or damaged or destroyed by fire or other casualty and same does not constitute a Material Casualty or Condemnation Event, this Agreement shall remain in full force and effect and Purchaser shall pay the full Purchase Price without deduction and Seller shall pay the applicable deductible under Seller's applicable insurance policies and assign to Purchaser any and all insurance proceeds received or to be received by Seller, less Seller's attorneys' fees and third party costs and other expenses incurred

[FINAL EXECUTION VERSION]

by Seller to collect or adjust such insurance or to secure the Improvements or initiate repairs of restoration of the Property and any portion of such proceeds paid or to be paid on account of the loss of rents or other income from the Property for the period prior to the Closing Date.

## ARTICLE VII.
## REMEDIES

### Section 7.01.  Remedies

(a)  If Purchaser shall default in the performance of Purchaser's obligations under this Agreement and the Closing does not occur as a result thereof (a "**Purchaser Default**"), Seller's sole and exclusive remedy shall be to cause the Escrow Agent to pay to Seller the Escrow Deposit plus any accrued interest thereon, if any, as and for full and complete liquidated and agreed damages for a Purchaser Default, and the parties shall be released from further liability to each other hereunder, except for those obligations and liabilities that are expressly stated to survive termination of this Agreement.  Seller waives any right it may have to seek specific performance of Purchaser's obligation under this Agreement or to sue for damages for a Purchaser Default. SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE ESCROW DEPOSIT AND ANY INTEREST EARNED THEREON, AS THE CASE MAY BE, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT. SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW. THIS SECTION DOES NOT LIMIT THE SELLER'S RIGHTS TO INDEMNIFICATIONS IN THIS AGREEMENT.

(b)  If Seller shall default in the observance or performance of any of the terms of this Agreement, and Purchaser is ready, willing, and able to close in accordance with the terms, provisions and conditions of this Agreement and the Closing does not occur as a result thereof (a "**Seller Default**"), Purchaser shall elect as its exclusive remedy either (i) terminate this Agreement and obtain the return of the Escrow Deposit plus any accrued interest thereon, or (ii) specific performance.  The remedy of specific performance is only available to Purchaser if (i) any suit for specific performance is filed within sixty (60) days after Purchaser first becomes aware of the breach or default by Seller, and (ii) Purchaser is not then in breach or default in the performance of any of its obligations under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, except for claims brought by Purchaser under Section 10.03 of this Agreement after the Closing Date, in no event shall Seller be liable to Purchaser for any damages.

(c)  Upon the termination of this Agreement and release of the Escrow Deposit, and any interest accrued thereon, to either Purchaser or Seller, as the case may be, in accordance with this Section, this Agreement shall be deemed null and void and no party hereto shall have any obligations to, or rights against, the other hereunder, except as to any terms herein that expressly survive termination of this Agreement.

(d)     The provisions of this Article shall survive the Closing or termination of this Agreement.

## ARTICLE VIII.
## ESCROW

**Section 8.01.  Escrow Terms**.  Escrow Agent shall hold and disburse the Escrow Deposit in accordance with the following provisions:

(a)     Escrow Agent shall hold the Escrow Deposit in a federally insured interest-bearing account, and shall not be liable for any losses suffered in connection with any such investment.

(b)     If the Closing occurs, then the Escrow Agent shall deliver the Escrow Deposit to the Title Company for the Seller's benefit.

(c)     If for any reason the Closing does not occur and either party makes a written demand upon Escrow Agent for payment of the Escrow Deposit, the Escrow Agent shall give written notice to the other party of such demand. If the Escrow Agent does not receive a written objection from the other party to the proposed payment within five (5) days after the giving of such notice, the Escrow Agent is hereby authorized to make such payment. If the Escrow Agent does receive such written objection within such five (5) day period or if for any other reason the Escrow Agent in good faith shall elect not to make such payment, the Escrow Agent shall continue to hold such amount until otherwise directed by written instructions from the parties to this Agreement or a final judgment in the Bankruptcy Court. However, the Escrow Agent shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Bankruptcy Court. The Escrow Agent shall give written notice of such deposit to Seller and Purchaser. Upon such deposit, the Escrow Agent shall be relieved and discharged of all further obligations and responsibilities as an escrow agent hereunder.

## ARTICLE IX.
## BANKRUPTCY MATTERS

**Section 9.01.  Bankruptcy Court Approval**.  Seller's and Purchaser's obligations under this Agreement are subject to the Bankruptcy Court having entered the Sale Order (defined below) and the Sale Order not being subject of a stay (pursuant to Bankruptcy Rule 6004 or otherwise) or appeal as of the Closing Date, or in the event a stay is in effect the Sale Order shall have become final.

**Section 9.02.  Sale Motion**.  Within five (5) Business Days of the Effective Date, the Seller shall file a motion with the Bankruptcy Court seeking authority to sell the Property under the terms of this Agreement (the "**Sale Motion**"), which Sale Motion shall be subject to the prior approval of Purchaser, which approval shall not be unreasonably withheld, conditioned or delayed. The Sale Motion will also seek approval to assign the Assigned Contracts, the Construction Warranties, the Licenses and Permits and other contract rights contemplated by this Agreement to Purchaser at Closing.

**Section 9.03.  Sale Order**

4830-4018-7953.13

23

(a)     Seller shall use Reasonable Efforts to promptly obtain the entry of an order (the "**Sale Order**") of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby (which Sale Order must be in form and substance acceptable to Purchaser, approval of which shall not be unreasonably withheld, conditioned or delayed provided that the Sale Order otherwise substantively satisfies the requirements set forth in subsection (b) below).

(b)     The Sale Order contemplated hereby shall contain the following provisions (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Sale Order):

(i)     the sale of the Property by Seller to Purchaser: (A) are or will be legal, valid and effective transfers of the Property; and (B) vests or will vest Purchaser with all right, title and interest of Seller to the Property free and clear of all liens, encumbrances, interests and claims pursuant to Section 363(f) of the Bankruptcy Code except as to the Permitted Exceptions and those matters which may be expressly approved by Purchaser;

(ii)     Purchaser has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, the transactions contemplated by this Agreement are undertaken by Purchaser and Seller at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of Section 363(m) of the Bankruptcy Code;

(iii)     all persons and entities, including lien holders and interest holders, are enjoined from taking any actions against Purchaser or any affiliate or assignee of Purchaser or the Property to recover any claim that such person has solely against Seller unless such claim or interest is specifically assumed under this Agreement by the Purchaser;

(iv)     the Bankruptcy Court retains exclusive jurisdiction to interpret and enforce the provisions of this Agreement and the Sale Order in all respects; *provided, however*, that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other federal court in the Western District of Texas or Texas state court in Williamson County, Texas, having competent jurisdiction with respect to any such matter.

Section 9.04.  **Assumption Contracts**.  If applicable, Seller shall use Reasonable Efforts to obtain entry of an order by the Bankruptcy Court authorizing the Seller to assign the Assigned Contracts to the Purchaser as of the Closing Date (collectively, the "**Assignment Order**"). To the extent any of the Assigned Contracts are assigned to and assumed by Purchaser, Seller shall be responsible for paying any cure costs associated with such contracts or agreements.

Section 9.05.  **Cooperation in Bankruptcy Matters**

(a)     Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, such as furnishing affidavits, non-confidential financial information, confidential information subject to a reasonable form of

**[FINAL EXECUTION VERSION]**

confidentiality agreement or other documents or information for filing with the Bankruptcy Court and making its representatives available to be interviewed by Seller's attorneys and to testify before the Bankruptcy Court and at depositions.

(b)     If a written objection is filed to the motion seeking approval of this Agreement, which is an objection that would prohibit or otherwise prevent the Closing from occurring pursuant to the terms of this Agreement, Seller and Purchaser shall use reasonable efforts to have such objection overruled.

(c)     In the event the Sale Order is appealed, Seller and Purchaser shall each use their respective reasonable efforts to defend such appeal or, by mutual written agreement, close the transactions contemplated hereby unless such closing is stayed by the Bankruptcy Court.

## ARTICLE X.
## MISCELLANEOUS

**Section 10.01. <u>Governing Law</u>**. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Texas in accordance with the laws applicable to contracts executed in such state (without giving effect to the principles of conflicts of laws thereof), provided that the validity and enforceability of all conveyance documents or instruments executed and delivered pursuant to this Agreement insofar as they affect title to real property shall be governed by and construed in accordance with the laws of the jurisdiction in which such property is located. Without limiting any party's right to appeal any order of the Bankruptcy Court, the parties agree that the Bankruptcy Court shall retain sole jurisdiction over any legal action or proceeding with respect to this Agreement and Seller. Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby; *provided, however*, that if the Bankruptcy Case has been fully and finally dismissed and/or the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Western District of Texas. If that court declines jurisdiction, the parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the Texas courts located in Williamson County, Texas. In addition, the parties irrevocably consent to service of process by delivering a copy of the process to such person to the address provided pursuant to <u>Section 10.05</u> of this Agreement by federal express or other overnight courier for overnight delivery or by certified mail, postage prepaid.

**Section 10.02. <u>Merger; No Representations; Entire Agreement</u>**. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersedes any other prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. This Agreement is entered into after full investigation, no party relying upon any statement or representation, not set forth in this Agreement, made by any other party.

**Section 10.03. <u>Limited Survival</u>**. All representations, warranties, covenants or other obligations of the parties contained in, or arising out of, this Agreement shall survive the Closing

[FINAL EXECUTION VERSION]

hereunder for a period of six (6) months after the Closing Date (the "**Survival Period**") as provided in this Section. If any claim for a breach of a representation, warranty, covenant, or other obligation is not made prior to the expiration of the Survival Period, then such claim shall be forever waived and barred, regardless of whether either the Seller or the Purchaser had knowledge of such claim or the facts giving rise to such claim before the expiration of the applicable survival period. If the party asserting a claim under, or arising out of, this Agreement (the "**Claiming Party**") provides notice to the other party of a claim prior to the end of the Survival Period, then the Claiming Party shall be required to file suit on such claim within ninety (90) days after such notice of claim is delivered to the other party (unless such claim has been mutually resolved in writing prior to the expiration of such ninety (90) day period), otherwise such claim shall be forever waived and barred. If the Claiming Party provides notice of a claim prior to the end of the Survival Period and files suit on such claim in accordance with the immediately preceding sentence, then the liability for such claim will continue until the claim is fully resolved. Notwithstanding anything to the contrary contained in this Agreement (including the remedy of specific performance or return of the Escrow Deposit) or in any exhibits attached hereto or in any documents executed or to be executed in connection herewith (collectively, the "**Purchase Documents**"), it is expressly agreed that: (1) after Closing, the remedies of Purchaser or its successors or assigns against Seller with respect to the alleged breach by Seller of any representation, warranty, covenant, undertaking, indemnity or obligation contained in any of the Purchase Documents shall be limited to an amount not to exceed $500,000.00 in the aggregate; (2) no personal liability or personal responsibility of any sort with respect to any representation, warranty, covenant, undertaking, indemnity or  obligation contained in any of the Purchase Documents or any alleged breach thereof is assumed by, or shall at any time be asserted or enforceable against Seller's shareholders, directors, officers, employees, agents, constituent partners, members, beneficiaries, trustees or representatives. Notwithstanding anything to the contrary contained in the Purchase Documents, in no event shall Purchaser or Seller be liable for consequential, indirect, or punitive damages.

Section 10.04. **Time: Business Days**. **TIME IS OF THE ESSENCE IN THIS AGREEMENT**; however, whenever any action must be taken (including the giving of notices) under this Agreement during a certain time period (or by a particular date) that ends or occurs on a non-Business Day, then such period (or date) shall be extended until the next succeeding Business Day. As used herein, the term "**Business Day**" shall be deemed to mean any day, other than a Saturday or Sunday, on which commercial banks in Austin, Texas are not required or authorized to be closed for business.

Section 10.05. **Notices**. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (a) on the day of service if served personally on the party to whom notice is to be given; (b) on the day of transmission if sent via facsimile transmission to the facsimile number given below, and confirmation of receipt is obtained; (c) on the day of transmission if sent via e-mail transmission to the e-mail address given below; (d) on the Business Day of delivery to Federal Express or similar overnight courier for overnight delivery; or (e) on the date of postmark, if mailed to the party to whom notice is to be given by first class, registered, or certified mail, with postage prepaid, to the party as follows, so long as a copy is also sent the same day under subsection (a), (b), (c) or (d):

4830-4018-7953.13

| If to Seller: | FPMC Austin Realty Partners, LP |
|---|---|
| | c/o Mary Hatcher |
| | 2101 Cedar Springs Road, Suite 1540 |
| | Dallas, TX 75219 |
| | Email: MHatcher@glendonTodd.com |
| | |
| With a copy to: | Law Offices of Ray Battaglia, PLLC |
| | 66 Granburg Circle |
| | San Antonio, TX 78218 |
| | Attn:  Ray Battaglia |
| | Email:  rbattaglialaw@outlook.com |
| | |
| If to Purchaser: | St. David's Healthcare Partnership, L.P., LLP |
| | c/o HCA Inc. |
| | One Park Plaza |
| | Nashville, Tennessee 37203 |
| | Attn:  Senior Vice President - Development |
| | |
| with copies to: | HCA Inc. |
| | One Park Plaza |
| | Nashville, Tennessee 37203 |
| | Attn: General Counsel |
| | |
| with copies to: | Waller Lansden Dortch & Davis, LLP |
| | 511 Union Street, Suite 2700 |
| | Nashville, Tennessee 37219-1760 |
| | Attention: John Tishler, Esq. |
| | |
| If to Title Company: | First American Title Insurance Company |
| | National Commercial Services Unit |
| | 6363 Poplar Avenue, Suite 434 |
| | Memphis, Tennessee 38119 |
| | Attention:  Rita Bost/Carol Slone |

Any Party may change its address for the purpose of this <u>Section 10.05</u> by giving the other parties written notice of its new address in the manner set forth above.

**Section 10.06.** <u>**Modifications and Amendments**</u>. This Agreement cannot under any circumstance be modified or amended orally and no agreement shall be effective to waive, change, modify, terminate or discharge this Agreement, in whole or in part, unless such agreement is in writing and is signed by both Seller and Purchaser.

**Section 10.07.** <u>**No Recording**</u>. Neither this Agreement, nor any memorandum of this Agreement, shall be recorded. The recording of this Agreement, or any memorandum of this Agreement, by Purchaser shall constitute a material default and shall entitle Seller to retain the Escrow Deposit and any interest earned thereon.

4830-4018-7953.13

[FINAL EXECUTION VERSION]

**Section 10.08. <u>Successors and Assigns; Assignment</u>**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns. Purchaser may assign its rights and obligations under this Agreement to an entity under common control with Purchaser without Seller's prior written consent, provided such assignee accepts and assumes Purchaser's obligations under this Agreement, Purchaser provides written notice to Seller at least five (5) Business Days before the Closing and such assignment is consummated on the Closing Date. No assignment of this Agreement or Purchaser's rights hereunder shall relieve Purchaser of its liabilities under this Agreement.

**Section 10.09. <u>Severability</u>**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect, invalidate or render unenforceable any other term or provision of this Agreement. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

**Section 10.10. <u>Further Assurances</u>**. Each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby, provided such documents are customarily delivered in real estate transactions in Texas and do not impose any material obligations upon any party hereunder except as set forth in this Agreement.

**Section 10.11. <u>Counterparts</u>**. This Agreement may be executed by the parties in separate counterparts, each of which when so executed and delivered shall be an original for all purposes, but all such counterparts shall together constitute but one and the same instrument.

**Section 10.12. <u>Headings</u>**. The captions or paragraph titles contained in this Agreement are for convenience and reference only and shall not be deemed a part of the text of this Agreement.

**Section 10.13. <u>No Waivers</u>**. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party providing the waiver. No waiver by either party of any failure or refusal to comply with any obligations under this Agreement shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

**Section 10.14. <u>Waiver of Jury Trial</u>**. SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY SUCH PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

**Section 10.15. <u>Confidentiality</u>**. Seller agrees to maintain in confidence the dealings, negotiations and agreements of the parties with respect to the Property and this Agreement, and will not make any public release of information regarding those matters, unless (a) both parties

otherwise agree in writing, (b) as either party may deem necessary or in order to comply with the federal securities law, after consultation with its legal counsel or (c) as required under applicable bankruptcy law; *provided, however*, that the Seller shall include a copy of this Agreement and disclose details regarding the Seller's dealings, negotiations and agreements with the Purchaser as it deems appropriate in connection with the Sale Motion. All non-public information provided by Seller to Purchaser or obtained by Purchaser relating to the Property in the course of Purchaser's inspection, including, without limitation, (a) the Property Documents, (b) any environmental assessment or audit, (c) the identities of Seller and Purchaser, and the fact that they have entered into this Agreement, and (d) the terms of this Agreement (collectively, the "**Information**") shall be treated as confidential by Purchaser, and Purchaser agrees to transmit the Information only to such of its attorneys, accountants, consultants, equity investors and lenders ("**Representatives**") who need to know the Information for the sole purpose of Purchaser's review and who agree to maintain the confidentiality of such Information, unless (i) both parties otherwise agree in writing, (ii) as either party may deem necessary or in order to comply with the federal securities law, after consultation with its legal counsel or (iii) as required under applicable bankruptcy law. In the event that this transaction is not closed for any reason, then Purchaser shall destroy or return to Seller all copies of all Information (including electronic copies) in its possession or in the possession of any of its Representatives, shall maintain the confidentiality of the Information, and shall require all Representatives not to disclose any Information to any other party. In the event either party desires to issue a press release concerning the execution of this Agreement or the closing of the transaction contemplated by this Agreement, the party desiring to make such press release shall submit a draft of such press release to the other party for review and approval. Neither party shall issue such a press release unless and until both parties have mutually agreed upon the form and substance of such press release.

**Section 10.16. Exclusivity; Irrevocable Offer**. Upon and after the Effective Date, Seller will not enter into any agreement pertaining to (a) the sale, exchange, or transfer or all or any party of the Property to any person or entity other than Purchaser or its assigns, unless the Bankruptcy Court orders the Seller to conduct an auction of the Property, or (b) the lease of all or any party of the Property without the prior written consent of Purchaser, such consent not to be unreasonably withheld. Purchaser agrees that upon submission of an executed counterpart of this Agreement to Seller, such submission shall be irrevocable.

**Section 10.17. Independent Consideration**. Purchaser tenders to Seller and Seller acknowledges receipt of the sum of $100 as independent and non-refundable Agreement consideration ("**Independent Consideration**") for any options granted in this Agreement, provided that the option is subject to Bankruptcy Court approval. This Independent Consideration is in addition to any other deposits made under this Agreement, is earned by Seller upon its execution of this Agreement, and will not be credited against the Purchase Price.

**Section 10.18. Effective Date**. As used herein, the "**Effective Date**" of this Agreement or "date" of this Agreement shall in each case mean and be deemed to be the date the Bankruptcy Court enters the Sale Order on its docket.

**Section 10.19. Authorship**. Each of the parties has actively participated in the negotiation and drafting of this Agreement and the Closing Documents and each has received

independent legal advice from attorneys of its choice with respect to the advisability of making and executing this Agreement and the Closing Documents. In the event of any dispute or controversy regarding this Agreement or any of the Closing Documents, the parties will be conclusively deemed to be the joint authors of this Agreement and the Closing Documents and no provision of this Agreement or the Closing Documents will be interpreted against a party be reason of authorship.

**Section 10.20. <u>Dispute</u>.** In the event of any dispute between the parties hereto regarding any of the transactions contemplated by this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all reasonable out-of-pocket costs and expenses, including reasonable attorneys' fees on an hourly basis and not as a percentage of the debt, actually incurred by the prevailing party in connection with such dispute, with any right to have the amount of "reasonable" attorneys' fees determined by the Bankruptcy Court in accordance with any applicable laws of the State of Texas.

**Section 10.21. <u>Reporting Person</u>.** Seller and Purchaser hereby designate Title Company to act as and perform the duties and obligations of the "reporting person" with respect to the transaction contemplated by this Agreement for purposes of 26 C.F.R. Section 1.6045 4(e)(5) relating to the requirements for information reporting on real estate transactions closed on or after January 1, 1991. In this regard, Seller and Purchaser each agree to execute at Closing, and to cause Escrow Agent to execute at Closing, a designation agreement designating Title Company as the reporting person with respect to the transaction contemplated by this Agreement.

**Section 10.22. <u>Water Control and Improvement District Notice</u>.** The Property is located in the Upper Brushy Creek Water Control and Improvement District (the "<u>District</u>") formerly known as Brushy Creek Water Control and Improvement District of Williamson and Milam Counties. The District has taxing authority separate from any other taxing authority and may, subject to voter approval, issue an unlimited amount of bonds and levy an unlimited rate of tax in payment of such bonds. As of this date, the rate of taxes levied by the District on real property located in the District is $0.02 on each $100 of assessed valuation. The total amount of bonds, excluding refunding bonds and any bonds or any portion of bonds issued that are payable solely from revenues received or expected to be received under a contract with a governmental entity, approved by the voters and which have been or may, at this date, be issued is $-0-, and the aggregate initial principal amounts of all bonds issued for one or more of the specified facilities of the district and payable in whole or in part from property taxes is $-0-.

The purpose of this District is to provide drainage and flood control facilities and services within the District through the issuance of bonds payable in whole or in part from property taxes. The cost of these facilities is not included in the purchase price of the Property, and these facilities are owned or to be owned by the District.

PURCHASER IS ADVISED THAT THE INFORMATION SHOWN IN  THIS SECTION 10.22 IS SUBJECT TO CHANGE BY THE DISTRICT AT ANY TIME. THE DISTRICT ROUTINELY ESTABLISHES TAX RATES DURING THE MONTHS OF SEPTEMBER THROUGH DECEMBER OF EACH YEAR, EFFECTIVE FOR THE YEAR IN WHICH THE TAX RATES ARE APPROVED BY THE DISTRICT. PURCHASER IS

4830-4018-7953.13

[FINAL EXECUTION VERSION]

ADVISED TO CONTACT THE DISTRICT TO DETERMINE THE STATUS OF ANY CURRENT OR PROPOSED CHANGES TO THE INFORMATION SHOWN IN THIS SECTION 10.22.

**Purchaser is advised that the Property may or may not be within an inundation easement or downstream of a District-owned flood control structure. For further information Purchaser is encouraged to contact the District through its website at www.upperbrushycreekwcid.org.**

Purchaser, by its execution of this Agreement, hereby acknowledges receipt of the foregoing notice at or prior to execution of a binding contract for the purchase of the Property.

**[SIGNATURE PAGE FOLLOWS]**

4830-4018-7953.13

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

PURCHASER

ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP, a Texas limited liability partnership

By:     ROUND ROCK HOSPITAL, INC., a Delaware
        corporation, its Co-General Partner

        By:
        Name:                        K
        Title: JL1ef44

SELLER

FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership

By:     NEAL RICHARDS GROUP AUSTIN
        DEVELOPMENT LLC,
        Its: General Partner

        By: _____
            Todd Furniss
            Manager


ACKNOWLEDGED BY:

ESCROW AGENT:

ALLEGIANCE TITLE COMPANY


By: _____
Print Name:_____
Print Title:_____


TITLE COMPANY:

FIRST AMERICAN TITLE INSURANCE COMPANY


By:
Print Name: _____
Print Title:_____


4830-4018-7953.13

32

[FINAL EXECUTION VERSION]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

PURCHASER

ST. DAVID'S HEALTHCARE PARTNERSIDP, L.P., LLP, a Texas limited liability partnership

By: ROUND ROCK HOSPITAL, INC., a Delaware corporation, its Co-General Partner

By: _____
Name: _____
Title: _____

SELLER

FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership

By: NEAL RICHARDS GROUP AUSTIN DEVELOPMENT LLC,

By: Gener l Partner
dd Fumiss
Manager

ACKNOWLEDGED BY:

ESCROW AGENT:

ALLEGIANCE TITLE COMPANY

By: _____
Print Name: _____
Print Title: _____

TITLE COMPANY:

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____
Print Name: _____
Print Title: _____

4830-4018-7953.13

32

[FINAL EXECUTION VERSION]

LIST OF EXHIBITS

| EXHIBIT A | LEGAL DESCRIPTION OF THE LAND |
|---|---|
| EXHIBIT B | LIST OF ASSIGNED CONTRACTS |
| EXHIBIT C | DESCRIPTION OF EXCLUDED PERSONAL PROPERTY |
| EXHIBIT D | FORM OF SPECIAL WARRANTY DEED |
| EXHIBIT E | FORM OF BILL OF SALE |
| EXHIBIT F | FORM OF ASSIGNMENT OF CONTRACTS |
| EXHIBIT G | FORM OF FIRPTA AFFIDAVIT |
| EXHIBIT H | FORM OF ASSIGNMENT OF CONSTRUCTION WARRANTIES, CONSTRUCTION GUARANTIES, LICENSES AND PERMITS |
| EXHIBIT I | FORM OF OWNER'S AFFIDAVIT |
| EXHIBIT J | PERMITTED EXCEPTIONS |
| EXHIBIT K | VIOLATIONS |
| EXHIBIT L | TITLE CURATIVE ACTIONS |

**EXHIBIT A**

**LEGAL DESCRIPTION OF THE LAND**

Lot 1, Block A, Forest Park Medical Center, a subdivision in Williamson County, Texas, according to the Map or Plat thereof recorded in County Clerk's File NO. 2013109810, Official Public Records of Williamson County, Texas.

**EXHIBIT B**

**ASSIGNED CONTRACTS**

None

## EXHIBIT C

## DESCRIPTION OF EXCLUDED PERSONAL PROPERTY

| **Vendor** | **Description** |
|---|---|
| Balfour Beatty Construction Group | Proj 12627000 (Equipment Planning contract)- Not Signed, Warehouse Agrmt CO #002 |
| Park Place International | Meditech Servers |
| FormFast | Digital custom form image for checks |
| Meditech | Meditech Software |
| ACCESS | Access Eforms & Signatures |
| COREPOINT HEALTH | Corepoint Engine - 20 connections |
| INTERCLOUD | Technology Package CAD Drawings |
| VDI | VMWare expansion & storage upgrade |
| Dell | Laptops for C-levels |
| Healthline Systems | Echo credentialing |
| STRYKER | Inpatient beds |
| STRYKER | OR Lights & Booms |
| VDI | VM ware hosts for the SIS project - VDI |
| CDW-G | Terminal Server Hardware for the SIS project - CDW |
| SIS | Surgical Information System |
| Carefusion | Carefusion Carousel |
| Siemens Healthcare Diagnostics | Siemens Luminos Agile R & F |
| Siemens Healthcare Diagnostics | Siemens CT |

[FINAL EXECUTION VERSION]

| | |
|---|---|
| Siemens Healthcare Diagnostics | Siemens portable x-ray machine |
| Siemens Healthcare Diagnostics | Siemens Espree MRI 1.5T/Magnet/Chiller |
| Selart | 175 pieces of Hospital Artwork |
| Steris | Double Sink Chair Carriers |
| AP Gulf States | Kitchen Equipment |
| AP Gulf States | Pneumatic Tube |
| Siemens Healthcare Diagnostics | Crane for chiller |
| Innovative Consulting, LLC | Onsite PM |
| Forward Advantage | Fax Server Application for Radiology and Lab |
| Steris | Start Up Facility Purchases |
| MoreDirect | 3 Laptops |
| Baker | Hoods |
| DMI | Structured Cabling |
| Convergint Technologies | Access Control System |
| Critical Alert Systems | Nurse Call & RTLS systems |
| Fisher Healthcare | Gross Lab Station |
| VDI | DAS Solution |
| VDI | LAN Equipment |
| VDI | Virtual Servers Network Configuration |
| VDI | WAP Proposal |
| EPS Texas | Ice Machines |
| EPS Texas | Dishwasher |
| Ultrapure | Water purification system |
| Medivators | Scope Buddy, Medivator DSD Edge, 2 each |

| | |
|---|---|
| EPS Texas | Viewbox 2 panel recessed |
| More Direct | 10 Laptops |
| More Direct | SmartDraw Acrobat |
| VDI | Telephone system |
| Page | MOB TI Arch design |
| Siemens Healthcare Diagnostics | Bypass Panel |
| More Direct | Blue Beam software |
| DMI | UPS & PDU's for IT rooms |
| DMI | Nurse Call & RTLS systems - Installation |
| Solta Medical | Vaser Lipo system |
| Mindray | Gateway Installation |
| Mindray | Mindray Infrastructure |
| Universal Medical | Wall Mounted lead apron rack - 15 |
| Beckman Coulter | DxH 600 Hematology Analyzer |
| Orthoscan | HD Flat Detector Mini C-Arm |
| Stryker Corporation | Cast cutter |
| Stryker Corporation | Tourniquets |
| Stryker Instruments | System 7 Drills and Saw |
| Stryker Corporation | Core console |
| Stryker Corporation | Flyte Helmets |
| Stryker Corporation | Neptunes - 2 |
| Stryker Corporation | Camera Head & Light Cord - No Charge |
| Stryker Corporation | Camera Heads, Laparoscopes, Arthroscopes, Instruments |
| Stryker Corporation | CCU-10, L9000 light source-10, Insufflators - 8 |

| | |
|---|---|
| Stryker Corporation | Flexible Control Unit - 2 - No Charge |
| Stryker Corporation | Digital Ureteroscopes - 4 |
| DMI | Overhead paging System |
| Databank | Onbase - Phase I(AP and MM) |
| Medical Information tech | Interface for billing vendors |
| COREPOINT HEALTH | 10 connection licenses |
| AEC | Shower Curtains/Privacy Curtains |
| MIndray | Central monitoring station |
| MoreDirect | 10 laptops and accessories |
| Beckman Coulter | DxC and Access 2 Analyzer |
| Carefusion | Alaris pumps |
| VDI | Non-MediTech SAN expansion |
| Stryker | camera heads, light source, camera box (for 4 future OR) |
| Mindray | GCX brackets |
| Mindray | Ultrasound units |
| Mindray | Patient Monitoring |
| Stryker | Camera Heads, Laparoscopes, Arthroscopes, Instruments |
| Southwest Solutions | High Density Shelving |
| McKesson | System Software, Implementation, Equipment |
| Baker Co | interface cable for hood to connect to BAS |
| Stryker Endoscopy | HD 3 chip CCU, L9000 light source, Pneumo Sure, Standard video cart, 26"display |

**EXHIBIT D**

**FORM OF SPECIAL WARRANTY DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**SPECIAL WARRANTY DEED**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | Known all men by these presents: |
| COUNTY OF WILLIAMSON | § | |

FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership ("**Grantor**") and a debtor in the bankruptcy case styled In re FPMC Austin Realty Partners LP in the United States Bankruptcy Court for the Western District of Texas, Case No. 16-10020-TMD (the "**Bankruptcy Case**"), as of [_____], 2016, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other valuable consideration to the undersigned in hand paid by ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP, a Texas limited liability partnership ("**Grantee**"), the receipt and sufficiency of which are hereby acknowledged, has GRANTED, SOLD AND CONVEYED, and by these presents does GRANT, SELL AND CONVEY unto Grantee, the land in Williamson County, Texas fully described on **Exhibit A** attached hereto (the "**Land**"), together with (a) all buildings, structures, parking areas, sidewalks, landscaping and other improvements and fixtures located on the Land (collectively, the "**Improvements**") and (b) all of Grantor's right, title, and interest in and to all related rights and appurtenances, including, without limitation, any and all right, title and interest of Grantor in and to (i) easements, adjacent streets, waterways, air rights, strips and gores, roads, alleys or rights of way open or proposed, and rights, titles and interests of Grantor in and to any reversionary rights, if any, attributable or appurtenant to the Land, (ii) any land lying in the bed of any street, alley, road or avenue, opened or proposed, public or private, in front of or adjoining the Land, (iii) any award made or to be made with respect to a condemnation, eminent domain or other governmental acquisition proceedings applicable to the Land, (iv) any unpaid award for damage to the Land by reason of change of grade of any street, and (v) minerals and mineral interests, royalty interests, working interests, leasehold interests, production payments and any other economic interests and executive rights that are owned by Grantor in, on, under, across and/or relating to the Land or the Improvements (collectively, the "**Appurtenant Rights**"; together with the Land and the Improvements being referred to hereinafter as the "**Property**"), pursuant to that certain Order Confirming Sale of Property [Docket No. ] as attached hereto as **Exhibit B** (the "**Bankruptcy Order**");

4830-4018-7953.13

This conveyance, however, is made and accepted subject to the matters described on **Exhibit C** attached hereto and made a part hereof (hereinafter referred to as the "**Permitted Encumbrances**").

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee and Grantee's successors and assigns forever, subject to the Permitted Encumbrances. Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND all and singular the Property unto Grantee, Grantee's successors and assigns against every person whomsoever claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise.

THE CONVEYANCE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" BASIS, AND GRANTEE ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF GRANTOR HEREIN, EXCEPT AS OTHERWISE SPECIFIED HEREIN, GRANTOR MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY.

EXECUTED on the date set forth in the acknowledgement certificate below, to be effective as of the date first written above.

GRANTOR:

**FPMC AUSTIN REALTY PARTNERS, LP,**
**a Texas limited partnership**

By:     Neal Richards Group Austin Development
LLC,
its General Partner

By: _____
Todd Furniss
Manager

THE STATE OF_____          §
                                                §
COUNTY OF_____               §

Before me, the undersigned Notary Public of the State of Texas, on this day personally appeared_____, _____ of Neal Richards Group Austin Development, LLC, a Texas limited liability company and the general partner of FPMC Austin Realty Partners, LP, a Texas limited partnership, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he or she executed the same in such capacity for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of_____, A.D., _____.

_____
Notary Public in and for the State of _____

GRANTEE'S ADDRESS FOR TAX NOTICES &
WHEN RECORDED RETURN TO:

_____

_____

_____

4830-4018-7953.13

**EXHIBIT A TO SPECIAL WARRANTY DEED**

**LAND**

[TO BE ATTACHED AT CLOSING]

**EXHIBIT B TO SPECIAL WARRANTY DEED**

**BANKRUPTCY ORDER**

[TO BE ATTACHED AT CLOSING]

**EXHIBIT C TO SPECIAL WARRANTY DEED**

**PERMITTED ENCUMBRANCES**

[TO BE ATTACHED AT CLOSING]

## EXHIBIT E

## FORM OF BILL OF SALE

This Bill of Sale (this "**Bill of Sale**") is made as of_____, 2016, by FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership ("**Grantor**") and a debtor in the bankruptcy case styled In re FPMC Austin Realty Partners LP in the United States Bankruptcy Court for the Western District of Texas, Case No. 16-10020-TMD  (the "**Bankruptcy Case**") to ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP, a Texas limited liability partnership ("**Grantee**"). Unless otherwise defined in this Bill of Sale, all capitalized terms used herein shall have the meaning given to them in that certain Purchase and Sale Agreement by and between Grantor and Grantee (the "**Contract**").

For and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other valuable consideration to Grantor paid by the Grantee, the receipt and sufficiency of which are acknowledged, Grantor GRANTS, SELLS, and CONVEYS to Grantee, all equipment, furniture, fittings, fixtures, and articles of personal property owned by Grantor and either located on or used exclusively in connection with the real property described on **Exhibit A** attached to this Bill of Sale (such equipment, furniture, fittings, fixtures, and articles of personal property are referred to collectively as the "**Personal Property**") more particularly described on **Exhibit B** attached hereto and made a part hereof pursuant to that certain Order Confirming Sale of Property [Docket No. ] as attached hereto as **Exhibit C** (the "**Bankruptcy Order**").  It is expressly agreed, however, that the Personal Property shall not include the Excluded Personal Property as defined in the Contract.

Except as expressly set forth in the Contract to which this Bill of Sale relates, THE CONVEYANCE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" BASIS, AND GRANTEE ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF GRANTOR HEREIN, EXCEPT AS OTHERWISE SPECIFIED HEREIN, GRANTOR MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY. The conveyance is made without recourse against Grantor.

**[Signature page follows]**

4830-4018-7953.13

EXECUTED to be effective as of the date first written above.

**FPMC AUSTIN REALTY PARTNERS, LP**,
a Texas limited partnership

By:     NEAL RICHARDS GROUP FOREST PARK
         DEVELOPMENT LLC,
         its General Partner

By: _____
         Todd Furniss
         Manager

**Exhibit A to Bill of Sale**

**Real Property Description**

[TO BE ATTACHED AT CLOSING]

**Exhibit B to Bill of Sale**

**Personal Property Description**

[TO BE ATTACHED AT CLOSING]

**Exhibit C to Bill of Sale**

**Bankruptcy Order**

[TO BE ATTACHED AT CLOSING]

**EXHIBIT F**

**FORM OF ASSIGNMENT OF CONTRACTS**

This ASSIGNMENT OF CONTRACTS (this "**Assignment**") is made as of _____, 2016 (the "**Effective Date**"), by FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership ("**Assignor**") and a debtor in the bankruptcy case styled In re FPMC Austin Realty Partners LP in the United States Bankruptcy Court for the Western District of Texas, Case No. 16-10020-TMD (the "**Bankruptcy Case**"), and ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP, a Texas limited liability partnership ("**Assignee**").

Recitals:

A. Pursuant to the Purchase and Sale Agreement dated as of_____, 2016 by and between Assignor and Assignee (the "**Purchase Agreement**"), Assignor is conveying to Assignee certain real property, together with all structures and other improvements located thereon and thereunder, located in Williamson County, Texas as described on **Exhibit A** of the Purchase Agreement and by this reference incorporated herein (the "**Property**"). Capitalized terms used but not defined in this Assignment shall have the meanings ascribed to them in the Purchase Agreement.

B. This Assignment is being entered into pursuant to the Purchase Agreement, upon the closing thereunder, in order to effect the assignment and assumption of Assignor's interest under the contracts for service, repair, supply, utility, equipment and maintenance of the Property set forth on Schedule A attached to this Assignment (the "**Service Contracts**"), pursuant to that certain Order Confirming Sale of Property [Docket No.      ] as attached hereto as **Exhibit B** (the "**Bankruptcy Order**") entered in the Bankruptcy Case.

NOW, THEREFORE, FOR VALUE RECEIVED, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Assignment. Assignor hereby ASSIGNS, GRANTS, DELIVERS and CONVEYS to Assignee all of Assignor's rights, interests and obligations in the Service Contracts.

2. Assumption. Assignee hereby (i) accepts the assignment of the Service Contracts, and (ii) assumes those obligations of the Assignor under the Service Contracts that first arise or accrue from and after the date hereof.

3. Indemnification. Assignor hereby agrees to indemnify Assignee from and against any and all actual losses incurred by Assignee arising from claims brought against Assignee, as successor to the interest of Assignor under the Service Contracts, relating to the breach by Assignor of any of the obligations under the Service Contracts which accrued prior to the date hereof.

4. Binding Effect. This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

4830-4018-7953.13

51

5.      <u>Counterparts</u>. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

**[SIGNATURE PAGES FOLLOW]**

DATED EFFECTIVE as of the first date above written.

**GRANTOR**:

**FPMC AUSTIN REALTY PARTNERS, LP,**
a Texas limited partnership

By:    NEAL RICHARDS GROUP FOREST PARK
       DEVELOPMENT LLC,
       its General Partner


By: _____
     Todd Furniss, Manager

DATED EFFECTIVE as of the first date above written.

**ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP**, a Texas limited liability partnership

By:    **ROUND ROCK HOSPITAL, INC.,** a Delaware corporation, its Co-General Partner

By: _____

Name: _____

Title: _____

**EXHIBIT A TO ASSIGNMENT OF CONTRACTS**

**SERVICE CONTRACTS**

[TO BE ATTACHED AT CLOSING]

**EXHIBIT B TO ASSIGNMENT OF CONTRACTS**

**BANKRUPTCY ORDER**

[TO BE ATTACHED AT CLOSING]

**EXHIBIT G**

**FORM OF NON-FOREIGN CERTIFICATE**

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by **FPMC Austin Realty Partners, LP**, a Texas limited partnership ("**Transferor**"), the undersigned hereby certifies the following on behalf of Transferor.

1.      Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Transferor is not a disregarded entity as defined in Section 1.1445-2(b)(2)(iii);

3.      Transferor's U.S. employer identification number is                    ; and

4.      Transferor's office address is:      2101 Cedar Springs Road, Suite 1540 Dallas, Texas 75219

Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

**FPMC AUSTIN REALTY PARTNERS**, **LP**, a Texas limited partnership

By:      NEAL RICHARDS GROUP FOREST PARK DEVELOPMENT LLC, its General Partner

By:      _____

Todd Furniss
Manager

4830-4018-7953.13

STATE OF_____          §
                                 §
COUNTY OF_____           §

     This instrument was acknowledged before me on _____, 20 , by _____,_____of_____, a_____, on behalf of said_____.

_____
Notary Public, State of _____

     SWORN TO AND SUBSCRIBED BEFORE ME by_____on _____, 20____.


Notary Public, State of _____

## EXHIBIT H

## ASSIGNMENT OF CONSTRUCTION WARRANTIES, CONSTRUCTION GUARANTIES, LICENSES AND PERMITS

This ASSIGNMENT OF CONSTRUCTION WARRANTIES, CONSTRUCTION GUARANTIES, LICENSES AND PERMITS (this "**Assignment**") is dated as of _____, 2016 (the "**Effective Date**"), by and between FPMC AUSTIN REALTY PARTNERS, LP, a Texas limited partnership ("**Assignor**"), and ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP, a Texas limited liability partnership ("**Assignee**").

Recitals:

A.     Pursuant to the Purchase and Sale Agreement dated as of_____, 2016 by and between Assignor and Assignee (the "**Purchase Agreement**"), Assignor is conveying to Assignee certain real property, together with all structures and other improvements located thereon and thereunder, located in Williamson County, Texas as described on **Exhibit A** of the Purchase Agreement and by this reference incorporated herein (the "**Property**"). Capitalized terms used but not defined in this Assignment shall have the meanings ascribed to them in the Purchase Agreement.

B.     In connection with the above conveyance, Assignor is to assign, transfer and convey to Assignee to the extent assignable or transferable, all of Assignor's right, title and interest in and to all (i) construction warranties and construction guaranties with respect to the improvements on the Property that are capable of being assigned to Assignee (collectively, the "**Construction Warranties**"), and (ii) licenses, permits or similar documents to the improvements on the Property that are capable of being assigned to Assignee (collectively, the "**Licenses and Permits**" and together with the Construction Warranties, the "**Intangible Property**").

NOW, THEREFORE, FOR VALUE RECEIVED, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     Assignment. Assignor hereby grants, transfers, assigns, delivers and conveys to Assignee, without any representation or warranty (whether express or implied), as of the Effective Date, all of Assignor's right, title and interest in and to the Intangible Property. Except as expressly set forth in the Purchase Agreement, the Intangible Property is sold and conveyed, AS IS, WHERE IS, AND WITH ALL FAULTS, and without recourse against Assignor. Assignor remains responsible for all liabilities and obligations of Assignor relating to the Intangible Property which accrue prior to the Effective Date.

2.     Assumption. Assignee hereby assumes, and agrees to be bound by, all obligations and liabilities of Assignor under or relating to the Intangible Property which shall arise or be incurred, or which are required to be performed, on and after the Effective Date.

3.     Binding Effect. This Assignment shall inure to the benefit of, and be binding upon, each of the parties hereto and their respective successors and assigns.

4830-4018-7953.13

4.      Applicable Law.    This Assignment shall be governed by, and construed in accordance with, the laws of the State of Texas.

5.      Recitals.  The recitals are herein incorporated into this Assignment.

6.      Counterparts.  This Assignment may be executed in multiple counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument.

**[Signatures appear on the following page]**

IN WITNESS WHEREOF, the undersigned have executed this Assignment as of the Effective Date.

ASSIGNOR:

**FPMC AUSTIN REALTY PARTNERS, LP**,
a Texas limited partnership

By:    Neal Richards Group Austin Development LLC,
       its General Partner


       By: _____
            Todd Furniss, Manager


ASSIGNEE:

**ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P.,
LLP**, a Texas limited liability partnership

By:    **ROUND ROCK HOSPITAL, INC.**, a Delaware
       corporation, its Co-General Partner


       By: _____
       Name: _____
       Title: _____

**EXHIBIT I**

**[RESERVED]**

## EXHIBIT J

## PERMITTED EXCEPTIONS

1.      Any covenants, conditions or restrictions recorded in Document No(s). 2000005167, 2000023342, 2001027717, 2002101212, 2005085794, 2005085796, 2006101705, 2007106315, 2013067772, 2013107373, and 2013109810 of the Official Public Records of Williamson County, Texas. Maintenance Charge/Assessments as provided for herein. Subordination to first lien of record contained therein.

2.      Any portion of subject property lying within the boundaries of a public or private roadway whether dedicated or not.

3.      All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records.

4.      Terms, conditions, stipulations and provisions as set out in Reciprocal Easement Agreement by and between Cousins La Frontera LLC, a Texas limited liability company, as successors by name change to Cousins La Frontera, LP, and FPMC Austin Realty Partners, LP, a Texas limited partnership, filed under County Clerk's File No. 2013067773, Official Public Records of Williamson County, Texas, as affected by Amended and Restated Reciprocal Easement Agreement filed under County Clerk's File No. 2013107372, Official Public Records of Williamson County, Texas.

5.      Water Lines Easement recorded November 22, 2013 in County Clerk's File No. 201308928 of the Official Public Records of Williamson County, Texas.

6.      Easement and Right-of-Way for overhead and/or underground electric supply and communication facilities recorded August 28, 2014 in County Clerk's File No. 2014068842 of the Official Public Records of Williamson County, Texas.

7.      Deed Recordation Affidavit concerning Edwards Aquifer Protection Plan as set forth in instrument recorded as County Clerk's File No. 2014032889, Official Public Records of Williamson County, Texas.

8.      Property lies within Edwards Aquifer Recharge Zone.

9.      Inclusion within Upper Brushy Creek Water Control and Improvement District No. 1a.

10.     Any matters shown on that certain ALTA/ACSM Land Title Survey of the Property dated April 11, 2016 (as revised on April 14, 2016 and April 20, 2016) by Pixis, LLC, Job Number 16-03-019.

**EXHIBIT K**

**VIOLATIONS**

Certificate of Blocking Code Violation dated January 27, 2016.

City of Austin Environmental Inspection Report dated December 17, 2015, Case No. SP-2013-0135D.

### EXHIBIT L
### TITLE CURATIVE ACTIONS

Seller shall have caused the following documents to be executed and delivered to Purchaser in form and substance reasonably acceptable to Purchaser and Title Company prior to the Closing Date:

1.  An estoppel certificate executed by La Frontera Property Owners Association confirming that (i) the Property is in compliance with the Declaration of Covenants, Conditions and Restrictions entered into as of January 24, 2000 by 35/45 Investors, LP, a Texas limited partnership ("**Original Declarant**"), recorded in the Official Public Records of Williamson County, Texas under cc# 2000005167, as amended by that certain Amendment to Declaration of Covenants, Conditions and Restrictions entered into as of April 13, 2000 by Original Declarant and recorded in the Official Public Records of Williamson County, Texas under cc# 2000023342, as further amended by that certain Second Amendment to Declaration of Covenants, Conditions and Restrictions entered into as of April 25, 2001 by Original Declarant, recorded in the Official Public Records of Williamson County, Texas under cc# 2001027717, as further amended by that certain Third Amendment to Declaration of Covenants, Conditions and Restrictions entered into as of December 11, 2002 by 35/45 LaFrontera, L.P. ("**LaFrontera Declarant**"), recorded in the Official Public Records of Williamson County, Texas under cc# 2002101212, as further amended by that certain Fourth Amendment to Declaration of Covenants, Conditions and Restrictions entered into as of November 16, 2006 by LaFrontera Declarant, recorded in the Official Public Records of Williamson County, Texas under cc# 2006101705, and as finally amended by  that certain Fifth Amendment to Declaration of Covenants, Conditions and Restrictions entered into as of December 27, 2007 by LaFrontera Declarant, recorded in the Official Public Records of Williamson County, Texas under cc# 2007106315 (collectively, the "**LaFrontera Declaration**"), and (ii) there are no pending unpaid assessments due and payable with respect to the Property under the LaFrontera Declaration.

2.  A written confirmation from the Architectural Control Committee created by the LaFrontera Declaration that the Improvements on the Property were approved by the Architectural Control Committee and that the Architectural Control Committee has issued a Certificate of Compliance with respect to the Improvements.

3.  An estoppel certificate executed by Cousins La Frontera, LLC confirming that (i) the Property is in compliance with the Cousins/Seller Agreement and the Reciprocal Easement Agreement dated July 12, 2013 by and between Cousins La Frontera LLC and Seller, filed for record under cc# 2013067773 in the Official Public Records of Williamson County, Texas, as amended by that certain Amended and Restated Reciprocal Easement Agreement dated November 14, 2013, filed for record under cc# 2013107372 in the Official Public Records of Williamson County, Texas (the "**REA**"), and (ii) there are no pending unpaid assessments due and payable with respect to the Property under the Cousins/Seller Agreement or the REA.