# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **BANKRUPTCY NO. 16-10020-TMD** |
| **FPMC AUSTIN REALTY** | § | |
| **PARTNERS, LP,** | § | **CHAPTER 11 PROCEEDING** |
| | § | |
| **DEBTOR.** | § | |

## NEAL RICHARDS GROUP, LLC'S OPENING BRIEF IN SUPPORT OF ITS APPLICATION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSES INCURRED IN MAKING A SUBSTANTIAL CONTRIBUTION TO THIS CHAPTER 11 CASE PURSUANT TO 11 U. S.C. § 503(b)

**Jacob B. Kring**
Texas State Bar No. 24062831
**Joel B. Bailey**
Texas State Bar No. 24069330

**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Phone:  (214) 880-9600
Fax:      (214) 481-1844
Jacob@HedrickKring.com
Joel@HedrickKring.com

**ATTORNEYS FOR NEAL RICHARDS GROUP, LLC**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iii

PRELIMINARY STATEMENT .........................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

   A. The Relevant Parties .................................................................................................2

   B. NRG Contracts with glendonTodd ..........................................................................3

   C. The Limited Partnership Agreement ........................................................................4

   D. Pre-Petition Offer of $95 Million Fails to Close ....................................................4

   E. Investment Valued at Roughly 56% of Cash Invested ............................................6

   F. Mr. Furniss Persuades HCA to Increase Offer to $100 Million .............................8

   G. Limited Partners Make Vulgar Threats Amidst Fear Over Losing Deal...................8

   H. HCA Increases Offer to $115 Million ...................................................................10

   I. The Court Approves the Sale ..................................................................................11

   J. Timeline of Offers ..................................................................................................11

   K. Deal Praise from Brokers, Limited Partners, and HCA ........................................13

   L. Extraordinary Benefits from Sale ..........................................................................14

RELIEF REQUESTED.......................................................................................................15

ARGUMENTS AND AUTHORITIES...............................................................................17

   A. Legal Standard for Substantial Contribution.........................................................17

   B. Examples of Substantial Contribution ..................................................................19

   C. NRG's Substantial Contribution............................................................................20

      a. Factors #1 and #2: The Services Provided a Benefit to the Estate and Were Undertaken for the Benefit of All Parties to the Estate................................................................21

      b. Factor #3: NRG Pursued the Ultimate Goal of the Best Deal Possible Knowing It May

Not Receive Reimbursement ............................................................................... 23

    c.   Factor #4: The Benefit Conferred Vastly Exceeds the Costs ....................................... 24

    d.   Factor #5: NRG's Efforts Were Not Duplicative of Statutory Fiduciaries ................. 26

    e.   Factor #6: Other Than Payment of Its Claim, NRG Will Not Profit from the Situation, But May Have Faced Substantial Loss ......................................................................... 30

    f.    Factor #7: NRG's Efforts Did Not Have a Negative Effect on the Case .................... 31

D.  NRG's Actual and Necessary Expenses for Mr. Furniss's Services Satisfy the Substantial Contribution Standard ..................................................................................................... 31

E.  Even if NRG's Claim Does Not Fall Within the Statutory Language, Section 503(b) Is Illustrative, Not Exclusive and NRG's Application Should be Granted Pursuant to the Court's Equitable Powers ................................................................................................... 32

CONCLUSION ..................................................................................................................... 34

CERTIFICATE OF SERVICE ............................................................................................. 36

# TABLE OF AUTHORITIES

<span style="font-variant: small-caps">CASES</span>                                                                                                                        <span style="font-variant: small-caps">PAGE(S)</span>

*Cahall v. Lofland*,
  114 A. 224 (Del. Ch. 1921)..................................................................29

*Gearhart Indus., Inc. v. Smith Intern., Inc.*,
  741 F.2d 707 (5th Cir. 1984) ...............................................................29

*In re Am. Plumbing & Mech., Inc.*,
  327 B.R. 273 (Bankr. W.D. Tex. 2005).................................................18, 20, 28

*In re Condere Corp.*,
  251 B.R. 693 (Bankr. S.D. Miss. 2000)...............................................19, 22

*In re DP Partners Ltd.*,
  106 F.3d 667 (5th Cir. 1997) ...........................................................17, 19, 24

*In re Energy Partners, Ltd.*,
  422 B.R. 68 (Bankr. S.D. Tex. 2009) ................................................19, 22, 25

*In re General Electrodynamics Corp.*,
  368 B.R. 543 (Bankr. N.D. Tex. 2007)..............................................20, 22

*In re Hers Cosmetics Corp.*,
  114 B.R. 240 (Bankr. C.D. Cal. 1990).....................................................28

*In re Johnson*,
  433 B.R. 626 (Bankr. S.D. Tex.2010) ....................................................29

*In re Mirant Corp.*,
  354 B.R. 113 (Bankr. N.D. Tex. 2006)....................................19, 24, 25, 30, 33

*In re Penn-Dixie Indus., Inc.*,
  18 B.R. 834 (Bankr. S.D.N.Y 1982) ......................................................22

*In re Philadelphia News., LLC*,
  445 B.R. 450 (Bankr. E.D. Pa. 2010) ....................................................28

*In re Richton Intern. Corp.*,
  15 B.R. 854 (Bankr. S.D.N.Y. 1981) ....................................................22

*In re R.L. Adkins Corp.*,
  505 B.R. 770 (Bankr. N.D. Tex. 2014)..............................................24, 31

*In re S&Y Enterps., LLC*,
  480 B.R. 452 (Bankr. E.D.N.Y. 2012)..............................................32, 33

*Sneed v. Webre*,
    465 S.W.3d 169 (Tex. 2015)........................................................................................29

**STATUTES AND REGULATIONS**

11 U.S.C. § 503.......................................................................................17, 23, 32, 33, 34

**SECONDARY SOURCES**

Black's Law Dictionary, *Duplicative* (10th ed. 2014).................................................27

Neal Richards Group, LLC ("NRG") submits its Opening Brief in Support of its Application for Allowance of Administrative Expenses Incurred in Making a Substantial Contribution to this Chapter 11 Case Pursuant to 11 U.S.C. § 503(b) (the "Application").  In support of the Application, NRG respectfully states as follows:

## PRELIMINARY STATEMENT

The purchase price for the Debtor's real property increased by $20 million between the initial pre-petition offer and the ultimate sales price.  Because the Debtor's real property sold for $115 million in this bankruptcy proceeding, 100% of the secured creditors have been paid in full, 100% of the unsecured creditors have been paid in full, 100% of the equity owners have or will receive a full return on their investment, and the equity holders will ultimately receive approximately a 1.47% return on their money (even after accounting for the payment of the amount requested herein) in less than three years after their investment.  This result cannot be characterized as anything other than an extraordinary and rare outcome for a Chapter 11 proceeding.  Most importantly, this result would not have been achieved without the efforts of Todd Furniss and his team at glendonTodd Capital, LLC ("glendonTodd").

One of the Debtor's brokers characterized the sale as an "amazing accomplishment" and the efforts of Mr. Furniss as "heroic."  The largest limited partner stated that the sale was "outstanding."  And the purchaser stated that there was no one more important to the sales process than Mr. Furniss.

In return for its substantial contribution to this case through its retention of glendonTodd, NRG seeks repayment of the actual and necessary expenses it incurred in utilizing glendonTodd's services.  Because NRG and glendonTodd's services satisfy all factors used by courts in determining whether a creditor made a substantial contribution to a bankruptcy

1

proceeding, and because the evidence establishes that the expenses were actual and necessary expenses, the Court should find that NRG is entitled to an administrative expense claim in the amount of $2,875,000.

## FACTUAL BACKGROUND

### A.     The Relevant Parties.

The Debtor owned a short term acute care hospital (the "Hospital") and medical office building (the "MOB"), together with a 445 stall adjacent parking garage (the "Garage," and together with the Hospital and MOB, the "Property") and various pieces of personal property.[1] The Debtor has eighty limited partners.[2]  Twenty-four of the eighty limited partners (less than 1/3 of the limited partners) have filed objections to the Application.[3]  CH Realty VI/MO Austin FPMC, LP ("CH Realty") is one of the limited partners.  CH Realty invested the largest amount of any limited partner by investing $13,500,000 in December 2013 in exchange for 45% ownership in the Debtor.[4]  The total amount of capital raised by the partnership was $30 million.[5] Neal Richards Development Group Austin Development, LLC ("NRG Austin") is the General Partner of the Debtor.[6]  NRG Austin has five managers: (1) Todd Furniss; (2) Dr. David Genecov; (3) Dr. Robert Wyatt; (4) Dr. Wade Barker; and (5) Mary Hatcher.[7]  NRG, a separate

---

[1] *Declaration and Proffer of Testimony of Todd Furniss in Support of Application for Allowance of Administrative Expenses Incurred in Making a Substantial Contribution to this Chapter 11 Case Pursuant to 11 U.S.C. § 503(b)* ¶ 10 [Dkt. No. 222] [hereinafter, "Furniss Proffer"].
[2] Ex. 53 (showing each limited partner's investments, percentage ownership, and whether or not they have filed objections).
[3] *Id.*
[4] *CH Realty's Proffer of Testimony of Carlos Rainwater in Opposition to Application for Allowance of Administrative Expenses Incurred in Making a Substantial Contribution to this Chapter 11 Case Pursuant to 11 U.S.C. § 503(b)* 2:8-10 [Dkt. No. 224] [hereinafter, "Rainwater Proffer"]; Furniss Proffer ¶ 11.
[5] Rainwater Proffer 2:9.
[6] Ex. 58 at 32.
[7] *Id.*

legal entity from NRG Austin, is a creditor of the Debtor.[8]  NRG is also a member of NRG Austin.[9]

GlendonTodd is a private equity fund.[10] Todd Furniss is the founder, CEO, and Managing Partner of glendonTodd.[11]  Todd Furniss is also a manager of NRG Austin and is the acting CEO of NRG.[12]  Todd Furniss took over as the acting CEO of NRG in May of 2015 amidst allegations of fraud and mismanagement of NRG's prior management.[13]

**B.    NRG Contracts with glendonTodd.**

NRG was financially distressed at the time Mr. Furniss took over as CEO.  Contractors were not being paid and liens were being placed on the Property.[14]  Furthermore, NRG Austin had insufficient operating capital to pay employees.[15]  Accordingly, in the face of uninviting financial prospects, NRG contracted with glendonTodd to provide consulting services.[16]  NRG and glendonTodd also discussed additional compensation to be paid to glendonTodd for the services it would provide on the sale of the Property, but this was never a certainty and no formal written agreement was signed.[17] NRG and glendonTodd also entered into a consulting agreement whereby NRG agreed to pay glendonTodd a monthly fee of $125,000.00 per month in exchange for its services in connection with not just the Property, but also its involvement in facilities and

---

[8] Ex. 57 at 5; Ex. 58 at 27; Ex. 126 (support for NRG's claim).
[9] Furniss Proffer ¶ 7.
[10] Furniss Proffer ¶ 5.
[11] *Id.*
[12] Furniss Proffer ¶ 7.
[13] Hearing Transcript from the Application for Allowance of Administrative Expenses Incurred in Making a Substantial Contribution for Interested Party Neal Richards Group, LLC, Sept. 22, 2016 [hereinafter, "Hr'g Tr."] 97:8-98:2 (Furniss testimony).
[14] Furniss Proffer ¶ 13; Hr'g Tr. 98:3-11 (Furniss testimony that, "the building was not complete, liens were being filed…the general contractor had not been paid").
[15] Furniss Proffer ¶ 14; Hr'g Tr. 98:19-22 (Furniss testimony that the operating capital was insufficient); Hr'g Tr. 99:1-5 (Furniss testimony that, "there were limited resources and we had to do a tremendous amount of work").
[16] Furniss Proffer ¶ 15; Hr'g Tr. 111:19-112:14 (Furniss testimony regarding consulting agreement between NRG and glendonTodd).
[17] Furniss Proffer ¶ 15.

other properties owned across Texas.[18]  For most months, however, NRG either failed to pay that consulting fee to glendonTodd or only paid a portion of the consulting fee as a result of the inability to pay glendonTodd.[19]  At this time, there is a significant receivable owed from NRG to glendonTodd for these monthly consulting payments.[20]  NRG's failure to pay these consulting fees resulted in glendonTodd's inability to pay or retain employees, or finance glendonTodd's obligations.[21]

## C.      The Limited Partnership Agreement.

The Debtor is governed by a *Limited Partnership Agreement* (the "Limited Partnership Agreement") dated April 3, 2012.[22]  The Limited Partnership Agreement provides for payment to the General Partner for various pre-bankruptcy activities, but specifically disclaims any limits on the activities of affiliates of the Debtor.[23]  The Limited Partnership Agreement does not prohibit payment to a creditor such as NRG for expenses incurred in substantially benefitting the estate of the Debtor in connection with a bankruptcy.[24]  In fact, the Limited Partnership Agreement does not address the present circumstance.[25]

## D.      Pre-Petition Offer of $95 Million Fails to Close.

Before the Petition Date, the Property was without a tenant and was not generating any revenue, thus complicating any potential sale of the Property.[26]  Accordingly, there was a significant amount of anxiety and concern among the limited partners, including CH Realty,

---

[18] Furniss Proffer ¶ 15.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] Ex. 1.
[23] Ex. 1 at ¶¶ 7.2(a), 7.3.
[24] *Id.*; Hr'g Tr. 69:18-70:6 (Rainwater testimony: "Q: Are you aware of any provision in the partnership agreement that would prohibit the filing of an application for substantial contribution and increasing the value of bankruptcy Estate? A: I'm not aware of any…").
[25] *Id.*
[26] Furniss Proffer ¶ 21.

regarding their investments and whether they would be able to recoup their investments.[27] Indeed, CH Realty described the situation as a "clearly distressed situation" and had expressed a strong desire to divest itself of the Property.[28] There was a very real chance that the investors would not recoup their investments.[29]

On September 4, 2015, the Debtor and MedEquities Realty Trust, Inc., in association with Surgical Development Partners, LLC (collectively, "MedEquities") entered into a non-binding letter of intent to sell the Property for $95 million.[30] Although CH Realty expressed a clear desire to close the deal for $95 million,[31] this would have resulted in a meager return for the limited partners, especially when compared with the final sales price that was $20 million higher.[32] Regardless, MedEquities defaulted on the deal later in 2015 and the sale to MedEquities never closed.[33]

Just before the Petition Date, on or around December 23, 2015, and December 29, 2015, the Debtor received letters of intent from Mayco Development, LLC ("Mayco") for $104 million.[34] However, after meeting with Mayco, both Mr. Furniss and CH Realty believed that Mayco was not a "real" buyer, and that it was unlikely to purchase the Property because its

---

[27] Furniss Proffer ¶ 20; *see* Hr'g Tr. 162:15-163:14 (Furniss testimony); *see* Hr'g Tr. 27:4-8 (Rainwater testimony).
[28] Furniss Proffer ¶¶ 17, 20.
[29] Furniss Proffer ¶ 20; Hr'g Tr. 41:9-10 (Rainwater testimony describing possibility of losing entire equity investment like in San Antonio); Hr'g Tr. 101:10-17 (Furniss testimony: "Q: Do you have any opinion on what would have happened had you done nothing? A: Yes, it would have gone to a zero, the bank would have gone---would have taken over the hospital"); Hr'g Tr. 159:22-160:4 (Furniss testimony describing that had HCA withdrew its offers the limited partners "would have lost virtually everything" and "crushed" the purchase price).
[30] Ex. 3.
[31] Ex. 5 ("Hopefully, the Austin LOI can be turned into a definitive P&As Agreement and cash closing."); Hr'g Tr. 25:22-26:3 (Rainwater testimony).
[32] Ex. 49; Hr'g Tr. 26:4-27:1 (Rainwater testimony describing how CH Realty would not have received a full return on equity and would not have received a preferred return).
[33] Furniss Proffer ¶ 22.
[34] Exs. 95-96.

interest was contingent upon a credit-worthy, operating tenant occupying the Property.[35]

### E. Investment Valued at Roughly 56% of Cash Invested.

On January 5, 2016 (the "Petition Date"), Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").[36]



.[37]

.[38]

.[39] Other investors were angry and literally threatening Mr. Furniss.[40]

Immediately after the Petition Date, Mr. Furniss began contacting and soliciting offers from entities that might be interested in purchasing the Property.[41] In February 2016, Mr. Furniss contacted the Vice President of Development for Hospital Corporation of America ("HCA") to persuade him to consider the Property and the opportunities presented in the Chapter 11 Case.[42] Because of Mr. Furniss's knowledge and expertise on both the real estate and operations-side of the Property, and because he was a key decision-maker on any opportunities

---

[35] Furniss Proffer ¶¶ 24-26; Rainwater Proffer 4:18-5:2.

[36] Ex. 57.

[37] Ex. 51; Sealed Portion of Application for Allowance of Administrative Expenses Incurred in Making a Substantial Contribution for Interested Party Neal Richards Group, LLC Hr'g Tr. 8:7-11, 8:21-9:22, Sept. 22, 2016 [hereinafter, "Sealed Port. Hr'g Tr."].

[38] Id.

[39] Sealed Port. Hr'g Tr. 10:11-22; Hr'g Tr. 27:4-8 (Rainwater testimony describing concern of all limited partners).

[40] Hr'g Tr. 102:12 (Furniss testimony describing limited partners as "angry"); Hr'g Tr. 158:7-22 (Furniss testimony describing vulgar threats and legal threats being made by limited partners again him).

[41] Furniss Proffer ¶ 32.

[42] Furniss Proffer ¶ 37.

presented, HCA negotiated with Mr. Furniss in order to see if a deal could be done.[43]  Between

February and May 2016, Mr. Furniss was on multiple telephone calls each week with HCA, and

exchanged hundreds of emails with HCA concerning the Property and the deal itself.[44]  He was

available on nights, evenings, and weekends to answer questions, and when questions arose,

HCA would contact Mr. Furniss to get a direct answer.[45]  Mr. Furniss's calendar reflects eight

(8) separate meetings with HCA and there were countless other conferences and calls that did not

make it on to his calendar.[46]  Mr. Furniss also served as the point of contact for other prospective

purchasers, even when brokers became involved.[47]

Meanwhile, in early March, another Forest Park property in San Antonio was foreclosed

upon resulting in the equity investors losing their entire investment.[48]  CH Realty acknowledged

the very real possibility of a complete loss on the Austin Property like in San Antonio.[49]

Despite all momentum to the contrary, by the middle of March 2016, Mr. Furniss had

obtained the following offers for the Property:

| Mayco | HCA | Seton |
|---|---|---|
| $101,500,000.00 | $60,000,000.00[50] | $90,000,000.00[51] |

---

[43] Furniss Proffer ¶ 37; *see* Hr'g Tr. 108:19-23 (Furniss testimony: "[W]e did 100 percent of the negotiations"); *see also* Hr'g Tr. 43:7-9 (Rainwater testimony: "[Mr. Furniss] kept HCA at bay, he kept them interested"); Stone Dep. 22:8-18 (describing Mr. Furniss as the "focal point" for HCA in connection with their negotiations for Forest Park projects); *Joint Filing of Deposition Designations of Jeffrey Stone* [Dkt. No. 220] [hereinafter "<u>Stone Dep.</u>"] at 23:2-7 (HCA generally approached Mr. Furniss instead of someone else when it needed answers in connection with the Property); Stone Dep. 25:14-18 ("Q: In other words, every time – every time you had a question on the property, you didn't try to get attorneys involved, brokers involved; you went straight to Mr. Furniss? A: Yes").
[44] Furniss Proffer ¶ 38.
[45] *Id.*; Stone Dep. 15:5-16
[46] Ex. 55 at NRG 5050, 5066, 5067, 5078, 5079, 5080, 5081, 5083.
[47] Furniss Proffer ¶¶ 51-52; Ex. 17.
[48] Furniss Proffer ¶ 39.
[49] Hr'g Tr. 29:10-24 (Rainwater testimony: "I didn't want…to lose all of our equity on Austin like it happened in San Antonio"); Sealed Port. Hr'g Tr. 10:13-15 ██████████████████████; Ex. 8.
[50] This offer excludes the sale of the MOB.
[51] Ex. 11.

Although three offers had been made, there were real concerns that neither Mayco nor Seton would actually close the sale.[52]  The only offer that seemed genuine was the $60 million offer from HCA—an outcome that could have left numerous constituencies unpaid.[53]

**F.    Mr. Furniss Persuades HCA to Increase Offer to $100 Million.**

Accordingly, Mr. Furniss continued his discussions and relationship with HCA to convince them to make another offer on the Property.[54]  He emphasized the virtues of the Property, its location, the contiguous land, and the chance to take advantage of this strategic opportunity in a growing market.[55]  No brokers were on this telephone call between Mr. Furniss and HCA.[56]

On March 29, 2016, following this telephone call, HCA submitted a revised offer for $100 million.[57]  Mr. Stone, a non-party representative of HCA, acknowledged that Mr. Furniss had a clear hand in causing HCA's offer to increase from $60 million to $100 million.[58]  That same day, CBRE told HCA that it would be able to purchase the Property for $100 million.[59]

However, on March 31, 2016, the Debtor received a revised offer from Winstead/Seton for $105 million.[60]  Once again, there was concern that this increased offer was not legitimate, and was only an attempt to drive away competitive bidders thereby driving the price down.[61]

**G.    Limited Partners Make Vulgar Threats Amidst Fear Over Losing Deal.**

At this point, the Debtor, Mr. Furniss, and his team at glendonTodd were faced with a

---

[52] Furniss Proffer ¶¶ 50, 56.
[53] Furniss Proffer ¶ 57.
[54] Furniss Proffer ¶ 60.
[55] *Id.*
[56] *Id.*
[57] Ex. 24.
[58] Stone Dep. 38:3-6.
[59] Ex. 25.
[60] Furniss Proffer ¶ 63.
[61] *Id.*

difficult decision of whether to move forward with HCA at $100 million and potentially leave a higher bid on the table, or to re-open the bidding process and risk having HCA leave the process altogether.[62] There was additional risk that Winstead/Seton had only made the offer in the hopes of chasing other prospective purchasers away (like HCA) and lowering the ultimate purchase price well below the current offer of $100 million.[63]

Had HCA dropped out of the bidding, it would have "crushed" the purchase price, the Debtor would have been lucky to get $70-75 million, and the limited partners would have lost virtually everything.[64] Fearful of the result of losing their entire investment, some of the Limited Partners threatened to harm Mr. Furniss physically and professionally if the Debtor did not move forward with HCA's $100 million offer.[65] Other Limited Partners characterized the potential of HCA walking away as a financial and professional "tragedy" and encouraged the Debtor to close the sale at $100 million.[66]

Mr. Furniss was hopeful that he would be able to inform HCA that the Debtor would not be moving forward with the $100 million offer and still keep HCA at the negotiating table.[67] Indeed, the Vice President of Development for HCA—Jeffrey Stone—acknowledged that Mr. Furniss's professionalism and credibility throughout the sale process was a key factor in keeping

---

[62] *See* Hr'g Tr. 159:8-160:18 (Furniss testimony: "There was a concern [HCA] would fall out of the bidding process"); Hr'g Tr. 76:2-4 (Siverburg testimony: "our concern was that at some point in time they were going to get frustrated and retract their offer. And, you know, this was –to us this is a lot of money").

[63] Furniss Proffer ¶ 63; *see also See* Hr'g Tr. 159:8-160:18 (Furniss testimony describing risks of communicating to HCA that its $100 million offer was not sufficient after communicating acceptance).

[64] Hr'g Tr. 158:23-160:4 (Furniss testimony).

[65] Hr'g Tr. 158:7-22 (Furniss testimony: "[S]ome of [the threats] were particularly vulgar in nature, some of them were physical in nature, some of them were legal in nature…").

[66] Furniss Proffer ¶ 65; Ex. 27; *see* Hr'g Tr. 76:10-12 (Silverburg testimony: "Obviously a financial tragedy, but the other reason it would be a tragedy is that we would like to work with somebody who we knew.")

[67] Furniss Proffer ¶ 68.

HCA at the table.[68]  Mr. Stone characterized Mr. Furniss as the "focal point for all things related to the Forest Park projects," that he was pleased with how Mr. Furniss used "straight up conversation [and] direct dealings," and that Mr. Furniss was efficient in conducting negotiations.[69]

Mr. Furniss ultimately explained to HCA that the Property would not be sold for $100 million, and that an auction process would be engaged to maximize the purchase price for all creditors and limited partners.[70]  Mr. Stone testified that HCA was unsure whether they would continue to engage in negotiations after being told that its $100 million offer was no longer sufficient, but that Mr. Furniss persuaded HCA to stay in the negotiations.[71]  While HCA was not happy, Mr. Furniss's positive relationship and professionalism with HCA allowed the process to continue in an efficient, meaningful, and deliberate manner.[72]

## H.     HCA Increases Offer to $115 Million.

On April 6, 2016, HCA advised that it was willing to engage in an auction process on certain conditions.[73]  Mr. Furniss and his team at glendonTodd organized a meeting with HCA (without brokers) on April 21, 2016, where the transaction logistics, concerns, and questions were addressed by and between HCA and Mr. Furniss.[74]  At the meeting, Mr. Furniss sought to negotiate a sales price of $115 million for HCA's purchase of the property.[75]

Between April 21, 2016 and May 4, 2016, Mr. Furniss negotiated a purchase and sale agreement, obtained necessary consents, communicated with creditors, and communicated with

---

[68] Stone Dep. 13:5-8, 13:22-25.
[69] Stone Dep. 22:2-12, 23:11-24.
[70] Furniss Proffer ¶ 68; Hr'g Tr. 160:5-18.
[71] Stone Dep. 40:17-41:15.
[72] Stone Dep. 47:17-48:2; Furniss Proffer ¶ 68.
[73] Ex. 29.
[74] Ex. 33; Ex. 34.
[75] Furniss Proffer ¶ 74; Hr'g Tr. 86:20-87:1-4.

the owners of the General Partner and limited partners to close the deal with HCA.[76]  Mr. Stone testified that Mr. Furniss was instrumental in helping HCA increase its offer to $115 million.[77] CH Realty consented to the sale to HCA for $115 million on May 4, 2016.[78]

## I.  The Court Approves the Sale.

On May 10, 2016, the Debtor filed its *Motion for an Order (I) Approving Purchase and Sale Agreement for Sale of Substantially All of the Debtor's Assets to St. David's Healthcare Partnership, L.P., LLC, (II) Authorizing Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Sale Motion") [Dkt. No. 97].  Through the Sale Motion, the Debtor sought, among other things, the Court's approval of the Purchase and Sale Agreement to St. David, an affiliate of HCA.

On May 17, 2016, the Court granted the Sale Motion and entered its *Order (I) Approving the Purchase and Sale Agreement Between Debtor and St. David's Healthcare Partnership, L.P., (II) Authorizing the Sale of the Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances, and (III) Granting Related Relief* ("Sale Order") [Dkt. No. 113].  Mr. Furniss proffered testimony in support of the sale at the hearing on the Sale Motion.

## J.  Timeline of Offers.

The negotiation and sale of the Property was a highly complex and difficult process with multiple bidders, multiple offers, and a constant barrage of opinions on which offers were legitimate, and which offers to accept, reject, or counter.[79]  The chart below summarizes the

---

[76] Furniss Proffer ¶ 74.
[77] Stone Dep. 48:7-13.
[78] Ex. 36.
[79] *See* Furniss Proffer ¶ 30; Stone Dep. 11:11-25, 12:4-16; Hr'g Tr. 101:25-102:19 (Furniss testimony); Hr'g Tr. 161:21-162:8 (Furniss testimony).

relevant events highlighting the complexity of the deal and the effort required by Mr. Furniss to get the deal done.

| Date | Offer | Party | Exhibit |
|---|---|---|---|
| Sept. 4, 2015 | $95 million (LOI) | MedEquities Realty Trust, Inc. | 3 |
| Dec. 23, 2015 | $104 million (LOI) | Mayco Development, LLC | 95 |
| Dec. 29, 2015 | $104 million | Mayco Development, LLC | 96 |
| Jan. 5, 2015 | **Petition Date** | | 57 |
| ~Mar. 1, 2016 | $101.5 million | Mayco Development, LLC | 13, 18 |
| Mar. 4, 2016 | $90 million | Seton Healthcare | 11 |
| Mar. 8, 2016 | $60 million | St. David's/HCA | 12 |
| Mar. 17, 2016 | **Amended Application to Retain Brokers CBRE and KOA** | | 19 |
| Mar. 24, 2016 | $65 million | St. David's/HCA | 22 |
| Mar. 24, 2016 | $96.5 million | Seton Healthcare | 21 at p. 233 |
| Mar. 29, 2016 | $100 million | St. David's/HCA | 24 |
| Mar. 31, 2016 | **Communication of Acceptance of $100 million offer to HCA** | | Ex. 25 |
| ~Mar. 31, 2016 | $105 million | Seton Healthcare | Furniss Proffer ¶ 63 |
| Apr. 4, 2016 | **Order Granting Retention of Brokers CBRE and KOA** | | 26 |
| Apr. 21, 2016 | **Meeting between Furniss and HCA to discuss final deal** | | 33, 34 |
| ~May 4, 2016 | $115 million | St. David's/HCA | 36, 117 |

**K.    Deal Praise from Brokers, Limited Partners, and HCA.**

The sale to St. David's was celebrated by numerous constituencies in the Chapter 11 Case.  Harry Lake—the CEO of one of the brokers retained by the Debtor and holder of a small limited partnership interest in the Debtor—described the efforts of the glendonTodd team as an "amazing accomplishment."[80]  He further described the efforts by Mr. Furniss and Ms. Hatcher by stating, "you two are machines and your leadership on this was amazing."[81]  In a subsequent email, Mr. Lake characterized the efforts of the glendonTodd team as "heroic" and stated that "[t]he investors are going to be very excited once [the sale] is official."[82]

On May 18, 2016, a representative from CH Realty described the closing as "outstanding" and congratulated Mr. Furniss.[83]

Mr. Stone, the only disinterested witness that provided testimony in this matter, testified that there was no one more important to the sale process than Mr. Furniss, and that without Mr. Furniss's involvement, a deal may have never been reached for the Property.[84]  Mr. Stone agreed that Mr. Furniss had a diverse knowledge base relating to the Property, the sale, and the structure, that Mr. Furniss was available on nights and weekends, and that Mr. Furniss was a formidable negotiator as evidenced by achieving a sale price in the zone of HCA's top valuation based on analytics.[85]  As stated above, Mr. Stone described Mr. Furniss as the "focal point" for all things relating to the Property.[86]  During the negotiation period, Mr. Stone acknowledged that he would have routine calls with Mr. Furniss (sometimes multiple calls each day), and that those

---

[80] Ex. 40.
[81] *Id.*
[82] Ex. 41.
[83] Ex. 43.
[84] Stone Dep. 34:9-12, 47:17-20, 75:23-76:17.
[85] Stone Dep. 15:2-16:6.
[86] Stone Dep. 22:8-12.

calls were more often with only Mr. Furniss as opposed to Mr. Furniss, plus the brokers, plus attorneys.[87]  Indeed, Mr. Stone characterized the number of discussions he had with CBRE as a "handful," had never heard of KOA, and did not remember ever speaking to KOA.[88]

## L.    Extraordinary Benefits from Sale.

This transaction was extremely complex.  There were numerous conflicting interests of creditors and different limited partners.[89]  The complexity was further multiplied by the bankruptcy process and the simultaneous failure of the hospital operating entities and other facilities with similar parties.  Additionally complicating the matter was that prospective purchasers all had different agendas and a number of the prospective purchasers were sending misinformation that appeared to be designed to drive the price down.  This same activity was going on in San Antonio, Dallas, and Fort Worth.[90]

Mr. Furniss estimates that he sent or received hundreds of emails or text messages concerning the sale process for the Property, and spent countless hours on the phone with various constituencies and long nights reviewing documents and revisions to agreements.  Although the brokers were involved in aspects of the sale, Mr. Furniss was on numerous calls, emails, and communications without the brokers, given his unique insight, knowledge, and experience of the Property.[91]

As a result of the work performed by Mr. Furniss and his team at glendonTodd, 100% of secured creditors have been paid in full, 100% of unsecured creditors have been paid in full, 100% of the equity owners received a full return on their investment, and the equity holders will

---

[87] Stone Dep. 26:15-27:1.
[88] Stone Dep. 31:4-20.
[89] *See* Hr'g Tr. 157:8-158:6 (Furniss testimony).
[90] Furniss Proffer ¶ 82.
[91] Furniss Proffer ¶ 83.

receive an approximately 1.47% return on their money in less than three years (even after accounting for NRG's substantial contribution expenses).[92]  In other words, an investor who put in $100,000 will receive $147,000 **after** payment of NRG's substantial contribution claim.  As Ms. Hatcher explained, Exhibit 49 below demonstrates the benefits achieved by Mr. Furniss and his team at glendonTodd by comparing the potential returns to the limited partners and CH Realty under various offers made on the Property:[93]

| | HCA #2 | Mayco | HCA #1 | Winstead | Med-Equities |
|---|---|---|---|---|---|
| LOI    Date/Offer Date | 4/20/2016 | 12/29/2015 | 3/24/2016 | 3/4/2016 | 9/4/2015 |
| Closing Date | 5/16/2016 | | | | |
| **Sales Price** | **$  115,000,000.00** | **$  104,000,000.00** | **$  65,000,000.00** | **$  96,500,000.00** | **$  95,000,000.00** |
| Less: Debt | $    60,226,533.00 | $    60,226,533.00 | $  60,226,533.00 | $    60,226,533.00 | $    60,226,533.00 |
| Less:  Transaction Costs | $      2,651,768.00 | $      2,651,768.00 | $    2,651,768.00 | $      2,651,768.00 | $      2,651,768.00 |
| Less:    Unsecured Claims | $      1,275,318.00 | $      1,275,318.00 | $    1,275,318.00 | $      1,275,318.00 | $      1,275,318.00 |
| Less:  Substantial Contribution | $      2,875,000.00 | | $                 - | $                 - | $                 - |
| **Cash    Available for Equity** | **$    47,971,362.00** | **$    39,846,381.00** | **$        846,381.00** | **$    32,346,362.00** | **$    30,846,362.00** |
| **LP Cash on Cash Return** | **1.47x** | **1.31x** | **0.03x** | **1.08x** | **1.03x** |
| LP Distributions | $    44,085,343.68 | $    39,210,344.00 | $        846,381.00 | $    32,346,362.00 | $    30,846,362.00 |
| **Crow    Holdings Distributions** | | | | | |
| Original Contribution | $    13,500,000.00 | $    13,500,000.00 | $        380,863.00 | $    13,500,000.00 | $    13,500,000.00 |
| Preferred Return | $      3,715,342.37 | $      3,715,342.00 | $                 - | $      1,055,863.00 | $        380,863.00 |
| Promote | $      2,623,062.29 | $        429,312.00 | $                 - | $                 - | $                 - |
| **Total** | **$    19,838,404.66** | **$    17,644,655.00** | **$        380,863.00** | **$    14,555,863.00** | **$    13,880,863.00** |

[94]

The return to the other limited partners is the same on a percentage basis return on investment to CH Realty.  The ultimate purchase price of $115 million increased by $20 million from the purchase price identified in the September 2015 letter of intent with MedEquities that

[92] Furniss Proffer ¶¶ 4, 81; Hr'g Tr. 47:4-47:24.
[93] Hr'g Tr. 83:22-85:5 (Hatcher testimony describing that all limited partners are in a better position as a result of efforts of glendonTodd even after the granting of the substantial contribution application).
[94] Ex. 49.

CH Realty wanted to be turned into "a definitive P&S [Purchase and Sale] Agreement and cash closing."[95]  Had the property sold for $95 million as requested by CH Realty, the limited partners would have received almost no return on their investment.  Specifically, CH Realty would have received a total of $13,880,863.00 for their investment of $13,500,000.00. However, with the sale price of $115 million, CH Realty will receive approximately $19,838,405.00 which is $6,338,405.00 better than less than a year prior.  The percentage benefit also accretes to the other limited partners who will likewise share in the increase in value for the sale of the Property.[96]

███████████████████████████████████████████

█████████████████████████████████████████████████████.[97]  This result also stands in stark contrast to other cases like *FPMC San Antonio Realty Partners* where the property was foreclosed upon and there was little, if any, recovery for the unsecured creditors and no recovery for the equity holders.[98]

The expenses sought in connection with the Application were approved by NRG.[99]  NRG recognized that glendonTodd provided "laudatory and profitable services" on behalf of NRG relating to the sale of the Property and that these services "[resulted] in the successful sale of the real estate in an amount that maximized recovery for [NRG] and all constituencies in the bankruptcy."[100]

---

[95] Ex. 5.
[96] Furniss Proffer ¶ 86.
[97] Sealed Port. Hr'g Tr. 8:7-11, 8:21-9:22.
[98] Furniss Proffer ¶ 81; Sealed Port. Hr'g Tr. 10:13-15 ███████████████████████████████████.
[99] Ex. 44; Ex. 46.
[100] Ex. 44.

## RELIEF REQUESTED

Pursuant to Bankruptcy Code Section 503(b), NRG seeks approval for allowance of an administrative expense in the amount of $2,875,000 representing the actual, necessary expenses incurred in retaining glendonTodd's services that made a substantial contribution through finding, negotiating, and closing the sale of the Property to St. David.

## ARGUMENTS AND AUTHORITIES

### A.     Legal Standard for Substantial Contribution.

Section 503(b)(3)(D) of the Bankruptcy Code states, "there shall be allowed administrative expenses, . . . including . . . the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by— . . . a creditor, an indenture trustee, an equity security holder, or a committee . . . in making a substantial contribution in a case under chapter 9 or 11 of this title." 11 U.S.C. § 503(b)(3)(D). The policy behind allowing substantial contribution applications is to "promote meaningful creditor participation in the reorganization process." *In re DP Partners Ltd.*, 106 F.3d 667, 672 (5th Cir. 1997). There is no requirement to give a "preconfirmation warning" of intent to seek fees and expenses under section 503(b)(3)(D). *See id.*

The phrase "substantial contribution" is not defined in the Bankruptcy Code. However, the Fifth Circuit has broadly explained that the term generally means a contribution that is "considerable in amount, value or worth," and that services which make a substantial contribution are those which "foster and enhance, rather than retard or interrupt the progress of reorganization." *Id.* at 672-73.

While the development of a more concrete standard is "best left on a case-by-case basis," a court should employ a balancing test by weighing, "the cost of the claimed fees and expenses against the benefits conferred upon the estate which flow directly from those actions." *Id.* at

673. In the Fifth Circuit, the substantial contribution applicant's motives are irrelevant to the substantial contribution inquiry. *Id.* ("[N]othing in the Bankruptcy Code requires a self-deprecating, altruistic intent as a prerequisite to recovery of fees and expenses under section 503."). Rather, the party seeking reimbursement need only show that its actions directly and demonstrably benefited the estate. *Id.* at 672.

Courts in this district have emphasized the case-by-case nature of this standard by analogizing the substantial contribution inquiry to the excusable neglect inquiry in that, "no single circumstance controls; nor is a court to simply proceed down a checklist ticking off traits. Instead, courts are to look for a synergy of several factors that conspire to push the analysis one way or the other." *In re Am. Plumbing & Mech., Inc.*, 327 B.R. 273, 281 (Bankr. W.D. Tex. 2005).

Courts have also synthesized and utilized the following seven factors in the substantial contribution inquiry:

a)  Whether the services involved in the contribution provided a benefit to the estate;

b)  Whether the services involved in the contribution were undertaken just for the applicant alone or for the benefit of all parties in the case;

c)  Whether the applicant would have undertaken the same approach absent the expectation of compensation from the bankruptcy estate;

d)  Whether the benefit conferred through the applicant's contribution exceeds the cost which the applicant seeks to assess against the estate;

e)  Whether the efforts of the applicant were duplicative of efforts undertaken by statutory fiduciaries;

f)  Whether the applicant profited from the situation or rather faced substantial loss if it had not undertaken the approach it did; and

g)  Whether the applicant had a negative effect on the case, such as making questionable objections to pleadings filed by the debtor or engaging in improper conduct in some other fashion which caused the debtor to incur costs or which delayed resolution of the case.

*In re Energy Partners, Ltd.*, 422 B.R. 68, 80 (Bankr. S.D. Tex. 2009); *In re Mirant Corp.*, 354 B.R. 113, 132-33 (Bankr. N.D. Tex. 2006).  As demonstrated below, these factors weigh heavily in favor of finding that Mr. Furniss substantially contributed to the Chapter 11 Case.

## B.      Examples of Substantial Contribution.

Applying this standard, courts have granted substantial contribution applications in a variety of situations.  In *DP Partners*, the Fifth Circuit affirmed a bankruptcy court's finding that a creditor made a substantial contribution to the case by: (1) the discovering of a fraudulent conveyance; (2) termination of exclusivity; and (3) causing the Debtor to change its proposed plan for the benefit of the estate.  *DP Partners*, 106 F.3d at 673.  The creditor's participation in the confirmation fight resulted in at least a $3,000,000 benefit to all creditors of the estate.  *Id.*

In *Mirant*, the court held that certain creditors had made a substantial contribution to the proceeding by actively participating in negotiations of the term sheet or the plan itself which eliminated certain issues and saved costs and time of all involved.  *See In re Mirant*, 354 B.R. 113, 135-36 (Bankr. N.D. Tex. 2006).

Another court held that locating a viable purchaser for the debtor that resulted in substantially increasing the value of the debtor's assets constituted a substantial contribution under the Bankruptcy Code.  *In re Condere Corp.*, 251 B.R. 693, 695 (Bankr. S.D. Miss. 2000). In *Condere*, the court found substantial contribution even though the creditors were not ultimately paid the entire amount of their claims.  As the court explained,

> By virtue of Richardson's efforts, creditors received substantially more than they would have received under the debtor's original plan. The debtor's assets were finally sold with court approval under a plan providing for the unsecured creditors receiving 65 cents on the dollar, while the original oral offer submitted contemplated 25 cents on the dollar. Considering the estimation that approximately $24,000,000 in claims will be allowed, this is a significant increase in returns to creditors. Richardson also led the efforts to locate a viable purchaser of the debtor, thereby substantially increasing the valuation of the debtor's assets.

*Id.*

Similarly, in *In re General Electrodynamics Corp.*, the court held that an unsecured creditor made a substantial contribution by, among other things objecting to the debtor's initial proposed plan likely resulting in a $400,000 commitment of capital from the debtor's president and other favorable amendments/restrictions in the amended plan. 368 B.R. 543, 554-55 (Bankr. N.D. Tex. 2007).

In *American Plumbing,* a court in this District set forth the following examples of actions that could support a substantial contribution claim: (1) proposing a plan that is ultimately confirmed when the debtor did not propose a plan; (2) enhancing disclosure to an impaired shareholder class; (3) providing substantial assistance in drafting and confirming a plan; (4) preserving the examiner's right to object to insider-employee claims; (5) urging the appointment of a Chapter 11 trustee; and (6) lowering the temperature of a case by preventing excessive litigation and encouraging cooperation. *In re Am. Plumbing & Mech., Inc.*, 327 B.R. 273, 282-83 (Bankr. W.D. Tex. 2005). The court also provided examples of "expected or typical" activities that may not constitute substantial contribution: (1) reviewing documents and attending hearings; (2) negotiating reductions in fee applications: (3) reviewing the debtor's financial status; (4) proposing agreeable terms through negotiation; and (5) commenting on the disclosure statement and plan of reorganization. *Id.* at 283. Here, given the extent of his efforts and the results obtained, Mr. Furniss's actions on behalf of NRG are more analogous to cases granting a substantial contribution application.

**C.    NRG's Substantial Contribution.**

NRG made a substantial contribution to the Chapter 11 case through Mr. Furniss's efforts

and, as a result, has incurred actual and necessary expenses from glendonTodd.[101] Mr. Furniss located, negotiated, and consummated the deal with HCA on terms that were $20 million more favorable than the offer that existed prior to the Petition Date, and millions of dollars more than if the secured creditor foreclosed on the Property. Because of his efforts, all constituencies are being paid in full, and are being paid significantly more than what they would have received absent Mr. Furniss's efforts. NRG's substantial contribution is demonstrated through application of each of the factors identified above.

a) *Factors #1 and #2: The Services Provided a Benefit to the Estate and Were Undertaken for the Benefit of All Parties to the Estate.*

The first two factors are similar in examining whether the services provided a benefit to the estate and whether they were undertaken for the benefit of all parties to the estate. Both factors weigh substantially in favor of substantial contribution. Through Mr. Furniss's efforts and the efforts of his team at glendonTodd, the purchase price for the Property increased from $95 million pre-petition to $115 million.[102] The Debtor further avoided a foreclosure of the Property.[103] The outcome of the Chapter 11 Case is not only extraordinary, but exceedingly rare: 100% of secured creditors have been paid in full, 100% of unsecured creditors have been paid in full, 100% of the equity owners received a full return on their investment, and the equity holders will further receive an approximately 1.47% return on their money even after accounting for the payment sought in this Application.[104] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

[101] Ex. 46.
[102] *Compare* Ex. 3 *with* Ex. Nos. 36, 117.
[103] Hr'g Tr. 101:6-23 (Furniss testimony describing how, had he not continued his efforts after the bankruptcy case was initiated, the bank "would have taken over the hospital," and "liens would have been filed and tremendous litigation would have ensued.").
[104] Furniss Proffer ¶¶ 4, 81.

█████████████████████████████████████████████████

███████████.[105]

Courts have found substantial contribution where the applicant played a critical role in the bankruptcy proceeding resulting in a plan or resolution where creditors were paid and equity received an interest. *See In re General Electrodynamics Corp.*, 368 B.R. 543, 557 (Bankr. N.D. Tex. 2007) ("The product of this case is a feasible plan that will provide 100% recovery to all creditors over a realistic time period. [The applicant] played an important role in bringing about this result."); *In re Energy Partners Ltd.*, 422 B.R. 68, 76-77, 87 (Bankr. S.D. Tex. 2009) (finding substantial contribution where debtor's initial plan would have essentially wiped out common stockholders, but applicant had been instrumental in formation of an equity and proposal of a joint plan leading to equity receiving 5% of shares in the reorganized debtor); *In re Penn-Dixie Indus., Inc.*, 18 B.R. 834, 835, 838 (Bankr. S.D.N.Y 1982) (granting substantial contribution applications of indenture trustee and counsel in case where, "[e]ffectively the recovery to creditors will be 100% in each case.").

Even where a bankruptcy did not result in immediate payment of all claims to creditors, courts have still found substantial contribution where the applicant fostered and enhanced the bankruptcy proceeding. *See In re Condere Corp.*, 251 B.R. 693, 695 (Bankr. S.D. Miss. 2000) (applicant made substantial contribution in bankruptcy where court approved plan for the unsecured creditors to receive 65 cents on the dollar, compared to the original plan where the creditors received 25 cents on the dollar); *In re Richton Intern. Corp.*, 15 B.R. 854, 855-56 (Bankr. S.D.N.Y. 1981) (creditors' counsel had made substantial contribution to bankruptcy proceeding where counsel had been instrumental in negotiating a plan that provided for either

---

[105] Ex. 51; Sealed Port. Hr'g Tr. 8:7-11, 8:21-9:22.

immediate payments equal to 60 percent of creditors' claims or payments over time of 100 percent of creditors' claims with interest).

Here, as Exhibit 49 demonstrates and Ms. Hatcher testified, had the sale closed for a lesser purchase price of $95 million, as requested by CH Realty pre-petition,[106] or for $100 million as suggested by other limited partners,[107] the equity holders would have received significantly less than they will otherwise receive under the actual Sale (even after accounting for NRG's substantial contribution expenses). If NRG were only seeking to create a benefit for itself, there would have been no attempts to obtain a higher purchase price once NRG knew its creditor claim would be paid in full.[108] As Mr. Furniss stated, "I worked tirelessly and selflessly to benefit not just myself but also the limited partners."[109] Further, "the benefit accreted to the bankruptcy estate … was significant not just to NRG as a creditor but also to all of the limited partners."[110] No evidence has been adduced indicating that this extraordinary result was accomplished through any other source other than through the efforts of Mr. Furniss. Thus, the first and second factor strongly weigh in favor of substantial contribution.

b)      *Factor #3:  NRG Pursued the Ultimate Goal of the Best Deal Possible Knowing It May Not Receive Reimbursement.*

This factor "should only be given moderate weight as any party hoping to apply for administrative expense priority under § 503(b) must surely realize that there is no guaranty of

---

[106] *See* Ex. 5 ("Hopefully, the Austin LOI can be turned into a definitive P&As Agreement and cash closing."); Hr'g Tr. 25:22-26:3 (Rainwater testimony); Ex. 49.

[107] Furniss Proffer ¶ 65; Ex. 27; *see* Hr'g Tr. 76:10-12 (Silverburg testimony: "Obviously a financial tragedy, but the other reason it would be a tragedy is that we would like to work with somebody who we knew."); Hr'g Tr. 158:7-22 (Furniss testimony: "[S]ome of [the threats] were particularly vulgar in nature, some of them were physical in nature, some of them were legal in nature…").

[108] *See* Hr'g Tr. 151:7-10 (Furniss testimony: "I wanted to be…at a price range that felt to me like it was fair and reasonable, that would give…all of the limited partners a return on equity above the pref and would pay off all the secured and unsecured claimants.").

[109] Furniss Proffer ¶ 87.

[110] *Id.*

such an application being granted; they merely have a hope." *In re R.L. Adkins Corp.*, 505 B.R. 770, 782 (Bankr. N.D. Tex. 2014); *In re Mirant Corp.*, 354 B.R. 113, 133 (Bankr. N.D. Tex. 2006) ("The court is disinclined to place much weight on this factor.").

Of course, NRG incurred the expenses through Mr. Furniss's services with some hope that it would receive reimbursement for those expenses. As *Mirant* explains, "the conclusion that potential reimbursement or compensation was not the motive of the parties is inescapable." *Mirant*, 354 B.R. at 133. But, because NRG and Mr. Furniss's goal was to obtain the highest and best deal so that **all** constituencies would receive the best outcome possible, NRG was determined to pursue this ultimate goal without the guarantee of payment or reimbursement.[111] This factor weighs in favor of substantial contribution.

        *c)*     <u>*Factor #4: The Benefit Conferred Vastly Exceeds the Costs*</u>.

In *DP Partners*, the Fifth Circuit emphasized that, "at a minimum, . . . the court should weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate which flow directly from those actions." *DP Partners*, 106 F.3d at 673. Here, the amount sought by NRG is a paltry percentage of the benefit conferred on the Debtor's estate by Mr. Furniss increasing the purchase price of the Property and saving the Debtor and numerous constituencies an enormous amount of time and money from a Chapter 11 Case was a contentious fight over an insufficient amount of money.

The same facts that support the first two factors also support this factor. Through glendonTodd's services, the Debtor's estate obtained a $20 million higher purchase price than it would have received pre-petition, resulting in full payment to all constituencies in the Chapter 11 Case (even accounting for the substantial contribution expense). Representatives of CH Realty

---

[111] Furniss Proffer ¶ 34.

were initially willing to accept an offer of $95 million from MedEquities in hopes "that somebody would step up and buy the asset before we had to frankly go into bankruptcy."[112] Had CH Realty's sale occurred it would be a much worse position than it is today as a result of the efforts of Mr. Furniss.[113]

Moreover, Mr. Furniss's efforts led to a result that all constituencies in this Chapter 11 Case could agree to, avoiding the enormous time and expenses that would otherwise be associated with a highly contested bankruptcy proceeding where secured creditors, unsecured creditors, and equity holders are fighting over a limited amount of money. Courts agree that the elimination of issues in a bankruptcy proceeding that would have otherwise led to the Debtor and other parties expending time, money, and resources is important for the substantial contribution determination. *See Mirant*, 354 B.R. at 135 ("By eliminating one of the issues that might have required attention at the confirmation hearing, the Convenience Creditors have saved costs and time."); *In re Energy Partners, Ltd.* 422 B.R. at 83 ("Birch Run's efforts benefitted the estate because a consensual plan was negotiated, thereby minimizing the fees and expenses that the estate would otherwise have been responsible for paying.").

All NRG seeks in return are its actual and necessary expenses owed to glendonTodd. Even after payment to NRG for its substantial contribution, the creditors still get paid in full and the equity holders obtain a return on their investment.[114] Exhibit 49 clearly shows that all of the equity holders are in a far better position with the amount sought in this Application being paid in full and a sale price of $115 million than the equity holders would have been if the amount

---

[112] Hr'g Tr. 25:22-26:3 (Rainwater testimony).
[113] Ex. 49.
[114] Hr'g Tr. 84:3-6 (Hatcher testimony: "[E]ven with a substantial contribution claim…the proceeds to the Limited Partners and actually to the General Partner are quite a bit higher than they would be under any other scenario."); Ex. 49.

sought in this Application was not paid and the Property sold for the pre-petition price of $95 million. In other words, the benefit conferred on the equity holders as a result of the work described herein vastly exceeds the substantial contribution costs to the estate. The benefit provided to the estate cannot be seriously contested.

        d)       *Factor #5: NRG's Efforts Were Not Duplicative of Statutory Fiduciaries.*

The arguments made by those objecting to the Application primarily relate to the fifth factor. Various objecting parties argue that glendonTodd's services were duplicative of either (i) other professional persons retained in the case, such as the brokers and the Debtor's lawyers; and/or (ii) Mr. Furniss' fiduciary duties as the manager of the general partner of the Debtor. While this is just one of seven factors, both of these arguments nevertheless fail.

First, the argument that glendonTodd's services were duplicative of services provided by the brokers fails because the uncontroverted evidence demonstrates that no one was more important to the sales process than Mr. Furniss, and that HCA negotiated almost exclusively with Mr. Furniss rather than the brokers.

> 12 **A.** **So you are asking me if there was anyone more**
> 13 **important to the process --**
> 14 Q.    Yes, sir.
> 15 **A.** **-- than Mr. Furniss?**
> 16 Q.    Yes.
> 17 **A.** **No.[115]**

Mr. Stone's testimony further rebuts the argument that glendonTodd and Mr. Furniss's services overlapped with the retained brokers in this proceeding. Specifically, Mr. Stone testified that he only recalled having a "handful" of conversations with CBRE, and that he had never heard of KOA:

---

[115] Stone Dep. 76:12-17.

4  Q.      How many -- from this --- from March to the
5  end of May, 2016, how many times do you remember
6  actually talking to CBRE?
**7  A.      A handful.**
8  Q.      Handful.  Less than five?
**9  A.      Perhaps.**
10  Q.      Okay.  What about KOA, how many times do you
11  remember speaking to anyone at KOA from March 2016 to
12  May 2016?
**13  A.      I don't know who that is.**
14  Q.      Okay.  You never heard of KOA?
**15  A.      Only recently in conversations with John did**
**16  it remind me that there was another party somewhere in**
**17  the process.**
18  Q.      Is it fair to say you don't ever remember
19  talking to KOA?
**20  A.      That's accurate.[116]**

"Duplicative" is defined as, "having or characterized by having overlapping content, intentions, or effect."  Black's Law Dictionary, *Duplicative* (10th ed. 2014).  Although Mr. Furniss acknowledges Mr. Herbold and Mr. Lake made "the marketplace somewhat aware of the property for sale," the brokers' presence did not impact or affect HCA because "those conversations [between HCA and Mr. Furniss] had been ongoing for quite sometime, they were already fully engaged."[117]  Unlike Mr. Furniss and his team at glendonTodd, the brokers did not otherwise conduct negotiations, manage the sale process, negotiate the purchase agreements, or close the transaction.[118]  Yet, CBRE received a commission of $1.15 million and KOA received a commission of $575,000 from the Sale for what CH Realty's representative testified was

---

[116] Stone Dep. 31:4 to 31:20
[117] Hr'g Tr. 103:20-104:6 (Furniss testimony).
[118] Hr'g Tr. 108:13-23 (Furniss testimony).

"typical" or "ordinary" efforts.[119]  There is nothing about the services provided by glendonTodd and Mr. Furniss that are overlapping with the services provided by any other professional.[120]

Second, Mr. Furniss's work was not duplicative of any fiduciary duties he owes as a manager of the general partner of the Debtor or that the Debtor owed as a debtor-in-possession. Indeed, Mr. Furniss' services and the outcome achieved went above and beyond the conduct required by a fiduciary.

The fact that Mr. Furniss may be considered an "insider" does not foreclose his Application.  *See In re Philadelphia News., LLC*, 445 B.R. 450, 464-65 (Bankr. E.D. Pa. 2010) (finding that an equity shareholder considered an "insider" under Bankruptcy Code section 101(31)(b) had made a substantial contribution to the Debtors' estate through his role in providing options and alternatives to a DIP loan); *In re Hers Cosmetics Corp.*, 114 B.R. 240, 241 (Bankr. C.D. Cal. 1990) (discussing prior holding that individuals who were "shareholders, officers, and creditors of the debtor" had made a substantial contribution to the case and obtained reimbursement of their expenses as an administrative claim).[121]

---

[119] Ex. 45; Hr'g Tr. 23:7-15 (Rainwater testimony).

[120] To be clear, neither NRG, glendonTodd, nor Mr. Furniss are saying that any of the professionals failed to do their job or that they should not be compensated for their time, energy, or effort.  Rather, what the facts demonstrate is that without glendonTodd and Mr. Furniss, the sale for $115 million would never have occurred.

[121] NRG acknowledges the court's holding in *In re American Plumbing & Mechanical, Inc.* that four "founders" who had served as directors and officers of the debtors at various times had not made a substantial contribution.  327 B.R. 273, 288-94 (Bankr. W.D. Tex. 2005).  However, NRG's Application is distinguishable from *American Plumbing*.  In *American Plumbing*, the founders were taking credit for the same activities such that there was significant duplication, and there was less clear testimony concerning whether the reorganization would have been achieved without their efforts.  *Id.* at 290-91.  Here, as explained above, no one duplicated Mr. Furniss's efforts (nor could they), and there is clear testimony that Mr. Furniss was essential to the sale process.  Moreover, the court acknowledged that the four founders engaged in fairly "routine" negotiating activity and not the negotiating that "dramatically improv[es] treatment of all creditors."  *Id.* at 291.  Here, Mr. Furniss's services resulted in at least a $20 million benefit to the estate.  Perhaps the most distinguishable fact is that, under the confirmed plan in *American Plumbing*, all holders of preferred and common stock received nothing.  *Id.* 294.  Although the court considered the fact that the applicants were directors and officers, it did not completely foreclose an application by such fiduciaries.

Here, there is no dispute that the general partner fulfilled fiduciary obligations through its dedication of "uncorrupted business judgment for the sole benefit" of the bankruptcy estate. *Sneed v. Webre*, 465 S.W.3d 169, 178 (Tex. 2015); *see also Gearhart Indus., Inc. v. Smith Intern., Inc.*, 741 F.2d 707, 720-21 (5th Cir. 1984) (summarizing duties of directors under Texas law). There is also no dispute that the Debtor satisfied its obligations to maximize the value of its estate to pay all creditors. *In re Johnson*, 433 B.R. 626, 638 (Bankr. S.D. Tex.2010). Yet, the expenses sought by NRG here reflect the expense incurred by Mr. Furniss (on NRG's behalf) negotiating, managing and selling the Property, with the risk of not being paid anything. Mr. Furniss's efforts went beyond any fiduciary obligations and were necessary to avoid an absolutely tragic result to creditors and equity owners alike and the loss of millions of dollars.[122]

The evidence demonstrates that Mr. Furniss went above and beyond what is required by a fiduciary by seeking out prospective purchasers, leading negotiations and maintaining positive relationships with those prospective purchasers, pulling prospective purchasers back to the negotiating table when anxiety ran high, being the only person who was simultaneously the go-to expert on the real estate, operations, and management of the Property, being the "focal point" for all negotiations with HCA, and convincing prospective purchasers to increase their initial offers to a purchase price that was $20 million higher than what the Property would have sold pre-petition. Such conduct clearly exceeds the long-standing principles of high-level strategies and management that is expected of fiduciaries of corporate entities. *See Cahall v. Lofland*, 114 A. 224, 229 (Del. Ch. 1921) ("The duties of directors are administrative, and relate to supervision, direction and control, the details of the business being delegated to inferior officers, agents and employees.").

---

[122] Furniss Proffer ¶ 34; Hr'g Tr. 76:10-12 (Silverburg testimony); Ex. 27.

Moreover, Mr. Furniss is not ***the only*** manager of the general partner. He is one of five managers of the general partner.[123] It is undisputed that Mr. Furniss and his team at glendonTodd exerted substantially more time, energy, and expense than any of the other managers combined.[124] Yet, no one is asserting that the other managers breached any duties to the partnership by not exercising the same amount of time, energy, and expense. Since the other managers fulfilled any fiduciary obligations by overseeing and reviewing what was placed before them, Mr. Furniss exceeded any such obligations by going above and beyond mere administrative oversight. *See In re Mirant Corp.*, 354 B.R. 113, 134 (Bankr. N.D. Tex. 2006) ("While each of the parties (arguably excepting Phoenix) was represented by a statutory fiduciary, the contribution made by each of the parties was in addition to work done by its statutory representative."). Accordingly, NRG should be reimbursed for the actual and necessary expenses it incurred through glendonTodd's substantial contribution.

       e)       *Factor #6:  Other Than Payment of Its Claim, NRG Will Not Profit from the Situation, But May Have Faced Substantial Loss.*

NRG is not seeking to obtain a profit from its involvement of the bankruptcy. Rather, NRG has a trade claim greater than $500,000 and desired to use Mr. Furniss's talents and services to obtain the best result possible for all constituencies, including payment of its claim.[125] But for Mr. Furniss's efforts, NRG may have faced a loss if the deal obtained by Mr. Furniss's actions was not realized. Therefore, this factor weighs in favor of substantial contribution.

---

[123] Ex. 58 at 32.
[124] *See* Hr'g Tr. 43:14-44:20 (Rainwater testimony describing his knowledge of the existence of other managers of NRG Austin).
[125] Ex. 58 at 15; Ex. 126.

*Factor #7: NRG's Efforts Did Not Have a Negative Effect on the Case.*

This factor examines whether the applicant "had a negative effect on the case, such as making questionable objections to pleadings filed by the debtor or engaging in improper conduct in some other fashion, resulting in the debtor incurring costs of which delayed the resolution of the case." *In re R.L. Adkins Corp.*, 505 B.R. 770, 783 (Bankr. N.D. Tex. 2014). Mr. Rainwater acknowledges that he is not aware of any negative impact Mr. Furniss had on the bankruptcy estate.[126] No evidence has been adduced that would indicate Mr. Furniss or his team have had a negative effect on the bankruptcy estate after obtaining such an extraordinary result.

**D. NRG's Actual and Necessary Expenses for Mr. Furniss's Services Satisfy the Substantial Contribution Standard.**

The services Mr. Furniss provided to NRG satisfy all seven factors that courts examine to determine whether a creditor made a substantial contribution to the bankruptcy proceeding. The fact that these expenses were "actual, necessary" expenses was confirmed through Mr. Stone's unequivocal testimony that the deal may have never closed without Mr. Furniss:

> 9  Q.    Is it fair to say that without Mr. Furniss'
> 10  involvement, a deal may never have gotten done on
> 11  Austin?
> **12  A.    Yes.**
> . . .
> 17  Q.    And if Mr. Furniss had not been involved like
> 18  he was in the Austin sale, would you have been as
> 19  confident in closing the deal?
> 20  **A.    No.**
> . . .
> 7  Q.    Was Mr. Furniss instrumental in helping you or
> 8  helping HCA come up to the $115 million number?
> **9  A.    I believe, yes.**
> 10  Q.    In the ways we talked about before in terms of
> 11  being responsive, being knowledgeable, being a

---

[126] Hr'g Tr. 23:20-22 (Rainwater testimony: "Q: You aren't aware of anything, any impact Mr. Furniss had on the bankruptcy estate that would be negative; is that fair?" "A: Not that I'm aware of, no.").

**13   A.     Yes.**[127]

Here, NRG has incurred "actual, necessary expenses" in the form of the amount owed to Mr. Furniss for his services that culminated in an extraordinary result. Accordingly, NRG is entitled to recover its actual and necessary expenses reflected in the invoice from glendonTodd for $2,875,000.

**E.     Even if NRG's Claim Does Not Fall Within the Statutory Language, Section 503(b) Is Illustrative, Not Exclusive and NRG's Application Should be Granted Pursuant to the Court's Equitable Powers.**

Even if this Court believes that NRG's Application does not fall within the statutory language in Section 503(b)(3)(D), this Court should still grant NRG's Application and allow an administrative expense in its favor for its substantial contribution. Given the unique facts and circumstances here—including the extraordinary result obtained by NRG through Mr. Furniss— the Court should grant NRG's request for an administrative expense because Bankruptcy Code Section 503(b) is not an exhaustive list of administrative expenses that can qualify for such treatment, and the facts warrant an administrative expense claim here.

While Bankruptcy Code Section 503(b) lists nine examples of administrative expenses that may be paid from the assets of a debtor's estate (including substantial contribution), those nine examples are illustrative, not exclusive of the administrative expenses that may be allowed. *In re S&Y Enters., LLC*, 480 B.R. 452, 461 (Bankr. E.D.N.Y. 2012). As *S&Y* explained,

> Section 503(b)(3)(D) and the cases that interpret it recognize the prospect that a substantial contribution in a Chapter 11 case may come from many quarters, and that sometimes, an applicant's efforts in advancing a debtor's reorganization are of such a nature and extent that the reasonable costs of those efforts should be shifted from the applicant to the estate. Viewed another way, Section 503(b)(3)(D) opens the door to the possibility that where the estate as a whole

---

[127] Stone Dep 34:9-12, 47:17-20, 48:7-13

directly benefits from an entity's participation in a Chapter 11 case, that entity's counsel fees and expenses may be paid as an administrative expense.

*Id.*

In reaching its conclusion, the *S&Y* court relied heavily on the fact that Section 503(b) uses the word "including" in describing the nine categories of administrative expenses and that Bankruptcy Code Section 102(3) states that the words "includes" and "including" are "not limiting." *Id.* at 459. Based on its interpretation of Section 503(b), the *S&Y* court held that a losing bidder had standing to bring a substantial contribution application. *Id.*at 462.

Moreover, the Court exercises its equitable jurisdiction in awarding compensation. *In re Mirant*, 354 B.R. 113, 134 (Bankr. N.D. Tex. 2006). "Equity is invoked by Courts to prevent injustice." *Id.* The thrust of section 503(b) is to "prevent a creditor or interest holder from suffering greater loss from a debtor's bankruptcy than do its peers where that loss resulted from expenditures by the applying party that benefitted those very peers." *Mirant*, 354 B.R. at 134.

NRG's substantial contribution to the Chapter 11 Case through Mr. Furniss's services and efforts cannot be questioned or seriously contested. The contribution satisfies all seven factors outlined by the courts, and the result achieved is exceedingly rare in a chapter 11 proceeding. While other constituencies sat idly and did nothing in the Chapter 11 Case other than wait for a potential payout, Mr. Furniss went to work and was unwilling to accept anything less than what he thought was possible. To permit others to profit from the Chapter 11 Case while not rewarding Mr. Furniss for his time, energy, and effort would be the definition of injustice. *S&Y's* holding that the list of administrative expenses in Bankruptcy Code Section 503(b) was illustrative rather than exclusive exists for a case such as the one here. Had NRG

retained attorneys to do the work done by Mr. Furniss, the attorneys' fees and expenses would have undoubtedly been close to, or greater than the fees Mr. Furniss is seeking here.[128]  And, those attorneys would not have been able to work on the matter nearly as efficiently as Mr. Furniss given his extensive background knowledge and expertise.

As a result, even if this Court does not believe NRG's request fits within the statutory list of administrative expenses in Bankruptcy Code Section 503(b), the Court should still grant the Application pursuant to its equitable powers.

## CONCLUSION

For the foregoing reasons, NRG respectfully request that this Court grant its Application awarding NRG $2,875,000 or, alternatively, such other amount as the court deems appropriate, and that the Court award all such other and further relief as it deems necessary.

---

[128] Similarly, had a trustee be appointed by the Court, the trustee could have been awarded reasonable compensation in the form of a commission up to "3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest."  11 U.S.C. § 326(a).

Dated: November 9, 2016

Respectfully submitted,

*/s/ Jacob B. Kring*
**Jacob B. Kring**
Texas State Bar No. 24062831
**Joel B. Bailey**
Texas State Bar No. 24069330

**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Phone: (214) 880-9600
Fax:    (214) 481-1844
Jacob@HedrickKring.com
Joel@HedrickKring.com

**ATTORNEYS FOR NEAL RICHARDS GROUP, LLC**

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system.

*/s/ Jacob B. Kring*
Jacob B. Kring
