UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| FPMC AUSTIN REALTY PARTNERS, | § | CASE NO. 16-10020-TMD |
| L.P., | § | |
| | § | CHAPTER 11 |
| DEBTOR. | § | |

**CH REALTY'S RESPONSE TO NEAL RICHARD GROUP, LLC'S OPENING BRIEF IN
SUPPORT OF ITS APPLICATION FOR ALLOWANCE OF ADMINISTRATIVE
EXPENSES INCURRED IN MAKING A SUBSTANTIAL CONTRIBUTION TO THIS
<u>CHAPTER 11 CASE PURSUANT TO 11 U.S.C. § 503(b)</u>**

Francis B. Majorie
State Bar No. 12851420
(Pro Hac Vice)
Thomas J. Annis
State Bar No. 24077478
THE MAJORIE FIRM, LTD.
4901 LBJ Freeway, Fourth Floor
Dallas, Texas 75244
Telephone: (214) 522-7400
Facsimile: (214) 522-7911
<u>fbmajorie@themajoriefirm.com</u>
<u>tannis@themajoriefirm.com</u>

ATTORNEYS FOR CH REALTY
VI/MO AUSTIN FPMC, LP

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .................................................................................................. 1

II. STATEMENT OF FACTS ..................................................................................................... 2

    A. The Debtor, Its Limited Partners, And The NRG  Insiders .................................................. 2

    B. Debtor's Hospital/Medical Office Building Campus, The Defaulting Insider Tenant,

    And The Commencement Of This Bankruptcy ....................................................................... 3

    C. The LPA Already "Rewards" The General Partner For Extraordinary Success

    Through The GP Promoted Interest ......................................................................................... 5

    D. The Furniss/Barker Coup: NRG Tries To Protect NRG's Hospital Business

    At The Expense Of The Real Estate Partnership .................................................................... 7

    E. No Application For This Court's Permission To Pay Furniss Or glendonTodd As

    Managers Was Ever Filed ...................................................................................................... 10

    F. Furniss/glendonTodd Did Not Inform This Court Or The Limited Partners That

    They Intended To Receive Additional Compensation When Asking For Approval Of

    A Sale Of The Property .......................................................................................................... 11

    G. Furniss Successfully Sold A Brand New, State Of The Art Building For

    Appraised Value—Just What Is Expected From Every Fiduciary ......................................... 12

    H. Furniss/glendonTodd's "Fee" Was Literally Tailor-Made For Seeking

    Substantial Contribution ....................................................................................................... 14

III. ARGUMENTS AND AUTHORITIES ................................................................................. 16

    A. Legal Standards ................................................................................................................. 16

    B. NRG LLC's "Examples of Substantial Contribution" Are Inapposite .............................. 16

    C. The "Substantial Contribution" Factors Are Not Met In This Case ................................... 17

        a. Factors #1 And #2 Weight Against An Award ............................................................ 17

        b. Factor #3 Weights Against An Award .......................................................................... 20

        c. Factor #4 Weights Against An Award ........................................................................... 20

        d. Factor #5 Weighs Strongly Against An Award ............................................................. 21

        e. Factor #6 Weighs Against An Award ............................................................................ 23

        f. Factor #7 Is Neutral Or Weighs Against An Award ...................................................... 23

    D. NRG LLC's Claimed Expenses Were Neither Actual Nor Necessary ............................... 24

    E. The Equities Weigh Against Awarding A Fee ..................................................................... 27

IV. CONCLUSION ..................................................................................................................... 29

CH Realty VI/MO Austin FPMC, LP ("CH Realty") respectfully files this response to Neal Richards Group, LLC's Opening Brief In Support Of Its Application For Allowance Of Administrative Expenses Incurred In Making A Substantial Contribution To This Chapter 11 Case Pursuant To 11 U.S.C. §503(b) (Dkt. No. 264) (the "Opening Brief") filed by Neal Richards Group, LLC ("NRG LLC"), as follows:

## I.

## PRELIMINARY STATEMENT

The Application[1] seeks a $2.875 million bonus payment for services rendered by Todd Furniss, the manager of the general partner of debtor FPMC Austin Realty Partners, L.P. ("Debtor" or the "Partnership"). The evidence at the hearing adduced several material facts which are essentially undisputed and are dispositive of the Application:

- No application to employ Furniss or his company as a professional was filed under 11 U.S.C. § 327. That failure was tactical: Furniss was installed by insider Wade Barker pre-petition to protect his control over the Debtor and shield him from massive personal liability under a guaranty of the Debtor's real estate debt. Furniss' pre-petition appointment was strenuously objected to by CH Realty and the other non-insider limited partners, and the mere act of filing a 327 motion would have derailed the insiders' efforts to maintain control.

- The $2.875 million of "fees" that are the subject of the Application were set after-the-fact by the insiders, based on their perception of how the services benefitted *them*, pursuant to a series of corporate resolutions authorizing Furniss/glendonTodd to file a substantial contribution application. The "fees" are therefore neither "actual" nor "necessary" within the meaning of 11 U.S.C. § 503(b)(3)(D).

- Furniss and his company, glendonTodd Capital, LLC ("glendonTodd"), were already being paid to perform as the manager of the Debtor under an agreement that passed through management fees paid by the Debtor to the general partner under the limited partnership agreement (the "LPA"). The general partner and its affiliates have already been paid $4 million in pre-

---

[1] Application of Neal Richards Group, LLC for Allowance of Administrative Expenses Incurred in Making a Substantial Contribution to this Chapter 11 Case Pursuant to 11 U.S.C. § 503(b) [Dkt. No. 145].

petition fees and have been or will be paid $325,000 in additional management fees for these "services."

- The LPA does not authorize the payment of any bonus to the general partner, other than through its promoted interest. The general partner will receive $4 million for that promoted interest as a result of the sale.

- Based on the distribution waterfall under the LPA, the limited partners and the general partner would split the $2.875 million which is the subject of the substantial contribution motion on a 60/40 basis. Approving the Application would therefore provide a $1.725 million windfall to the insiders of the Debtor at the direct expense of the limited partners.

- No advance notice that any bonus would be sought was provided to the Debtor's counsel, the Court, or the limited partners at any time during the process undertaken to sell the property. Furniss had a fiduciary duty to disclose that material fact so that fully-informed decisions could be made in each step of the process. Paying the bonus requested in the Application therefore rewards Furniss for breaching his fiduciary duty.

In sum, the Application should be denied because it does not meet the requirements of section 503(b)(3)(D) of the Bankruptcy Code. The Application should also be denied for failing to establish reasonableness, for violating Bankruptcy Code sections 503(c)(3) and/or 327, and because the requested fees are prohibited by the Texas Real Estate Licensing Act. Finally, the Application should be denied because the equities favor a denial of the requested payment, not an award.

## II.

## STATEMENT OF FACTS

### A.    The Debtor, Its Limited Partners, And The NRG  Insiders

The Debtor is a limited partnership formed on April 3, 2012, with eighty limited partners (the 'Limited Partners") who invested a total of $30 million.[2] CH Realty is one of those Limited

---

[2] Ex. 1 (Limited Partnership Agreement) at 1; Ex. 53 (list of limited partners).

Partners, having invested $13.5 million for a 45% interest in the Partnership.[3] The general

partner of the Debtor is Neal Richards Group Austin Development, LLC ("NRG GP"), which

invested a mere $100 for an equity interest in the Partnership.[4] The applicant, Neal Richards

Group, LLC ("NRG LLC"), is the managing member of NRG GP, is an affiliate of NRG GP as

that term is defined in the limited partnership agreement ("LPA") governing the Debtor, and is

also an insider under the Bankruptcy Code.[5]

## B.     Debtor's Hospital/Medical Office Building Campus, The Defaulting Insider Tenant, And The Commencement Of This Bankruptcy

The Debtor, NRG GP, and their affiliates are members of a group of entities formed and

managed by NRG LLC and its principals to engage in developing and then operating several

hospital/medical office campuses across Texas doing business under the name "Forest Park

Medical Center" or "FPMC."[6] At the time of the commencement of this bankruptcy case, the

Partnership's primary asset was a brand new, state-of-the-art medical campus located on 8.5

acres in Round Rock, Texas (the "Property").[7] The Property consists of a short-term acute care

hospital ("Hospital") and a medical office building ("MOB"), together with a 445 stall adjacent

---

[3] CH Realty's Proffer Of Testimony Of Carlos Rainwater In Opposition To Application For Allowance Of Administrative Expenses Incurred In Making A Substantial Contribution To This Chapter 11 Case Pursuant to 11 U.S.C. § 503(b) [Dkt. No. 224] [hereinafter, "Rainwater Proffer"] 2:8-10.

[4] Ex. 1 (LPA) at 1 & 12 (§ 3.1(b)).

[5] Hearing Transcript from the Application for Allowance of Administrative Expenses Incurred in Making a Substantial Contribution for Interested Party Neal Richards Group, LLC, Sept. 22, 2016 [hereinafter "Transcript"] 122:11-20; Ex. 19 (Decl. of Harry Lake) at 18, ¶ 11; and Ex. 1 at 6 (defining "Affiliate" as a person or entity that "directly or indirectly, though one or more intermediaries controls, is controlled by, or is under common control with" the other). Under the LPA, "control" means "the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract, or otherwise. . . ." Ex. 1 at 1.

[6] Declaration and Proffer of Testimony of Todd Furniss in Support of Application for Allowance of Administrative Expenses Incurred in Making a Substantial Contribution to this Chapter 11 Case Pursuant to 11 U.S.C. § 503(b) ¶ 5 [Dkt. No. 222] [hereinafter, "Furniss Proffer"] at 5.

[7] Ex. 67 (Debtor's Motion For Order Approving Sale) at 2; Ex. 113 (brochure about the Property).

parking garage.[8] The Property was vacant and had received certificates of occupancy for both the Hospital and MOB, with only "minor additional completion and punch list items remaining."[9]

The Partnership spent approximately $87 million to develop the Property, about $57.5 million of which came from a loan from Frost Bank and $30 million of which came from the Limited Partners.[10] The $57.5 million loan was personally guaranteed by Wade Barker and Richard Touissant, the two founders of the NRG business and principals of applicant NRG LLC.[11] Barker was and is "one of the largest investors in glendonTodd"[12] (i.e., the "Furniss" entity which the Application seeks to pay).[13] At the time the Debtor filed its chapter 11 petition, the Property was subject to three leases: two leases for spaces in the MOB; and one lease for the entire Hospital.[14] The tenant in the Hospital lease (the "NRG Tenant") was an affiliate of NRG GP, NRG LLC, and the Debtor.[15]

The NRG Tenant did not take occupancy of the Hospital, never paid rent, and was in default under its lease.[16] The NRG Tenant's failure to pay rent required the Partnership to use construction loan proceeds to cover operating expenses,[17] caused construction liens to be filed on the Property,[18] and prevented the Partnership from making debt service payments to Frost Bank for several months.[19] On January 4, 2016, the Partnership filed a voluntary petition under chapter 11 to stave off an impending foreclosure of the Property.[20]

---

[8] Ex. 67 at 2.
[9] *Id.* at 3.
[10] Transcript 65:18-24; Ex. 58 (Debtor's schedules) at 9 (listing Frost Bank debt at $57,577,111.00).
[11] Ex. 58 at 20 (listing Barker and Touissant as co-debtors on the Frost bank debt).
[12] Transcript 100:23 to 101:2.
[13] *Id.* 110:9-12 (the "substantial contribution claimed that's being asked for by NRG would go to glendonTodd").
[14] Ex. 63 at 3.
[15] Transcript 60:18-24.
[16] *Id.* 59:11-15.
[17] *Id.* 62:5-11.
[18] *Id.* 98:3-11.
[19] *Id.* 27:4-7.
[20] Ex. 57 (Voluntary Petition); Ex. 132 (docket) at 1.

## C. The LPA Already "Rewards" The General Partner For Extraordinary Success Through The GP Promoted Interest

The LPA governing the Debtor, NRG GP, and the Limited Partners was drafted by the NRG affiliates as part of their efforts to raise capital for developing the Property.[21] The LPA is over thirty pages long and contains detailed provisions governing, among other things, management, management fees, Limited Partner approval for a sale of the Property, and distribution of the proceeds of such a sale.[22]

Section 7.1(a) of the LPA, for example, imbued NRG GP with the "exclusive right and power" to "manage the Partnership's affairs and control all the decisions relating to the business and operations of the Partnership."[23] Section 7.1(c) of the LPA imposed a limitation on that broad delegation of authority by requiring NRG GP and the Partnership itself to obtain the consent of two-thirds of the Limited Partners' units to sell the Property.[24]

Section 7.13 of the LPA provided that the "General Partner shall be (*or one or more of its equity owners or their Affiliates*) shall be entitled to receive the following compensation": (a) a $900,00 development fee; (b) up to $25,000 to reimburse the costs of offering limited partner units; (c) a loan acquisition fee of up to one percent of the of the maximum principal balance of borrowed money; (d) a development fee of five percent of the total hard and soft costs for development of the Property; and (e) "an annual asset management fee of 2% of the aggregate Capital Contributions of the Limited Partners under management each year beginning on the commencement date of the initial lease of hospital building to be developed on the Property."[25] The Partnership made pre-petition payment of such fees to NRG GP and its affiliates of about $4

---

[21] Rainwater Proffer 9:3-5.
[22] Ex. 1 (LPA) *passim*.
[23] *Id.* at 19.
[24] *Id.* (requiring "Approval of the Limited Partners") & 6 (defining "Approval" to mean the "consent of the Limited Partners who own at least two-thirds (2/3) of the Units").
[25] *Id.* at 19-20 (italics added).

million.[26] NRG LLC has sought an additional $325,504 of such fees as an "unsecured creditor," of which $175,504 has already been paid and $150,000 of which has been held back pending a ruling on the Application.[27]

Finally, the LPA set forth detailed provisions concerning the distribution of net proceeds from a sale of the Property. Section 2.1 of the LPA empowered the Partnership to acquire, develop, hold, and then sell the Property[28] pursuant to an investment strategy for creating an income-producing asset that could eventually be sold at a multiple of net income in the marketplace.[29] Until that occurred, the LPA provided that each Limited Partner would receive a "Preferred Return" equal to a cumulative 9% annually-compounding return on their unreturned capital contributions.[30] Section 6.1 provided that available cash on hand on the last day of each calendar quarter must be distributed under the following "waterfall":

(a)     First, to the Limited Partners *pro rata* for their unpaid Preferred Returns;

(b)     Second, to the Limited Partners *pro rata* for their unpaid capital contributions;

(c)     Third, to NRG GP for its unpaid capital contribution; and

(d)     Finally, 40% to NRG GP (the "GP Promote") and 60% to the Limited Partners *pro rata*.[31]

The foregoing waterfall structure is standard in the real estate industry and is designed to allow NRG GP to maintain overhead and receive the bulk of its compensation through its promoted interest.[32] As CH Realty's representative Carlos Rainwater, explained:

---

[26] Transcript 118:10-15.
[27] The Debtor's schedules listed NRG LLC an unsecured creditor possessing a claim for $167,542.78. Ex. 57 at 5. Inexplicably (since it prepared both filings), NRG LLC filed a proof of claim for $518,552, including $175,504.68 for its project management fees and $150,000 for its asset management fees under the LPA. Ex. 126. The remaining amounts of its claim were for reimbursement of out of pocket expenses, including legal fees to a law firm tasked to litigate against Limited Partners who may have wanted to remove NRG GP as the manager of the Debtor. Transcript 120:15 to 122:10; *see also* Exs. 88 to 92 (San Antonio litigation filings).
[28] Ex. 1 (LPA) at 11.
[29] Transcript 59:23 to 60:17.
[30] Ex. 1 at 9 (definition of "Preferred Return").
[31] *Id.* at 17.

The idea is that the GP will reap the benefits of a successful investment if and when the investment works out the way it is represented to be when the GP asks investors to buy limited partnership interests. The better the investment performs over those milestones, the more money the GP makes for serving as general partner. Extraordinary success (however that may be defined) is [therefore] built into the model for GP compensation. [33]

In fact, the GP Promote for the Partnership in this case was at the high end of the market for real estate investments, which typically involve an 80/20 split and not the 60/40 split provided in the LPA. [34]

It is undisputed that, as a result of the sale of the Property, distribution of the Partnership's remaining cash will fall under the last tranche of the LPA waterfall (the 60/40 split). If the Application is granted, the Limited Partners will receive $1,725,000 and NRG GP will receive $1,150,000 of the $2.875 million being sought by Furniss. [35] CH Realty's 45 percent of the $1,725,000 is $776,250. [36] Thus, the issue raised by the Application is whether the Limited Partners should be forced to pay $1.15 million towards fees for services they have already agreed to pay through the GP Promote. [37]

**D.    The Furniss/Barker Coup: NRG Tries To Protect NRG's Hospital Business At The Expense Of The Real Estate Partnership**

CH Realty and its parallel vehicle, known as "Fund VI," holds $1.067 billion of investor commitments which, as of September 30, 2015, were deployed to invest in sixty transactions totaling more than $3 billion, spread across six product types in 24 different markets. [38] CH Realty invested in the Partnership based on projections from NRG showing a 2.8 to 3 times

---

[32] Rainwater Proffer 5:1-6.

[33] *Id.* 5:6-10.

[34] *Id.* 5:10-12.

[35] *Id.* 5: 13-22.

[36] *Id.*

[37] Transcript 142:13-18 ("Q [to Furniss]: So, you're here to ask, at the request of the NRG Group, who's getting the $4 million, to have the Court essentially surcharge the limited partners 60 percent of the money that . . . the GP would otherwise pay you for the work you performed; is that right? A: Yes.").

[38] Rainwater Proffer 3:2-24 to 4:1-2.

return under a five year develop-lease-hold-sell strategy for the asset. [39] At the time CH Realty invested in the Partnership, the entity was managed by Derrick Evers. [40]

Management by Evers was important to CH Realty because Evers and his team were "real estate people who knew how to build real estate and ultimately would be able to sell real estate. . . ." [41] The Partnership's management structure would also protect CH Realty and the other Limited Partners from a conflict of interest which might arise between the Partnership and its NRG-affiliated hospital tenant. To that end, when it made its investment, CH Realty executed a Supplemental Rights Agreement (the "SRA") with NRG GP that, among other things, required NRG GP to obtain CH Realty's consent for: (a) any action that resulted in Derrick Evers being removed as manager of NRG GP; (2) any disposition of Partnership assets; and (3) any transaction between the Partnership and NRG GP's affiliates. [42]

On May 14, 2015, a majority of NRG's owners, including Dr. Barker, acted by written consent to place Evers and other members of his team on "administrative leave" and appointed Furniss to serve as CEO "effective on the same date." [43] The corporate resolution of NRG LLC relating to that action shows that Furniss himself participated in the change as both a member of NRG LLC and as an investor in Jeff Plover Interests, Ltd. (a member of that NRG LLC). [44] Within a few days, Evers and the others tendered their resignations. [45]

CH Realty was not asked to consent to Evers' removal despite the requirements of the SRA. [46] On June 8, 2015, CH Realty sent a letter notifying NRG GP that it had violated the SRA but also stating that, to avoid disruption of the Partnership's business, CH Realty would

---

[39] *Id.* 4:11-14.
[40] Transcript 60:25 to 61:4.
[41] Transcript 61:5-12.
[42] Ex. 77 (SRA) at 2-4.
[43] Ex. 80 (Furniss letter) at 2.
[44] Ex. 78 (Joint Written Consent) at 2 & 3.
[45] Ex. 80 at 2.
[46] Transcript 68:16-18.

cooperate with NRG GP while reserving all rights.[47] The most salient issue from CH Realty's perspective was that steps were not being taken to remove NRG Tenant as the tenant in favor of a new tenant that would pay rent.[48] Rainwater was concerned that Furniss lacked real estate experience and that NRG's desire to operate the Hospital would keep it from actively seek a viable purchaser that would replace NRG Tenant.[49] These concerns—and others—were also held by "a number of limited partners."[50]

The Limited Partners' concerns proved prescient. On September 4, 2015, Furniss submitted for limited partner consideration a non-binding letter of intent from MedEquities Realty Trust, Inc. "("MedEquities") under which MedEquities would pay $95 million for the Property.[51] This was, at best, a way for the Limited Partners to at least get their money back from Partnership being run by a new—and conflicted—manager.[52] As Rainwater noted at the time:

> As I have stated to you repeatedly, we see the real problem with these investments to be the presence of FPMC and its management company, Vibrant, which have serious black eyes in the communities. We have long believed that an independent management approach to the real estate would have terminated those leases and found more viable tenants. Austin is the perfect example. People want to lease and/or buy these facilities and be a part of the local physician group. What they don't want is to be involved with anything Forest Park or Vibrant related. Hopefully, the Austin LOI can be turned into a definitive P&S Agreement and cash closing. But pursuit of that possible transaction was only made possible when the bank forced NRG's hand to clear the way for a new operator.[53]

---

[47] Ex. 82 (notice letter).
[48] Transcript 60:20-21 & 61:16-22.
[49] Transcript 27:2-8. Indeed, that is what happened to CH Realty's investment in the San Antonio property "managed" by Furniss. *Id.* 29:5-20.
[50] Furniss Proffer at 6.
[51] Ex. 3 (MedEquities LOI).
[52] Transcript 62:12-16.
[53] Ex. 5 (Rainwater memo) at 1.

The MedEquities LOI never reached the purchase and sale agreement stage. The reason (according to MedEquities)? "[S]eems to be a Landlord (as the Borrower)/tenant problem at this juncture."[54]

## E. No Application For This Court's Permission To Pay Furniss Or glendonTodd As Managers Was Ever Filed

The Debtor's bankruptcy petition estimated the value of the Debtor's assets to be more than $100 million and stated that the Debtor expected "[f]unds [to] be available for distribution to unsecured creditors."[55] The Debtor's schedules represented to the Court that the Debtor held accounts receivable of more than $1.92 million and that the value of the Property was $104 million.[56] Mary Hatcher signed the Petition and Schedules as a manager of NRG GP.[57] Hatcher is also the Chief Financial Officer and Chief Compliance Officer for glendonTodd.[58] The Debtor's schedules also listed Furniss as a manager of the Debtor.[59]

On January 25, 2016, the Debtor filed an application for approval to retain the Law Offices of Ray Battaglia ("Battaglia") as counsel under sections 327(a) and 329 of the Bankruptcy Code and Bankruptcy Rules 2014 and 2016.[60] On March 17, 2016, the Debtor filed applications to employ CBRE, Inc. ("CBRE") and KOA Partners, LLC ("KOA") as co-real estate brokers to assist the Debtor in selling the Property.[61] The application touted KOA's "unparalleled familiarity with the Property."[62] In April 2016, the Debtor filed an application to employ special real estate counsel to assist the Debtor in selling the Property.[63] At no time did

---

[54] Ex. 7 (email chain) at 4.
[55] Ex. 57 (Voluntary Petition) at 3-4.
[56] Ex. 58 (Schedules) at 2 & 6.
[57] Ex. 57 at 6; Ex. 58 at 33.
[58] Transcript 83:20-21.
[59] Ex. 58 at 32.
[60] Ex. 59 (Battaglia Application).
[61] Ex. 19 (broker application) & Ex. 26 (order approving broker retention).
[62] Ex. 19 at 3.
[63] Ex. 61 (special real estate application) & Ex. 64 (order approving retention of special real estate counsel).

the Debtor ever file a similar application to approve payment of Hatcher, Furniss, or glendonTodd for serving as managers for the Debtor.[64]

## F. Furniss/glendonTodd Did Not Inform This Court Or The Limited Partners That They Intended To Receive Additional Compensation When Asking For Approval Of A Sale Of The Property

On April 11, 2016, the Debtor filed a motion to approve procedures for selling the Property.[65] That motion was heard and, seventeen days later, approved by the Court.[66] On May 10, 2016, the Debtor filed a motion for an order approving a sale of the Property and, after hearing the motion, the Court entered an order approving the sale on May 17, 2016.[67] At no time during the presentations of those motions did Furniss or glendonTodd inform the Court—or any parties-in-interest who were noticed with the motions—that they would be seeking compensation in connection with the sale of the Property.

The Limited Partners were also never asked to give their consent to payment of compensation by the Partnership for the efforts of Furniss/glendonTodd to sell the Property. There were numerous investor calls held from January 2016 until the sale.[68] Furniss organized and led those calls.[69] During those calls, Furniss represented himself as a manager of NRG GP[70] and never discussed his plan to seek additional compensation.[71]

CH Realty always assumed that Furniss was acting as and for NRG GP.[72] Dr. Silverberg testified that he also believed that Furniss was involved with NRG GP and expected him to

---

[64] Transcript 113:4 to 114:8.
[65] Ex. 63 (sale procedures motion).
[66] Ex. 66 (order granting sale procedures motion).
[67] Ex. 39 (order granting sale motion).
[68] Transcript 56:9-12.
[69] *Id.* 56:3-15.
[70] *Id.* 31:7-9.
[71] *Id.* 57:9-13.
[72] *Id.* 51:7-9.

provide the services that form the basis of the Application in that capacity.[73] Dr. Vaughn testified

that he had the same understanding[74] and was opposed to the Application because NRG/Furniss

were already being paid for their services through fees under the LPA and the GP Promote.[75]

Finally, the Court and the Limited Partners were not the only ones kept in the dark about

any potential bonus being sought by Furniss or glendonTodd. The first conversation that

Battaglia had with anyone about the application was with Art Stewart, an in-house lawyer of

glendonTodd, after the sale.[76]

## G.  Furniss Successfully Sold A Brand New, State Of The Art Building For Appraised Value—Just What Is Expected From Every Fiduciary

The gravamen of the Application is that Furniss/glendonTodd worked very hard to

address competing bidders in a process which ultimately yielded a $115 million sales price. CH

Realty does not contend that Furniss did not work hard. CH Realty contends that Furniss simply

undertook the work which is required of every fiduciary of a debtor in possession and that

Furniss should look solely to NRG LLC or its affiliates—and not the Debtor's estate—for any

compensation for the services he provided to the Partnership as the manager of the Debtor. The

following facts deserve emphasis:

• Offers are not valuations.[77] It is therefore grossly misleading for NRG LLC to "chart"

offers as if the progression of numbers shows anything other than bidding activity.

• An independent third party appraisal obtained by HCA Holdings, Inc. ("HCA") to

support its affiliate St. David's Healthcare Partnership, LP's ("St. David's") purchase of the

---

[73] *Id.* 73:7-15.
[74] *Id.* 78:14-17.
[75] *Id.* 80:4-6.
[76] Transcript 167:23-25 & 168:1-22; Ex. 71 at 49.
[77] Transcript 144:9-11.

Property supports the $115 million sale price.[78] This means that NRG GP succeeded in selling the asset for fair market value (something it was duty bound to try to do).

• There is nothing in the progression of offers that shows Furniss doing anything extraordinary to obtain higher bids. An email from Furniss to Rainwater on April 1, 2016 lays out the timeline in detail.[79] On March 17, 2016, there were three outstanding bidders for the Property: HCA/St David's; Mayco Development, LLC ("Mayco"); and Winstead/Ascension. CBRE broker Scott Herbold asked all three bidders to submit their best and final offers and told Winstead that it needed to increase its bid to $100 million or more to be competitive. On March 24, HCA, Mayco, and Winstead submitted offers. Then, on March 29, in what Furniss described as "an unsolicited adjustment to their offer," HCA increased its offer to $100 million and submitted a draft purchase and sale agreement. On March 31, Winstead increased its offer to $105 million. HCA and the other bidders were then informed that their offers were unlikely to be accepted by the Limited Partners in the face of a meaningfully higher bid and that a Court-supervised auction process would commence.

• Furniss asserts that he was instrumental in obtaining an increase in HCA's bid, but the evidence shows otherwise. In a conference call held by Battaglia, Rainwater, Herbold, and Furniss, the participants discussed whether to go forward with HCA's $100 million offer or open an auction bidding process in light of what they believed to be a "real" $105 million offer from Winstead/Ascension.[80] Rainwater—not Furniss—opined that the Limited Partners would probably not approve a $100 million transaction in the face of the $105 million offer and that the Debtor should therefore continue to seek more money for the Property.[81] Furniss was tasked with

---

[78] Ex. 38 at 2.
[79] Ex. 108.
[80] Transcript 35:7-14, 40:17-18, 41:5-6 & pages 16-18.
[81] *Id.* 35:15-24.

going back to HCA, and HCA initially consented to an auction.[82] Furniss then told HCA that it needed to make a $115 million offer in order to avoid the auction, and HCA increased its offer to the $115 million number.[83] Thus, despite all of the hyperbole in the Application and Opening Brief, Furniss essentially asks to be awarded $2.875 million because he "leaked" what would be the winning number to HCA.

## H. Furniss/glendonTodd's "Fee" Was Literally Tailor-Made For Seeking Substantial Contribution

The Application attaches an invoice for $2.875 million from glendonTodd for "Services Rendered Per Agreement."[84] The "agreement" is actually comprised of two written "consents" by NRG LLC's owners purporting to affirm earlier "written and verbal agreements."[85] But Furniss and glendonTodd did not produce a copy of any earlier agreements in discovery or at the hearing.[86] Nor did they produce copies of the operating and other organizational governance documents showing the connections and duties for the various NRG entities at issue here.[87] The Applicant's failure to produce these critical documents should be enough to deny the Application outright. But, even without those documents, the contents of the "consents" and the circumstances in which they were created should tell the Court all it needs to know to deny the Application in all respects.

The consents were prepared by in-house counsel for glendonTodd after the sale of the Property in this case and the sale of two other FPMC properties (one in Fort Worth and one in Dallas).[88] The consents "authorize" Furniss to file substantial contribution claims for $5 million in "expenses" and assign certain arbitrary percentages of the sale prices of the three assets to

---

[82] Ex. 110 at 5.
[83] Transcript 152:20-23; Ex. 67.
[84] Ex. 46 (invoice).
[85] *See* Exs. 44 & 122 (June consents).
[86] Transcript 7:3 to 9:15.
[87] *Id.*
[88] Exs. 44 & 122.

achieve that total.[89] The percentage assigned to the Austin Property was 2.5% of the sales price (which is how the $2.875 million was derived.[90] The consents state that, if the substantial contribution claims recover less than the $5 million, NRG LLC "will direct the General Partner in each limited partnership to make payments paid by the General Partner from proceeds contemporaneous with the distribution of funds from the corresponding partnership, which amounts are equal to those that were requested of the court."[91]

The evidence also showed that

In other words, the "expenses" being sought in the Application were not "actual, necessary expenses incurred" to retain glendonTodd or Furniss to perform services in the future. These "expenses" were created out of whole cloth after the fact to appear to justify a substantial contribution application. This is nothing more than an effort by the NRG group to charge the Limited Partners additional fees after receiving over $4 million in fees and another $4 million of

---

[89] Ex. 44.
[90] *Id.*
[91] Ex. 122 (June consent).
[92]
[93]
[94]
[95]

promoted interest payments from the transaction. The "expenses" do not meet the standard for substantial contribution and the Application must be denied in all respects.

III.

**ARGUMENTS AND AUTHORITIES**

**A.     Legal Standards**

The Application seeks a $2.875 million administrative "expense" payment under section 503(b)(3)(D) of the Bankruptcy Code, which allows for the payment of "the actual, necessary expenses . . . incurred by . . . a creditor . . . in making a substantial contribution in a case under chapter 9 or 11 of this title."[96] In deciding whether to grant a substantial contribution award, Courts examine the facts of a case to "look for a synergy of factors" that "conspire to push the analysis one way or the other."[97] Seven factors in particular are often used in the inquiry.[98] Even if these factors are met, however, section 503(c)(3) bars any substantial contribution awards to insiders of the Debtor, including its officers and managers.[99]

**B.     NRG LLC's "Examples of Substantial Contribution" Are Inapposite**

A variety of actions that may support an award of substantial contribution are recited in section B at pages 19-20 of the Opening Brief, but none are present here. The only action recited that arguably fits the facts of this case—locating a viable purchaser of the debtor's assets—cannot support an award in this case because it is duplicative of the efforts of the Debtor's fiduciaries and retained professionals. The Fifth Circuit has admonished that section 503(b)

---

[96] 11 U.S.C. § 503(b)(3)(D).
[97] *In re Am. Plumbing & Mech., Inc.*, 327 B.R. 273, 281 (Bankr. W.D. Tex. 2005).
[98] *See In re Energy Partners, Ltd.*, 422 B.R. 68, 80 (Bankr. S.D. Tex. 2009); *In re Mirant Corp.*, 354 B.R. 113, 132-33 (Bankr. N.D. Tex. 2006) (reciting factors).
[99] 11 U.S.C. § 503(c) ("*Notwithstanding subsection (b)*, there shall neither be allowed, nor paid . . . transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.").

requires the Court "to scrutinize claimed expenses for waste and *duplication*. . . ."[100] For

example, in *DWGK Restaurants*, the applicants claimed they had made a substantial contribution

by finding and selling the debtor's property. In rejecting those arguments, the court ruled:

> The fifth area in which the [applicants'] claim that they benefited the estate is
> their involvement in the sale of the 3rd & K property. The sale of assets, however,
> clearly falls within the duties of the debtor-in-possession and any professional
> hired by the debtor-in-possession. To the extent any benefit resulted from the
> [applicants'] involvement . . . it is duplicative and therefore non-compensable.
>
> The sixth area in which the [applicants'] claim a benefit was rendered involves
> their role in the sale of the Sheryl Lane property. The [applicants'] point to their
> finding a potential buyer and this potential buyer's contacting the ultimate buyer
> as being a substantial benefit. However, as with the 3rd & K property, the duty to
> sell the property falls on the debtor-in-possession and professional persons it
> chooses to hire. Absent a showing that the debtor-in-possession was unwilling or
> unable to perform its duties, the [applicants] must be considered volunteers.[101]

As the Court knows, the debtor in possession and professionals in this case were willing

and able to perform their duties in selling the Property. NRG LLC has not pointed to anything

that Furniss did that was not duplicative of his role as a manager of the Debtor or the numerous

professionals the Debtor retained in this case. The record also shows that there was nothing

extraordinary about "locating" HCA as a viable bidder, given its involvement in other Forest

Park properties and its position as the largest health care provider in the United States.

**C.     The "Substantial Contribution" Factors Are Not Met In This Case**

The Opening Brief recites seven factors to support its assertion that NRG LLC made a

substantial contribution due to "the extent of [Furniss'] efforts and the results obtained."[102] Each

of the factors is either neutral or weighs against the Application:

**a. Factors #1 And #2 Weight Against An Award.** NRG LLC argues that the first

factor, that Furniss' services provided a benefit to the bankruptcy estate, weighs in its favor in

---

[100] *In re DP Partners, Ltd.,* 106 F.3d 667, 673 (5th Cir. 1997) (italics added).

[101] *In re DWGK Restaurants, Inc.*, 84 B.R. 684, 690 (Bankr. S.D. Cal. 1988).

[102] Opening Brief at 20.

that "the purchase price for the Property increased from $95 million pre-petition to $115 million," which "avoided a foreclosure" and resulted in all creditors being paid in full and a return to equity.[103] But Furniss, as a manager of the debtor in possession, had a preexisting fiduciary duty to do anything necessary to obtain the highest and best price for the Property.[104] Expected or routine activities in a Chapter 11 case do not constitute substantial contribution,[105] even if dressed up as "extensive" or "active" participation.[106] Nor does the fact that the applicant's efforts were admirable, excellent, or done with professionalism make them specially compensable under section 503(b)(3)(D).[107] Thus, the Application must be denied because any "benefit to the Estate" was the result of Furniss' pre-existing duty to work hard and well to maximize value.

In addition, although a higher purchase price for the Property was a "benefit" in the narrowest sense, the price was largely a function of the Property's intrinsic value and not due to any "extraordinary" efforts by Mr. Furniss. In a marketing brochure prepared by CBRE, the Property is described as a "new, best-in-class surgical hospital with on-campus MOB and parking garage at one of the most desirable locations in Texas."[108] The budget to build the Property was roughly $95 million;[109] even vacant, the Property was worth more than it cost to build it.[110] In fact, the Debtor estimated the value of the Property to be $104 million in its

---

[103] Opening Brief at 21.

[104] *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("the willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.") (internal quotation marks omitted).

[105] *See, e.g.*, *In re The Columbia Gas Sys., Inc.*, 224 B.R. 540, 548 (Bankr. D. Del. 1998).

[106] *See In re Granite Partners, LP*, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997) (citing cases).

[107] *See Columbia Gas*, 224 B.R. at 555 ("admirable"); *Granite Partners*, 213 B.R. at 450 ("excellent"); *In re Baldwin-United Corp.*, 79 B.R. 321, 341 (Bankr. S.D. Ohio 1987) ("professionalism").

[108] Ex. 113 at 8.

[109] Transcript at 65:18-20.

[110] *Id.* 65:21-24.

schedules[111] and stated in its petition that "[f]unds will be available for distribution to unsecured creditors."[112] The Property was merely sold for fair market value after a competent marketing and sales effort by the Debtor's management and retained professionals, as reflected by the fact that HCA/St. David's received an independent third-party appraisal that supported the eventual purchase price of $115 million.[113] Substantial contribution "require[s] something more than satisfactory performance of fiduciary duties."[114] Double payment for services rendered by "Todd the Consultant" that were perfectly duplicative of the services the Debtor was already receiving from "Todd the DIP Manager" is of zero benefit to the bankruptcy estate.

The second factor concerns whether the services benefitted all parties and not just NRG LLC. NRG LLC argues that if it were only attempting to obtain a purchase price sufficient to pay its half-a-million dollar proof of claim, "there would have been no attempts to obtain a higher purchase price."[115] But Furniss had a fiduciary duty as a manager of the debtor in possession to obtain the maximum price for the Property and Furniss testified that he did not believe that he could have met his fiduciary obligations to the Debtor by simply allowing the brokers to find a buyer.[116] Thus, the fact that there were efforts to obtain a higher price should not weigh in NRG LLC's favor.

Moreover, the evidence shows that

The "who benefits" factor therefore does not weigh in favor of substantial contribution.

---

[111] Ex. 58 at 6.
[112] Ex. 57 at 3.
[113] Ex. 38 at 2.
[114] *In re Flight Transp. Corp. Secs. Litig.*, 874 F.2d 576, 580-81 (8th Cir. 1989).
[115] Opening Brief at 23.
[116] Transcript 103:11-19.
[117]

**b. Factor #3 Weights Against An Award**. NRG LLC argues that the third factor weighs in its favor because it "was determined to [obtain the highest and best deal] without the guarantee of payment or reimbursement" of its "expenses."[118] But the evidence shows that the $2.875 million "expense" was: (1) incurred *after* the sale to HCA closed;[119] and (b) after it closed at a $115 million purchase price that would guarantee that NRG GP (and therefore NRG LLC) over $4 million in distributions from the sale.[120] Even if the Application is denied, NRG GP will pay glendonTodd the $2.875 million from that $4 million.[121] The "no guaranty" factor therefore cuts against awarding a substantial contribution claim.

**c. Factor #4 Weights Against An Award.** NRG LLC argues that it is entitled to a substantial contribution award because "the amount sought by NRG is a paltry percentage of the benefit conferred on the Debtor's estate by Mr. Furniss. . . ."[122] First, and as set forth elsewhere in this brief, CH Realty disputes that a letter of intent is a meaningful valuation method to measure the "increase" in value and disputes that any such increase is wholly attributable to Furniss' efforts versus the intrinsic value of the Property, the efforts of the Debtor's retained professionals, and the efforts of Furniss and Mary Hatcher themselves in their capacity as managers of the Debtor and debtor in possession. Second, glendonTodd's $2.875 million "fee" is approximately 26 percent of the "increase" in value of the Property from the $104 million estimate contained in the Debtor's schedules[123] to the $115 million sale price ($2.875 million/$11 million = 26.14%). That is substantially higher than the combined percentage CBRE and KOA received and more than a trustee would have been due if one had been appointed.

---

[118] Opening Brief at 24.
[119] Transcript 127:4-25, 128:1-3, & 140:6-10.
[120] *Id.* 50:1-6.
[121] *Id.* 137:1-6 & 142:8-12.
[122] Opening Brief at 24.
[123] Ex. 58 at 6 (schedules).

Thus, the "benefit conferred" factor cuts against awarding a substantial contribution claim in this case.

        **d. Factor #5 Weighs Strongly Against An Award.** NRG LLC argues that its efforts were not duplicative of the Debtor's management or the other retained professions. It must make such an argument because no substantial contribution is made when the cost involves needless duplication of time and effort.[124] This argument fails for numerous reasons.

        First, any actions that Furniss took as glendonTodd were perfectly duplicative of the actions he took as a fiduciary of the Debtor. In a similar case, the applicants claimed they made a substantial contribution through their involvement in finding and selling the debtor's property. In rejecting those arguments, the court ruled:

> The fifth area in which the [applicants'] claim that they benefited the estate is their involvement in the sale of the 3rd & K property. The sale of assets, however, clearly falls within the duties of the debtor-in-possession and any professional hired by the debtor-in-possession. To the extent any benefit resulted from the [applicants'] involvement . . . it is duplicative and therefore non-compensable.

> The sixth area in which the [applicants'] claim a benefit was rendered involves their role in the sale of the Sheryl Lane property. The [applicants'] point to their finding a potential buyer and this potential buyer's contacting the ultimate buyer as being a substantial benefit. However, as with the 3rd & K property, the duty to sell the property falls on the debtor-in-possession and professional persons it chooses to hire. Absent a showing that the debtor-in-possession was unwilling or unable to perform its duties, the [applicants] must be considered volunteers.[125]

        Here, there has been no showing that the debtor in possession was unwilling or unable to perform its duties; indeed, the Application and all the evidence proffered by NRG LLC in support can be viewed as a recitation of all the actions the debtor in possession *was* taking to sell the Property.

---

[124] *Matter of Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1252 (5th Cir. 1986).
[125] *DWGK Restaurants*, 84 B.R. at 690.

Second, contrary to NRG LLC's assertion that Furniss' status as an insider does not preclude the requested payment, section 503(c)(3) limits administrative expense payments to insiders by providing: "*Notwithstanding subsection (b)*, there shall neither be allowed, nor paid . . . transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." The evidence shows that NRG LLC's expenses were not "incurred" until after the sale of the Property (*i.e.* outside the ordinary course of business) and that the obligation to pay is for the direct benefit of glendonTodd. Thus, payment is barred under section 503(c)(3).

Third, if NRG LLC/Furniss/glendonTodd "identified potential purchasers, did 100 percent of the negotiations, managed the process, negotiated the purchase agreements, and closed the transaction"[126] outside their capacity as the Debtor's principals, then they are seeking payment for unlicensed broker activity in violation of the Texas Real Estate Licensing Act ("TRELA"). A person or business entity may not act or be compensated as a "broker" unless they it hold a license issued under the chapter.[127] Furniss admitted that he does not have such a license.[128]

Moreover, under TRELA, "[a] person acts as a broker or salesperson under this chapter if the person, with the expectation of receiving valuable consideration, directly or indirectly performs or offers, attempts, or agrees to perform for another person any act described by Section 1101.002(1), as a part of a transaction or as an entire transaction."[129] Included in § 1101.002(1) are, among others, the following acts: (i) sells, exchanges, purchases, or leases real

---

[126] Transcript 108:17-23.
[127] TEX. OCC. CODE § 1101.351(a), (a-1).
[128] Transcript 109:15-17.
[129] TEX. OCC. CODE § 1101.004.

estate; (ii) offers to sell, exchange, purchase, or lease real estate; (iii) negotiates or attempts to negotiate the listing, sale, exchange, purchase, or lease of real estate; or (viii) procures or assists in procuring a prospect to effect the sale, exchange, or lease of real estate. *Id.* at § 1101.002(a)(A)(i)–(iii), (viii). These are the exact actions that NRG LLC alleges Furniss performed and form the basis for his fee.[130]

      **e. Factor #6 Weighs Against An Award**. NRG LLC claims that it will not "obtain a profit from its involvement of the bankruptcy [sic]" other than payment of its "trade claim."[131] To the contrary, every dollar of glendonTodd's "fee" that NRG LLC is able to offload onto the Limited Partners represents a dollar of profit for it. Because the prior cash distributions made in this case have repaid the Limited Partners for their capital contributions and preferred return, every dollar that is distributed now is split 60 percent to the Limited Partners and 40 percent to NRG GP, which flows upwards to NRG LLC.[132] NRG LLC will in fact profit from a substantial contribution award. Thus, this factor weighs against NRG LLC.

      **f. Factor #7 Is Neutral Or Weighs Against An Award.** Finally**,** NRG LLC argues that the seventh factor weights in its favor because "Mr. Rainwater acknowledges that he is not aware of any negative impact Mr. Furniss had on the bankruptcy estate."[133] Whether Furniss has had an overall negative influence the bankruptcy estate or not, the resolution of this case has been substantially delayed by NRG LLC's decision to file its Application more than two months after the sale instead of seeking Court approval of Furniss as a retained professional early in the case. This has led at a minimum to increased costs for the Debtor; for example, its attorney has been

---

[130] TRELA § 1101.005 does provide an exemption from the license requirement for "a person employed by an owner in the sale of structures and land on which structures are located if the structures are erected by the owner in the course of the owner's business." If Furniss, glendonTodd, and/or NRG LLC were acting in their capacities as officers, managers, or employees of the Debtor, then they would be exempt from TRELA. But, if they persist in seeking substantial contribution as a "creditor," then they are subject to the statute's prohibitions.

[131] Opening Brief at 15.

[132] Ex. 1 (LPA) at 17.

[133] Opening Brief at 31.

forced to travel to Nashville, Tennessee and Dallas, Texas to attend depositions and to Austin for the September 22 hearing. Thus, this factor is neutral or weighs against an award of substantial contribution.

### D. NRG LLC's Claimed Expenses Were Neither Actual Nor Necessary

Even if the Court finds that the foregoing factors weigh in favor of award to NRG LLC (and it should not), NRG LLC must still "prove that [its] claimed expenses were actual and necessary and that any fees are reasonable."[134] NRG LLC has proved neither. Its Opening Brief contains a conclusory statement that NRG LLC "has incurred 'actual, necessary expenses' in the form of the amount owed. . . ."[135] The only evidence set forth in support is Jeffrey Stone's testimony that it is "fair to say that without Mr. Furniss' involvement, a deal may never have gotten done . . . ."[136] But it is equally fair to speculate that a deal would have been achieved through the involvement of the Debtor's numerous retained professionals. In fact, the evidence shows that Mr. Herbold of CBRE was very involved in negotiating with interested buyers[137] and did not lead the negotiations with HCA only because Mr. Furniss stated that he wanted to "remain the point of contact" because of his previous relationship with HCA.[138]

In contrast, there is a multitude of evidence showing that the incurrence of glendonTodd's fee by NRG LLC was neither actual nor necessary. First, the fee is not an actual expense because NRG LLC's obligation to pay it did not exist until after the sale of the Property. The invoice submitted by glendonTodd to NRG LLC is dated June 29, 2016 and states that it is for "Services Rendered Per Agreement" (the "Invoice").[139] The evidence has revealed that the

---

[134] *DP Partners Ltd,* 106 F.3d at 673; *see also* 11 U.S.C. § 503(b)(3)(D).
[135] Opening Brief at 32.
[136] *Id.* at 31.
[137] *See, e.g.,* Ex. 108 at 3 (demonstrating Herbold's interactions with the various potential buyers, including HCA).
[138] Ex. 17 at 1.
[139] Ex. 46.

"agreement" referenced in the Invoice is in fact the two consents executed by NRG LLC in June 2016.[140] Although there may have been discussions between Furniss and the other NRG LLC members and managers prior to the sale concerning paying glendonTodd a bonus, Furniss admitted that: (1) the consents were not finally negotiated and executed until after the sale;[141] (2) there was no resolution concerning how glendonTodd was going to be paid until the consents was formally signed;[142] and (3) there was no other agreement in place prior to the sale that would have obligated NRG LLC to pay glendonTodd its bonus.[143] Thus, glendonTodd's fee is not an actual expense because it did not exist prior to the sale.

Similarly, the fee is not a necessary expense. Furniss was obligated by his pre-existing fiduciary duties as a manager of the Debtor and debtor in possession to pursue vigorously the highest and best sale price for the Property. There has been no suggestion that he would not have done so absent the expectation of a bonus payment from NRG LLC. To the contrary, the Opening Brief[144] and Furniss' own testimony[145] state otherwise. The sale occurred before NRG LLC agreed to pay glendonTodd a bonus—the timeline itself reveals that the expense was not "necessary" to accomplishing the sale of the Property.

Finally, NRG LLC has made no attempt to justify the reasonableness of its claimed expenses. The Invoice is devoid of a breakdown of the work performed or time records to support the claimed $2.875 million fee.[146] The only arguments made by NRG LLC that can be read to support the reasonableness of the fee are found on the final page of the Opening Brief,

---

[140] Transcript at 136:10-20.

[141] *Id.* 140:6-10.

[142] *Id.* 127:14 to 128:3.

[143] *Id.* 127/4-7.

[144] Opening Brief at 24 ("NRG was determined [to obtain the highest and best deal] without the guarantee of payment or reimbursement."); *id.* at 29 ("[T]he expenses sought by NRG here reflect the expense incurred by Mr. Furniss . . . with the risk of not being paid anything.").

[145] Transcript 103:11-19 (Furniss testified that he does not believe that he could have met his fiduciary obligations to the Debtor by simply allowing the brokers to find a buyer).

[146] Ex. 46.

which states that a "trustee could have been awarded reasonable compensation" up to 3 percent of disbursements above $1 million.[147] Accepting that comparison *arguendo*, glendonTodd's $2.875 million fee is fully 26 percent of the "increase" in value of the Property from the $104 million estimate contained in the Debtor's schedules[148] to the $115 million sale price ($2.875 million/$11 million = 26.14%). The facial unreasonableness of the claimed expenses can also be demonstrated by counting the 122 days, excluding weekends and public holidays, between the petition date and date of the Invoice and then making the extraordinary assumption that the glendonTodd team worked eight hours a day, every day, just on selling the Property. Its rate would come to an unthinkable $2,945/hour ($2,875,000/122/8). The Court cannot conduct a reasonableness analysis beyond these simple calculations because NRG LLC and glendonTodd/Furniss have studiously avoided providing it with such information.

Furthermore, the evidence reveals that

In short, the Application must be denied because NRG LLC's claimed expense is neither actual nor necessary and NRG LLC has failed to adduce evidence to show its reasonableness.

---

[147] Opening Brief at 34, fn. 128.
[148] Ex. 58 at 6 (schedules).
[149]
[150]
[151]

E.        **The Equities Weigh Against Awarding A Fee**

Finally, the Opening Brief argues that the Application should be granted as a matter of equity even if NRG LLC does not meet the statutory requirements of substantial contribution. NRG LLC blames "other constituencies" for sitting "idly and [doing] nothing in the Chapter 11 Case other than wait for a potential payout" and says it would be "the definition of injustice" to not reward Mr. Furniss for his "time, energy, and effort."[152] But CH Realty and the other Limited Partners *did* do something: they executed the LPA which granted NRG GP "the exclusive right and power . . . to manage the Partnership's affairs and control all decisions relating to the business and operations of the Partnership."[153] In return, NRG GP has been paid approximately $8 million.[154] NRG GP's rights and responsibilities to manage the Partnership continued after the bankruptcy. As stated by the Court at the September 22 hearing:

> If Mr. Furniss hadn't been out there breaking bushes or looking under bushes and doing everything he could to find an offer, because that's the report I got from Mr. Battaglia consistently in the bankruptcy case, if he hadn't been doing all those things and CH Realty asked for a trustee, I would have signed that order in five minutes. So operate with that assumption in mind.[155]

As the manager of the debtor in possession, Furniss had a fiduciary duty to spend the time necessary to obtain the highest and best price for the Property.[156] It does not follow that NRG LLC deserves to have its bonus payment to glendonTodd partially offset through an equitable award in this Court because Furniss did the work the law required him to do already.

Additionally, the equities disfavor an award to NRG LLC because Furniss purposefully avoided compliance with the bankruptcy professional retention rules. Section 327(a) of the

---

[152] Opening Brief at 33.
[153] Ex. 1 (LPA) at 19.
[154] Transcript 50:1-6.
[155] *Id.* 33:1-7.
[156] *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("the willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.") (internal quotation marks omitted).

Bankruptcy Code authorizes the debtor in possession to employ "disinterested" persons to perform professional services for the estate upon Court approval.[157] But it is axiomatic that Court approval of the professional's application is required *in advance* of such employment.[158] Absent such approval, there is no right to compensation.[159] "Any professional not obtaining approval is simply considered a volunteer if it seeks payment from the estate."[160]

Financial advisors, workout specialists and consultants—like Furniss/glendonTodd—are "professionals" for the purposes of section 327.[161] This means that if they wanted to be compensated directly by the bankruptcy estate, Furniss/glendonTodd should have sought approval and followed the strict guidelines of Federal Rule of Bankruptcy Procedure 2014 to be appointed. It also means that Furniss would have to show that he was "disinterested" (*i.e.*, not an "insider" and "is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor").[162]

But Furniss knew that he was not a mere disinterested professional rendering services at arms-length to the debtor in possession and, given the acrimony recited in the facts above and in NRG LLC's Opening Brief, knew that the Limited Partners would strenuously object to paying him anything more than what they were already obligated to pay under the LPA. The Court can and should find that Furniss decided to lay behind the log until after the sale and then file the Application for a bonus. A professional may not avoid the requirements of sections 327 by seeking an administrative expense allowance for fees under section 503.[163] Allowing

---

[157] 11 U.S.C. §327(a)

[158] *Id.*; *In re Triangle Chemicals, Inc.*, 697 F.2d 1280, 1289 (5th Cir.1983).

[159] *In re Madison Management Group, Inc.*, 137 B.R. 275, 285 (Bankr. N.D. Ill. 1992) (*citing In re Banhalmi*, 84 B.R. 123, 125 (Bankr. N.D.Ill.1988)).

[160] *In re Albrecht*, 245 B.R. 666, 671 (10th Cir. BAP 2000), *aff'd*, 233 F.3d 1258 (10th Cir.2000).

[161] *In re Madison Mgmt. Group, Inc.*, 137 B.R. at 283.

[162] *See* 11 U.S.C. § 101(14)(A), (B).

[163] *See Cushman & Wakefield, Inc. v. Keren Ltd. P'ship (In re Keren Ltd. P'ship)*, 189 F.3d 86, 88 (2d Cir.1999) (denial of motion to be retained nunc pro tunc as a professional or to classify its brokerage commission as a post-

professionals to be compensated under section 503(b) without seeking approval under section 327 "would render section 327(a) nugatory and would contravene Congress' intent in providing for prior approval [for the retention of professionals]."[164] The Court should therefore refuse to grant the Application because it represents an improper and inequitable attempt to avoid the requirements of section 327.

## IV.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should: (a) deny the Application; and (b) grant CH Realty such other relief to which it proves entitled.

Dated:  November 23, 2016

Respectfully submitted,

THE MAJORIE FIRM, LTD.


By:  */s/ Francis B. Majorie*
      Francis B. Majorie (Pro Hac Vice)
      Texas State Bar No. 12851420
      Thomas J. Annis
      Texas State Bar No. 24077478
4901 LBJ Freeway, Fourth Floor
Dallas, Texas 75244
Telephone: (214) 522-7400
Facsimile: (214) 522-7911
fbmajorie@themajoriefirm.com
tannis@themajoriefirm.com

ATTORNEYS FOR CH REALTY
VI/MO AUSTIN FPMC, LP

---

petition administrative expense affirmed); *F/S Airlease II, Inc. v. Simon (In re F/S Airlease II, Inc.),* 844 F.2d 99, 108–09 (3d Cir.1988) (bankruptcy court's grant of airplane leasing broker's motion to be retained *nunc pro tunc* and classification of brokerage commission as a post-petition administrative expense reversed); *In re Albrecht,* 245 B.R. 666, 670–71 (10th Cir. BAP 2000), *aff'd,*233 F.3d 1258 (10th Cir.2000) (denial of fees to law firm for services performed after denial of appointment as general counsel to the trustee affirmed).
[164] *F/S Airlease,* 844 F.2d at 109.

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing instrument has been served electronically via the Court's ECF noticing system on those parties who receive notice from that system, on the 23rd day of November, 2016.

*/s/ Thomas J. Annis*
Thomas J. Annis