

**Dated: March 10, 2017.**

_____
**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 16-10020-TMD** |
| **FPMC AUSTIN REALTY** | § | |
| **PARTNERS, LP,** | § | **CHAPTER 11** |
| | § | |
| **DEBTOR.** | § | |

### MEMORANDUM OPINION

Did Neal Richards Group, LLC ("NRG"), the managing member of the general partner of

the Debtor, make a "substantial contribution" to this bankruptcy case and, if so, can it collect

$2.875 million?

### I.    BACKGROUND AND FACTS

#### A.  The parties.

The Debtor, a Texas limited partnership, owned a short-term acute care hospital and

medical office building, together with a 445 stall adjacent parking garage (collectively, the

"Property") and various pieces of personal property.[1] The Property was advertised as "one of the most desirable locations in Texas."[2]

Neal Richards Development Group Austin Development, LLC ("General Partner") is the general partner of the Debtor,[3] and paid $100 for its general partnership interest.[4] NRG, the party seeking the substantial contribution award, did not produce copies of the operating and other organizational governance documents showing the connections between and duties of NRG, the General Partner, and the managers and members of those entities, even though CH Realty sought those documents in discovery.[5] The General Partner also has five managers: (1) Todd Furniss; (2) Dr. David Genecov; (3) Dr. Robert Wyatt; (4) Dr. Wade Barker; and (5) Mary Hatcher.[6]

The managing member of the General Partner is NRG.[7] NRG is also is a creditor of the Debtor.[8]

One of NRG's managers, Mr. Furniss, is the founder, CEO, and managing partner of glendonTodd, a private equity fund.[9] Mr. Furniss is also the acting CEO of NRG.[10] He took

---

[1] Furniss Proffer 4:10, ECF 222. Citations to documents filed in the electronic case filing ("ECF") system will refer to the page number stamped at the top of the document.

[2] Ex. 113 at 8. Citations to trial exhibits will refer to the page number stamped on the bottom of the document by the parties.

[3] Ex. 58 at 32.

[4] Ex. 1 at 12.

[5] Hr'g Tr. 8:3-9:9, ECF 244.

[6] The Debtor's Statement of Financial Affairs says these five people are "managers" of the Debtor. Ex. 58 at 32. But this is likely wrong, as the Debtor is a limited partnership, not an LLC. See Ex. 1 at 19 (The General Partner has the "exclusive right and power" to manage Partnership's affairs). Due to NRG's failure to produce, the inference will be made that these five individuals were managers of the General Partner, which seems more likely.

[7] According to the Debtor's Schedules, Ex. 58 at 26-27. The proffer made by Mr. Furniss is cagey about this. It says that "NRG is a manager of [the General Partner]" and that "The General Partner has a number of other members other than NRG." Furniss Proffer 3:7, ECF 222. But are the other members also managers? More precision about these relationships could not be gleaned because of NRG's failure to produce. Based on this failure to produce, and the reference in the Debtor's schedules, the adverse inference will be made that NRG is the managing member of the Debtor's General Partner.

[8] Ex. 57 at 5; Ex. 58 at 15; Ex. 126 (support for NRG's claim).

[9] Furniss Proffer 2:5, ECF 222.

[10] Furniss Proffer 3:7, ECF 222.

2

over as the acting CEO of NRG in May of 2015 amidst allegations of fraud and mismanagement by NRG's prior CEO, Derrick Evers.[11]

The Debtor has eighty limited partners.[12] Twenty-four of the eighty limited partners, including CH Realty, filed objections to NRG's application for a substantial contribution award.[13] CH Realty invested $13.5 million—the largest of any limited partner—in December 2013 in exchange for 45% ownership of the Debtor.[14] The total amount of equity capital raised by the Debtor was $30 million.[15]

The Debtor used this $30 million in capital, together with $57.5 million borrowed from Frost Bank, to develop the Property.[16] The Debtor obtained certificates of occupancy, but unpaid contractor bills, together with an impending foreclosure threat from Frost Bank, led the Debtor to file this bankruptcy case on January 5, 2016 (the "Petition Date").[17]

**B. NRG contracts with glendonTodd.**

Two somewhat different stories were told about NRG's retention of glendonTodd. According to Mr. Furniss, NRG was financially distressed at the time he took over as CEO, which happened about eight months prior to the Petition Date.[18] Contractors were not being paid and liens were being placed on the Property.[19] Furthermore, the General Partner had insufficient operating capital to pay employees.[20] In the face of these uninviting financial prospects,

---

[11] Hr'g Tr. 97:8-98:2, ECF 244.
[12] Furniss Proffer 3:9, ECF 222.
[13] Furniss Proffer 3:9, ECF 222; CH Realty Obj., ECF 212; Limited Partners Obj., ECF 211.
[14] Rainwater Proffer 4:8-10, ECF 224; Furniss Proffer 4:11, ECF 222.
[15] Rainwater Proffer 4:9, ECF 224.
[16] Hr'g Tr. 65:18-24, ECF 244; Ex. 58 at 9.
[17] Ex. 63 at 2-3.
[18] Furniss Proffer 4:13, ECF 222.
[19] Furniss Proffer 4:13, ECF 222; Hr'g Tr. 98:3-11, ECF 244.
[20] Furniss Proffer 4:14, ECF 222; Hr'g Tr. 98:19-22, ECF 244.

according to Mr. Furniss, NRG contracted with glendonTodd to provide consulting services.[21] NRG and glendonTodd also discussed paying additional compensation to glendonTodd for selling the Property, but this was never a certainty and no formal written agreement was signed.[22] NRG and glendonTodd also entered into a consulting agreement whereby NRG agreed to pay glendonTodd a monthly fee of $125,000 per month in exchange for its services in connection with not just the Property, but also its involvement in other facilities and properties owned by NRG in Texas.[23] Mr. Furniss further testified that for most months, however, NRG either failed to pay that consulting fee to glendonTodd or only paid a portion of it.[24] According to Mr. Furniss, NRG's failure to pay these consulting fees resulted in glendonTodd's inability to pay or retain employees, or finance glendonTodd's obligations.[25]

A somewhat different take on the retention of glendonTodd was offered by Carlos Rainwater, who has overall responsibility for the office and land investment activities of CH Realty, the Debtor's biggest limited partner. According to Mr. Rainwater, when CH Realty made its investment, it specifically negotiated a supplemental rights agreement that, among other things, prevented NRG's CEO, Mr. Evers, from being removed from control of NRG without CH Realty's consent.[26] CH Realty wanted Mr. Evers involved because it understood that Mr. Evers was a real estate professional.[27] But Mr. Evers was placed on administrative leave—

---

[21] Furniss Proffer 5:15, ECF 222; Hr'g Tr. 111:19-112:14, ECF 244 (Furniss's testimony regarding the consulting agreement between NRG and glendonTodd).
[22] Furniss Proffer 5:15, ECF 222.
[23] Furniss Proffer 5:15, ECF 222.
[24] Furniss Proffer 5:15, ECF 222.
[25] Furniss Proffer 5:15, ECF 222.
[26] Hr'g Tr. 52:21-53:13, ECF 244.
[27] Hr'g Tr. 60:25-61:10, ECF 244.

without CH Realty's consent—when NRG appointed Mr. Furniss as the interim CEO of NRG.[28] NRG retained glendonTodd at the same time.[29]

CH Realty was not happy with the removal of Mr. Evers, expressed its disapproval in writing, but elected to deal with Mr. Furniss under a reservation of rights.[30] Mr. Rainwater generally agreed that the Debtor encountered financial difficulties, but placed at least some blame on the fact that the tenant, yet another NRG entity, failed to pay rent.[31]

What seems clear from the emails, the testimony,[32] and the chronology of events is that (i) Mr. Furniss was discharging the duties of the debtor in possession in this case; (ii) everyone believed he was in control of the Debtor; and (iii) he was in fact in control of the Debtor, notwithstanding that the General Partner had four other managers.

### C. The Limited Partnership Agreement.

The Debtor is governed by a limited partnership agreement (the "Limited Partnership Agreement") dated April 3, 2012.[33] The Limited Partnership Agreement provides for payment to the General Partner for various activities, and specifically disclaims any limits on the activities of the Debtor's affiliates.[34] The Limited Partnership Agreement does not allow or prohibit payment to a creditor such as NRG for expenses incurred in substantially benefitting the

---

[28] Hr'g Tr. 52:21-53:13, 97:24-98:2, ECF 244; Ex. 78.
[29] Hr'g Tr. 96:15-98:2, ECF 244.
[30] Hr'g Tr. 54:2-55:6, ECF 244.
[31] Hr'g Tr. 60:18-62:1, ECF 244.
[32] Hr'g Tr. 56:9-20, 73:3-15, 78:4-79:15, 108:19-22, 166:21-167:5, ECF 244; Stone Dep. 18:8-18; 52:17-53:6; 54:23-55:2, ECF 220-1.
[33] Ex. 1.
[34] Ex. 1 at 19-22.

Debtor's estate in connection with a bankruptcy.[35] In fact, the Limited Partnership Agreement does not explicitly address the present circumstance.[36]

On the other hand, the Limited Partnership Agreement allows the General Partner to recover a "development fee of five percent (5%) of the total hard and soft costs for the development of the Property, an annual asset management fee of two percent (2%) of the aggregate capital contributions of the limited partners under management each year, and forty percent (40%) of all distributions made after the limited partners receive distributions equal to one hundred percent (100%) of their original investment plus a nine percent (9%) 'preferred return.'"[37] According to Mr. Rainwater, the "waterfall" that contains these fees and the 40% split is a standard structure within the real estate industry, and is set up to incent the General Partner to perform well.[38] In particular, the 40% split is designed to compensate the General Partner for extraordinary success, and according to Mr. Rainwater, 40% is at the upper end of a market where 20% is more typical.[39]

### D. Pre-petition offers for the Property fail.

Before the Petition Date, the Property did not have a paying tenant and was not generating any revenue, thus complicating any potential sale of the Property.[40] Accordingly, the limited partners, including CH Realty, were concerned about whether they would be able to recoup their investments.[41] Indeed, CH Realty described the circumstances as "clearly a

---

[35] Ex. 1 at 19-22; Hr'g Tr. 69:18-70:6, ECF 244 (Rainwater testimony: "Q: Are you aware of any provision in the partnership agreement that would prohibit the filing of an application for substantial contribution and increasing the value of bankruptcy estate? A: I'm not aware of any. . . .").

[36] Hr'g Tr. 69:18-70:6, ECF 244.

[37] Rainwater Proffer 4:20-25, ECF 224; Ex. 1 at 17, 20.

[38] Rainwater Proffer 5:1-9, ECF 224.

[39] Rainwater Proffer 5:9-12, ECF 224.

[40] Furniss Proffer 6:21, ECF 222.

[41] Furniss Proffer 6:20, ECF 222; Hr'g Tr. 27:4-8: 162:15-163:14, ECF 244.

distressed situation" and had expressed "a strong desire to divest itself of the Property."[42]

According to Mr. Furniss, "There was a very real chance that the investors would not recoup their investments."[43]

Four months prior to the Petition Date, the Debtor entered into a non-binding letter of intent to sell the Property for $95 million with MedEquities Realty Trust, Inc., in association with Surgical Development Partners, LLC (collectively, "MedEquities"), which was approximately what the Debtor had spent on the Property.[44] CH Realty expressed a desire to close the deal for $95 million because the lender was in a position to foreclose.[45] This would have resulted in a meager return for the limited partners.[46] Yet, CH Realty thought that to get out at cost, with the many difficulties associated with the Property at that time, would be acceptable and in line with the value that CH Realty then placed on the Property.[47] Regardless, MedEquities defaulted on the deal later in 2015 and the sale to MedEquities never closed.[48]

Just before the Petition Date, the Debtor received a letter of intent from Mayco Development, LLC ("Mayco") for $104 million.[49] However, after meeting with Mayco, both Mr. Furniss and CH Realty believed that Mayco was not a "real" buyer, and unlikely to purchase the Property because Mayco's interest was contingent upon a credit-worthy, operating tenant occupying the Property.[50]

---

[42] Furniss Proffer 5:17-6:20, ECF 222.
[43] Furniss Proffer 6:20, ECF 222; Hr'g Tr. 41:9-10 (Rainwater testimony describing possibility of losing entire equity investment like in San Antonio), 244.
[44] Ex. 3; Rainwater Proffer 6:4-17, ECF 224.
[45] Ex. 5 at 1 ("Hopefully, the Austin LOI can be turned into a definitive P&S Agreement and cash closing."); Hr'g Tr. 25:22-26:3, ECF 244.
[46] Hr'g Tr. 26:4-27:1 (Rainwater testimony describing how CH Realty would not have received a full return on equity and would not have received a preferred return), ECF 244.
[47] Rainwater Proffer 6:12-17, ECF 224.
[48] Furniss Proffer 6:22, ECF 222.
[49] Furniss Proffer 6:23, ECF 222.
[50] Furniss Proffer 7:24-26, ECF 222; Rainwater Proffer 6:18-7:2, ECF 224.

### E. The Debtor files this bankruptcy case.

On the Petition Date of January 5, 2016, the Debtor filed for relief under chapter 11 of the Bankruptcy Code.[51] A few weeks later, the Debtor filed an application to employ Ray Battaglia as bankruptcy counsel,[52] but the Debtor never filed an application to employ Mr. Furniss or glendonTodd as managers under section 327 of the Bankruptcy Code. The Debtor did file applications and obtained authority to employ two real estate brokers; CBRE Inc. and KOA Partners, LLC.[53] The Debtor also sought and obtained approval to retain Kreader Mitchell, PLLC as special real estate counsel to assist the Debtor with the sale to the eventual buyer.[54]

### F. Mr. Furniss pursues offers for the Property.

Immediately after the Petition Date, Mr. Furniss began contacting and soliciting offers from entities that might be interested in purchasing the Property.[55] In February 2016, Mr. Furniss contacted the Vice President of Development for Hospital Corporation of America ("HCA"), Jeffrey Stone, to persuade him to consider buying the Property.[56] Because HCA believed that Mr. Furniss was the decision-maker for the Debtor, HCA negotiated with Mr. Furniss directly in order to see if they could reach a deal.[57] Between February and May 2016, Mr. Furniss was on multiple telephone calls each week with HCA, and exchanged hundreds of emails with HCA

---

[51] Ex. 57.

[52] Ex. 59.

[53] Order Authorizing Employment of CBRE and KOA Partners, ECF 60.

[54] Order Authorizing Employment of Kreager Mitchell, PLLC, ECF 77.

[55] Furniss Proffer 8:32, ECF 222.

[56] Furniss Proffer 10:37, ECF 222.

[57] Furniss Proffer 10:37, ECF 222; Hr'g Tr. 108:19-23 (Furniss testimony: "[W]e did 100 percent of the negotiations."), 43:7-9 (Rainwater testimony: "[Mr. Furniss] kept HCA at bay, he kept them interested."), ECF 244; Stone Dep. 18:8-18 (describing Mr. Furniss as the "focal point" for HCA in connection with their negotiations for Forest Park projects), 19:2-7 (HCA generally approached Mr. Furniss instead of someone else when it needed answers in connection with the Property.), 21:14-18 ("Q: In other words, every time – every time you had a question on the property, you didn't try to get attorneys involved, brokers involved; you went straight to Mr. Furniss? A: Yes."), ECF 220-1

concerning the Property and the deal itself.[58] He testified that he was available on nights, evenings, and weekends to answer questions, and when questions arose, HCA would contact Mr. Furniss to get a direct answer.[59] Mr. Furniss's calendar reflects eight separate meetings with HCA and Mr. Furniss claimed that there were countless other conferences and calls that he did not put on his calendar.[60] Mr. Furniss also served as the point of contact for other prospective purchasers, even after brokers became involved.[61]

Meanwhile, in early March, another FPMC property in San Antonio was foreclosed upon, and its equity investors lost their entire investment as a result.[62] CH Realty acknowledged the possibility that its investment in the Austin Property could have been lost in the same manner.[63]

By mid-March 2016, Mr. Furniss had obtained the following offers for the Property:

| | |
|---|---|
| Mayco | $101.5 million[64] |
| HCA | $60 million[65] |
| Winstead/Seton | $90 million[66] |

Mr. Furniss was concerned, however, that neither Mayco nor Winstead/Seton would actually close the sale.[67] The only offer of the three that seemed genuine to Mr. Furniss was the $60 million offer from HCA—a sale price that would have left numerous constituencies unpaid.[68]

---

[58] Furniss Proffer 10:38, ECF 222.
[59] Furniss Proffer 10:38, ECF 222; Stone Dep. 13:5-16:13, ECF 220-1.
[60] Furniss Proffer 10:38, ECF 222.
[61] Furniss Proffer 13:51-52, ECF 222; Ex. 17 at 1.
[62] Furniss Proffer 10:39, ECF 222; Rainwater Proffer 8:4-5, ECF 224.
[63] Hr'g Tr. 29:10-24 (Rainwater testimony: "I didn't want. . . to lose all of our equity on Austin like it happened at San Antonio . . . ."), ECF 244; Ex. 8 at 1.
[64] Ex. 13 at 1, Ex. 18 at 7.
[65] Ex. 12 at 3 (this offer excluded the sale of the medical office building).
[66] Ex. 11 at 1-3.
[67] Furniss Proffer 13:50, 14:56, ECF 222.
[68] Furniss Proffer 14:57, ECF 222.

### G. Mr. Furniss persuades HCA to increase offer to $100 million.

Accordingly, Mr. Furniss continued his discussions with HCA to convince them to make another offer on the Property.[69] During a telephone call with HCA, he "emphasized the virtues of the Property, its location, the contiguous land, and the chance to take advantage of this strategic opportunity in a growing market."[70] The real estate brokers employed by the Debtors were not on this telephone call between Mr. Furniss and HCA.[71]

On March 29, 2016, following this telephone call, HCA submitted a revised offer for $100 million.[72] Mr. Stone acknowledged that "Mr. Furniss had a clear hand in causing HCA's offer to increase from $60 [million] to $100 [million]."[73] That same day, CBRE told HCA that the Debtor had selected HCA's offer to purchase the Property for $100 million.[74]

Then, just two days later, the Debtor received a revised offer from Winstead/Seton for $105 million.[75] But Mr. Furniss was concerned that this increased offer was not legitimate.[76]

### H. A point of inflection: whether to have an auction at the risk of losing HCA's offer.

At this point, the Debtor, Mr. Furniss, and his team at glendonTodd were faced with the difficult decision of whether to move forward with HCA at $100 million and potentially leave a higher bid on the table, or to re-open the bidding process and risk having HCA leave the process altogether.[77]

---

[69] Furniss Proffer 15:60, ECF 222.
[70] Furniss Proffer 15:60, ECF 222.
[71] Furniss Proffer 15:60, ECF 222.
[72] Ex. 24 at 1.
[73] Stone Dep. 34:3-6, ECF 220-1.
[74] Ex. 25 at 2.
[75] Furniss Proffer 15:63, ECF 222.
[76] Furniss Proffer 15-16:63, ECF 222.
[77] Hr'g Tr. 159:8-160:18 (Furniss testimony: "There was a concern [HCA] would fall out of the bidding process."), 74:22-76:4 (Silverberg testimony: "Our concern was that at some point in time [HCA was] going to get frustrated and retract their offer. And, you know, this was—to us this is a lot of money."), ECF 244.

Mr. Furniss believes that, had HCA dropped out of the bidding, the Debtor would have been "lucky to get $70,75 million," and the limited partners "would have lost virtually everything."[78] Fearful of the result of losing their entire investment, some of the limited partners threatened to harm Mr. Furniss physically and professionally if the Debtor did not move forward with HCA's $100 million offer.[79] Other limited partners characterized the potential of HCA walking away as a financial and professional "tragedy" and encouraged the Debtor to close the sale at $100 million.[80] On the other hand, Mr. Rainwater, who—unlike the physician limited partners[81]—was experienced in real estate sale negotiations, believed that the $100 million HCA offer should not be accepted while a $105 million offer was on the table.[82]

## I. Mr. Furniss convinces HCA to continue negotiating despite rejection of offer.

Mr. Furniss believed that he would be able to inform HCA that the Debtor would not be moving forward with the $100 million offer and still keep HCA at the negotiating table.[83] Indeed, Mr. Stone acknowledged that Mr. Furniss's professionalism and credibility throughout the sale process was a positive factor in their negotiations.[84] Mr. Stone characterized Mr. Furniss as the "focal point for all things related to the [FPMC] projects," that Mr. Furniss used "straight up conversation [and] direct dealings," and that Mr. Furniss was efficient in conducting negotiations.[85]

---

[78] Hr'g Tr. 158:23-160:4, ECF 244.
[79] Hr'g Tr. 158:7-22 (Furniss testimony: "[S]ome of [the threats] were particularly vulgar in nature, some of them were physical in nature, some of them were legal in nature. . . ."), ECF 244.
[80] Furniss Proffer 16:65, ECF 222; Ex. 27; *see* Hr'g Tr. 76:10-12 (Silverberg testimony: "Obviously a financial tragedy, but the other reason it would be a tragedy is that we would like to work with somebody who we knew."), ECF 244.
[81] Dr. Kaylen Silverberg and Dr. Thomas Vaughan testified on behalf of the limited partners who are physicians who invested money with the hope of opening a practice at the Property. Hr'g Tr. 72:11-14, 79:21-25, ECF 244.
[82] Hr'g Tr. 35:15-36:11; 40:6-41:6, ECF 244.
[83] Furniss Proffer 17:68, ECF 222.
[84] Stone Dep. 11:5-25, ECF 220-1.
[85] Stone Dep. 18:2-12, 19:11-24, ECF 220-1.

Mr. Furniss "ultimately explained to HCA that the Property would not be sold" for $100 million, and "that an auction process would be engaged in order to maximize the purchase price for all creditors and limited partners."[86] Mr. Stone testified that HCA was unsure whether they would continue to engage in negotiations after HCA was told that its $100 million offer was no longer sufficient, but that Mr. Furniss persuaded HCA to stay in the negotiations.[87] While HCA was not happy, Mr. Furniss's positive relationship and professionalism with HCA "allowed the process to continue in an efficient, meaningful, and deliberate manner."[88] Of course, as Mr. Rainwater testified, prospective purchasers will often complain when faced with the threat of an auction.[89]

### J.  HCA increases offer to $115 million, but only if the Debtor agrees to take the property off the market.

On April 6, 2016, HCA advised that it was willing to engage in an auction process on certain conditions.[90] Mr. Furniss and his team at glendonTodd organized a meeting with HCA (without any brokers) on April 21, 2016, where the parties discussed transaction logistics, concerns, and questions.[91] At the meeting, Mr. Furniss sought to negotiate a sales price of $115 million for HCA's purchase of the property.[92] HCA agreed to this price, but only if the Debtor agreed to take the Property off the market.[93]

Between April 21, 2016 and May 4, 2016, Mr. Furniss negotiated a purchase and sale agreement, obtained necessary consents, communicated with creditors, and communicated with

---

[86] Furniss Proffer 17:68, ECF 222; Hr'g Tr. 160:5-18, ECF 244.
[87] Stone Dep. 35:17-36:15, ECF 220-1.
[88] Furniss Proffer 17:68, ECF 222.
[89] Hr'g Tr. 58:20-24, ECF 244.
[90] Ex. 29 at 2.
[91] Ex. 33, Ex. 34.
[92] Furniss Proffer 18:74, ECF 222; Hr'g Tr. 86:20-87:4, ECF 244.
[93] Hr'g Tr. 152:20-23, ECF 244.

the owners of the General Partner and limited partners to close the deal with HCA.[94] Mr. Stone

testified that Mr. Furniss was instrumental in helping HCA increase its offer to $115 million.[95]

CH Realty consented to the sale to HCA for $115 million on May 4, 2016.[96]

### K.  The parties provide conflicting testimony regarding the complexity of the sale.

Mr. Stone testified that he had experience with more than 20 transactions involving the

purchase and sale of hospital facilities, and that he generally considered them complex

transactions.[97] Then he suggested that this transaction was no more complex than an ordinary

real estate transaction because the facility was not yet operating.[98] But he later agreed, in

response to leading questions, that this sale was complex because there were multiple bidders, a

bankruptcy, and the price was over $100 million.[99] Mr. Furniss described the transaction as

"complex," and that the bankruptcy "further complicated" the transaction.[100] He also stated that

the narrow use of the property narrowed the number of potential purchasers, but he did not

explain how fewer buyers would complicate the transaction.[101] Mr. Rainwater, on the other hand,

testified consistently with Mr. Stone's initial testimony by stating that selling a vacant building is

not complicated.[102]

### L.  The sale to HCA is approved.

On May 10, 2016, the Debtor filed a motion to sell the Property to HCA for $115

million.[103] It is unusual to sell property in bankruptcy cases without an auction when there are

---

[94] Furniss Proffer 18-19:74, ECF 222.
[95] Stone Dep. 43:7-13, ECF 220-1.
[96] Ex. 36 at 44.
[97] Stone Dep. 8:7-24, ECF 220-1.
[98] Stone Dep. 8:25-9:5, ECF 220-1.
[99] Stone Dep. 9:11-25, 10:4-16, ECF 220-1.
[100] Furniss Proffer 8:30, ECF 222.
[101] Furniss Proffer 8:30, ECF 222.
[102] Hr'g Tr. 63:14-21, ECF 244.
[103] Ex. 67.

multiple interested bidders, simply because an auction is usually the best way to encourage those bidders to increase the ultimate purchase price.[104] Recently, an auction conducted in bankruptcy court for a limited partnership interest drew bids that more than doubled the starting bid.[105] In fact, after receipt of the HCA $115 million offer, the Debtor received notice of an intent by another bidder to make a higher offer.[106] Even after being informed about the possibility of a higher offer, the limited partners nonetheless approved the HCA sale.[107] Since the creditors were being paid in full, and the Debtor's owners approved the transaction in accordance with the Debtor's governance structure, the motion to sell the property to HCA was approved on May 17, 2016.[108]

### M. The deal was praised by brokers and limited partners.

Harry Lake—the CEO of one of the brokers retained by the Debtor and holder of a small limited partnership interest in the Debtor—described the efforts of the glendonTodd team as an "amazing accomplishment."[109] He further described the efforts by Mr. Furniss and Ms. Hatcher by stating, "you two are machines and your leadership on this was amazing."[110] In a subsequent email, Mr. Lake characterized the efforts of the glendonTodd team as "heroic" and stated that "[t]he investors are going to be very excited once [the sale] is official."[111] On

---

[104] Kelly E. Porcelli, *Finality of Section 363 Sales in the Face of an Upset Bid*, 24 AM. BANKR. INST. L. REV. 497, 498 n.4 (2016) (citing Richard G. Mason & Saish R. Setty, *Bidding Procedures—Stalking-Horse Protections and Collusion*, LAWRENCE P. KING AND CHARLES SELIGSON WORKSHOP ON BANKRUPTCY & BUSINESS REORGANIZATION 2013 299, 300 (2013), http://www.weil.com/~/media/files/pdfs/363salestopics.pdf (discussing trend toward asset sales in bankruptcy and noting "a competitive auction allows the debtor and its creditors to test the market and obtain a sale price that is potentially higher than what could be obtained through other means.").

[105] *In re Davila*, No. 10-11776 (Bankr. W.D. Tex. hr'g held Jan. 6, 2017) (Davis, J.), ECF 35, 46. The trustee's motion proposed to sell the property for $20,000 or to the highest bidder at an auction. The highest bid at the end of the auction was $58,500.

[106] Ex. 67 at 5.
[107] Ex. 67 at 5.
[108] Ex. 39.
[109] Ex. 40 at 2.
[110] Ex. 40 at 2.
[111] Ex. 41 at 1.

May 18, 2016, a representative from CH Realty described the closing as "outstanding" and congratulated Mr. Furniss.[112]

On the other hand, it is quite customary to exchange laudatory and congratulatory messages after a successful closing.

Mr. Stone testified that there was no one more important to the sale process than Mr. Furniss,[113] and that without Mr. Furniss's involvement, a deal may have never been reached for the Property.[114] Mr. Stone agreed that Mr. Furniss had a diverse knowledge base relating to the Property, the sale, and the structure, that Mr. Furniss was available on nights and weekends, and that Mr. Furniss was a formidable negotiator.[115] As stated above, Mr. Stone described Mr. Furniss as the "focal point" for all things relating to the Property.[116] During the negotiation period, Mr. Stone acknowledged that he would have routine calls with Mr. Furniss (sometimes multiple calls each day), and that those calls were more often with only Mr. Furniss, and did not include brokers or attorneys.[117] Indeed, Mr. Stone characterized the number of discussions he had with CBRE as "a handful," had never heard of KOA, and did not remember ever speaking to KOA.[118]

On the other hand, when asked to agree with the praise in favor of Mr. Furniss offered by Mr. Lake, Mr. Stone said this: "I believe he was consistent and supportive of the process, and instrumental to getting the transaction done. Whether he had all of these other superlatives, I don't know."[119] Mr. Stone's deposition statements indicate that he perceived that Mr. Furniss

---

[112] Ex. 43.
[113] Stone Dep. 60:12-17, ECF 220-1.
[114] Stone Dep. 30:9-12, ECF 220-1.
[115] Stone Dep. 13:2-14:6, ECF 220-1.
[116] Stone Dep. 18:8-12, ECF 220-1.
[117] Stone Dep. 22:15-23:1, ECF 220-1.
[118] Stone Dep. 27:4-20, ECF 220-1.
[119] Stone Dep. 45:10-46:14, ECF 220-1.

worked in a professional manner,[120] and was a very good negotiator,[121] but that the efforts invested by Mr. Furniss were typical of what would be expected by someone in Mr. Furniss's position.[122]

## N. Evaluations of the sale.

In this case, 100% of secured creditors have been paid in full, 100% of unsecured creditors have been paid in full, 100% of the equity owners received a full return on their investment, and the equity holders will receive approximately 1.47 times the money they invested in less than three years (even after accounting for NRG's substantial contribution expenses).[123]

As proof of benefit, NRG points out that the ultimate purchase price of $115 million is $20 million higher than the $95 million offer identified in the September 2015 letter of intent with MedEquities.[124] If the MedEquities offer had been accepted, "the limited partners would have received almost no return on their investment."[125] Specifically, argues NRG, CH Realty would have received a total of $13,880,863 for their investment of $13.5 million.[126] However, with the sale price of $115 million, CH Realty will receive approximately $19,838,405.[127] The other limited partners will likewise benefit from the higher sale price for the Property.[128] This result is also better than the result in *In re FPMC San Antonio Realty Partners*[129] case, where

---

[120] Stone Dep. 19:11-20:3, ECF 220-1.
[121] Stone Dep. 13:10-12, ECF 220-1.
[122] Stone Dep. 50:19-52:16, ECF 220-1.
[123] Furniss Proffer 2:4, 20:81, ECF 222; Hr'g Tr. 47:2-24, ECF 244.
[124] Furniss Proffer 21-22:85.
[125] Furniss Proffer 22:86, ECF 222.
[126] Furniss Proffer 22:86, ECF 222.
[127] Furniss Proffer 22-23:86, ECF 222.
[128] Furniss Proffer 23:86, ECF 222.
[129] *In re FPMC San Antonio Realty Partners, LP,* No. 15-52462 (Bankr. W.D. Tex. filed Oct. 6, 2015) (Gargotta, J.).

the property was foreclosed upon and there was little, if any, recovery for the unsecured creditors and no recovery for the equity holders.[130]

On the other hand, Mr. Rainwater testified that when CH Realty made the initial investment, it expected to achieve a return of 2.8 to 3 times its investment, instead of the 1.47 times investment actually achieved.[131] He further testified that he believes NRG might have achieved a better return if Mr. Furniss had removed the NRG affiliate that was not paying rent, installed a paying tenant, and then held the Property for a few years before selling it.[132] And he testified that the 1.4 times investment achieved was an average result when compared with the results achieved by the other 59 properties held by the more than $3 billion fund of which the CH Realty's investment in the Debtor was a part.[133]

If the Application is not granted, the $2.875 million will be paid to the limited partners and the General Partner under the last tranche of the Limited Partnership Agreement waterfall.[134] The limited partners' portion of the $2.875 million would be $1.725 million and CH Realty's portion of that (45%) would be $776,250.[135]

If the Application is granted, the limited partners will not receive the amounts they would have otherwise received under the Limited Partnership Agreement.[136] The General Partner has already received approximately $4 million in pre-petition fees and approximately another $4 million in post-petition distributions.[137]

---

[130] Furniss Proffer 20:81, ECF 222.
[131] Rainwater Proffer 4:11-14, ECF 224.
[132] Rainwater Proffer 7:21-8:2, ECF 224. Mr. Furniss disagreed with this, stating that it reflected Mr. Rainwater's "naiveté" about the healthcare industry and suggested that Mr. Rainwater did not understand the "nuances." However, he never explained what those nuances were. Hr'g Tr. 105:4-16, ECF 244.
[133] Rainwater Proffer 3:22-4:2, 5:13-6:2, ECF 224.
[134] Hr'g Tr. 118:16-120:4, ECF 244.
[135] Rainwater Proffer 5:13-22, ECF 224.
[136] Hr'g Tr. 119:5-19, ECF 244.
[137] Hr'g Tr. 118:3-20, ECF 244.

### O.  Documenting NRG's "expense."

On June 29, 2016, glendonTodd submitted an invoice to NRG totaling $2.875 million for "Services Rendered Per Agreement" (the "Invoice").[138] No other description or itemization of those services is included in the Invoice. Mr. Furniss has not calculated how many hours he spent in connection with the services referenced in the Invoice.[139] The agreement refers to two written consents executed by NRG's owners in June 2016 purporting to affirm earlier "written and verbal agreements."[140] There are no earlier written agreements.[141] The consents were prepared by in-house counsel for glendonTodd after the sale of the Property in this case and the sale of two other FPMC properties (one in Fort Worth and one in Dallas).[142] The consents "authorize" Mr. Furniss to file substantial contribution claims for $5 million in "expenses" and assign certain arbitrary percentages based on the sale prices of the three assets to achieve that total.[143] The percentage assigned to the Austin Property was 2.5% of the sales price, which equals $2.875 million.[144] Mr. Furniss testified that if the substantial contribution claims recover less than the amounts authorized in the consents, NRG will look to the General Partner for the difference.[145]

On July 26, 2016, NRG filed the Application, attaching the $2.875 million invoice and a declaration by Mr. Furniss in support.[146] Mr. Furniss never asked the limited partners for their consent to file the Application even though he had multiple opportunities to do so during the numerous investor calls he organized and led from January 2016 until the sale.[147] Further, Mr.

---

[138] Ex. 46.
[139] Hr'g Tr. 109:18-20, ECF 244.
[140] *See* Ex. 44, Ex. 122.
[141] Hr'g Tr. 136:17-20.
[142] Hr'g Tr. 140:15-17; Ex. 44, 122.
[143] Ex. 44 at 1-2; Ex. 122 at 1-2.
[144] Ex. 44 at 1-2.
[145] Hr'g Tr. 142:8-12, ECF 244.
[146] Appl. for Allowance of Admin. Expense, ECF 145.
[147] Hr'g Tr. 56:9-57:13, ECF 244.

Furniss did not even notify all the limited partners of the filing of the Application.[148] The first conversation that the Debtor's counsel had with anyone about the Application was with Arthur Stewart, an in-house lawyer with glendonTodd, after the sale. [149]

## II.  ANALYSIS

### A.  Bankruptcy courts have broad discretion in ruling on substantial contribution requests.

CH Realty and NRG have both argued that the seven-factor test promulgated in *In re Mirant Corporation*[150] should govern whether granting a substantial contribution claim is appropriate. Unsurprisingly, they reach opposite conclusions about the result compelled by application of the seven factors, likely because the seven factors were drawn from cases with facts very different from the facts of this case.

Here, a substantial contribution award is sought for activities engaged in by the person responsible for discharging the duties of the debtor in possession. In most of the published cases, someone who is not a case fiduciary seeks a substantial contribution award for engaging in activities that benefited the case.[151] The Fifth Circuit has recognized that the policy aim of this provision is to incent parties to participate in the reorganization process,[152] and case fiduciaries should need no extra incentives to fulfill their fiduciary duties.

But a safer place to start, before getting to multi-factor tests or policy, is with the language of the statute and Fifth Circuit cases interpreting the statute. The statute provides that a

---

[148] Hr'g Tr. 114:9-15, ECF 244.

[149] Hr'g Tr. 167:23-168:22, ECF 244.

[150] *In re Mirant Corp.*, 354 B.R. 113, 131-34 (Bankr. N.D. Tex. 2006).

[151] *See, e.g.*, *In re DP Partners Ltd.*, 106 F.3d 667, 670 (5th Cir. 1997) (award sought by creditor); *In re Energy Partners, Ltd.*, 422 B.R. 68, 71 (Bankr. S.D. Tex. 2009) (award sought by an equity holder); *In re Gen. Electrodynamics Corp.*, 368 B.R. 543, 547 and 554-55 (Bankr. N.D. Tex. 2007) (awarding a substantial contribution to an unsecured creditor). The exception is *In re Am. Plumbing & Mech., Inc.*, 327 B.R. 273, 276 (Bankr. W.D. Tex. 2005) (reviewing applications for substantial contributions filed by the debtors' founders and an indenture trustee).

[152] *In re Consol. Bancshares Inc.*, 785 F.2d 1249, 1253 (5th Cir. 1986).

creditor, indenture trustee, or an equity security holder that has made a "substantial contribution" to a chapter 11 case can recover its "actual, necessary expenses."[153] It cannot be disputed that NRG is a creditor of the Debtor.[154] What is in dispute is whether the fee sought by NRG in order to pay glendonTodd was an "actual, necessary" expense and whether a "substantial contribution" has been made.

The Fifth Circuit has ruled twice on this statutory provision in published cases.[155] In *In re Consolidated Bancshares*, a group of shareholders sought a substantial contribution award, to recover for attorney fees they incurred, for their pursuit of a derivative action, and their activities in connection with confirmation.[156] The Fifth Circuit stated that "[t]he question of substantial contribution is one of fact."[157] The Fifth Circuit also noted that bankruptcy courts have broad discretion in determining attorney fee awards.[158] The Fifth Circuit went on to rule that the bankruptcy court did not abuse its discretion in ascribing a "minimal" value to the derivative suit, and in finding that the actions of the group in connection with the confirmation proceedings were duplicative of the efforts of the official equity security committee.[159]

The Fifth Circuit's second published case, *In re DP Partners*, affirmed that bankruptcy courts have broad discretion in ruling on substantial contribution requests.[160] The Fifth Circuit went on to suggest that, in exercising that discretion, bankruptcy courts should (i) measure

---

[153] 11 U.S.C. § 503(b)(3)(D).

[154] Although CH Realty initially argued NRG's status as a "true creditor," CH Realty Obj. 16-17, ECF 212, NRG's position as a creditor is supported by the record. *See* Ex. 57 at 5; Ex. 58 at 15; Ex. 126 (support for NRG's claim).

[155] In an unpublished case, the Fifth Circuit granted an award to a creditor that proposed a plan that prompted the debtor to improve the payout proposed in the debtor's plan. *In re Bodin Concrete, L.P.*, 616 F. App'x 738, 741-42 (5th Cir. 2015).

[156] *In re Consol. Bancshares Inc.*, 785 F. 2d 1249, 1252 (5th Cir. 1986).

[157] *Id.* at 1253.

[158] *Id.* at 1252.

[159] *Id.* at 1253-54.

[160] *In re DP Partners,* 106 F. 3d 667, 673-74 (5th Cir. 1997).

whether the contribution is "considerable in amount, value, or worth,"[161] and (ii) "weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate."[162]

And although the word "contribution" would seem to suggest a focus on result as opposed to effort,  this court and others have stated that substantial contribution awards should not be made for services that are merely "routine" or "expected."[163] In *In re American Plumbing and Mechanical, Inc.*, the court found that the activities of the lawyers representing the company's founders in negotiating key reorganization documents were not a substantial contribution, because "negotiating is an expected and routine activity in Chapter 11 cases[.]"[164]

### B. NRG did not carry its burden of showing the contribution was "substantial."

That NRG had the burden is not in doubt.[165] The parties appropriately provided evidence both on what glendonTodd did, as well as on what resulted from those activities. In measuring whether the activities undertaken by glendonTodd in general, and Mr. Furniss in particular, rose

---

[161] *In re DP Partners*, 106 F. 3d 667, 673 (5th Cir. 1997) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (4th ed.1976)).

[162] *Id.*

[163]    The clearest rule courts have settled on is that expected or routine activities in a Chapter 11 case do not constitute substantial contribution. *See, e.g., In re The Columbia Gas Sys., Inc.*, 224 B.R. 540, 548 (Bankr.D.Del.1998). By the same token, expected or routine activities in the guise of extensive or active participation also cannot establish substantial contribution. *See Granite Partners*, 213 B.R. at 445 (citing cases). The efforts and activities of the applicant or its attorney may be admirable, excellent, or done with professionalism, but that cannot elevate expected or routine activities to the level of substantial contribution. *See Columbia Gas*, 224 B.R. at 555 ("admirable"); *Granite Partners*, 213 B.R. at 450 ("excellent"); *Baldwin–United*, 79 B.R. at 341 ("professionalism").

*In re Am. Plumbing & Mech., Inc.*, 327 B.R. 273, 283 (Bankr. W.D. Tex. 2005).

[164] *Id.* at 291.

[165] *In re TransAmerican Nat. Gas. Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)(party seeking administrative expense claim has burden); *In re Tropicana Entm't LLC*, 498 F. App'x 150, 152 (3d Cir. 2012) ("[T]he party seeking [a substantial contribution claim] bears the burden of proving to the Bankruptcy Court that it is so entitled."); *Am. Plumbing & Mech., Inc.*, 327 B.R. at 279 ("The applicant must prove by a preponderance of the evidence that he rendered a substantial contribution."); *In re Canton Jubilee, Inc.*, 253 B.R. 770, 775 (Bankr. E.D. Tex. 2000) (same); *In re Am. 3001 Telecomm., Inc.*, 79 B.R. 271, 273 (Bankr. N.D. Tex. 1987) ("The burden of proof of substantial benefit to the estate is squarely on the party claiming the expense.").

above the expected or routine, the standard to apply is not the standard applicable to an interested creditor or indenture trustee, the more typical substantial contribution applicants. Rather, the standard must be that applicable to a fiduciary, and this is an exacting standard.[166] At a minimum, when faced with the potential of a motion to lift stay by Frost Bank, Mr. Furniss should have attempted to pursue a prompt sale at the best price available.

Mr. Stone spoke some to the efforts engaged in by Mr. Furniss, but this testimony came in by deposition excerpt, and was mixed. For the most part Mr. Stone affirmed that Mr. Furniss was the point of contact for the Debtor, and that he worked diligently and professionally.[167] However, he also testified that Mr. Furniss's efforts were neither extraordinary nor unusual.[168] Mr. Furniss testified that he did more than the brokers in that he "identified potential purchasers. . . brought them into conversations; [glendonTodd] did 100% of the negotiation; we managed the process; we negotiated the purchase agreements and closed the transaction."[169] There is no doubt that Mr. Furniss engaged in these activities, and did so proficiently. But these are all steps that are routine and expected when pursuing and closing a sale.

---

[166]    Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. (*Wendt v. Fischer*, 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.

*Meinhard v. Salmon*, 249 N.Y. 458, 463-64 (N.Y. 1928).
[167] Stone Dep. 19:11-24, 29:13-20, ECF 220-1.
[168] Stone Dep. 50:8-15, 50:19-52:16, ECF 220-1.
[169] Hr'g Tr. 108:16-23, ECF 244.

Mr. Furniss testified that: "the General Partner could have met its fiduciary obligations without seeking out purchasers and without taking the lead role in negotiations."[170] It is potentially troubling, and certainly disappointing, that someone in the role of a fiduciary who has knowledge and ability to contribute, would consider not doing so. But Mr. Furniss is probably right; he could have let the brokers and the attorney handle the transaction and simply made decisions based on their advice without breaching his fiduciary duty. (Though it's hard to see how glendonTodd could then justify its $125,000 per month fee.)[171]

But there is another reason more was expected of the General Partner. Chapter 11 abhors a leadership vacuum. A passive, unengaged General Partner here, with an impatient Frost Bank ready to seek stay relief and foreclose, and a vigilant CH Realty looking over the General Partner's shoulder, would likely have faced a motion to appoint a trustee or examiner, which would likely have been granted.[172]

There was a harmony between Mr. Stone's opinion that Mr. Furniss's actions were neither extraordinary nor unusual,[173] and Mr. Rainwater's opinion that the sale was not

---

[170] Furniss Proffer 9:34, ECF 222.

[171] Mr. Furniss also said that in order to pull off this sale, he had to "understand the financial, legal, industry dynamic, macroeconomic and organizational dynamics issues associated with a complex purchase and sale like this." Hr'g Tr. 161:25-162:3, ECF 244. But beyond the recitation of these abstract concepts, the only specific example he gave was to explain the need to understand at what point you could say a particular buyer was actually bound to purchase—a concern that, as Mr. Rainwater pointed out, would apply to any potential buyer. Hr'g Tr. 36:16-22, ECF 244.

[172] 11 U.S.C. § 1104 (a)(1) and (2) (a trustee can be appointed for "cause" or if the appointment is in the best interests of the estate); *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010) (standard for appointing a trustee is flexible); *In re Patman Drilling Int'l, Inc.*, No. 07–34622, 2008 WL 724086, at *6 (N.D. Tex. Mar. 14, 2008) (the appointment of trustee pursuant to § 1104(a)(2) was appropriate where the management held conflicts of interest, the majority of creditors supported the appointment of a trustee, and the creditor body lost confidence in the debtor's management); *In re Tahkenitch Tree Farm P'ship*, 156 B.R. 525, 528 (Bankr. E.D. La. 1993) (appointment of a trustee to be in the best interest of the estate because the debtor's two partners were effectively deadlocked on management issues); and *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (court should consider confidence of business community and creditors in present management).

[173] Stone Dep. 50:19-52:16, ECF 220-1.

23

complicated.[174] Moreover, both had demonstrable experience in real estate transactions.[175] These two opinions compel the conclusion that Mr. Furniss's activities were, like those of the founders' lawyers in *In re American Plumbing and Mechanical, Inc.*,[176] no more than would have been expected of someone engaged to fulfill the duties of a general partner charged with selling the assets of the partnership.

In assessing the results of the sale, to see if the contribution was "considerable in amount, value, or worth,"[177] the laudatory emails are not persuasive; they are often sent around when a deal closes, and mostly as a matter of professional courtesy. Ultimately, the test of whether the contribution, or the result achieved, was substantial comes down to the credibility of Mr. Furniss and Mr. Rainwater. Both were intelligent, articulate, poised on the stand, and professional in demeanor, and both were precise, direct, and credible in responding to questions about facts and documents. Mr. Furniss views his contribution as substantial because he was able to raise the purchase price from $95 million to $115 million. But this is why assets are put out for bid; to allow bidders to compete against one another and thereby increase the ultimate selling price. Also, as Mr. Furniss acknowledged, offers are not evidence of value.[178] The only evidence of value adduced at the hearing was the purchase price of $115 million.[179]

Moreover, it is hard to assess the value of the high opinion held by Mr. Furniss concerning the results of his efforts. The record is practically void of any mention of the qualifications or experience possessed by Mr. Furniss. According to the proffer submitted by Mr.

---

[174] Hr'g Tr. 63:14-21, ECF 244.

[175] Stone Dep. 8:1-20, ECF 220-1; Rainwater Proffer 3:7-20, ECF 224.

[176] *In re Am. Plumbing & Mech, Inc.*, 327 B.R. 273, 291 (Bankr. W.D. Tex 2005).

[177] *In re DP Partners*, 106 F. 3d 667, 673 (5th Cir. 1997) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (4th ed.1976)).

[178] Hr'g Tr. 144:12-16, ECF 244.

[179] Hr'g Tr. 147:19-148:10, ECF 244. There was also mention of an appraisal, but this was apparently obtained by HCA to satisfy a regulatory requirement. Hr'g Tr. 148:3-7, ECF 244; Huffstutler Proffer 2:6, ECF 102.

Furniss, "GlendonTodd is a private equity fund whose owners and operating partners have a differentiating competence of substantial operational skills in restructuring and operations across a range of industries."[180] But this tells us nothing about Mr. Furniss's specific experience with selling real estate inside or outside bankruptcy cases.[181] Mr. Stone did testify that Mr. Furniss had experience in transactions of this type, and that he knew about the Austin property, but did not point to any specific transactions that Mr. Furniss worked on.[182]

In contrast, Mr. Rainwater's real estate background and experience is substantial. He has worked in real estate for 28 years.[183] The $3 billion fund that made this particular investment, one of sixty made by the fund, is only one of seven funds managed by Mr. Rainwater's real estate firm.[184] He has been involved with hundreds of real estate transactions.[185] And while none of those involved a bankruptcy,[186] the decision by NRG to take the HCA bid and forgo the auction took this transaction largely outside the typical bankruptcy sale process.

Although Mr. Rainwater was not objecting to the sale to HCA—indeed, he consented to the sale for CH Realty—his overall opinion was that the sale was at best average, and even somewhat disappointing from the standpoint of what CH Realty was hoping for at the start of the investment.[187]

Because Mr. Rainwater has demonstrably greater experience with real estate transactions, his testimony about the contribution made by glendonTodd is more probative than the testimony

---

[180] Furniss Proffer 2:5, ECF 222.
[181] Although no one drew the Court's attention to Exhibit 127, which is apparently a copy of pages from the glendonTodd website, it contained extensive information on glendonTodd and its principles. According to this document, Mr. Furniss has held a number of positions that sound impressive. But no details were offered about these positions, or the other content of Exhibit 127, so no weight can be put on Exhibit 127.
[182] Stone Dep. 13:2-4, ECF 220-1.
[183] Rainwater Proffer 3:7-20, ECF 224.
[184] Hr'g Tr. 57:14-58:3, ECF 244; Rainwater Proffer 3:22-4:2.
[185] Hr'g Tr. 20:2-3, ECF 244.
[186] Hr'g Tr. 20:4-9, ECF 244.
[187] Rainwater Proffer 5:23-6:2, ECF 224.

of Mr. Furniss; NRG therefore did not carry its burden of establishing that the contribution was substantial, and certainly did not prove that the cost of the fee—$2.875 million—outweighed the benefit of selling the Property at market value.

### C.  The fee sought here is neither "actual" nor "necessary."

The limited partners who filed objections to the Application also argue that the expense of the fee sought by the application does not satisfy the statute's "actual, necessary" requirement.[188] As they note, NRG took the position that Mr. Furniss, glendonTodd and NRG did not act with the intent to be paid for their services.[189] If they did not act with the intent to be paid, then there could not have been a pre-existing agreement by NRG to pay glendonTodd, which means the payment by NRG of the glendonTodd invoice is not "necessary." Further, the "agreement" referenced in the invoice are the two consents signed by NRG after the sale.[190] There was no agreement in place prior to the sale.[191] That being the case, the "expense" represented by the invoice was not "actually" incurred in order to get Mr. Furniss to take the actions necessary to complete the sale. Indeed, Mr. Furniss himself, and NRG's opening brief, both affirm that Mr. Furniss attempted to get the best price possible without a guarantee of payment from NRG.[192]

In contrast, the monthly fee NRG previously contracted to pay to glendonTodd was an "actual, necessary" expense, and could have been the basis for a substantial contribution award.

---

[188] CH Realty Obj. 10, ECF 212; Limited Partners Obj. 4, ECF 270.
[189] NRG Reply 9:17-10:19, ECF 221.
[190] Hr'g Tr. 136:4-20, ECF 244.
[191] Hr'g Tr.127:4-13, ECF 244.
[192] Furniss Proffer 9:34; NRG Brief 29, ECF 264.

But NRG did not include a request for reimbursement of this monthly fee in its substantial contribution claim.[193]

### III.    <u>CONCLUSION</u>

For the foregoing reasons, the Application will be denied by separate order.[194]

---

[193] Ex. 46.

[194] CH Realty argues that because NRG, Mr. Furniss, and glendonTodd are insiders of the Debtor, the fee sought is precluded by section 503(c)(3) of the Bankruptcy Code. CH Realty Obj. 22-33, ECF 212. "Section 503(c) was enacted to limit a debtor's ability to favor powerful insiders economically and at estate expense during a chapter 11 case." *In re Pilgrim's Pride Corp.,* 401 B.R. 229, 234 (Bankr. N.D. Tex. 2009). Since NRG has not carried its burden in establishing a "substantial contribution," there is no need to decide whether the payment of the fee is precluded.

The objecting limited partners have also argued that whatever success has been achieved in the sale by NRG, that success has been rewarded and compensated by the 40% return over the limited partner's preferred return, and this reward is what the parties have agreed to as a matter of contract. Hr'g Tr. 49:24-50:6, ECF 244. To be sure, courts are not free to revise the terms of parties' contacts. *In re WBH Energy, LP.,* 2016 WL 3049666 at *15 (Bankr. W.D. Tex. May 20, 2016). But this question, too, does not need to be decided.

Finally, and also not decided, is CH Realty's cogent argument that as a fiduciary, NRG/glendonTodd cannot now be compensated for a fee for which advance court approval was not sought. CH Realty Obj. 7, ECF 212. *See In re Consol. Bancshares Inc.,* 785 F.2d 1249, 1254 (5th Cir. 1986) (failure to obtain advance approval for fees incurred in performing services "parallel to but not coordinated with" a case fiduciary results in denial of those fees as a later substantial contribution claim).