IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| § | CASE NO. 16-10020-TMD | |
| FPMC AUSTIN REALTY § | (Chapter 11) | |
| PARTNERS, LP, § | | |
| § | | |
| Debtor. § | | |

| | | |
|---|---|---|
| FPMC AUSTIN REALTY PARTNERS, § | | |
| LP, ACTING BY AND THROUGH ITS § | | |
| GENERAL PARTNER, HOWARD MARC § | MOTION FOR ORDER TO SHOW | |
| SPECTOR AS RECEIVER OF NEAL § | CAUSE (D.E. #311) | |
| RICHARDS GROUP AUSTIN § | | |
| DEVELOPMENT, LLC, § | | |
| § | | |
| Movant, § | HEARING DATE: October 3, 2018 | |
| § | | |
| VS. § | HEARING TIME: 9:00 a.m. | |
| § | | |
| GLENDONTODD CAPITAL LLC AND § | | |
| TODD FURNISS, § | | |
| § | | |
| Respondents. § | | |

**RESPONDENT'S MEMORANDUM
REGARDING AUTHORITY TO ACT ON CONSENTS**

Pursuant to the Court's instructions at the hearing held on August 15, 2018, gLENDONTODD CAPITAL LLC ("**GTC**") and TODD FURNISS ("**Furniss**") (Collectively "**Respondents**") file this *Memorandum Regarding Authority To Act On Consents*, as follows:

**A.      The Debtor, its General Partner, and NRG**

Neal Richards Group, LLC ("**NRG**"), founded in 2008, specialized in developing and managing of health-care related real estate. Under NRG's Limited Liability Company Agreement ("**LLC Agreement**"), *see* **Exhibit "1"** hereto, NRG is a manager-managed limited liability company. *See* Exhibit "1" at art. IV. Per the LLC Agreement, the Managers are solely responsible

**RESPONDENT'S MEMORANDUM REGARDING AUTHORITY TO ACT ON CONSENTS – PAGE 1**

for the operation and management of the business of NRG and have full power and authority to do all things they deem necessary or desirable to conduct NRG's business. *Id*. at §4.1(a).

FPMC AUSTIN REALTY PARTNERS, LP ("**Debtor**"), was a partnership formed and managed by NRG and its principals to develop, own and operate Forest Park Medical Center in Austin, Texas ("**Austin Property**"). Neal Richards Group Austin Development, LLC ("**GP**") served as the Debtor's General Partner. Like NRG, the GP was a manager-managed limited liability company, with Richard Toussaint, Wade Barker, and Derrick Evers serving as its initial managers. *See* **Exhibit "2"** hereto.

The GP had the authority to manage the Debtor and the Austin Property as a real estate investment pursuant to the Debtor's limited partnership agreement. *See* **Exhibit "3"** hereto. In 2014, Debtor contracted with NRG to serve as the asset manager for the Austin Property pursuant to an Asset Management Agreement dated as of February 19, 2014. *See* **Exhibit "4"** hereto. Under the Asset Management Agreement, Debtor delegated broad authority to NRG relating to the operation, administration, renovation, financing, refinancing, and ultimate disposition of the Austin Property.[1] *See* Exhibit 4 at art. II.

**B.    NRG Brings in GTC**

In May 2015, Debtor was in financial distress. NRG brought in GTC to perform management and consulting services for NRG and its affiliates, including Debtor. Dr. Toussaint, who had been indicted on 17 counts of healthcare fraud, was bought out of his membership interest in NRG. Under a written consent executed as of May 14, 2015, Derrick Evers and every other

---

[1] NRG responsibilities under the Asset Management Agreement included: (a) the preparation, revision, and implementation of annual capital and operating budgets for the Austin Property; (b) all alterations, repairs, maintenance, renovations, and construction activities for the Austin Property; (c) maintaining the company's books and records; and (d) monitoring, consulting with, and advising the Debtor regarding (i) regulatory compliance; (ii) insurance; (iii) property taxes; (iv) accounting; (v) tax returns; and (vi) cash management; (vii) monitoring the monthly income and expenses of the project; (viii) construction management services; (ix) financing services; (x) maintaining compliance with debt covenants; and (xi) the disposition of the Property, among other things. *See* Exhibit 4 at art. II.

**RESPONDENT'S MEMORANDUM REGARDING AUTHORITY TO ACT ON CONSENTS – PAGE 2**

member of NRG's executive team were removed from their respective positions with NRG and Mr. Furniss, the CEO of GTC, was appointed as a manager of NRG. *See* **Exhibit "5"** hereto. Under a written consent executed as of May 15, 2015, Mr. Furniss was named CEO of NRG, Mary Hatcher, the CFO of GTC, was named CFO of NRG, and Ms. Hatcher was also appointed as a manger of NRG. *See* **Exhibit "6"** hereto.

From that point forward, Mr. Furniss, Ms. Hatcher, Dr. Barker, Dr. Genecov, and Dr. Wyatt served as the five managers of NRG. *Id*. These five individuals were solely responsible for the operation and management of the business of NRG and had full power and authority to do all things they deem necessary or desirable to conduct NRG's business. *See* Exhibit "1" at §4.1(a).

Pursuant to a written consent executed as of May 27, 2015, all managers of the GP, save and except for Dr. Barker, were removed and Mr. Furniss, Ms. Hatcher, Dr. Genecov, and Dr. Wyatt were appointed managers of the GP. *See* **Exhibit "7"** hereto. Mr. Furniss and Ms. Hatcher were similarly named CEO and CFO, respectively, of GP. *Id*. Thus, from that point forward, the same five people, Mr. Furniss, Ms. Hatcher, Dr. Barker, Dr. Genecov, and Dr. Wyatt, served as the five managers of GP, with sole responsibility for the operation and management of the GP's business and full power and authority to do all things they deemed necessary or desirable to conduct GP's business. *See id*.; Exhibit "2" at § 4.1(a).

**C.     The Consents**

Thereafter, GTC performed services NRG and its affiliates, including GP, such as managing assets of NRG and its affiliates, managing the books and records of NRG and its affiliates, and managing all aspects of the operations of the various NRG-affiliated limited liability companies and limited partnerships. Although GTC initially performed its services solely pursuant to a written consulting agreement, NRG either failed to pay the consulting fee to GTC or paid only a portion of it for many months and failed to reimburse GTC for substantial expenses incurred by

**RESPONDENT'S MEMORANDUM REGARDING AUTHORITY TO ACT ON CONSENTS – PAGE 3**

GTC on NRG's behalf. Services performed by GTC required significantly more time and effort than the parties anticipated. GTC was forced to expend a great deal of time, money and resources in managing Debtor and other various NRG real estate entities.

In recognition of GTC's services on behalf of NRG and its affiliates, historical nonpayment of agreed upon consulting fees, and that GTC's services required far more time and effort than originally anticipated, the managers of and holders of the majority of the membership interests in NRG (who were also the managers and holders of a majority of the membership interests in the GP) – Dr. Barker, Dr. Genecov, Mr. Furniss, Ms. Hatcher, Dr. Wyatt, Jefe Plover Interests, Ltd. (Dr. Barker's entity), West Summit Investments, LP (Dr. Genecov's entity), and JACS Investments, LP (Dr. Wyatt's entity) – executed two written consents in or about June 2016 (the "**Consents**") to memorialize certain agreements to pay additional compensation to GTC. *See* **Exhibits "8"** (the "**First Consent**") and **Exhibit "9"** (the "**Second Consent**") hereto.

The managers of NRG and its affiliates, including GP, played an active role in negotiating the terms of the Consents. It was a collaborative effort involving Dr. Barker, Dr. Genecov, and Dr. Wyatt, who collectively owned the majority of the membership interests in NRG and were three of the five managers of NRG and its affiliates at the time. Although the GP and Debtor have placed great weight on the designated capacities in the which the managers and approving members signed the Consents (as managers and members of NRG, not the GP), they are nevertheless binding on the GP since they reflect on their face that they are intended to create a GP obligation. *See Womack v. First Nat'l Bank*, 613 S.W.2d 548, 554 (Tex. App.—Tyler 1981, no writ) (note was binding as partnership obligation even though signature block did not reflect that man signed the notes in representative capacity on behalf of partnership).

The First Consent addresses the amounts to be paid to GTC. The consent necessarily contemplated an allocation to each of the limited partnerships, but did not place a limit on the amount to be paid to GTC by any entity. For example, as it pertains to the Debtor, the parties agreed GTC should be paid an amount equal to not less than 2.5% of the sales price of the Austin Property, or $2,875,000.00. See Exhibit "8."

The Second Consent addresses the manner in which GTC is to be paid. The Managers felt strongly that the burden to compensate GTC should not be shouldered disproportionately by Dr. Barker, Dr. Genecov, and Dr. Wyatt, as the limited partnerships had enjoyed the benefit of GTC's services. The managers elected to have NRG pursue a "substantial contribution" claim in bankruptcy, which would minimize Dr. Barker's, Dr. Genecov's, and Dr. Wyatt's portion of the expense should the substantial contribution claims prevail. If not, the expense would remain with and be shouldered by the general partner entities.[2] At the time the consents were signed, the amount owed to GTC per the Consent was recorded as an account payable owed to GTC in the GP's financials.

A request for allowance of administrative expense claim was filed by NRG. The amount of the claim was reserved by the GP in the Debtor's account, save and except for the portion that the GP distributed to GTC in September 2017, the payment of which was partial performance by the GP under the consents. The Court denied the application, and the amount reserved in the LP

---

[2] To this end, the managers agreed that NRG would file an application in the limited partnerships' bankruptcy proceedings for substantial contributions made by NRG to the benefit of those entities' bankruptcy estates and, in addition to all other amounts owed to GTC, $5,000,000.00 from the recovery on those substantial contribution claims would be paid to GTC. See Exhibit 9. If the bankruptcy substantial contribution claims recovered less than $5,000,000.00, however, the parties agreed that in order to make up the difference between the amount awarded and paid, if any, and $5,000,000.00, NRG would direct GP and the other general partners to make payments to GTC, paid from proceeds contemporaneous with the distribution of funds from the Debtor and the other limited partnerships. The parties also agreed that if for any reason the bankruptcy courts did not award such amounts and the general partners were unable to make such payments, Jefe Plover, West Summit, and JACS would work collaboratively with GTC to make up the difference though the distributions made from the sales of real estate in the bankruptcy cases.

**RESPONDENT'S MEMORANDUM REGARDING AUTHORITY TO ACT ON CONSENTS – PAGE 5**

for the substantial contribution claim of $2,875,0000 was then re-allocated to the limited partners and GP per the Partnership Agreement.

Under the authority delegated to NRG in the Consents, NRG then sent letters to the GP and the other general partners on or about March 12, 2017, in accordance with the Consents, directing the general partners to pay GTC the amounts owed under the Consents as part of the GP allocation from the bankruptcy estates of the limited partnerships. *See* **Exhibit "10"** hereto. The instructions in the letter were self-executing since: the GP is a manager-managed LLC; all of its managers agreed to the payment arrangements in the Consents; and GTC and its principals were the managers and persons responsible for the affairs of the GP at the time. Pursuant to the consents, GTC was paid a total of $4,025,000.21 by GP from the GP's distributions or allocations, leaving a balance of $1,608,780.79 due and owing to GTC.[3]

Dated: September 21, 2018.

Respectfully submitted,

/s/ Bruce W. Akerly
Bruce W. Akerly
Texas Bar No. 00953200
Akerly Law PLLC
878 S. Denton Tap Rd., Suite 100
Coppell, Texas 75019
(469) 444-1864 Telephone
bakerly@ackerlylaw.com

COUNSEL FOR gLENDONTODD CAPITAL LLC AND TODD FURNISSS

---

[3] None of the five managers of NRG and GP ever complained about the payments received and to be received by GTC pursuant to the Consents. Neither have any of the Debtor's secured creditors, all of whom were paid in full, any of the Debtor's unsecured creditors, all of whom were paid in full, or any of the Debtor's limited partners, who were repaid their entire investment plus a substantial return on their investment. It was not until NRG and GP were placed in receivership and complaints regarding the payments were raised by Dr. Toussaint's lawyer, who now represents GP in this proceeding, that the GP and Debtor began challenging GTC's right to be paid, despite the fact that GTC's management and consulting services are what caused every other interested person to be paid in full.

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that a true and correct copy of the foregoing pleading was forwarded by electronic transmission and/or first class mail, postage prepaid, to the following person on September 21, 2018:

Stephen W. Lemmon
Rhonda B. Mates
Streusand Landon Ozburn & Lemmon LLP
811 Barton Springs Road, Suite 811
Austin, Texas 78704

Joel W. Reese
Tyler J. Bexley
Reese Marketos LLP
750 N. St. Paul St., Ste. 600
Dallas, Texas 75201-3201

/s/ Bruce W. Akerly
Bruce W. Akerly